IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL MCSHANE SUTTON | : | |
| | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | NO. 19-cv-2420 |
| | : | |
| v. | : | ORAL ARGUMENT |
| | : | REQUESTED |
| BRYN MAWR BANK CORPORATION d/b/a | : | |
| BRYN MAWR TRUST COMPANY | : | |
| **Defendant** | : | |
| | : | |

**PLAINTIFF MICHAEL SUTTON'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION AND SUMMARY OF MATERIAL FACTS IN DISPUTE[1]**

Plaintiff Michael Sutton (hereinafter "Mr. Sutton" or "Plaintiff") is a 38 year old, Caucasian man who was employed by Defendant Bryn Mawr Trust Corporation (hereinafter "Defendant" or "BMT") from for a brief period from December 11, 2017 until his unlawful and retaliatory firing on July 24, 2018.  Mr. Sutton's firing came just days after he supported and corroborated the racial discrimination and racially hostile work environment complaints of his African-American co-worker, Ms. McDaniel, Mr. Sutton was unlawfully terminated in retaliation for standing up for Ms. McDaniel and reporting the truth about the racially-discriminatory environment that is prevalent at BMT.

---

[1] Plaintiff makes reference to and incorporates the corresponding Statement of Disputed Facts and Exhibits filed herewith.  Plaintiff also incorporates by reference the facts presented in each of the six cases that have been consolidated for discovery (Dinger, No. 19-02324; Russo, No. 19-2408; Hughes, No. 19-2417; Stevens, No. 19-2418; McDaniel, No. 19-2419; and Sutton, No. 19-2420).

1

Mr. Sutton started his tenure at Bryn Mawr Trust during an exceedingly difficult and challenging period in his life. Just one month after he started at BMT, his mother became gravely ill and was hospitalized in Pottstown, Pennsylvania and the responsibility fell on Mr. Sutton to care for her after work. His mother went on hospice in late January and passed away on March 5, 2018. The immense grief and stress that he experienced during this period led to his own health problems, including pneumonia and a bleeding ulcer. (Plaintiff's Complaint at ¶13). Mr. Sutton recognized that his attendance due to his personal family issues and his need to care for his sick mother was an issue.[2] "However, I would say that there were mitigating circumstances for most of those instances." (Plaintiff's Statement of Disputed Facts in Response at ¶9; Sutton Dep. at 106:17-107:2).

Plaintiff was told by HR Representative Nancy Pinkowicz not to worry about his past in terms of where he stood with continued tenure at the Bank (Plaintiff's Statement of Disputed Facts at ¶28; Sutton Dep. at 269:12) He was told to just keep doing what you need to do. (Plaintiff's Statement of Disputed Facts at ¶28; Sutton Dep at 294:13-24) He was told by Ms. Pinkowicz that "looking at your file, it seems like things are trending in the right direction. Keep focused on that. I wouldn't really worry about this writeup." (Plaintiff's Statement of Disputed Facts at ¶28; Sutton Dep. at 299:23-24) Ms. Pinkowicz tried to assure him "that in due time everything, you know, was fine." (Plaintiff's Statement of Disputed Facts at ¶28; Sutton Dep. at 303:24-304:1).

The Ardmore branch, to which Mr. Sutton was assigned, was "not a very cohesive branch. There was a lot of tension….a lot of racial tension." (Plaintiff's Statement of Disputed

---

[2] Mr. Sutton leaned heavily on his wife for support, particularly during this period of time. Mr. Sutton admitted that he would send emails to his wife occasionally during work hours, but he didn't "think this was something atypical for spouses to do." (Plaintiff's Statement of Disputed Facts in Response at ¶4; Sutton Dep. at 347:14-17).

Facts at ¶9; Sutton Dep at 33:12-17)  It was based on "interpersonal racist commentary."[3] (Plaintiff's Statement of Disputed Facts at ¶9; Sutton Dep at 36:22-24).  Mr. Sutton worked very closely with Alicia McDaniel (African-American) at the Ardmore branch and witnessed "racist comments, very insensitive comments, very appalling comments" that were directed toward Ms. McDaniel by their co-worker Magdaline Intzes (Caucasian). (Plaintiff's Statement of Disputed Facts in Response at ¶90; Sutton Dep. at 365:11-15; Plaintiff's Statement of Disputed Facts at ¶10).  Plaintiff Sutton testified that he "heard some commentary by Maggie Intzes to Alicia [McDaniel] on at least four occasions referring to her children and how it would be better if she was home with them, that it would really be in their best and in her best interest, and that from her perspective she didn't understand why Alicia wanted to work. Things of that nature that I felt just were not comments that should be made or opinions that should be voiced about other people's choices in how they have to live their lives." (Plaintiff's Statement of Disputed Facts at ¶11; Sutton Dep at 39:7-17).  Plaintiff Sutton further testified:

> I observed specifically Magdaline Intzes say a few comments that were definitely very racist…Such as suggesting to Alicia that, because she was Greek, that she had a better background for education and things of that nature that I felt if I were African-American I would have felt assaulted by some of these comments. So I can recall talking with my manager, Danielle Llewellyn-Perez, who was African-American, in an effort to have her talk to the two of them and see if we couldn't, again, get to the bottom of this. The environment had become such that they could not work well together, obviously, and it had become a weight around the branch's neck effectively. (Plaintiff's Statement of Disputed Facts at ¶12; Sutton Dep at 41:9-42:2; 43:14-44:17)

The comments observed by Mr. Sutton were "very much in terms of a racial context." (Plaintiff's Statement of Disputed Facts at ¶12; Sutton Dep at 45:13) and that "race was certainly a primary

---

[3] Plaintiff kept a journal when he was working for Defendant "both for psychiatric purposes to deal with the process of grief, but also to document "*a very challenging work environment of race*" which was uncomfortable for him. (Plaintiff's Statement of Disputed Facts at ¶8; Sutton Dep at 18:7-14)  Plaintiff threw out the journal by mistake when he was cleaning out his car because his son was being born (Plaintiff's Statement of Disputed Facts at ¶8; Sutton Dep at 19:4-11).

3

motivator as far as I could tell in why they could not work together." (Plaintiff's Statement of Disputed Facts at ¶12; Sutton Dep at 150:2-3, 24)

Mr. Sutton also observed racial disparities in the manner in which clients at the Ardmore branch were serviced. Clients were directed to either Ms. Intzes or Ms. McDaniel according to their race by the office manager based on coaching by the district manager. (Plaintiff's Statement of Disputed Facts in Response at ¶104; Sutton Dep at 151:9-11) It was Ms. Perez and Ms. Biernacki who directed this (Plaintiff's Statement of Disputed Facts in Response at ¶104; Sutton Dep at 152:3-7). Further, "Ms. McDaniel was, again, being given a disproportionally large workload between both the teller line and a lot of people coming in that she would have to service both to open accounts and just to do customer service. Whereas Ms. Intzes was not held to that same standard. That to me was very stark, again, having worked in a number of banks, having worked with bankers of a variety of different stripes. I've never seen the division of clientele done in such a deliberate manner." (Plaintiff's Statement of Disputed Facts in Response at ¶104; Sutton Dep at 149:13-23).

In June of 2018, Mr. Sutton reported and discussed with his manager, Danielle Perez, the racial tension between Ms. McDaniel and Magdaline Intzes (Plaintiff's Complaint at ¶15):

> Q. Did you ever discuss racial issues and tension with either Ms. Perez or Ms. Biernacki?
>
> A. I did speak with Ms. Perez regarding tensions between Magdaline and Alicia. I tried to address what I felt were some disparities in both the customers that were being directed to both individuals and, again, their attitudes toward each other were -- were obvious to customers, let alone to us as employees, that there was conflict there. And so I simply was doing what I thought I could do to contact my manager and say, I think this is a situation that you need to get involved in, and my sense is that nothing positive came from it, as within about a month Alicia was moved out of the branch and Magdaline then soon thereafter. (Plaintiff's Statement of Disputed Facts in Response at ¶93; Sutton Dep at 145:1-18)

4

After speaking out about the racial intolerance and hostile atmosphere to which Ms. McDaniel and the African-American employees were subjected to a BMT, Mr. Sutton was admonished by his superiors to mind his own business and not discuss it.

> My instructions had been from management to really just mind my business and to do my job and again.
>
> Q. And so who had instructed you to mind your business and do your job?
>
> A. The instructions I was getting from my manager and my district manager were to focus on the teller line and not to worry about anything else within the branch. For instance, any racial issues that were in existence, any tension that existed within the branch" (Plaintiff's Statement of Disputed Facts in Response at ¶97; Sutton Dep at 144:14-24).

On July 13, 2018, in response to complaints to HR by Ms. McDaniel, which led to her transfer out of the Ardmore branch,[4] Mr. Sutton was contacted by HR Representative Nicola Fryer to discuss Ms. McDaniel's allegations.  (Plaintiff's Complaint at ¶17).  Mr. Sutton told Ms. Fryer that the environment was "toxic" specifically with respect to the racial interaction between Ms. Intzes and Ms. McDaniel (Statement of Disputed Facts at ¶22; Sutton Dep at 142:22-143:7).

> Q. Tell me your best memory of what happened in that room.
>
> A. Again, I was asked have I ever experienced -- or have I ever witnessed any toxic environment. And I said, I really would not like to get into that; I'm just trying to keep my head down.  Then they asked me about it again and I said I've really been thinking about it and I said the environment here is toxic. That is -- at that point I was essentially cut off from talking about that." (Plaintiff's Statement of Disputed Facts in Response at ¶97; Sutton Dep at 164:23-165:10)

---

[4] With respect to Ms. McDaniel's transfer, management refused to explain to Mr. Sutton and others in Ardmore the reason for her transfer and he was instructed not to contact Ms. McDaniel with the clear undertone that there would be trouble for him if he did . (Statement of Disputed Facts at ¶26; Sutton Dep at 253:22-24-255:11)

When asked by HR directly about racial issues, Plaintiff was initially hesitant and did not want to get involved because he understood that there was risk to him for speaking out (Statement of Disputed Facts at ¶20).

> However, I also was aware that I needed to live with myself and that given that some of the toxic issues that I had witnessed were something that I could speak to, they were not just rumors, that I felt that I had an obligation knowing that -- again, you know, knowing that I was going to be a father, I didn't want to look back on this and say, I didn't say anything because I was afraid of losing a job…"
> (Statement of Disputed Facts at ¶20).

On July 24, 2018, only 11 days after he met with Ms. Fryer and reported about the toxic racial atmosphere at the Ardmore branch, BMT fired him. (Plaintiff's Complaint at ¶18) (Plaintiff's Statement of Disputed Facts at ¶18; Sutton Dep at 143:24-144:1; 162:1-17; 351:24-352:6)

> Q. Why were you fired?
>
> A. Again, they, I believe, said something about my time. However, if as we've discussed a number of times and excuse me for my frustration, 11 days prior I had been interviewed over the phone with regards to any race issues and any time issues that I had observed in Ardmore and in other branches. After being pressed a second time I did admit to the toxic environment that I had observed in the branch and I did say that from time to time I do believe there were issues with time. However, I was not given an opportunity to elaborate. No one followed up with me. The only thing that I heard as a result of that was they came on that -- the Tuesday following my training and fired me.
>
> Q. And they said that you were being fired for attendance issues; correct?
>
> A. That was what they told me in that moment. However, I don't believe that to be the true reason that I was fired. Given they had taken me for a week and put me in Media to train, that's an extreme cost for a company that for whatever reason was already going to fire me. So I think that it does not make a lot of sense."
> (Plaintiff's Statement of Disputed Facts in Response at ¶134; Sutton Dep at 352:4-353:6)

There is evidence originating from BMT's own employees that Defendant has attempted to manipulate the evidence by having its employees lie about the discrimination alleged in this

6

case. Laura Biernacki is the former regional manager of BMT who was terminated after several employees complained about her discriminatory conduct. In clear reference to these six consolidated cases against BMT before this Court, including Mr. Sutton's case specifically, Ms. Biernacki asserted that she was pressured by BMT not to tell the truth and that she was told by BMT HR that she was terminated due to employee complaints and her "management style." (Plaintiff's Statement of Disputed Facts at ¶1-4; Biernacki 1-4)

Pertinent particulars of the Charge[5] dated September 1, 2020 and signed by Ms. Biernacki under penalty of perjury are as follows:

2. In April of 2018, I was contacted by an African American employee Wandrea Russo, who said she was being racially harassed by her manager. I contacted Nicola Fryer from Human Resources and advised that the manager be transferred. This request was denied and Ms. Russo quit shortly after that.

3. In or about August of 2018, I was interviewed by an attorney for Respondent regarding an employment discrimination claim brought by a terminated employee, Michael Sutton against Respondent. During the interview the attorney was trying to lead me from saying that I believed his medical situation could have been accommodated better.

4. In or about September of 2018, I spoke with Nicola Fryer in Human Resources and advised her that I was concerned that I was being pressured to give inaccurate testimony in the employment discrimination case.

---

8. In the June and July of 2020, Jerry Cary, Retail's HR Business Partner (who is African American) asked me "have you called your black employees? I asked for guidance about what he wanted me to do because of the racial discrimination lawsuits that were ongoing and an article in the Delaware County Times about how our [sp] the bank President, Frank Leto, was not communicating properly with our African American employees. I wanted to make sure I didn't make anything worse or cause tension, but Mr. Cary would not provide me with any guidance. I believe he was trying to get me to say something about racial issues and then blame me for not doing it properly.

---

[5] BMT entered into a settlement agreement with Ms. Biernacki whereby Ms. Biernacki was required to cooperate with and be represented by BMT's counsel in this consolidated litigation. (Plaintiff's Statement of Disputed Facts at ¶4; Biernacki 4). This dual- representation raises questions about Defendant's counsel's conflict of interest under Pa.R.P.C. 1.7.

7

(Plaintiff's Statement of Disputed Facts at ¶2; Biernacki 1, 3). Ms. Biernacki admitted to Alicia McDaniel her willingness to lie for HR with respect to Ms. McDaniel's discrimination claims, and was apparently willing to do so because she believed that HR[6] would "have her back." (Plaintiff's Statement of Disputed Facts at ¶29; McDaniel Dep. at 482:5-25, 483:1-12). Ms. Biernacki's admissions casts doubt on the veracity of all of Defendant's evidence and creates issues of fact and credibility that requires this case and the other cases consolidated with it to be decided by a jury, not on summary judgment.[7]

Mr. Sutton asserts claims for unlawful retaliation against BMT, in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act. There is significant and substantial evidence, including the testimony of Defendant's own employees, by which a reasonable jury could conclude that was terminated from his employment by BMT because he stood up for Ms. McDaniel and spoke out against the racially-hostile atmosphere and discrimination at the Bank. As redress for the adverse effects of BMT's unlawful retaliation, Mr. Sutton seeks declaratory and injunctive relief, back pay, front pay, compensatory and punitive damages, along with attorneys' fees and costs. Defendant has filed its summary judgment motion to which Mr. Sutton now responds.

## II. ARGUMENT

### A. Summary Judgment Standard

---

[6] BMT employee Barbara Pope of HR admitted at a manager's meeting at which Frantz Excellent was present that HR is primarily interested in protecting BMT's interests, not the employees. (Plaintiff's Statement of Disputed Facts at ¶30; Excellent Dep. at 50-51). According the Mr. Excellent, the former manager of the Media branch, BMT's purported policies with respect to discrimination and harassment are not taken seriously. (Plaintiff's Statement of Disputed Facts at ¶31; Excellent Dep. at 35:1-8)

[7] When asked about Ms. Biernacki's admission, Ms. Russo said: "I think that it is saying a lot. I feel like it confirms everything that I've been saying from the beginning, that Bryn Mawr Trust has a history of doctoring documents, of pressuring their employees to deny what's going on. That from the CEO on down, they have a pattern of behavior where they just cover up the wrongdoings and the wrongdoers and they push people out when they try to stand up for what's right." (Russo Dep. at 595-596).

Granting summary judgment is an extraordinary remedy. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether such relief is warranted, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 181 (3d Cir. 2009) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (*quoting Anderson*, 477 U.S. at 251-52). "A genuine dispute is one that 'may reasonably be resolved in favor of either party.'" *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011) (quoting Anderson, 477 U.S. at 250). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Id.* (*quoting Anderson*, 477 U.S. at 248).

In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3rd Cir. 1988). "[T]he court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3rd Cir. 1995). Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. *Anderson*, 477 U.S. at 255.

**B. There are sufficient facts by which a reasonable jury may find in favor Michael Sutton's Retaliation Claims Under Title VII and the PHRA**

To establish a prima facie case of retaliation under Title VII and the PHRA, a plaintiff must show: 1) a protected employee activity; 2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and 3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)(citation and internal quotations omitted).

An employee need not be a member of a protected class to be subject to actionable retaliation. *See Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)(finding that a white employee who complains about discrimination against black employees is protected by Title VII's anti-retaliation provision; "Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.")

Informal complaints and protests can constitute protected activity under the "opposition" clause of Title VII, 42 U.S.C. § 2000e-3(a). The law seeks to secure its primary objective to combat discrimination "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64 (2006). "Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management. To determine if retaliation plaintiffs sufficiently opposed discrimination, we look to the message being conveyed rather than

the means of conveyance." *Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006). "[A] Plaintiff need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996).

To satisfy the second prong, "the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels v. Sch. Dist. Of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015)(*quoting Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

To satisfy the third prong, a plaintiff may establish causation by relying on "an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action," "a pattern of antagonism coupled with timing," or "evidence gleaned from the record as a whole." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)(citations omitted). "It is important to emphasize that it is causation, no temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997); *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d. Cir. 1997)(finding a sufficient causal connection based on a "pattern of antagonism" during the *two-year period* between the protected activity and the adverse action). The element of causation in retaliation cases "is highly context-specific." *Moore v. City of Phila.*, 461 F.3d 331, 352 (3d Cir. 2006). A claim for retaliation may be proven using a "motivating factor" or "determinative factor" standard. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

11

Certainly the timing of Mr. Sutton's reports, within just days and weeks prior to his termination, particularly after he has just been sent to training on the company dime, is highly and unusually suggestive of a retaliatory motive. When Mr. Sutton made his first report of racial discrimination by Ms. Intzes in June, he was admonished by his superiors to mind his own business and not to discuss it, which clearly showed the BMT did not want him speaking about this and would take adverse action against him if he did not tow their line. Mr. Sutton highlighted why their stated reason for his termination was not credible: "I don't believe that to be the true reason that I was fired. Given they had taken me for a week and put me in Media to train, that's an extreme cost for a company that for whatever reason was already going to fire me. So I think that it does not make a lot of sense." (Plaintiff's Statement of Disputed Facts in Response at ¶134; Sutton Dep at 352, lines 4-24, 353, lines 1-6). Further, Mr. Sutton was assured by Ms. Pinkowicz of HR that "things are trending in the right direction" and that everything "was fine."(Plaintiff's Statement of Disputed Facts at ¶28). "And that is exactly what retaliation would be, would be using something that I had experienced or something that I had observed against me in order to terminate my employment." (Plaintiff's Statement of Disputed Facts at ¶134; Sutton Dep at 140:18-141:10).

Additionally, as noted above, Ms. Biernacki's admissions casts doubt on the veracity of all of Defendant's evidence and creates issues of fact and credibility that requires this case to be decided by a jury, not on summary judgment.

IV. CONCLUSION

For the reasons stated herein, Plaintiff Michael Sutton requests that this Honorable Court deny summary judgment with respect to his claims for retaliation against Defendant Bryn Mawr Trust.

Respectfully Submitted,

**MARK D. SCHWARTZ, ESQUIRE**

By:    /s/ Mark D. Schwartz
    MARK D. SCHWARTZ, ESQUIRE
    PA ID #30527
    300 Sandcastle Drive
    BRYN MAWR, PA 19010
    Telephone & Fax 610 525-5534
    Markschwartz6814@gmail.com

**THE PEARLMAN LAW FIRM, PLLC**

By:    /s/ Jason L. Pearlman
    JASON L. PEARLMAN, ESQUIRE
    PA ID #93879
    TWO BALA PLAZA, SUITE 300
    BALA CYNWYD, PA 19004
    Telephone (610) 660-7793
    jpearlman@pearlmanlawfirm.com

*Counsel for Plaintiff Michael Sutton*

DATED: May 21, 2021