IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

VOLUME I

ERIN DINGER,
                    Plaintiff

                              CIVIL ACTION
        v                     NO. 19-CV-2324

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                    Defendants

**CERTIFIED TRANSCRIPT**
_____

WANDREA RUSSO,
                    Plaintiff

                              CIVIL ACTION
        v                     NO. 19-CV-2408

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                    Defendants
_____

PENNY HUGHES,
                    Plaintiff

                              CIVIL ACTION
        v                     NO. 19-CV-2417

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                    Defendants
_____

KAREN STEVENS,
                    Plaintiff

                              CIVIL ACTION
        v                     NO. 19-CV-2418

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                    Defendants



```
 1   CAPTION: Continued

 2   ALICIA McDANIEL,
                   Plaintiff
 3        v                        CIVIL ACTION
                                   NO. 19-CV-2419
 4
     BRYN MAWR BANK CORPORATION d/b/a
 5   BRYN MAWR BANK COMPANY,
                     Defendants
 6   _____
     __
 7
     MICHAEL McSHANE SUTTON,
 8                 Plaintiff
          v                        CIVIL ACTION
 9                                 NO. 19-CV-2420

10   BRYN MAWR BANK CORPORATION d/b/a
     BRYN MAWR BANK COMPANY,
11                   Defendants

12

13

14

15                Video deposition of MICHAEL M.

16   SUTTON, taken on Wednesday, November 4, 2020, held

17   at the offices of Cozen O'Connor, 1650 Market

18   Street, Suite 2800, Philadelphia, Pennsylvania,

19   commencing at approximately 10:17 a.m., appearing

20   before Barbara McKeon Quinn, a Registered Merit

21   Reporter and Notary Public, pursuant to notice.

22

23

24
```

 1  | APPEARANCES:

 2  | MARK D. SCHWARTZ, ESQUIRE
    | markschwartz6814@gmail.com
 3  | 300 Sandcastle Drive
    | Bryn Mawr, Pennsylvania   19010
 4  | 610-525-5534
    | and
 5  | THE PEARLMAN LAW FIRM, PLLC
    | JASON L. PEARLMAN, ESQUIRE
 6  | jpearlman@pearlmanlawfirm.com
    | Two Bala Plaza, Suite 300
 7  | Bala Cynwyd, Pennsylvania   19004
    | 610-660-7793
 8  | Counsel for Plaintiffs

 9  |
    | COZEN O'CONNOR
10  | AARON KRAUSS, ESQUIRE
    | akrauss@cozen.com
11  | 1650 Market Street
    | 28th Floor
12  | Philadelphia, Pennsylvania   19103
    | 215-665-2000
13  | Counsel for Defendant

14  |
    | ALSO PRESENT:
15  |
    | Martin Zinkel, Videographer
16  | LORI GOLDMAN, ESQUIRE (Via Videoconference)

17  |

18  |

19  |

20  |

21  |

22  |

23  |

24  |

1                    EXAMINATION INDEX

2

MICHAEL M. SUTTON
3        BY MR. KRAUSS . . . . . . . . . . . . . .  8

4


5                      EXHIBIT INDEX

6
    BMT                                              PAGE
7
    6        Complaint                               311
8
    8        Interrogatories                          83
9
    10       BMT 0000720 through 780                 141
10
    14       Answers to Interrogatories               82
11
    17       Sutton 1 through 20                      12
12
    66       BMT 0002688                              94
13
    70       BMT 0933148                              97
14
    71       BMT 0886195                             157
15
    72       BMT 0933132 through 134                  57
16
    73       BMT 0002773 through 775                  99
17
    74       BMT 00331704 through 713                168
18
    75       BMT 0002433 through 435                 190
19
    76       BMT 0002766 through 769                 185
20
    77       BMT 0885161 through 162                 193
21
    81       BMT 0002751 through 752                 219
22
    82       BMT 0031735                             321
23

24



AdvancedONE LEGAL
(866) 715-7770
advancedONE.com

 1  | EXHIBITS: (Continued)

 2  | BMT                                                   PAGE

 3  | 83      BMT 0886194                                  166

 4  | 84      BMT 0002757 through 759                      231

 5  | 85      BMT 0002760 through 762                      236

 6  | 86      BMT 0002745 through 751                      271

 7  | 92      BMT 0002764                                  308

 8  | 96      BMT 0059795                                  279

 9  | 107     BMT 0005165                                   21

10  | 119     BMT 0891867 through 875                      227

11  | 122     BMT 0884172 through 175                      207

12  | 123     BMT 0884631 through 633                      215

13  | 124     BMT 0031108 through 113                      212

14  | 125     BMT 0002485                                  216

15  | 225     BMT 0935703 through 704                      260

16  | 226     BMT 0935154 through 155                       65

17  | 227     BMT 0936567 through 574                        6

18  | 228     BMT 0937369 through 371                        8

19  | 229     BMT 0935766 through 773                      196

20  | 230     BMT 0937017 through 20                       280

21  | 231     BMT 0936263 through 265                      282

22  | 232     BMT 0935425 through 428                      297

23  | 233     BMT 0934770 through 776                       24

24  |



ERIN DINGER v BRYN MAWR BANK                                    Page 6
Michael Sutton, 11/04/2020

1 | EXHIBITS: (Continued)

2 | BMT                                                        PAGE

3 | 234     BMT 0937785 through 386                             54

4 | 235     BMT 0935100 through 104                            299

5 | 236     BMT 0935028 through 33                             303

6 | 237     BMT 0935167 through 168                            306

7 | 238     BMT 0938342 through 348                             43

8 | 239     BMT 0934958 through 964                            203

9 | 248     BMT 0955861 through 0956054                         78

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

```
 1              VIDEOGRAPHER:  We are now on the
 2   video record.
 3              This is the video deposition of
 4   Michael Sutton, taken by the defendant, in the
 5   matter of Michael Sutton versus Bryn Mawr Bank
 6   Corporation, et al., in the United States District
 7   Court for the Eastern District of Pennsylvania,
 8   Civil Action No. 19-CV-2420, consolidated with
 9   Case Nos. 19-CV-2324, 2408, 2417, 2418, 2419, held
10   at the offices of Cozen O'Connor, 1650 Market
11   Street, Suite 2800, Philadelphia, Pennsylvania, on
12   Wednesday, November 4th, at 10:17 a.m.
13              I am Martin Zinkel, the videographer;
14   the court reporter is Barbara Quinn.  We are from
15   the firm of AdvancedONE Legal in Philadelphia,
16   Pennsylvania.
17              Counsel will now introduce themselves
18   and the reporter will swear in the witness.
19              MR. PEARLMAN:  Jason Pearlman and
20   Mark Schwartz, on behalf of plaintiff, Michael
21   Sutton.
22              MR. KRAUSS:  Aaron Krauss, on behalf
23   of Bryn Mawr Trust from Cozen O'Connor.  With me
24   on the video is my client, Lori Goldman.  We're
```

 1  trying to obviously keep the room as empty as

 2  possible given the COVID precautions we are

 3  taking.

 4              MICHAEL M. SUTTON, having been duly

 5  sworn, was examined and testified as follows:

 6              MR. KRAUSS:  Same stipulations as at

 7  prior depositions?

 8              MR. PEARLMAN:  Yes.

 9                  EXAMINATION

10  BY MR. KRAUSS:

11  **Q.     Good morning, Mr. Sutton.**

12      A.      Good morning.

13      **Q.      You thought that working at Bryn Mawr**

14  **Trust was just like working at your last two jobs;**

15  **correct?**

16      A.      Could you clarify that question, sir?

17      **Q.      That's what you thought; right?**

18      A.      I -- I don't understand the question.

19      **Q.      Did you think that working at Bryn**

20  **Mawr Trust was just like working at your last two**

21  **jobs?**

22      A.      Was it similar to the prior banking

23  jobs that I had had?  Is that the question that

24  you're asking me, sir?

1      Q.        No.  The last two jobs.

2      A.        No.  It was different than my last

3  two jobs.

4      Q.        Okay.  Let me show you what's been

5  marked as Exhibit 227.  Exhibit 227 is a very long

6  string of e-mails you exchanged with your wife;

7  correct?

8      A.        Yes, I did.

9      Q.        Okay.  And you say to your wife at

10  the very top of Exhibit 227, Well, my last two

11  jobs were like this.  I don't see things changing

12  here ever.  It's basically my fate to work at a

13  menial job and be treated like an abused dog.

14  It's fine.  I give up.

15                Did you write that?

16      A.        If I may, can I read the document

17  before?

18      Q.        Well, my question was, did you write

19  that?

20      A.        Yes, I did write that.  And if I may

21  just briefly review the paper.  This was really a

22  dialogue in the week after my mother passed.  I

23  was very depressed and my wife I think was trying

24  to keep me on an even keel and trying to do what

1  spouses often do when one is having a rough

2  period.  Things were obviously very rough.  Just

3  from that perspective.

4      **Q.      Did you mean what you wrote in**

5  **Exhibit 227?**

6      A.      So my wife had written it was not --

7  it's going to be a crappy day and you're dealing

8  with someone that has no empathy or compassion; it

9  won't be like this forever.  So when I wrote that

10  my last two jobs were menial, that was certainly

11  correct.  And feeling that it was a difficult

12  environment, I would agree with that statement,

13  yeah.

14     **Q.      Well, in fact, you believed you were**

15  **treated horribly everywhere; correct?**

16     A.      I would not describe that.  Again, I

17  think this was a conversation in literally the

18  week after my mother had been buried, in which I

19  obviously was still going through and processing

20  quite a bit of grief and understandably was very

21  down about things, as one is during a period of

22  mourning.

23     **Q.      Now, let me show you what's been**

24  **marked as Exhibit 228.  Exhibit 228 is another**

1   long e-mail exchange you had your with wife;

2   correct?

3        A.        It appears to be so.

4        Q.        And, in fact, the most recent thing

5   you said in Exhibit 228 is, it's about how I get

6   no quarter where I am not treated horribly.

7                  Did I read that correctly?

8        A.        Yes, you read that correctly.

9        Q.        Did you write it?

10       A.        I did write that, again, in the

11  context of being very depressed in the week after

12  my mother had passed and that was a very traumatic

13  time.

14       Q.        So you at the bottom of the first

15  page of Exhibit 228 wrote, quote, "I just figure

16  if I get no breaks here, no breaks at home and no

17  breaks personally, I just don't see why I should

18  continue to do it."

19                  Did I read that correctly?

20       A.        You did.  You did read that

21  correctly.

22       Q.        Okay.  Did you mean that?

23       A.        And the implication, again, was just

24  that I felt overwhelmed in the week after my

1  mother passed unexpectedly after a very severe and

2  rapid decline in her health.  That was, again, a

3  rough, rough period for me.

4       **Q.      Let me ask you to turn to the second**

5  **page of Exhibit 228 at the bottom.  And do you see**

6  **where your wife said that you should call her and**

7  **she was worried about your last text.**

8            **Do you see that?**

9       A.      Yes.

10      **Q.      So in addition to e-mailing your wife**

11 **you were texting her while at work; correct?**

12      A.      I had texted her on my lunch break.

13      **Q.      Okay.  So --**

14      A.      Which would have been prior to that.

15      **Q.      Did you gather documents to be**

16 **produced in this lawsuit?**

17      A.      I did not have a great opportunity as

18 I was escorted out directly after being dismissed

19 unexpectedly and 11 days after I was asked about

20 the environment at the bank.  So I did not have a

21 great opportunity to collect documents, but I had

22 certainly these e-mail exchanges with my wife that

23 she had kept.

24      **Q.      My question was, did you collect**

1  documents to be produced in this lawsuit?

2       A.       As best I could, yes, sir.

3       Q.       Okay.  Did you look on your phone?

4       A.       As best I could, yes, I did, sir.

5       Q.       And so why didn't you produce any

6  texts in this litigation?

7       A.       Again, I don't have those texts on a

8  device that is available to me when this occurred.

9  My phone in March was no longer my phone in June

10 or July, I believe, when I was let go from the

11 bank.

12      Q.       What happened to your phone?

13      A.       Got a new phone.

14      Q.       Did you port over the information

15 from the old phone?

16      A.       I don't recall that I did.

17      Q.       Now, your wife is a partner at a law

18 firm; correct?

19      A.       That would be correct.

20      Q.       Kennedys; right?

21      A.       That is correct.

22      Q.       It's a big firm; right?

23      A.       It's a sizable firm, I believe.

24      Q.       And you talked to her about your

1  lawsuit; correct?

2       A.        I've talked to her about my lawsuit,

3  yes.

4       Q.        And she told you that you've got to

5  preserve documents; right?

6                 MR. PEARLMAN:  Objection.

7                 MR. SCHWARTZ:  Objection.  Attorney-

8  client privilege.

9  BY MR. KRAUSS:

10      Q.        Is your wife --

11      A.        Spousal privilege.  I asked that of

12  my --

13                MR. PEARLMAN:  Hold on.

14  BY MR. KRAUSS:

15      Q.        So let's go there for a moment.

16                MR. PEARLMAN:  Objection.

17  BY MR. KRAUSS:

18      Q.        Is your wife representing you in this

19  lawsuit?

20      A.        In no way, shape, or form.

21      Q.        Okay.  So now I'm not asking you to

22  testify against your wife; that's spousal

23  privilege.  I'm asking what your wife told you.

24  Did she tell you to preserve documents?

 1              MR. PEARLMAN:  Objection.

 2   BY MR. KRAUSS:

 **3**       **Q.       Can you answer my question, please?**

 4              MR. PEARLMAN:  I object.  To the

 5   extent that he was relying on legal advice being

 6   provided by his wife, that would fall under the

 7   protection of attorney-client privilege.

 8              MR. KRAUSS:  And he just testified

 9   that in no way, shape, or form was she

10   representing him.  Therefore, there is no --

11              MR. PEARLMAN:  Whether she was

12   representing him in this litigation --

13              MR. KRAUSS:  There's no attorney-

14   client privilege.

15              MR. PEARLMAN:  -- or not, if she was

16   -- if was relying on advice that she was

17   providing, legal advice, whether she represents

18   him in this litigation or not, that information

19   would be privileged.

20   BY MR. KRAUSS:

**21**       **Q.       Answer my question, please.**

22              MR. PEARLMAN:  I'm instructing you

23   not to answer the question.

24              THE WITNESS:  I decline.

 1  BY MR. KRAUSS:

 2       Q.        All right.  Let me show you what's

 3  been marked as Exhibit 17.  Exhibit 17 are the

 4  documents Bates stamped Sutton 1 through Sutton

 5  20, and these are all of the documents that you've

 6  produced in this litigation; correct?

 7       A.        If I can have a moment, sir, thank

 8  you.

 9                 (Witness reviewed document.)

10                 To the extent that I believe I had

11  any documentation, I believe this is

12  representative of it, correct.

13       Q.        Well, you said representative.  Do

14  you have other documents that you decided not to

15  produce?

16       A.        No, sir.

17       Q.        So the only documents you produced in

18  this lawsuit were the EEOC charge you filed;

19  correct?

20       A.        I do see that as attached.

21       Q.        And then a response to Bryn Mawr

22  Trust's EEOC Position Statement; correct?

23       A.        I do not see the response unless it

24  is in front of this.

ERIN DINGER v BRYN MAWR BANK                                    Page 17
Michael Sutton, 11/04/2020

1     Q.        Well, let's walk through.  The pages

2  Bates stamped Sutton 1 through Sutton 5 are the

3  EEOC charge that you filed and the EEOC's receipt

4  of that charge.

5              Do you see that?

6     A.        I do see that.

7     Q.        And then pages Bates stamped Sutton 6

8  through 9 are your lawyer's response to Bryn Mawr

9  Trust's Position Statement before the EEOC.

10             Do you see that?

11    A.        I do see that, sir.

12    Q.        Now, there's no copy of Bryn Mawr

13  Trust's Position Statement in the documents you

14  produced; correct?

15    A.        No.  I don't see that.

16    Q.        Did you ever see it?

17    A.        I'm sorry?

18    Q.        Did you ever see Bryn Mawr Trust's

19  Position Statement before the EEOC?

20    A.        Not that I can recall.

21    Q.        Okay.  Then pages 10 through 20 are

22  an application for a loan for your father.

23    A.        Yes, sir.

24    Q.        Correct?

```
 1        A.        Correct.

 2        Q.        Okay.  Those are the only documents

 3   that you produced in this lawsuit; correct?

 4        A.        As far as I'm aware, yes.  Best of my

 5   recollection.

 6        Q.        You were taking notes when you were

 7   at Bryn Mawr Trust; correct?

 8        A.        Uh-huh.  I was keeping a journal at

 9   the time as best I could both for psychiatric

10   purposes to deal with the process of grief but

11   also because things were very difficult there.  It

12   was a very challenging work environment from --

13   from the standpoint of race and I felt

14   uncomfortable.

15        Q.        And what did you do with that

16   journal?

17        A.        I don't have it retained.  I believe

18   I threw it out.  What information, again, I have,

19   I did provide to the Court.

20        Q.        When did you destroy your journal?

21        A.        I don't recall.

22                  MR. PEARLMAN:  Objection to form.

23                  You can answer.

24                  THE WITNESS:  I don't recall, sir.
```

1   BY MR. KRAUSS:

2       **Q.        Okay.  Why did you destroy your**

3   **journal?**

4       A.        I was cleaning out my car.  I wasn't

5   aware it was in there.  I was --

6       **Q.        So you're saying you accidentally**

7   **threw out your journal while cleaning your car?**

8       A.        Yes.  Again, I was trying to clean

9   out my car because my son was being born; I needed

10  to get a car seat in there.  I regretted throwing

11  it out, but that's what happened.

12      **Q.        How big was the journal?**

13      A.        It was only a few pages.  It was just

14  an opportunity for me, something that my therapist

15  had suggested initially just to really deal with

16  the grief of my mother.  But I did also take a few

17  notes about how I also felt very impacted by the

18  working environment and how separate from

19  obviously my mother passing that that was also

20  having a very deleterious effect on me.

21      **Q.        Was it a book?**

22      A.        It was a note pad.  I believe it was

23  from a hotel or some sort.  It was a few pages.

24      **Q.        Okay.  When you say "a note pad," was**

 1  it spiral bound?

 2       A.        No, it was not.

 3       **Q.        A tablet?**

 4       A.        It was like an 8-by-10 telephone

 5  tablet.

 6       **Q.        And approximately how many pages of**

 7  **notes had you taken?**

 8       A.        I would say no more than 12 or 10.

 9       **Q.        Now, when you threw away your notes,**

10  **you knew you were doing it; right?**

11       A.        Again, at the time I was trying to

12  get my car cleared for -- my son was being born; I

13  needed to get a car seat in.  I regretted doing

14  it, but I didn't know until frankly a month, if

15  not longer, after, because it was a hectic time

16  with my son being born.

17       **Q.        So I'm confused.  You didn't know**

18  **until a month or more after that you had thrown**

19  **away your notes?**

20       A.        I was trying to find anything else as

21  my lawyers had made sure to keep in contact with

22  me if I had anything.  I did not have it at that

23  time.

24       **Q.        When did you first hire lawyers in**

1   this case?

2        A.       I don't recall the exact date.  I

3   would have to -- I don't exactly recall.

4        **Q.       Was it before or after your son was**

5   **born?**

6        A.       It was before my son was born.

7        **Q.       So, again, let me ask.  You say you**

8   **were cleaning out your car; you knew that you**

9   **picked up your note pad; right?**

10       A.       Again, the condition of my car was

11  very dirty.  I just started throwing things out.

12  It was not an intentional act.  As best I can

13  recall, I just was trying to get the car clean.

14       **Q.       All right.  Let me focus on this.**

15  **You say you're cleaning out your car, you reach in**

16  **and you grabbed your note pad; correct?**

17       A.       I grabbed a bunch of papers.  As to

18  whether it was in there, that's the best I can do.

19       **Q.       How many papers did you have in your**

20  **car?**

21       A.       I had probably 50 or 100 because I

22  also had things that were put on my windshield

23  when we would park, all kinds of crap from

24  restaurants and takeout menus, and just was trying

 1  to clear all that stuff out.

 2      **Q.        Did you think you were throwing away**

 3  **a newspaper when you destroyed your notes?**

 4              MR. PEARLMAN:  Objection to form.

 5              THE WITNESS:  No.  I --

 6              MR. PEARLMAN:  You can answer.

 7              THE WITNESS:  Again, I was just

 8  trying to clear the seats from my car.  I was not

 9  aware of the exact contents at that time.  As best

10  I can recall the few pages of handwritten notes

11  that I had had again mostly related to me

12  processing my own grief which were really

13  psychological notes.  Just trying to keep myself

14  balanced.  Yeah, those I did throw away.

15  BY MR. KRAUSS:

16      **Q.        Did you think those notes were**

17  **important?**

18      A.        In retrospect I wish I had kept them.

19  However, I did not.

20      **Q.        My question was, did you think they**

21  **were important?**

22      A.        I think that would be hard for me to

23  say, because I can't exactly recall the specific

24  contents of those notes aside from generally

1  remembering that it was largely about a journal

2  processing my grief and my struggle with working

3  and balancing the racial environment, the toxic

4  environment at work with my own grief and just

5  trying to be present for my wife as we were trying

6  to have a child.

7              So, again, as to what contents it had

8  relating to this matter directly, I can't speak

9  with any specificity.

10     Q.        **Why did you destroy your grief**

11  **journal?**

12             MR. PEARLMAN:  Objection to form.

13             THE WITNESS:  I think -- I think

14  you've asked that question to me four different

15  ways and, again, I've answered it, I think, as

16  best I can to the best of my ability.  It was not

17  an intentional act.  Simply trying to clear my

18  car.  As best I can recall the few pages of notes

19  were likely there.

20  BY MR. KRAUSS:

21     Q.        **Do you believe that your destruction**

22  **of your grief journal harmed you psychologically?**

23             MR. PEARLMAN:  Objection to form.

24             THE WITNESS:  I don't think it harmed

1  me psychologically.  I do think that it would have

2  been beneficial for me to have it so I could

3  produce it to you and you could see what I had

4  written.  However, there was no intentional act.

5            And, again, I produced everything

6  that I was able to in the time frame in which I

7  was provided and I am -- I'm here speaking open

8  and honestly about my experience and that is --

9  that is the best I can answer your seventh or

10  sixth question in that same angle.

11  BY MR. KRAUSS:

12     **Q.      Well, you did destroy your journal;**

13  **right?**

14            MR. PEARLMAN:  Objection to form.

15            All right.  Let's take a break.

16            MR. KRAUSS:  Just if he would answer

17  the question yes or no --

18            MR. PEARLMAN:  Let's take a break.

19            THE WITNESS:  I would like to --

20            MR. PEARLMAN:  No, Aaron.

21            THE WITNESS:  I would like to use the

22  rest room.

23            MR. PEARLMAN:  No.  Aaron, you're

24  really headed -- you're really being unfair about

 1 | this.

 2 |            VIDEOGRAPHER:  Off the video record,

 3 | 10:36 a.m.

 4 |                    RECESS

 5 |            VIDEOGRAPHER:  Back on video record,

 6 | 10:46 a.m.

 7 | BY MR. KRAUSS:

 8 |      Q.        Mr. Sutton, let me show you what's

 9 | been previously marked as Exhibit 107.  Exhibit

10 | 107 is an e-mail exchange you had with Alicia

11 | McDaniel.

12 |            Do you see that?

13 |      A.        I do see it.

14 |      Q.        And she's a friend of yours; right?

15 |      A.        We were friendly when we worked

16 | together, correct.

17 |      Q.        When's the last time you talked to

18 | her?

19 |      A.        Several months ago, I would say.

20 | Christmas.

21 |      Q.        Have you ever discussed your lawsuit

22 | with her?

23 |      A.        No.  Not anything particular.

24 |      Q.        Have you ever discussed her lawsuit?

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

```
 1       A.        Nothing particular.
 2       Q.        So in her e-mail Alicia McDaniel says
 3  that she's learning from you and taking notes.
 4            Do you see that?
 5       A.        I do see that.
 6       Q.        So had you told Alicia McDaniel to
 7  take notes?
 8       A.        I had not referred to taking notes
 9  with Alicia.  I had worked at a number of banks
10  previously and I think, again, in this time frame
11  things were a little tumultuous in the bank, and
12  though things were very hectic, I think she saw me
13  as someone who was just doing their best to try
14  and keep the branch running and serving our
15  customers, and I think that is what she was
16  referring to in terms of taking notes, modeling
17  the behavior of just serve the customers.
18       Q.        Had you discussed taking notes with
19  her?
20       A.        I don't recall any kind of note
21  taking discussion.
22       Q.        Do you recall taking notes in front
23  of Ms. McDaniel so she could see that you were
24  taking notes?
```

1   A.        Again, I don't recall taking notes

2   that she could see except for perhaps in terms of

3   we were cross-training people so she would

4   occasionally teach me things I would take notes

5   for, but except for instructional needs, no.

6   **Q.        What do you mean by cross-train?**

7   A.        So they would occasionally try and

8   teach us things so we could provide service to

9   customers if the guest folks were busy on the

10  teller line, such as replacement debits cards,

11  things of that nature.  I would take notes so I

12  would have the procedure.

13  **Q.        Do you believe cross-training was**

14  **important?**

15  A.        It was something that I think was an

16  effort in the bank to try and make things work

17  better.

18  **Q.        So you mentioned your working for**

19  **other banks in the past in connection with Exhibit**

20  **107 and taking notes.  Had your prior banking**

21  **experience taught you the importance of taking**

22  **notes?**

23  A.        Again, Alicia's making a statement

24  about notes.  I made no statement about notes.  In

1  my prior banking experience, I learned that it was

2  the most important job is to take care of the

3  customers, make them feel comfortable.  So, again,

4  I think the exchange she's referring to making

5  sure that we were being professional.

6      **Q.      Now, you repeatedly told your wife**

7  **that you wanted to quit your job; correct?**

8      A.      I was looking to try and find a

9  better area to work in in retail banking.  I

10  applied, I believe, in June for a BSA job within

11  the bank.  But I really was -- again, I took the

12  job knowing what it was, working in the consumer

13  side of the bank, but I did see it as a stepping

14  stone to other areas within the bank.

15      **Q.      Now, let me show you what's been**

16  **marked as Exhibit 233.  Exhibit 233 is another**

17  **very long e-mail exchange you had with your wife;**

18  **correct?**

19      A.      It appears that is the case.

20      **Q.      In fact, you spent a lot of your**

21  **workday e-mailing your wife, didn't you?**

22      A.      I would occasionally e-mail with my

23  wife at work.

24      **Q.      Now, you say "occasionally."  Exhibit**

1   233 has 22 e-mail exchanges with your wife; right?

2       A.      It's the number of e-mails, yep.

3       Q.      And that's on one day; correct?

4       A.      Yes.

5       Q.      And you started -- actually your wife

6   started by e-mailing you at 9:00 in the morning;

7   right?

8       A.      Yes.

9       Q.      Okay.  And the e-mail exchange goes

10  through to just before 1:00 p.m.; right?  Right

11  before lunch.  And then two e-mails later; right?

12      A.      I was going to say, I do see some

13  time stamped in the afternoon.

14      Q.      So 20 e-mails before lunch; right?

15      A.      Again, I'm not doing a specific

16  count, but it's -- it's a number of e-mails, yes.

17      Q.      All right.  So your wife e-mails you

18  at 9:04 a.m. saying, Hope your day gets better,

19  baby, and you're not taking too much heat.  Sorry

20  your morning was so terrible.

21              Do you see that?

22      A.      I do see that.

23      Q.      Now, had your day started terrible at

24  home or was it only terrible when you got to Bryn

1  **Mawr Trust?**

2      A.       I can't recall specifically.  I'm

3  imagining based on her e-mail about my eye hurting

4  that may have been a rough part of my morning if I

5  had an eye infection of some sort, but I can't

6  directly recall with any accuracy.

7      **Q.       All right.  You respond to your wife**

8  **by saying you want to quit your job.**

9              **Do you see that?**

10     A.       I do.  I do see that.

11     **Q.       Was that true?**

12     A.       I think I was very depressed in the

13  moment and, again, having a rough day and so I,

14  again, I think I was just venting to my wife who's

15  my spouse something commonly I think spouses do to

16  one another.  Did not impact my productivity that

17  I'm aware of.

18     **Q.       You go on to say, quote, I'm being**

19  **treated like garbage.  They want to write me up**

20  **for being late and send me to final notice for**

21  **firing meaning next minor offense off goes my**

22  **head, all because the roads were blocked with**

23  **water and downed trees.**

24              **Did I read that correctly?**

 1        A.        I'm sorry.  Which exchange is that

 2   again, sir?

 3        **Q.        That was the e-mail that you sent at**

 4   **10:43 a.m. right after you told your wife you**

 5   **wanted to quit your job.**

 6               **Did I read that correctly?**

 7        A.        Could you read it again?

 8        **Q.        You said, quote, I'm being treated**

 9   **like garbage.  They want to write me up for being**

10   **late and send me to final notice for firing**

11   **meaning next minor offense off goes my head, all**

12   **because the roads were blocked with water and**

13   **downed trees.**

14               **Did I read that correctly?**

15        A.        You did read that correctly.

16        **Q.        So how did you believe you were being**

17   **treated like garbage?**

18        A.        If I recall again, I did feel that,

19   again, things were being -- I felt that things

20   were very much focused, and particularly with the

21   tellers in general and just people who worked in

22   my position, that things that were otherwise

23   excused by other employees, we were held to that

24   account.  So I was just, again, venting to my wife

1   that I felt it was unreasonable that there was

2   obviously issues with me getting to the branch on

3   time with what I imagine was a storm based on this

4   e-mail exchange.

5           So, again, the substance of it was

6   just that I was in a -- I was not feeling very

7   welcome throughout my time at Bryn Mawr and it's

8   just another example of ways in which they make

9   people feel uncomfortable.

10      **Q.      How did they make you feel**

11  **uncomfortable?**

12      A.      So, again, I think the environment in

13  general was very difficult because it was not a

14  very cohesive branch.  There was a lot of tension

15  that I came into that I -- over the months that I

16  was there, came to understand there was a lot of

17  racial tension; there was a lot of personal

18  tension between existing employees and it was a --

19  it was a very tough environment from that

20  perspective being a newer employee and trying to

21  deal with the things I was dealing with both

22  personally and trying to just get to know my

23  coworkers and start to make rapports with both

24  customers and my colleagues.  It was just a

1  difficult area in which to do that from, from the

2  branch perspective.

3       Q.        Who was the branch manager?

4       A.        At this time if I'm not mistaken, it

5  was Danielle Llewellyn-Perez.

6       Q.        And what was Ms. Perez's race?

7       A.        As far as I know, she was African-

8  American.

9       Q.        Now, you agree you have to show up on

10 time for work; right?

11      A.        Absolutely.

12      Q.        And on June 11th you hadn't shown up

13 on time for work; correct?

14      A.        Again, based on the exchange, I

15 imagine I was a few minutes late.

16      Q.        Now, you go on to say that you will,

17 quote, just keep on moving and doing the shuffle.

18                Do you see that?

19      A.        And I'm sorry.  Could you give me the

20 time stamp, because this is a very long document.

21      Q.        It was the same e-mail we were

22 reading from before, your 10:43 a.m. e-mail.

23 After you say that they want to write you up for

24 being late you say, quote, So I'll just keep on

1  moving and doing the shuffle.

2              Do you see that?

3       A.       Yes.

4       Q.       What did you mean by "doing the

5  shuffle"?

6       A.       Again, doing my job, doing what was

7  being asked of me, which was, I felt, a little bit

8  difficult in that we did not have a very cohesive

9  branch where people were helping one another.  So

10 it was a stressful environment.  So I just felt

11 that I would just keep focused on doing my job.

12      Q.       Did you often describe your job as

13 "doing the shuffle"?

14      A.       I think I would -- would describe it

15 as something that I just needed to do.  So the

16 nomenclature in which I used I don't think has any

17 great bearing other than to just say that doing my

18 routine, doing the shuffle, doing what I needed to

19 do, keep my head down, I believe, is what I

20 referred to in the last e-mail.  So, yeah, that

21 was certainly what was being messaged down to me

22 as what would be my best -- in my best interest.

23      Q.       Do you agree when somebody describes

24 "doing the shuffle" they're usually referring to

 1 | **putting in the minimum effort necessary?**

 2 |        A.        I'm not aware of that.  I've never

 3 | heard that.

 4 |        **Q.        Have you ever heard a high performer**

 5 | **describe their job as "doing the shuffle"?**

 6 |        A.        I think you --

 7 |                MR. PEARLMAN:  Objection to form.

 8 |                You can answer.

 9 | BY MR. KRAUSS:

10 |        **Q.        Can you answer my question?**

11 |        A.        I think it would be up to that

12 | individual.  Again, I think we all describe the

13 | way in which we do our jobs in various ways.  A

14 | lot of times when you're working on a busy teller

15 | line it's like a dance.  You're moving back and

16 | forth to multiple windows.  So in a way a shuffle

17 | would actually be an apt description but that was

18 | not -- I was not being poetic in that effort.

19 |        **Q.        Let me ask you to turn to the next**

20 | **page of Exhibit 233, your 10:51 a.m. e-mail where**

21 | **you say, No, you just want to go home now; this is**

22 | **not professional.**

23 |                **Do you see that?**

24 |        A.        I do see that.

1      Q.         Okay.  So did you just want to go

2  home at ten of 11:00 in the morning?

3      A.         Again, I think my attitude in this

4  e-mail, as best I can recall, would be that things

5  were not obviously very copacetic in the branch

6  and that I just felt it was an unprofessional

7  environment and I was venting to my wife that it

8  was not -- not a professional environment.  It did

9  not feel very good to be there.

10     Q.         And so you thought it was

11 unprofessional that they expected you to show up

12 on time?

13     A.         No.  I was likely referring to other

14 matters within the branch.  As I referred to

15 earlier, there was quite a bit of existing tension

16 between the staff when I arrived in December and

17 the situation, obviously, did not improve during

18 my tenure there.

19             So, again, I think the comment about

20 professional is not referring to the timing and

21 the timeliness, I think it had to refer to the

22 environment in which we were working, which was

23 very fraught with tension based on interpersonal

24 racist commentary.

ERIN DINGER v BRYN MAWR BANK                                  Page 37
Michael Sutton, 11/04/2020

1      Q.       So you keep referring to
2  interpersonal racist commentary.  Do you mention
3  any of that anywhere in these 22 e-mails with your
4  wife?
5      A.       I don't see that I did.
6      Q.       Okay.  So let's talk about what you
7  did say to your wife.  Let's turn to your
8  11:25 a.m. e-mail where you say you think you
9  might just write up a two weeks notice today and
10  hand it in.
11             Do you see that?
12      A.       I do see that.
13      Q.       So were you thinking of giving your
14  two weeks notice on June 11, 2018?
15      A.       Again, I believe, as I've mentioned I
16  think for the third time, this exchange was me
17  trying to just vent to my wife.  She was, as you
18  can see, very plainly just trying to keep me calm
19  and that I should just, as I've mentioned
20  previously, look for other opportunities within
21  the same bank.
22      Q.       Now, let me ask you to turn to the
23  next page and go to your 2:21 p.m. e-mail.  I'm
24  sorry.  I apologize.  It's your wife's 2:21 p.m.

1  e-mail to you where she says that you can talk

2  about it more tonight and she says, quote, I know

3  you're miserable, but I just don't want you to be

4  in a bad position like last year.

5                   Do you see that?

6       A.       I'm sorry.  Could you give me that --

7  that time stamp again?

8       Q.       It's your wife's 2:21 p.m. e-mail on

9  the second page --

10      A.       It's on the second page.

11      Q.       -- of Exhibit 233.  Do you see that

12  e-mail?

13      A.       Yes.  I do see that e-mail from her

14  at 12:21, sir.

15      Q.       And she says she knows you're

16  miserable.

17                   Now, you were miserable; right?

18      A.       Things were difficult.

19      Q.       Okay.  How long had you been

20  miserable at Bryn Mawr Trust?

21      A.       Again, there was -- there was a lot I

22  think in terms of what was making things difficult

23  for me.  In terms of making things difficult in

24  the branch, it was, again, the amount of the lack

1  of cohesion and the lack of really any decorum for

2  one another which, again, I had learned was a

3  result of people saying very racist things to one

4  another and causing rifts between employees.

5      **Q.       What racist things did you hear**

6  **anybody say?**

7      A.       I heard some commentary by Maggie

8  Intzes to Alicia on at least four occasions

9  referring to her children and how it would be

10  better if she was home with them, that it would

11  really be in their best and in her best interest,

12  and that from her perspective she didn't

13  understand why Alicia wanted to work.  Things of

14  that nature that I felt just were not comments

15  that should be made or opinions that should be

16  voiced about other people's choices in how they

17  have to live their lives.

18      **Q.       Can you remember anything else that**

19  **you heard somebody say that you thought was racist**

20  **at the Media branch?**

21      A.       So, sir, I was not at the Media

22  branch.

23      **Q.       I'm sorry.  At the Ardmore branch; I**

24  **apologize.**

1        A.        At the Ardmore branch I did hear a

2    few comments, again, around particularly with

3    child care that was certainly very racially

4    charged.

5        Q.        I'm sorry.  Tell me who said what.

6        A.        Again, I have a number of instances I

7    can recall that I observed Maggie Intzes speaking

8    to Alicia McDaniel and there was conversation

9    around her race and that again --

10       Q.        I'm sorry.  What was -- who said --

11       A.        Around Alicia McDaniel's race.

12       Q.        What did she say?  What did

13   Ms. Intzes say that mentioned race?

14       A.        She mentioned that she felt it would

15   be better, as she did, to be home with the kids

16   and things of that nature and that that perhaps

17   was something that would be better for Alicia to

18   choose to do given the, you know, the troubles in

19   African-American communities, things of that

20   nature.

21       Q.        And she said "given the troubles in

22   African-American communities"?  Those are the

23   words?

24       A.        It may have been black but, again,

ERIN DINGER v BRYN MAWR BANK                                    Page 41
Michael Sutton, 11/04/2020

 1  that's to the best of my recollection.
 2       Q.        Okay.  Those are the words you heard?
 3       A.        Those are the words I heard.
 4       Q.        Did you hear any other words that you
 5  believed were racist?
 6       A.        I heard other words that were racist
 7  there from customers as well as other employees.
 8       Q.        Any employees?  Name the employee --
 9       A.        So, again, I would say I observed
10  specifically Magdaline Intzes say a few comments
11  that were definitely very racist.
12       Q.        What?
13       A.        Such as suggesting to Alicia that,
14  because she was Greek, that she had a better
15  background for education and things of that nature
16  that I felt if I were African-American I would
17  have felt assaulted by some of these comments.
18              So I can recall talking with my
19  manager, Danielle Llewellyn-Perez, who was
20  African-American, in an effort to have her talk to
21  the two of them and see if we couldn't, again, get
22  to the bottom of this.
23              The environment had become such that
24  they could not work well together, obviously, and

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  it had become a weight around the branch's neck

2  effectively.  So I simply observed a few things

3  and made what I felt was my best effort to bring

4  it to the attention of the manager who was aware

5  of it and, again, told me to focus on my job.

6      **Q.      And do you recall anybody else who**

7  **worked for Bryn Mawr Trust saying anything that**

8  **you thought was racist?**

9      A.      I can recall working at the Bryn Mawr

10  branch for, I believe, four days filling in at one

11  point and hearing a lot of, again, commentary that

12  was not directed anywhere at me, but about there

13  being racial issues within that branch.

14      **Q.      My question is, tell me who said**

15  **what.  Do you recall anybody at the Bryn Mawr**

16  **branch, give me a name, saying something that you**

17  **recall hearing them say that you thought was**

18  **racist?**

19      A.      I believe I was working with a woman

20  by the name of Shakeena at the time.  I apologize

21  if I get that name incorrect.  And I just can

22  recall Mrs. Biernacki, who was the district

23  manager, making a comment to her that upset her at

24  the drive-through and, again, I don't --

ERIN DINGER v BRYN MAWR BANK                                    Page 43
Michael Sutton, 11/04/2020

1       Q.        What comment?

2       A.        I don't recall the exact comment as I

3  was actually at another window, but I recall that

4  Shakeena was very upset and did make mention that

5  she felt very uncomfortable about Mrs. Biernacki's

6  language.

7       Q.        Were you in the drive-through?

8       A.        I was not at the drive-through at the

9  time.

10      Q.        So all you observed is that Shakeena

11  Wilson was upset?

12      A.        Yes.  She came back out and was upset

13  and needed to take a break.

14      Q.        So my question to you again is, you

15  said you heard people who worked for Bryn Mawr

16  Trust say things that you believe are racist.

17  Tell me who said the words and what words you

18  heard.

19      A.        Again, I heard a number of

20  conversations between Magdaline Intzes and Alicia

21  McDaniel around what Alicia should be doing from

22  Magdaline's point of view which I felt, again,

23  were not conversations that were collegial or

24  appropriate.  And, again, I heard a number of

1  times suggestions about how she could be doing

2  more for her family, doing more for, again, for

3  her kids by leaving, and that that was something

4  that would benefit her and something that was a

5  problem for -- Maggie saw it as a problem in

6  African-American communities.

7       **Q.      So you've talked about this child**

8  **care example several times.  Did you hear**

9  **Magdaline Intzes say anything else that you**

10 **thought was racist?**

11      A.      I can remember one other comment that

12 was made, I believe, at a morning meeting that was

13 something about allowing, you know, the control in

14 the house should be with the man and that, you

15 know, she should let -- empower her husband to do

16 more.

17      **Q.      Okay.**

18      A.      Which, again, I just felt, just from

19 the dynamics, just felt like a very improper basis

20 for a conversation.

21      **Q.      Do you recall hearing anyone else say**

22 **anything that you thought was racist?**

23      A.      I can recall those instances between

24 Alicia and Mrs. Intzes that I witnessed directly.

 1       Q.       Okay.  Do you recall any others?  I'm
 2  just trying to understand what -- what you saw,
 3  what you heard.  Did you hear or see anything else
 4  or have you now exhausted your recollection of
 5  what you saw and heard?
 6       A.       Again, I think I've answered the
 7  question.
 8       Q.       Well, the question is, did you hear
 9  or see anything else?
10       A.       Aside from the comments around the
11  household and child care and what Alicia should be
12  doing, I did not hear anything else, but they were
13  very much in terms of a racial context.
14       Q.       Okay.  And you said that when you
15  were working at Bryn Mawr branch for four days --
16  by the way, was it four consecutive days?
17       A.       If I recall, I believe it was two or
18  three days in one week and maybe the Monday
19  following.
20       Q.       And why were you working at the Bryn
21  Mawr branch?
22       A.       I believe they had people out.
23       Q.       And were you stepping in as a
24  substitute head teller?

1       A.        If I recall correctly, yes.

2       Q.        Okay.  So Wandrea Russo was not at

3  the branch when you were there; correct?

4       A.        No.  She was not in the branch when I

5  was at that branch.

6       Q.        So is it fair to say that you've

7  never actually worked alongside of Wandrea Russo?

8       A.        I never worked alongside Wandrea

9  Russo.  I only worked in the Ardmore branch.  I

10  worked a few days in the Bala Cynwyd branch.  I

11  worked a few days in the Bryn Mawr branch, but I

12  did not work directly alongside Wandrea.

13       Q.        So is it fair to say you've never

14  observed Wandrea Russo work?

15       A.        I've never seen her working.  I've

16  never been in Bryn Mawr's branch when she was

17  there.  The four occasions I was there she was not

18  in attendance.

19       Q.        Do you know Wandrea Russo?

20       A.        I don't know her personally.  I've

21  never met her.

22       Q.        So you said when you were working at

23  the Bryn Mawr branch you saw Shakeena Wilson being

24  upset.  My question to you is, when you were

1  **working at the Bryn Mawr branch, did you see or**

2  **hear any Bryn Mawr Trust employee say or do**

3  **something you thought was racist?**

4       A.        Again, in my brief period in the Bryn

5  Mawr branch, I did not observe anything directly.

6  However, I did observe one client make an

7  inappropriate comment to Shakeena when she was in

8  the next window to me.  But sadly, the clients, we

9  don't have any recourse around their dialogue.

10      **Q.        Fair to say you can't control what**

11 **clients say?**

12      A.        Can't control what the client says is

13 right.

14      **Q.        And is it fair to say that if you're**

15 **in a customer-facing position that occasionally**

16 **you have to put up with crazy clients; correct?**

17      A.        It's fair to say that in a

18 customer-facing role there are occasionally times

19 where you have to deal with people who are upset.

20      **Q.        And, in fact, if you're in a**

21 **customer-facing role, part of your job is not**

22 **reacting when some customer says something that**

23 **you believe is either offensive or wrongheaded.**

24 **Is that fair?**

 1       A.       I don't think it's -- I don't think

 2  we were ever instructed to correct clients in

 3  terms of what they were saying if they were saying

 4  anything crazy or inappropriate.  I think we were

 5  at most allowed to say, you know, I prefer we

 6  don't discuss that or just try to change the

 7  topic.  But I can't recall anything beyond that in

 8  terms of our training.  Or, you know, I certainly

 9  would try and change the topic when things would

10  come up with my customers who were upset or had

11  something I did not want to discuss.

12       **Q.       Now, in your wife's e-mail on**

13  **12:21 p.m. that's part of Exhibit 233, she said**

14  **that she didn't want you to be in a bad position**

15  **like last year.  What was that referring to?**

16       A.       So if I recall correctly, I had a

17  volunteer job with Joe Torsella in 2016 and was

18  hoping to get a job then working with them, and I

19  had taken some classes and the job did not work

20  out basically.

21               So I don't think it was anything that

22  was -- "a bad position," I think my wife is just

23  referring to, you know, just want to have a plan

24  for what you want to do to move forward.

1       Q.         What was the bad position you were in
2   last year?
3       A.         So I think what she's referring to is
4   I was on the job hunt again.
5       Q.         And you said, It's fine; don't worry
6   for me; I like the pain.  Correct?
7       A.         In my response back to her I do say,
8   yes, don't worry about me.  I like the pain.  I
9   think that was me being dramatic and venting to my
10  wife.
11      Q.         You were often dramatic, weren't you?
12      A.         I think I like to vent to my wife
13  because I couldn't have -- I didn't have a great
14  support system in the branch.
15      Q.         You were talking about quitting your
16  job and getting your CPA; correct?
17      A.         I'm sorry?
18      Q.         You were talking about quitting your
19  job and getting your CPA; correct?
20      A.         In this document?  I don't see that.
21      Q.         You've talked about that with your
22  wife, right, quitting your job -- when you were
23  working at Bryn Mawr, you were talking about
24  quitting your job as a teller and getting your

 1  CPA; correct?

 2      A.        I don't recall that direct

 3  conversation.  I know I've taken a few accounting

 4  classes.

 5      **Q.        Let me show you what's been marked as**

 6  **Exhibit 238.  Exhibit 238 is another very long**

 7  **series of e-mails you exchanged with your wife.**

 8              **Do you see that?**

 9              MR. PEARLMAN:  Take your time and

10  review it.

11              THE WITNESS:  If I may, thank you.

12  BY MR. KRAUSS:

13      **Q.        The foundation question is, this is a**

14  **long series of e-mails you exchanged with your**

15  **wife, right, Mr. Sutton?**

16      A.        As I'm reviewing the e-mails, these

17  do seem to be an exchange of e-mails between

18  myself and my wife, that is correct.

19      **Q.        And you sent them while you were at**

20  **work at Bryn Mawr Trust; correct?**

21      A.        Yes.  I sent them from work while I

22  was at Bryn Mawr Trust.

23      **Q.        And the Subject line is, May not be**

24  **able to e-mail much.**

```
 1                    Do you see that?

 2        A.        I do see that.

 3        Q.        And after saying that you might not

 4   be able to e-mail your wife much, you exchanged 20

 5   e-mails with her that day; correct?

 6        A.        Yes.  I do -- I do see that we

 7   exchanged a number of e-mails on that Tuesday.

 8        Q.        It's 20 of them; right?

 9        A.        It's a good number.

10        Q.        Well, let's go through it.  Let's

11   start at the beginning and work backwards because

12   it's easier.  The first at the top of the first

13   page of Exhibit 238, that's the first; correct?

14        A.        Yes.

15        Q.        Then there's a second on that page;

16   correct?

17        A.        Yes.

18        Q.        Then a third on that page; correct?

19        A.        Yes.

20        Q.        And you turn the page and you see the

21   fourth, the fifth, the sixth, the seventh, and the

22   eighth; correct?

23        A.        I do.

24        Q.        Turn the page again and you see the
```

1  ninth, the tenth, and the eleventh; correct?

2      A.      Yes.  Is there a question?

3      Q.      And then we're just trying to

4  establish how many e-mails there are.

5      A.      There's 20, I believe.

6      Q.      On the next page the twelfth, the

7  thirteenth, the fourteenth, the fifteenth, and the

8  sixteenth; correct?

9      A.      Yep.

10     Q.      And the next page, the seventeenth,

11  the eighteenth, and the nineteenth; correct?

12     A.      I do see that.

13     Q.      And then on the last, the twentieth;

14  correct?

15     A.      Correct.

16     Q.      Okay.  So how many e-mails would be

17  much to exchange with your wife?

18     A.      That would be depending again on the

19  day.  I type very quickly.  As you can see, it's

20  not long dialogue.

21     Q.      So do you believe it was distracting

22  you from your work to be e-mailing your wife 20

23  times a day?

24     A.      I don't think it was as it was not

1  impacting my performance as far as I'm aware.

2     **Q.        Let me ask you to turn to the**

3  **eighteenth e-mail in the series.  This is your**

4  **10:19 a.m. e-mail.**

5            **Do you have that one?**

6     A.        Yes, I do.

7     **Q.        And you say, They've made the**

8  **announcement that tolls the bell of the end of**

9  **tellers effectively.**

10    A.        Uh-huh.

11    **Q.        We are buying TCR machines which will**

12 **automatically dispense and take money so tellers**

13 **are now essentially dinosaurs in banking.**

14           **Did I read that correctly?**

15    A.        That is -- that is the text.

16    **Q.        Okay.  What were you referring to?**

17    A.        I was referring to, again, TCR

18 machines which are automated machines that

19 dispense and take money.  This is actually

20 something that was commonly happening, and has

21 happened throughout many banks, in an effort to,

22 again, streamline operations.

23    **Q.        Is it fair to say that tellers are**

24 **going the way of the dinosaurs and it's moving to**

1    a universal banking model?

2         A.        I think that's fair to say.

3         Q.        And is it fair to say that if you

4    don't move over into universal banking, odds are

5    your teller job is going to disappear; correct?

6         A.        Again, that is my sense from having

7    worked at this bank and several other institutions

8    that that is the trajectory of banking.

9         Q.        At the top of that page of Exhibit

10   238 you say to your wife that, The future is going

11   back to sales side of retail or get a job doing

12   something else.  I think I'm going to get my CPA

13   maybe.

14                  Did I read that correctly?

15        A.        You are reading that correctly.

16        Q.        And was that your plan at the time?

17        A.        So, again, throughout this exchange

18   I'm trying to discuss with my wife what the

19   implication is and I think she's providing me some

20   good direction around thinking about finding other

21   jobs within the bank she has in several of these

22   e-mail exchanges we've now reviewed.  So the fact

23   that I had taken a few accounting classes might be

24   why I thought of CPA in the moment.

```
 1        Q.        So on the third page of Exhibit 238
 2   you, at 11:49 a.m., complain about the vacation
 3   schedule.
 4                  Do you see that?
 5        A.        Uh-huh.
 6        Q.        You have to say "Yes."
 7        A.        I do.  I see that.  Yes, sir.
 8        Q.        And then your wife asks what was
 9   Ms. Perez's problem.
10                  Do you see that?
11        A.        I do see that she asked me that
12   question.
13        Q.        And then you go on to say, quote, I
14   think she thinks they are taking me from her and
15   since she's petty she's taking it out on me.  Nice
16   folks.
17                  Did I read that correctly?
18        A.        That -- that is what I wrote.
19        Q.        And what were you referring to when
20   you wrote that?
21        A.        So, again, it sounds like, again,
22   there was transition in the branch.  If I recall,
23   they were at the time sending me to training.  I
24   had previous in other bank jobs worked on the
```

1  platform side.  So it was not something that was

2  new to me.  But, again, I think that I was venting

3  to my wife about difficulties, you know, in work.

4      **Q.      Did you believe that your job at Bryn**

5  **Mawr Trust was a step down from the jobs you had**

6  **previously held in banking?**

7      A.      I felt that it was a good opportunity

8  for me, because I had certainly worked in that

9  position.  I had worked in banking previously.  My

10  wife and I were trying and we eventually did have

11  a child.  My hope was that I could have a good

12  stable job that I could be around more for my son

13  than my father was for me.  So it was actually a

14  fine job in that respect.  So I hoped -- I had

15  hoped to keep it.

16      **Q.      So you and your wife had been trying**

17  **to have a child for quite a while; correct?**

18      A.      During -- during this time, yes, we

19  had been working to have a child.

20      **Q.      In fact, you were going through**

21  **infertility treatments; correct?**

22      A.      Yes.  We were going to infertility

23  treatments, sir.  Thank you.

24      **Q.      And your wife made partner in, what,**

1  February or March of 2018?

2      A.      I don't recall exactly when she did.

3      Q.      **Do you remember it was in early 2018?**

4      A.      I believe it was mid to late, but I

5  don't exactly recall the date.

6      Q.      **Okay.  Well, clearly by July she's a**

7  **partner; correct?**

8      A.      Based on, again, her e-mail

9  signature, I believe that is the case.

10     Q.      **And what was your plan for child care**

11 **after you had a baby?**

12     A.      We were going to send our son to day

13 care and I would be able to drop him off before

14 work and pick him up afterwards.

15     Q.      **Okay.  You said your wife made eight**

16 **to ten times as much as you did; correct?**

17     A.      Eight to ten times --

18     Q.      **Yeah.**

19     A.      -- as much as I did at the time?

20     Q.      **Yeah.**

21     A.      I don't think that's an accurate

22 figure.  If I wrote that, it would be an

23 exaggeration even based on her current salary.

24     Q.      **You exaggerate a lot when you write,**

1  **don't you?**

2              MR. PEARLMAN:  Objection to form.

3              THE WITNESS:  I think that's a gross

4  overcharacterization.

5  BY MR. KRAUSS:

6      **Q.        Let me go back and finish the e-mail**

7  **we were discussing on the third page of Exhibit**

8  **238.**

9      A.        I'm sorry.  Are we back to the third

10 page now, sir?

11     **Q.        Yes.**

12     A.        Okay.  Thank you.

13     **Q.        After you said that you thought that**

14 **Ms. Perez was taking it out on you and was being**

15 **petty, you go on to say, quote, I guess it's best**

16 **to talk to Therese, the new manager, in August**

17 **when she's back from PTO and in our office.  I've**

18 **heard she's understanding of logic so we will see.**

19             **Did I read that correctly?**

20     A.        That is what I wrote.

21     **Q.        Okay.  So the Therese you were**

22 **referring to, who is that?**

23     A.        I believe it was Therese Trainer and,

24 again, I had never met her.  I had only heard of

1  her and what I had heard to this date was not very

2  complete information but --

3      **Q.        But you had heard to that date was**

4  **that she was understanding of logic; correct?**

5      A.        My hope I believe in that statement

6  was that she would be understanding of logic.

7      **Q.        Did you believe on July 17, 2018 that**

8  **Therese Trainer would be a better manager for you**

9  **than Ms. Perez?**

10     A.        I don't believe I felt that.  I think

11  I was hopeful that change would hopefully provide

12  a better environment than what we were currently

13  working in, which was a very hostile day-to-day

14  environment.

15     **Q.        Now, on the first page of Exhibit 238**

16  **you wrote in your e-mail, quote, I think I can**

17  **hide most of my sensitive things from upstairs**

18  **here under our bed with creativity or with some**

19  **cleverness and confidence in where it will be dry,**

20  **the basement as well, to prevent any issues.**

21              **Did I read that correctly?**

22     A.        Uh-huh.

23              MR. PEARLMAN:  "Yes"?

24              THE WITNESS:  Yes, you read that

 1  correctly.

 2  BY MR. KRAUSS:

 3        **Q.        What were you referring to?**

 4        A.        Sensitive papers and things that I

 5  had consolidated from my mother's home, memories

 6  and things of that nature, and just that we could

 7  -- we were in the process of getting air

 8  conditioning, if I recall, in the next month and

 9  so I was trying to figure out where we could store

10  things so that they would be safe with obviously a

11  lot of work going on in the house.

12        **Q.        So you knew it was important to store**

13  **important papers safely; correct?**

14              MR. PEARLMAN:  Objection.

15              THE WITNESS:  Again, these were --

16  these were mementos from my childhood so I -- I

17  had them and wanted to store them to save them.

18  So, yes.  As I had mentioned in the prior sentence

19  that I had taken them from my father's.  So yes,

20  those were -- those are just a few childhood

21  memories that I wanted.

22  BY MR. KRAUSS:

23        **Q.        A couple of answers ago you were**

24  **referring to what you characterized as the hostile**

1  day-to-day environment at the bank.  Did you

2  mention anything about a hostile day-to-day

3  environment anywhere in these 20 e-mails you

4  exchanged with your wife?

5          A.        Again, I think you --

6              MR. PEARLMAN:  You're asking did he

7  use those words?

8              THE WITNESS:  I don't think I used

9  that nomenclature, but I think the tenor of the

10 e-mail certainly speaks to me being very stressed

11 and me being -- again, dealing with a lot both at

12 work and with -- interpersonally with others at

13 the bank.

14 BY MR. KRAUSS:

15         Q.        So you're flipping through Exhibit

16 238.  Please point me to anywhere you believe you

17 discussed a hostile day-to-day environment at the

18 bank.

19         A.        I just think -- again, I wasn't

20 referring to anything overtly hostile.  I did

21 mention as you mentioned on my e-mail on -- at

22 12:04 p.m. where I'm talking about, again, what I

23 felt was some heady behavior and that there were

24 things that I felt didn't make sense.  So while

1   I'm not being overt in my language, I think one

2   can certainly see that there were issues.

3       **Q.        And the issue you were referring to**

4   **was the scheduling of your vacation; correct?**

5       A.        In that specific e-mail, again,

6   referring to the 12:04 e-mail from these 20

7   exchanges, I was referring to, again, the issue

8   about I had communicated a request and I was not

9   able to take it.  So my wife and I had to cancel

10  our small vacation.  It was not much more

11  substantive than that.

12      **Q.        Let me show you what's been marked as**

13  **Exhibit 234.  Exhibit 234 is an e-mail you sent to**

14  **your wife attaching an article about Wandrea**

15  **Russo's discrimination claims against Bryn Mawr**

16  **Trust.**

17            **Do you see that?**

18      A.        I do see that.

19      **Q.        And what you wrote to your wife was,**

20  **quote, So makes sense now that I was in Bryn Mawr**

21  **last few weeks.**

22            **Did I read that correctly?**

23      A.        Yes.  You're reading that correctly.

24      **Q.        So reading this article that you**

1  **attached to Exhibit 234 was the first time you**

2  **learned of Wandrea Russo's claims; correct?**

3        A.       I can hardly make out anything but

4  the title, but I believe that would be the first

5  that I was ever aware of this issue at the Bryn

6  Mawr branch.

7        **Q.       Okay.  And, in fact, your wife was**

8  **shocked to receive it; correct?**

9        A.       I think my wife was surprised that at

10 the -- at the fact that the main branch had a lot

11 of the same issues that I appeared to be

12 experiencing in Ardmore as an observer.

13       **Q.       Now, let me show you what's been**

14 **marked as Exhibit 246.  Exhibit 246 at the**

15 **beginning picks up with the e-mail you sent,**

16 **Exhibit 234; correct?**

17       A.       I'm sorry.  Let me -- yes, I do.  I'm

18 reading the exchange now.

19       **Q.       And what was your wife's response**

20 **when you sent her the article that was attached to**

21 **Exhibit 234?**

22       A.       Her response was, "Holy crap."

23       **Q.       Now, you had preexisting issues with**

24 **anxiety and trouble sleeping; correct?**

 1        A.        Yes.  I have -- I have a long history

 2   of anxiety as a result of a traumatic brain

 3   injury.

 4        **Q.        What injury?**

 5        A.        I was in a car accident in 2003.

 6        **Q.        And what was the nature of your**

 7   **injury?**

 8        A.        I had a hemorrhage in my brain.

 9        **Q.        And what treatment did you receive**

10   **for that?**

11        A.        I don't understand the relevance of

12   that procedure to -- from 2003 to what we're

13   discussing today.

14        **Q.        Can you answer my question, please?**

15        A.        Could you repeat the question?

16        **Q.        What treatment did you receive for**

17   **the hemorrhage in your brain?**

18        A.        So I was medevaced to Hahnemann

19   Hospital.  I received a number of days of

20   emergency medical care there.  Thereafter, I

21   worked with a Dr. Maitz eventually in Philadelphia

22   to work to recover a number of other issues that I

23   had from the traumatic brain injury and post-

24   concussion syndrome.

1      Q.        Did you seek psychiatric care?

2      A.        Yes, I sought psychiatric care.

3      Q.        Have you been under the care of a

4   psychiatrist since 2003?

5      A.        I have been at times under the care

6   of a psychiatrist or a psychologist, depending on

7   the time and depending on the situation for 20

8   years.

9      Q.        Let me show you what's been marked as

10  Exhibit 72.  Exhibit 72 is another e-mail exchange

11  with your wife; correct?

12     A.        Yes.  This is an e-mail exchange with

13  my wife from February of that same year.

14     Q.        Okay.  Now, it starts off with your

15  e-mailing your manager, Ms. Perez, requesting a

16  mental break.

17               Do you see that?

18     A.        I do see that.

19     Q.        And you say that you are simply

20  overwhelmed at that point with your mother

21  actively dying.

22               Do you see that?

23     A.        Yes.

24     Q.        And you asked to cover everybody

 1  else's lunch and then leave early that day;

 2  correct?

 3        A.        Yes.  I did ask to leave early that

 4  day.

 5        Q.        And she let you; correct?

 6        A.        If I'm not mistaken, she did.  Again,

 7  because my -- the doctors were worried my mother

 8  might pass that day.

 9        Q.        And at the end of the second

10  paragraph of your e-mail you said that the

11  Catholic church was being difficult about honoring

12  your mother's funeral wishes; correct?

13        A.        Yes.  That was a challenge to deal

14  with.

15        Q.        And you went on to say, quote, I

16  understand that I will need some more time in the

17  future for the funeral which we are planning to do

18  on a Saturday to avoid work interference.

19        A.        Uh-huh.

20        Q.        Did I read that correctly?

21        A.        Yes.

22        Q.        So you were the one selecting the

23  funeral date; correct?

24        A.        My mother did not pass for another

 1   month.  So, again, I was trying both to visit my

 2   mother at this time.  I also had been trying to

 3   work with my manager to leave early, I believe, on

 4   a Wednesday every other week to attend a group

 5   therapy for people who had or were going through

 6   parents who were dying and I was not allowed to

 7   leave early for that.  I do recall being allowed

 8   to leave early this day.

 9        **Q.        So you weren't allowed to change your**

10   **schedule to leave early every week?**

11        A.        Again, I spoke to my manager well in

12   advance.  This -- my mother had been hospitalized

13   on January 10th completely unexpectedly.  We had

14   no sense that she was going to die until she was

15   hospitalized and they started their treatment of

16   her.

17               So in understanding that I was a new

18   employee, I was trying to proactively work with my

19   boss so that she understood what was happening

20   with my family and that I could, again, work to

21   accommodate what I felt would be reasonable, a

22   reasonable request such as being able to have time

23   to see my mother if she was passing that night,

24   and as things drew out, to also occasionally talk

1   to someone about the emotions I was going through.

2                   So I did understand that I would need

3   to plan her funeral as that was something my

4   father had asked me to do for him.

5        **Q.        But the point is, you were the one**

6   **that was picking the date; correct?**

7        A.        Again, I was not the one picking the

8   date at the time.  I made the suggestion because

9   it had been made very clear to me that there was

10  not a lot of flexibility with work.  So I

11  initially brought that up, again, in just any

12  effort to get a break in the three weeks since my

13  mother had been diagnosed with this very horrible

14  disease.

15                  So my sense from this e-mail is that

16  I was simply trying to be proactive and to discuss

17  all options that would be on the table.  However,

18  the only time that this was addressed, again, was

19  directed to me again later in that month and it

20  was not a request; it was a -- I'm sorry -- it was

21  a request but it was not an option as it felt to

22  me.

23       **Q.        Did you believe that Ms. Perez was**

24  **understanding of your situation?**

1     A.        I did not feel that she was in that I

2  can recall in January, I believe, while my mother

3  was still in the hospital, talking to her about

4  meeting to -- or wanting to try and do group

5  therapy as we were settling at the vault.

6              And she said to me that we were

7  working for sales and pushing because it was the

8  first quarter and that she could always talk to me

9  as her father had passed when she was young.

10             That to me was not a very good

11  substitution for professional care given the

12  situation I was going through nor was the idea of

13  reaching out to any EAP through Bryn Mawr ever

14  brought up to me as a resource to use.

15             So, you know, again, I was trying to

16  be proactive because no one else was being

17  proactive in trying to manage the situation.

18     **Q.        Were you aware of the existence of**

19  **EAPs?**

20     A.        I was -- I was aware the existence of

21  an EAP.

22     **Q.        Did you get your health insurance**

23  **through Bryn Mawr or through your wife's law firm?**

24     A.        I believe we got it through my wife's

ERIN DINGER v BRYN MAWR BANK                                    Page 70
Michael Sutton, 11/04/2020

```
 1  law firm.
 2       Q.        And did your wife's law firm have an
 3  EAP?
 4       A.        I believe they do.
 5       Q.        Okay.  Now, given that you were
 6  already under the care of a psychiatrist, did you
 7  believe that --
 8       A.        May I clarify?  I was under the care
 9  of psychologist.
10       Q.        I apologize.
11       A.        It should not make a difference but
12  --
13       Q.        Given that you were under the care of
14  a psychologist, did you believe that you needed an
15  EAP?
16       A.        I believe that I needed to have some
17  dialogue with my work, because I had been recently
18  employed, and this very much came out of left
19  field.
20            In an effort to be a professional, in
21  an effort to ensure that my job was not being
22  jeopardized, I tried to get ahead of the situation
23  and be proactive.  I was very much under stress
24  and strain in trying to take care of my mother,
```

 1  who lived about an hour from us, in a very

 2  difficult situation.

 3            So, again, I think it was my effort

 4  initially in the few weeks thereafter to be

 5  proactive and be very clear about what my

 6  situation was with my mother so that there would

 7  -- there was an understanding and an open dialogue

 8  around it in the hopes that there would be some

 9  compassion, but...

10      **Q.      Do you believe that Ms. Perez was**

11  **compassionate?**

12      A.      I did not get much sense of

13  compassion from -- from both Ms. Perez, nor from

14  Ms. Biernacki.

15      **Q.      So let me ask you to turn back to**

16  **Exhibit 72.  You tell your wife, after forwarding**

17  **to her your e-mail asking work for a mental break,**

18  **that the, quote, Big issue you have is dogramji**

19  **(sic) told me he can't do anything for you to help**

20  **sleep or anxiety.**

21            **Did I read that correctly?**

22      A.      Yes.  So, again, Doghramji, who's my

23  primary care physician, wanted to see me face to

24  face.  That was difficult to do given my work

1    schedule.  So in that time he could not help me at

2    that moment.  So that was something I was

3    frustrated about and venting to my wife.

4         **Q.       And you said that your doctor had**

5    **told you to take two clonezpam (sic) with**

6    **belsombra (sic) at bedtime and that you would**

7    **sleep fine; correct?**

8         A.       That was his suggestion, correct.

9         **Q.       And you said you reminded him that**

10   **that's been your prescription for two years and**

11   **it's not helping; correct?**

12        A.       Yes.  That is what I had told him at

13   the time.

14        **Q.       And then you said, quote, She's also**

15   **making me feel terrible about wanting to go out**

16   **there today like I'm a jerk.  Going to write to L**

17   **about it.**

18        A.       Yes.

19        **Q.       What were you referring to?**

20        A.       So, again, in my request from that

21   morning in asking to leave early to see my mother

22   it was -- my father had called, he was being told

23   that my mother would pass that afternoon.  I was

24   being made to feel that I was putting everyone

1  else out by wanting to leave early that day, and

2  as Ms. Biernacki had recently come in as the new

3  district manager in, I want to say two, three

4  weeks prior to this, I -- I believe I reached out

5  to her and just in an effort to, again, see if

6  there was any way, given that she's in charge of

7  the district, that she could put someone in

8  Ardmore to help provide me a break.

9            I was just trying to seek any remedy

10 I could knowing that there may be in the coming

11 weeks my mother dying; I may need time off to deal

12 with both the arrangements and, you know,

13 processing the event.  So that was the thrust of

14 what I was saying to my wife in that -- in that

15 moment.

16     **Q.      You mentioned a few moments ago about**

17 **your father being told your mother might die that**

18 **day.  Was he told that she might die that day?**

19      A.      Yes.  He was told that she might die

20 that day.  Her breathing was failing.  It was not

21 a good situation.  I don't know if you've ever

22 witnessed someone dying of COPD, but it is a very

23 rough, very rough and unpredictable disease.  So

24 it was very -- there were a number of times

 1  throughout my mother dying over the course of two

 2  months in which they thought she might die because

 3  of her breathing failing.

 4      Q.        Now, you also say that you had PTSD;

 5  correct?

 6      A.        I do have PTSD, that is correct.

 7      Q.        From what?

 8      A.        From the traumatic brain injury that

 9  I referred to earlier.

10      Q.        Let me show you what's been marked as

11  Exhibit 226.  Exhibit 226 is another series of

12  e-mails you exchanged with your wife; correct?

13      A.        It is.

14      Q.        And you start off by saying, quote,

15  I'm still feeling very guilty about my sleep

16  fighting.

17                Do you see that?

18      A.        Uh-huh.  I do see it, yes, sir.

19  Sorry.

20      Q.        And what did you mean by that?

21      A.        So I had -- the night before I had

22  been I guess pulling around the blankets and my

23  wife thought I was having a fight in -- in bed.

24  So it was me making a joke.

1      Q.        You went on to say, quote, I really
2   don't know how to keep my head up.
3               Did I read that correctly?
4      A.        That is what I wrote, yeah.
5      Q.        Okay.  And what were you referring
6   to?
7      A.        I think I was referring to, again,
8   just trying to keep positive and just try and be
9   bouncy and, you know, positive, which is frankly a
10  big requirement of being in a customer-facing
11  role.  So it was difficult for me to put on my
12  happy face that day.
13     Q.        Your wife asked you if you thought it
14  might be PTSD related.
15              Do you see that?
16     A.        Yes.
17     Q.        And you responded, quote, I
18  absolutely would think it's PTSD related.  Those
19  arshlocks (sic) have put me in a world of hurt
20  long before all of this has been going on.
21     A.        Uh-huh.
22     Q.        Did I read that correctly?
23     A.        Uh-huh.
24              MR. PEARLMAN:  "Yes"?

 1              THE WITNESS:  Yes, you read it
 2    correctly.  I apologize for not enunciating.
 3    BY MR. KRAUSS:
 4        **Q.        Which arschlochs were you referring**
 5    **to?**
 6        A.        So, again, in this exchange the
 7    arschlochs I'm referring to would be my wife's --
 8    or sorry -- my mother's brothers who were causing
 9    a lot of drama at the moment in trying to -- they
10    were calling my mother and telling her information
11    that was not accurate as to her health which,
12    since she was experiencing a lot of confusion due
13    to oxygen deprivation, it was very difficult.  So
14    I was just referring to my uncles as arschlochs.
15    It's a German phrase for -- you can figure it out.
16        **Q.        And how had your uncles put you in a**
17    **world of hurt long before all of this was going**
18    **on?**
19        A.        My uncles were always very demeaning
20    to my mother in their interactions, and
21    particularly around this, we referred to an e-mail
22    previously where I was explaining to Danielle I
23    was dealing with the extended family visitations,
24    they were, again, in contact with my mother and

 1  confusing her about her situation and causing a

 2  lot of drama for my father and my family.

 3              So I was just referring to their lack

 4  of common sense and their lack of compassion to us

 5  as a family.

 6      Q.      Did you believe that your uncles

 7  lacked compassion?

 8      A.      I do believe my uncles lacked

 9  compassion.

10      Q.      Now, when you refer to all of this

11  that's going on, what was the "this" that you were

12  referring to?

13      A.      Sir, that would be my mother dying, I

14  believe, based on, again, these -- these few

15  e-mails that are really talking about my sleep and

16  how I was having a difficult time with my mother.

17      Q.      So you've testified that you had

18  preexisting anxiety and sleep issues; correct?

19      A.      That's correct.

20      Q.      And you had preexisting PTSD?

21      A.      (Witness nods.)

22      Q.      "Yes"?

23      A.      That is correct.

24      Q.      Had you told anybody at Bryn Mawr

1  **Trust about these preexisting conditions?**

2      A.      I can't imagine that I would have

3  kept anything hidden about.  I was pretty open

4  with people and I am pretty open to people about,

5  again, trying to interrelate personally.  So I

6  don't think if anyone had asked me that I would

7  have ducked the question if that what is what --

8  I'm struggling to understand the thrust of the

9  question.

10          MR. PEARLMAN:  Just listen to his

11  question.

12          THE WITNESS:  Sorry.  Could you

13  repeat?

14  BY MR. KRAUSS:

15      Q.      **Had you asked for any accommodations**

16  **because of any of these conditions?**

17      A.      I had certainly asked for

18  accommodations around the stress that I was

19  experiencing.  I'm sure that I had talked to

20  people, both my immediate supervisor and my

21  district manager, about how this entire experience

22  was very overwhelming.

23          However, as to directly recalling

24  that PTSD was brought up by me, I cannot

1  specifically speak to it.  I certainly was

2  speaking to the fact that I was overwhelmed and

3  anxious and any interaction I was having around

4  trying to manage the stress of my mother and the

5  care she needed.

6       Q.       Well, you said that you've asked Bryn

7  Mawr Trust, for example, to be able to leave early

8  because your mother was ill; correct?

9       A.       Yes, on that date, yeah.

10      Q.       Do you ever recall asking Bryn Mawr

11 Trust to make any accommodation to you because of

12 your PTSD?

13      A.       I cannot directly recall any

14 accommodation directly related to PTSD.

15      Q.       Do you recall asking Bryn Mawr Trust

16 for any accommodation for your sleep disorders?

17      A.       I don't recall asking for an

18 accommodation specifically related to my sleep

19 disorder.  The only accommodation that I can

20 recall asking for in this time was that I would

21 gladly take any days that I would need to be out

22 unpaid understanding that it was early on in my

23 employment and that it was a difficulty for the

24 branch if I needed to be out to make funeral

1  arrangements and so forth for my mother.

2      **Q.**      **Had you asked Bryn Mawr Trust for any**

3  **accommodations for your preexisting anxiety?**

4      A.      Not to my recollection.

5      **Q.**      **Okay.  So do you have any other**

6  **medical conditions that you haven't testified**

7  **about already?**

8      A.      I don't have any other medical

9  conditions that I have not testified about beyond

10 post-traumatic stress, anxiety.  I believe you all

11 know that I have asthma, controlled thankfully,

12 from -- I believe from rescheduling this

13 deposition at one point.  But I don't have any

14 other health issues beyond that.

15             MR. PEARLMAN:  Let's take a break.

16             MR. KRAUSS:  Go off the record.

17             VIDEOGRAPHER:  Off the video record,

18 11:53 a.m.

19                    RECESS

20             VIDEOGRAPHER:  We're back on the

21 video record, 12:13 p.m.

22 BY MR. KRAUSS:

23     **Q.**      **Mr. Sutton, do you believe that Bryn**

24 **Mawr Trust damaged you?**

1      A.        Could you be more specific?

2      **Q.        Do you believe you were harmed by**

3  **Bryn Mawr Trust?**

4      A.        I think it was a harmful experience

5  in that it was certainly not what I expected based

6  on my prior banking experience that that would be

7  what I would experience in terms of, again, the

8  environment and also in terms of just the

9  communication in the branch.  It was very

10  different from other banking environments I had

11  been in.

12      **Q.        Do you believe it harmed you**

13  **financially in any way?**

14      A.        Yes, I do believe it harmed me

15  financially in that I -- I did not have a job

16  anymore.

17      **Q.        Okay.**

18      A.        And it's been a challenge -- it was a

19  challenge when I was trying to get a new job in

20  financial services and, as a result, I decided to

21  make a move into teaching as a career change.

22      **Q.        So do you believe you were harmed**

23  **financially in any other way besides the loss of**

24  **salary?**

1        A.        Again, aside from the loss of my job,

2    I can't speak to any other financial damages.

3    Having a job would have been nice as that was my

4    intention to keep my job.

5        Q.        **Why did you decide to change careers?**

6        A.        I was looking for various positions

7    in both the non-profit development world, local

8    government, and in a few jobs in banking as well

9    when I -- Bryn Mawr let me go.  So essentially

10   what I came to determine was that I wanted to find

11   a more suitable career path that would give me

12   some sense of making a difference.  So that is why

13   I decided to pursue teaching.

14       Q.        **And why did you believe that banking**

15   **was an unsuitable career path for you?**

16       A.        Having worked for a number of

17   financial institutions prior to Bryn Mawr Trust,

18   Bryn Mawr I think was certainly a harmful

19   experience in -- in that it showed me that perhaps

20   this was not an industry that had a lot of

21   opportunities and it certainly did not appear to

22   me that there would be a lot of personal growth

23   opportunities within banking just, again, based on

24   my experience previously in consumer banking.  I

1  just felt that I needed a change after applying to

2  jobs and not getting much traction.

3      **Q.       Why do you say you believe it was**

4  **harmful that Bryn Mawr Trust showed you that there**

5  **weren't a lot of opportunities for you for**

6  **personal growth in banking?**

7      A.       I think when I interviewed and when I

8  approached taking the job, I was very honest about

9  my intentions.  That I had previously worked in

10 banking in management positions and was very happy

11 to work and be a part of the team.  But that I

12 would like opportunities for growth in the future.

13          And what became very plain to me was

14 that any opportunities would -- would be very few

15 and far between outside of the consumer bank.  So

16 that was a bit of a deflating experience while I

17 was there.

18     **Q.       You're referring to when Bryn Mawr**

19 **Trust wouldn't give you a position in the BSA**

20 **unit?**

21     A.       No.  I'm just saying that the sense

22 that I got was that there were not a lot of

23 opportunities outside of consumer banking in

24 general.  I can't speak strictly just to Bryn Mawr

1  Trust.  And so I did feel that I should try and

2  devote myself to doing something that would be,

3  you know, beneficial in making a change and so

4  teaching came to me as that was a profession that

5  I felt I could make a difference.

6      **Q.        What prior management positions had**

7  **you held in banking?**

8      A.         I worked as a manager for Wachovia

9  and Wells Fargo and I previously worked as a

10 manager at Univest Bank and Trust.  Prior to both

11 of those jobs I had worked as a teller/universal

12 banker at Patriot, which then became Susquehanna

13 actually in, I believe, the period shortly after

14 my car accident when I was home receiving medical

15 treatment as we discussed prior.

16     **Q.        Now, when you say manager at those**

17 **banks, do you mean a branch manager?**

18     A.         Yes.

19     **Q.        Okay.  When did you decide to make**

20 **your career change?**

21     A.         I'm sorry?  Can you repeat the

22 question?

23     **Q.        When did you decide to make your**

24 **career change?**

1      A.        When did I decide to make the career

2  change into teaching?

3      **Q.        Yes.**

4      A.        I want to say it was in the fall of

5  thereafter, in the aftermath, so to speak.  In

6  interviewing for other positions, I got the sense

7  that, again, that the -- my experience at Bryn

8  Mawr Trust was not going to help me get another

9  job and I think that I just -- I was looking for

10  -- I think I was looking for something that would

11  make me feel that I was doing something of

12  substance where I felt that my experience at Bryn

13  Mawr, on a variety of fronts, was very -- my

14  experience at Bryn Mawr Trust did not engender in

15  me the sense of team work and camaraderie that I

16  experienced at prior banks.

17            So, again, I just felt that perhaps

18  that was the direction banking was moving and so

19  it would be better for me to find an alternative

20  career.

21      **Q.        So you said that you didn't think**

22  **your experience at Bryn Mawr Trust helped you when**

23  **you were interviewing with other banks.  What did**

24  **you mean by that?**

1      A.        I don't think it helped me in that I
2  do think other banks, they do business with Bryn
3  Mawr Trust on a variety of fronts.  They -- I
4  think in meeting with the few banks that I did,
5  there was, I think, a little bit of hesitation
6  perhaps on their side with the fact that I had
7  been let go, and that they were aware certainly of
8  the fact that Bryn Mawr had these racial issues.
9           I did not address them in any
10  interviews but I certainly know that they were
11  aware that this was going on.  So to my mind, I
12  felt what I would do best would be to try and help
13  educate a new generation so I decided to get into
14  secondary education as a field.
15      **Q.        Do you believe that your experience**
16  **being a branch manager at Wachovia held you back**
17  **from getting any other banking jobs?**
18      A.        I wouldn't say that.  Again, I think
19  that what was brought into relief for me was I
20  wanted to do something that was more substantive
21  and that would make me feel that I was, you know,
22  again, trying to make things -- make a change, if
23  you will.
24           Again, I think having a child, as I

1  was expecting to have a child, and had a child

2  then in February of '19, made me want to try and

3  find a career path that would be something my son

4  could be proud of me for.  And obviously my

5  experience at Bryn Mawr, I was very reluctant to

6  speak about my experience, and it was only, I

7  think, in the idea that what would I say to my son

8  that I finally had the gumption to be honest

9  and -- and say what was happening, because I had

10  been, as we have gone in great detail, keeping my

11  head down and trying to avoid -- trying to just do

12  my job and get from day to day.

13      **Q.        What did you do to look for work**

14  **after you were terminated from Bryn Mawr?**

15      A.        I met with a number of banks.  I met

16  with --

17      **Q.        Who?**

18      A.        -- active number of banks and --

19              MR. PEARLMAN:  He's answering your

20  question, please.

21              THE WITNESS:  Could I have the

22  respect of answering.  Thank you.

23              MR. PEARLMAN:  Complete your answer.

24              THE WITNESS:  Yes.  I applied to a

 1  number of banks, financial institutions.  I also

 2  applied to local government jobs as well as

 3  non-profit institutions through LinkedIn, through

 4  Indeed, and other various applications.

 5              After not finding much that would,

 6  again, I felt I could sink my teeth into, I

 7  decided to make a change and applied to Cabrini

 8  University where I've been enrolled since the fall

 9  of '19 -- or I'm sorry -- spring of '19.

10  BY MR. KRAUSS:

11       Q.       Who did you apply to?

12       A.       I'm sorry?

13       Q.       Who did you apply to?

14       A.       I applied to Univest.  BB&T.  I'm

15  trying to remember.  A number of smaller community

16  type banks.  And, again, there were just not a lot

17  of opportunities for anything that really I felt

18  that I would be, you know, well suited for.

19       Q.       And you agree there were thousands of

20  teller jobs available in the Philadelphia area;

21  correct?

22       A.       Yes.  There were a number of teller

23  jobs available.

24       Q.       Thousands of them; right?

1      A.       I'm sure there were, yes.

2      Q.       Okay.  And let me just show you

3   what's been marked as Exhibit 248.  Exhibit 248 is

4   a printout of the teller jobs available in the

5   Philadelphia metropolitan area between February 1,

6   2018 and September 2, 2020.  And you see that on

7   the last page it reflects that there were over

8   5,000 teller jobs available in the Philadelphia

9   metropolitan area during that time period.

10                Do you see that?

11     A.       I do see that.  There's quite a

12  number.

13     Q.       And there were over 500 head teller

14  jobs; correct?

15     A.       Again, given the size of this

16  document I would have to take your word for it.

17     Q.       Well, it's on the last page.  Do you

18  see it?

19     A.       Yes, I do see that.

20     Q.       Okay.

21     A.       5,285.

22     Q.       Now, you listed a couple of banks you

23  said you applied to.  Where else did you -- I'm

24  sorry.  Did you get any interviews with banks?

1    A.        I interviewed with Univest Bank and,

2    again, essentially the only opportunity I would

3    have had would have been a part-time position in

4    Bucks County and it did not make sense for me at

5    that time to take that job.

6    **Q.        Where else did you apply besides the**

7    **couple of banks you listed?**

8    A.        I applied to a previous job I had

9    been discussing with the Montgomery County

10   Authority, which is a local government office,

11   just working in there basically trying to help

12   coordinate and bring business into Montgomery

13   County.

14            And their hesitation was around,

15   again, they worked with Bryn Mawr Trust to help

16   both their clients and finance the county.  So

17   they said, you know, you have a great resume but

18   perhaps you might want to look into a different

19   direction.

20   **Q.        And what position were you**

21   **interviewing for?**

22   A.        I was interviewing for a job working,

23   again, in -- for the Montgomery County government

24   in their, I believe it was under the Better

1  Business Bureau if I recall correctly, but I met

2  with Lee Soltysiak and a number of other

3  individuals at the county.

4      **Q.       What was the job title you were**

5  **interviewing for?**

6      A.       I think it was assistant business

7  development or something to that effect.

8      **Q.       Any other jobs you recall applying**

9  **for?**

10      A.       Again, I applied for a number of

11  jobs, again, in primarily three fields, banking,

12  and I applied in non-profit development, which I

13  also have a background in, and I applied for a

14  variety of jobs in local government.

15      **Q.       Where did you apply in non-profit**

16  **development?**

17      A.       I applied to a couple of local

18  universities and colleges and, again, any job

19  would have required a lot of travel and that was

20  not going to work given anticipating my son

21  arriving.  So there was not a lot of good fits for

22  me based on what I had been looking for.

23      **Q.       Which colleges and universities did**

24  **you apply to?**

1    A.         I know I reached out to Jefferson, as

2  I had worked there previously, and they just

3  didn't have open positions.  I know I reached out

4  to Temple, Drexel.  I reached out to Villanova,

5  Widener, and a few other places.  I also reached

6  out to a few places in New Jersey, I think, I went

7  as far -- just to see if they had gift officer

8  positions in Pennsylvania, but there was just not

9  a lot of opportunity in that field.

10   **Q.         Are you currently working outside the**

11 **home?**

12   A.         I'm not currently working outside of

13 the home.  I'm currently receiving my master's and

14 postbac in secondary education at Cabrini and

15 taking care of my son full time.

16   **Q.         Approximately how many hours a week**

17 **did you spend looking for work when you were**

18 **looking?**

19   A.         Again, I would say I was on a full-

20 time job hunt at that time.  45 hours I would say

21 a week I was looking for a job, so full time.

22   **Q.         Approximately for how many weeks were**

23 **you spending 45 hours a week looking for a job?**

24   A.         I would say well into December when I

1  was finally accepted at both Immaculata and

2  Cabrini and then I just determined that I could

3  not manage both education, my son arriving, and a

4  job at the same time.

5           So I had to make a very difficult

6  choice and decide to focus -- my wife and I both

7  tightened the belt strings and to focus on

8  reemerging with a new career opportunity.

9      **Q.      So you say it was approximately four**

10 **or five months that you were spending 45 hours a**

11 **week looking for work?**

12     A.      I would say four months, thereabouts.

13     **Q.      Were you collecting unemployment?**

14     A.      I was.

15     **Q.      Were you aware of the rules for job**

16 **searching if you're going to collect unemployment?**

17     A.      Yes.

18     **Q.      What were they?**

19     A.      That you need to be looking for a job

20 full time, you need to be applying for jobs, and I

21 had been.  I only stopped collecting unemployment

22 when I was accepted at Cabrini and enrolled.

23     **Q.      Were you aware specifically what**

24 **types of activities you had to do and how**

1  frequently to be able to continue to collect

2  unemployment?

3       A.        I had to apply and search actively

4  full time for a job, which is what I continued to

5  do throughout the duration.

6       Q.        Let me show you -- do you remember

7  answering interrogatories in this lawsuit?

8       A.        I do.

9       Q.        Well, let me show you what's been

10 marked as Exhibit 14.  Exhibit 14 are your Answers

11 to Interrogatories.  Let me also show you Exhibit

12 8, which is the interrogatories themselves,

13 because your lawyers didn't type in the questions.

14            Do you remember signing the

15 verification form for these interrogatories?

16       A.        Yes.

17       Q.        And did you know when you did so that

18 you were swearing that the answers you were giving

19 were true and accurate to the best of your

20 knowledge, information, and belief?

21       A.        Yes.  It was to the best of my

22 ability, yep.

23       Q.        So let me ask you to turn to

24 Interrogatory 8.

 1      A.          Uh-huh.

 2      **Q.          Which asks you to identify all jobs**

 3   **you've applied to or interviewed for since your**

 4   **separation date, including the name of the**

 5   **employer, the date of application, or the**

 6   **interview?**

 7               **Do you see that?**

 8      A.          I do.

 9      **Q.          And what was your response?**

10      A.          Plaintiff applied for a host of jobs

11   receiving offers for only $9 an hour in

12   substandard job.

13      **Q.          So what offers did you receive for $9**

14   **an hour?**

15      A.          I received a job offer from ADP, I

16   believe, to scan items in a grocery store

17   part-time in a territory ranging from Maryland to

18   Pennsylvania for $9 an hour.

19      **Q.          I'm sorry.  What would you be**

20   **scanning in grocery stores --**

21      A.          It's essentially a job, as far as I

22   could understand it in interviewing and on the

23   phone with them and doing research, essentially

24   you're scanning items and trying to provide data

1 to companies to determine if they're priced

2 competitive in a variety of different grocery

3 sectors.

4            Not a terribly -- it was not a

5 terribly interesting or substantive job in terms

6 of my previous experience or something that I

7 certainly wanted to make a new full-time position

8 for myself.

9      **Q.        And why did you believe that job was**

10 **substandard?**

11      A.        Because I felt that it was a job that

12 would have certainly been below my educational

13 background, below my prior experience, and while

14 it would have been -- it would have been a

15 difficult job and -- and I understand that.  I did

16 not feel that for $9 an hour that I would want to

17 travel to Maryland to scan groceries at 5:00 in

18 the morning.  Did not seem like a justifiable

19 compensation given the travel.

20      **Q.        Did you receive any other job offers?**

21      A.        I can recall, again, receiving

22 another job in that same vein.  It was not a very

23 promising job that was part-time, again, in like

24 the $8 to $9 range.  However, I don't exactly

1   recall what the job was aside from a similar job

2   to ADP where it was like mystery shopping, going

3   and doing consumer reports.

4       Q.       And why did you apply to ADP?

5       A.       I applied to every job I could see

6   essentially.  I was using Indeed and a number of

7   other app programs and just hoping to get

8   responses and see what would come back.

9       Q.       So you said you were using Indeed.

10  Were you using any other websites to look for

11  jobs?

12      A.       I used LinkedIn for a period.  I want

13  to say I used Monster as well.  However, I don't

14  -- I don't recall any additional application of

15  that nature.

16      Q.       Sir, you mentioned your educational

17  background.  What is your educational background?

18      A.       I have a BA in history and

19  international relations from Harvard University.

20      Q.       And when did you graduate from

21  Harvard?

22      A.       2008.

23      Q.       And how long were you at Harvard?

24      A.       I was at Harvard -- I entered in

 1  2001.  However, due to the car accident you

 2  referred to earlier, I had to take a significant

 3  amount of time off of school in order to both take

 4  care of myself and get myself healthy and able to

 5  complete my degree, but also to help my family

 6  financially as the amount of medical care I needed

 7  was a burden on the family.

 8       **Q.        So how long did you take off from**

 9  **Harvard?**

10       A.        So I took off 18 months initially and

11  I went back for a semester and things were getting

12  tight at home and I took about another year, year

13  and a half off.  So I took approximately four and

14  a half years to complete a four-year degree but

15  over seven years.

16       **Q.        All right.  And what were your grades**

17  **at Harvard?**

18       A.        My grades initially were very good.

19  It was certainly more difficult to perform at a

20  higher level given I also worked full-time while I

21  was a student from my freshman year forward.  I

22  believe my marks were, you know, about a 2.6 or

23  so.  It wasn't terrible.

24       **Q.        And what were you doing working full-**

1  time while at Harvard?

2       A.        So I worked a variety of jobs.

3  Initially I was a janitor for Sanitas I believe is

4  what they call it -- Veritas is the name up there

5  -- is the motto, if you will.  So Sanitas -- so I

6  cleaned upper classmen's dorms.  In the middle of

7  my freshman year I got a job in development

8  essentially calling alumni and soliciting

9  donations for scholarship and financial aide.

10      Q.        And that was a full-time job?

11      A.        Yes.  I was a full-time scholarship

12  student so I had to also have a full-time job.

13      Q.        How many hours a week?

14      A.        I worked 40-plus hours a week.

15      Q.        Did you reach out to Harvard's

16  employment office when you were looking for work?

17      A.        I have, and I did when I certainly

18  graduated.  I did not find them to be particularly

19  helpful in terms of trying to get a job in

20  Philadelphia, which was my -- my goal was to come

21  back to this area where I grew up.  So what offers

22  and help I was able to receive from the alumni

23  network were very limited.

24      Q.        Well, did you reach out to Harvard's

1  **alumni network when you were looking for a job**

2  **after you were fired from Bryn Mawr Trust?**

3      A.      I did not.  Again, because in

4  previous attempts to try and find work, I found

5  that other networks were providing me better

6  resources locally.  I think if I were -- had been

7  looking to relocate to New York or to Boston, I

8  certainly would have reached out as they had a lot

9  more contacts in those markets based on our

10 concentration of alumni.

11     **Q.      So did you reach out to Harvard's**

12 **career office when you were let go from Bryn Mawr?**

13     A.      Again, I did not.  As in previous

14 attempts to work with them, their best suggestion

15 to me was to try and find a job in the New York

16 metro area or Boston where they had a more robust

17 network of folks.

18     **Q.      So when did you start discussing the**

19 **possibility that you would stop looking for work**

20 **outside the home and become a full-time father?**

21     A.      I think what we determined, my wife

22 and I, in looking at our finances after I was

23 accepted at Cabrini, based on what we knew day

24 care rates were, I think 1,300 or 1,400 was about

1  the cheapest for 20 hours of care a week.  So that

2  would not have been sufficient for me to be

3  working full time.  So certainly a job making $9

4  an hour would not have made that cut even.

5              So we determined that we would trim

6  our budget and that I would stay home while

7  getting my education with our son and that my wife

8  and I would make do with that.

9      **Q.      How long had you been in banking**

10 **before you started working for Bryn Mawr Trust?**

11     A.      I had worked in banking for

12 approximately, in an aggregate, I'd say about four

13 and a half years prior to my job at Bryn Mawr.

14     **Q.      And what other careers had you had**

15 **before working for Bryn Mawr Trust?**

16     A.      I worked as a gift officer for The

17 Hill School.  I worked in fundraising for

18 Jefferson, Thomas Jefferson Medical College.  I

19 worked for West Chester University.  I worked in a

20 volunteer in a white paper writing position for

21 Joe Torsella.  I've had a variety of different

22 career paths, so to speak.

23     **Q.      And you've had a number of times when**

24 **you were out of work; correct?**

ERIN DINGER v BRYN MAWR BANK                                    Page 102
Michael Sutton, 11/04/2020

```
 1       A.         Very -- very limited prior to this
 2  most recent experience.
 3       Q.         When you were applying for jobs, were
 4  you applying in person, over the Internet, or some
 5  combination of both?
 6       A.         I would say a combination of both.
 7  Again, I was trying my best to certainly apply to
 8  a number of places through apps but I was also
 9  reaching out in my own network to try and find
10  work.
11       Q.         Were you reaching out through your
12  wife's network?
13       A.         Yeah.  My wife certainly did reach
14  out to a number of friends from college and
15  otherwise and there was not a lot of opportunity.
16       Q.         Did you reach out through your wife's
17  law firm?
18       A.         I did not.
19       Q.         Did you write any cover letters as
20  part of your job search?
21       A.         Yes.  I wrote cover letters.
22       Q.         Did you send follow-up e-mails as
23  part of your job search?
24       A.         I did send follow-up e-mails as part
```

1   of my job search.

2        Q.        Did you save all of them?

3        A.        I did not save all of them.

4        Q.        You threw them away?

5        A.        No, I don't think I threw them away.

6        Q.        And so what happened to them?

7        A.        I don't directly recall what happened

8   to all of those applications.  A lot of them were

9   through, again, applications, which I don't know

10  their method of record retention there.

11       Q.        So when you were sending e-mails you

12  were doing that from your home computer; correct?

13       A.        Yes.  Primarily, yep.

14       Q.        Do you still have your computer?

15       A.        We still have -- I still have that

16  e-mail address, yes.

17       Q.        And did you look for any e-mails you

18  might have that might be relevant to this lawsuit?

19       A.        I did.  However, I did not find

20  anything that was relevant to this lawsuit.  What

21  e-mails I did have were essentially just

22  coordinating times to meet or speak, which were

23  not exactly applicable, so I do not have them.

24       Q.        So you decided not to produce the

1  ones about coordinating job interviews?

2      A.        Again, I had no documentation that --

3  what documentation I had, I provided.

4      **Q.        Well, that was the 20 pages we looked**

5  **at before; right?**

6      A.        Yes.  What documentation I had, I

7  provided.

8      **Q.        Okay.  I thought you said you still**

9  **have other e-mails doing things like coordinating**

10  **job interviews.**

11      A.        Again, what I could produce and what

12  I -- I gave what I could produce.  I don't -- I

13  don't understand the -- what you're asking me

14  beyond that.

15      **Q.        Mr. Sutton, did you send e-mails, for**

16  **example, coordinating job interviews?**

17      A.        Yes.

18      **Q.        Okay.  Did you delete them after you**

19  **sent them?**

20      A.        Again, I don't have them anymore so I

21  don't -- I must have deleted them.  I don't try

22  and keep a lot of e-mail and crap on my phone.

23      **Q.        Just in your car?**

24                MR. PEARLMAN:  Objection.

```
 1              THE WITNESS:  I'm sorry?

 2  BY MR. KRAUSS:

 3       Q.        When did you clean up your phone?

 4       A.        I'm sorry?

 5       Q.        When did you clean up your phone?

 6       A.        I cleaned out e-mail and I do it on a

 7  fairly regular basis.  But I imagine when I

 8  started transitioning over to using my Cabrini

 9  e-mail that that is when that may have happened.

10  I'm not exactly -- again, for the most part, when

11  I did have interviews, they were often coordinated

12  and I would meet with people face-to-face

13  obviously to try and get any substantive work.

14       Q.        In answer to Interrogatory 9 you say

15  that you've done some small consulting work for

16  professors with occasional odd jobs like

17  babysitting and temporary work.

18       A.        That's correct.

19       Q.        What consulting work have you done

20  for professors?

21       A.        I worked with a professor at Cabrini

22  by the name of Mike Rayer just on some ESL

23  programming and things that he was trying to work

24  to make automated for his class.  I have a slight
```

1  background, I guess, in ESL in that I speak some

2  Spanish.  So he felt that I would be good in

3  assisting him in that role.

4           Most of my other odd jobs were, you

5  know, babysitting for my nephews or helping my

6  brother-in-law as a painter from time to time.  So

7  nothing again of great substance.

8      **Q.      Were you paid for babysitting your**

9  **nephews?**

10     A.      No.  I did that for free.

11     **Q.      Do you have computer experience that**

12  **was helpful in the ESL project you were talking**

13  **about?**

14     A.      Again, most of what we were doing was

15  not exactly coding or anything of that nature.  It

16  was simply inputting.  So I'm good at typing.

17     **Q.      You had an attendance problem at Bryn**

18  **Mawr Trust; right?**

19     A.      I think that is one way that one

20  could characterize that.

21     **Q.      Well, it's a fair characterization;**

22  **right?**

23     A.      I would not describe that as such.  I

24  would say that I did have an attendance issue.

ERIN DINGER v BRYN MAWR BANK                                    Page 107
Michael Sutton, 11/04/2020

 1  However, I would say there were mitigating

 2  circumstances for most of those instances.

 3       **Q.        You were hired at Bryn Mawr Trust on**

 4  **December 11th of 2011; correct?**

 5       A.        Yes.

 6       **Q.        I show you what's been marked as**

 7  **Exhibit 66.  Exhibit 66 notes that you were out on**

 8  **December 18 and then January 22 to 24.**

 9       A.        Uh-huh.

10       **Q.        Do you see that?**

11       A.        I do see that.

12       **Q.        Okay.  Was that true?**

13       A.        That is true.  In December I recall

14  that I was sick.  I did provide a doctor's note.

15  And in January of 2018 my mother had been

16  hospitalized the 10th and I had contracted an

17  upper respiratory infection that actually was

18  walking pneumonia at the time.  I did provide a

19  doctor's note.  I furnished all documentation

20  requested of me.

21            And it was at that point when I also

22  mentioned to my manager and the district manager

23  that I would be willing to take those dates,

24  particularly the January dates, unpaid

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  understanding that this was not something that I

2  could have avoided in taking care of my mother.

3      **Q.        Now, do you agree, Mr. Sutton, that**

4  **being out four days in your first six weeks of**

5  **work is not a good start?**

6      A.        It is not a good start.

7      **Q.        And it's problematic; correct?**

8      A.        It was obviously impactful to the

9  branch, which is why I did my utmost to try and be

10  proactive and communicate and I tried to, if

11  anything, be very clear about what my situation

12  was and what would be helpful to make things work.

13              Can we take a break for lunch?  I'm

14  hungry.

15              MR. KRAUSS:  Sure.  Let's go off the

16  record.

17              VIDEOGRAPHER:  Going off the video

18  record at 12:47 p.m.

19                  (Luncheon recess.)

20              VIDEOGRAPHER:  We're back on the

21  video record, 1:39 p.m.

22  BY MR. KRAUSS:

23      **Q.        Mr. Sutton, before the lunch break we**

24  **were talking about your job history and you were**

1  mentioning that you had had really three careers

2  before Bryn Mawr Trust?

3       A.        Three, yes.  You could say that.

4       Q.        And you were running through a bunch

5  of the jobs that you had had; correct?

6       A.        I believe we were, yeah.

7       Q.        And you said you graduated from

8  Harvard in 2007; correct?

9       A.        2008.

10      Q.        2008, I apologize.

11                So, and I admit, I lost count, you

12  had, was it ten jobs prior to Bryn Mawr Trust?

13      A.        I -- I believe it was seven or eight.

14 I'm not exactly sure.  My resume goes, you know,

15 pretty long going back even into college, so...

16      Q.        I was just trying to get a sense.  It

17 sounds like you were changing jobs about every

18 year, year and a half.  Is that fair?

19      A.        I think that at times is a fair

20 description of my -- of my career path.  I've gone

21 from banking into a non-profit, back into banking.

22 I've bounced around a little bit, I guess.  I've

23 just been, you know, trying to find what is best

24 for me.

1      Q.        Okay.  Now, look, admittedly, lawyers
2   can't do math, but you had prior to getting to
3   Bryn Mawr Trust, seven jobs in nine years;
4   correct?
5      A.        Yes.  Now, one of those positions was
6   relatively temporary for a political candidate,
7   but, yes.
8      Q.        Okay.  And we can all do the math;
9   right?  All right.
10               Let me ask you to take a look at
11   Exhibit 70.  Exhibit 70 was an e-mail you sent to
12   your manager, Ms. Perez; correct?
13      A.        Yes.
14      Q.        And you were asking her to adjust
15   your time card and to allow you to leave early;
16   correct?
17      A.        If I may finish the --
18      Q.        Oh, yeah.  Take your time.
19      A.        (Witness reviewed document.)  Yes.
20   So this was with regards to a mispunch effectively
21   because I had to take 15 minutes off of the floor
22   to speak with family regarding my mother.
23      Q.        Okay.  Now, you say a mispunch.  What
24   do you mean by that?

1    A.         So, again, I had to take a break

2    after lunch to speak to my brother because I could

3    not get through to him, I believe?  I'm sorry, I'm

4    trying to read this quickly.

5              (Witness reviewed document.)  Okay.

6    So I'm sorry.  I had thought this was post the

7    additional break.  So I talked to my dad at lunch

8    and realized I needed to take another break.  So I

9    was essentially just making sure that I accounted

10   for the 45 minutes I took off of the floor; that

11   they were reflected properly in my time.

12   **Q.         And you knew it was important that**

13   **your time clock accurately reflect the time you**

14   **were actually on the floor working; correct?**

15   A.         Yes.

16   **Q.         And that's what you were doing here;**

17   **right?**

18   A.         Yes.

19   **Q.         And you knew that at the end of every**

20   **two weeks you had to approve your time cards;**

21   **correct?**

22   A.         That is correct.

23   **Q.         And you knew by approving the time**

24   **cards you were certifying that they were accurate**

1  and they both weren't too high and weren't too

2  low; correct?

3      A.      Yes.  You were -- you were signing

4  off that your time was accurate.

5      Q.      Okay.  Now, at the end of your e-mail

6  you apologized to Ms. Perez for bothering her on

7  her day off.

8              Do you see that?

9      A.      I do.

10     Q.      And then you said, I hope you are

11  finding some closure with the service for your

12  uncle and, again, I express my condolences for

13  your loss.  Take care.  You are in my thoughts and

14  prayers.

15             Did I read that correctly?

16     A.      That is correct.

17     Q.      Okay.  What were you referring to?

18     A.      Again, I -- I don't exactly recall,

19  but I'm assuming she was off because she was at a

20  service for her uncle who must have passed.  So,

21  again, I was just expressing, as I was going

22  through a very similar situation, that I had

23  empathy for her and was thinking of her.

24     Q.      Let me show you what's been marked as

 1 | Exhibit 73.  Exhibit 73 starts off with a page and

 2 | a half long e-mail you sent to Laura Biernacki on

 3 | February 8; correct?

 4 |      A.      Yes.

 5 |      Q.      At this point, February 8, you had

 6 | been working for Bryn Mawr Trust a little under

 7 | two months; correct?

 8 |      A.      That is correct.

 9 |      Q.      All right.  And you had already been

10 | out of work for at least four days during that

11 | two-month period; correct?

12 |      A.      Correct.

13 |      Q.      All right.  Now, you say that you

14 | left your boss -- you left Ms. Perez a message at

15 | 7:45 in the morning saying that you were going to

16 | be out sick.

17 |      A.      Sorry.  It's just the break on this

18 | text is difficult to read.  So I have a lot of --

19 | yes.  It appears that I do indicate I left her a

20 | message and not received any response.

21 |      Q.      Let me just -- let's get the time

22 | line down.  So in the third paragraph of your

23 | e-mail to Ms. Biernacki you say that you're sick

24 | in bed and you haven't even gotten an

1  acknowledgment from your boss, Ms. Perez, that she

2  received your message at 7:45 about being sick,

3  let alone to tell you to feel better or to take

4  care of yourself.

5              Do you see that?

6      A.      I do see that.

7      Q.      Okay.  So you sent this very long

8  e-mail to Laura Biernacki at 20 after 10:00;

9  correct?

10     A.      Yes.

11     Q.      All right.  So you were very upset

12 that your boss hadn't called you back within two

13 and a half hours of receiving your message;

14 correct?

15     A.      Again, if I may finish the e-mail,

16 thank you.

17     Q.      Let me know when you're ready.

18     A.      Thank you.  (Witness reviewed

19 document.)  So I do see that, yes.  I indicated to

20 her I was concerned that no one had responded to

21 me from the branch.  So I was concerned that they

22 did not know that I was out, why I was out, and

23 what the circumstances around it was.

24     Q.      But just, again, to lay the time

1  line, you called your boss, Ms. Perez, at 7:45;

2  correct?

3       A.       Again, based on this e-mail, that

4  appears to be what I had done.

5       Q.       Okay.

6       A.       I don't directly recall the morning

7  in terms of the timing.

8       Q.       And then at 10:20 when you hadn't

9  heard back from her in two and a half hours you

10  sent a page and a half long e-mail to her boss;

11  correct?

12       A.       Yes.

13       Q.       Okay.  Now, in your one and a half

14  page long e-mail to your boss's boss you

15  bad-mouthed your boss; right?

16       A.       I did.

17       Q.       Okay.

18       A.       Again, I think in the moment I was

19  going through quite a bit and I was just

20  concerned, obviously, as you've mentioned, being a

21  new employee and having these absences and having

22  never really had any kind of productive

23  conversation around ways in which we could work

24  together to understand that, you know, this was a

 1  very difficult time for me.

 2              Laura Biernacki had been new to the

 3  branch, or to our district I should say, and had

 4  trained with me I feel like in January and was,

 5  you know, encouraging of me to reach out.  So I --

 6  I reached out in this manner.

 7      Q.      So as a new employee, did you think

 8  it was a good idea to bad-mouth your boss to her

 9  boss?

10      A.      No, I do not think it was a wise

11  decision at that moment.  However, I think I was

12  under an extreme amount of stress and strain and I

13  think I was just looking for someone to contact me

14  and -- and give me a sense of what -- what I could

15  do to get things back on a good footing given the

16  absences related to my mother's sickness and how

17  it was impacting my health and my well-being.

18      Q.      So you wanted somebody to contact you

19  within two and a half hours; right?

20      A.      I don't think that was my specific

21  expectation.  Again, I think I was not -- again,

22  this was a very difficult time.  I was not in a

23  great place in terms of knowing that my mother was

24  soon to pass, knowing that I needed to be at my

1  job, knowing that I could not be at my job, I was

2  trying, I think, my best to just to contact

3  someone so that everyone knew that I had not just

4  dropped off the map, I guess, for lack of a better

5  term.

6            So I was simply trying to connect her

7  so that she would have some kind of dialogue, I'd

8  get some kind of dialogue with someone that was

9  more empathetic or more productive than my

10  previous issues, which were, you know, again,

11  dismissive I feel like by my manager.  As she

12  references, I lost my father when I was ten, you

13  know, and she wanted to be my counselor.

14            I did not feel that these were

15  effective intercessions by my supervisor who,

16  having been a bank manager you're trained by HR to

17  encourage employees who are struggling to avail

18  themselves of help and obviously that was not

19  anything that was being offered or encouraged for

20  me to take advantage of, I guess I should say.

21  **Q.       So you knew from your training that**

22  **you could avail yourself of help; correct?**

23  A.       I knew that my supervisor could help

24  me.  I knew that based on having been a branch

1  manager that I had helped other people.

2              Normally what happens in a situation

3  like this is the branch manager does try and work

4  with the employee.  I felt like I was not getting

5  that traction and it was a poor decision to reach

6  out to her superior.  But, again, I think -- I

7  think it was something that I felt in the moment

8  I -- I should have done, and I remember having to

9  apologize for it.

10              So I think that I learned a lesson

11  that I should not have done that.  However, I did

12  feel that it was my only recourse at that time.

13      **Q.      Who did you apologize to?**

14      A.      If I recall correctly that when I

15  returned to work that I spoke with Danielle and

16  Laura and that I did apologize for that.

17      **Q.      When you were a branch manager, did**

18  **you counsel employees?**

19      A.      I would typically let them vent if

20  they needed to, but I would encourage them to

21  speak to someone at HR about anything that they

22  had going on as I'm not a counselor, I don't have

23  any training to do so.

24      **Q.      Now, when Ms. Perez didn't respond to**

1  **your voicemail within two and a half hours, did it**

2  **occur to you that she might be busy running the**

3  **branch?**

4      A.      Yes.  It should have.  Again, I feel

5  like, as we've seen in a number of the exhibits,

6  this was a very difficult situation for me and I

7  in this instance did reach out to -- to my boss's

8  boss and, again, just the hopes of clearing the

9  air, it did not turn out well and, again, I

10  remember apologizing for the instance and, again,

11  took account for what I had done.

12      **Q.      Did it --**

13      A.      I'm sorry.

14      **Q.      Did it occur to you that perhaps**

15  **Ms. Perez was on the teller line doing your job**

16  **because you were out and so she couldn't step off**

17  **the line and call you and see how you were doing?**

18      A.      I do understand that that may have

19  been the situation.  I do understand that

20  certainly my absence was impactful at the branch.

21      **Q.      Now, in your e-mail you wrote that**

22  **your requests, quote, has been met with scoffs,**

23  **incredulity and really horrible comments such as,**

24  **quote, My dad died when I was ten and you need to**

1  grow up, unquote.

2          Did I read that correctly?

3      A.      That is correct.

4      Q.      Okay.  Now, Ms. Perez never told you

5  that her dad died when she was ten and you needed

6  to grow up?

7      A.      Yes.  We had a conversation, again,

8  around my desire to go to group counseling for

9  grief and we needed to stay late to make calls and

10  her suggestion to me was that she had been through

11  this experience, she could provide that for me.

12          I did not feel like that was an

13  appropriate thing for someone who was my colleague

14  at work to say you don't need to worry about not

15  going to therapy; you can talk to me about it.

16  That was something that I did not feel was very

17  empathetic.

18      Q.      Mr. Sutton, please listen to my

19  question.  Ms. Perez told you that her father had

20  died when she was ten; correct?

21      A.      Yes.

22      Q.      Did Ms. Perez then go on to say, And

23  you should grow up?

24      A.      She said, You're an adult.  You

1  should grow up.

2       Q.        Is that what she said?

3       A.        As best I can recall, those were the

4  words.

5       Q.        All right.  You went on to say,

6  quote, My impression of my superior is she is

7  singularly concerned with her own issues at BMT

8  and beyond and has found my unfortunate

9  circumstances to be a good excuse to use to

10 exonerate herself and other teammates as to why

11 Ardmore isn't going where it needs to be while

12 letting the bus run over me in turn.

13                Did I read that correctly?

14      A.        You did read that correctly.

15      Q.        So you had only been working at

16 Ardmore for two months; correct?

17      A.        Correct.

18      Q.        How did you know after two months

19 where Ardmore needed to go?

20      A.        We were regularly updated in terms of

21 sales and other performance metrics and regularly

22 this was an opportunity to -- for our manager to

23 -- rather than motivate us, I felt that there were

24 times in which she would use, for instance, the

1  fact that I had been out, or other issues that

2  were happening within the branch as an excuse for

3  as to why we were not achieving the goals that we

4  needed to.

5              That being said, I do understand that

6  my absence, while impactful, was not something

7  that really would have been severely detrimental

8  to sales as I was still a relatively new employee.

9  However, I did feel that it was a convenient

10 excuse that I was having these issues and that it

11 was essentially being used as a method to pile on.

12             Again, I was in a very rough place

13 and I think feeling a little bit defensive, but I

14 do feel that that was something that was being

15 done by the manager because she was under a lot of

16 pressure being the face of the Ardmore branch and,

17 you know, she in turn, I think, ended up leaving

18 because I think that was a very difficult pressure

19 for her to deal with.

20    **Q.        After two months at Ardmore, how did**

21 **you know what issues Danielle Perez was dealing**

22 **with?**

23    A.        Again, I'm not -- I'm not in a

24 position to speak to what issues Danielle was

 1  going through.  I do know that sales was an issue
 2  and I just felt, again, that that was the sole
 3  focus and I think, again, I was in a very rough
 4  place and responded in a less than productive
 5  manner.
 6       Q.       So if you didn't --
 7       A.       But it was not -- it was in no way I
 8  think an inaccurate statement to say that I did
 9  feel that I was not getting support.  Obviously
10  the thrust of my message is lost in all of these
11  words.
12       Q.       **So if you didn't know what Ms. Perez**
13  **was going through, why did you tell your boss's**
14  **boss that that was the reason for her blaming you**
15  **for everything?**
16       A.       To -- to -- to elaborate, again, I
17  put -- I wrote my words are my impression.  So
18  again, I should have used more appropriate
19  language.  I should have perhaps, again, brought
20  this to my district manager in a more appropriate
21  forum.
22               However, I was feeling very isolated
23  and I was having difficulty on a variety of fronts
24  both personally and interpersonally within the

1  branch.  And was hoping that my district manager

2  would try and help to assist me.

**3      Q.       So did you think it was a good idea**

**4  for you to tell your boss's boss that your boss**

**5  was blaming everything on you and letting the bus**

**6  run you over?**

7      A.       Again, in hindsight, I should not

8  have used -- I should have brought this to my boss

9  in a more appropriate manner.

**10     Q.       In fact, you knew when you sent this**

**11  e-mail when you hit send, you knew it was**

**12  inappropriate for you to send it; right?**

13     A.       I think I -- again, I think I was

14  going through a very rough time and, yes, I think

15  that I used this as a, again, a method to vent and

16  it was not an appropriate method.

17              However, in terms of what is in here

18  as in terms of content, in terms of what is

19  actually being referred to as the day-to-day, that

20  is accurate.  Now, whether I should have written

21  this to my district manager two months into the

22  job, since I did not really know her or her -- and

23  I did not know the greater issues that were going

24  on within the branch because I was so new, it was

 1  not a good choice.

 2              And I think, again, as you can see

 3  from the entirety, it makes -- it left a very poor

 4  impression with others.  And, again, I remember

 5  apologizing for the content and the approach that

 6  I took, but it was a very difficult time and

 7  nothing in here is -- is that -- I'm sorry -- the

 8  facts that are in here are relevant.  However, I

 9  felt my approach in bringing up these issues

10  was -- was obviously poor.

11      **Q.       Now, Mr. Sutton, you closed your**

12  **e-mail by apologizing for speaking out of turn.**

13              **Do you see that at the very end of**

14  **your e-mail?**

15      A.       Yes.

16      **Q.       So you knew when you were typing this**

17  **e-mail that it was improper for you to send it;**

18  **right?**

19      A.       Yes.  I think I understood that it

20  was not the proper procedure to follow.  However,

21  I think, again, I was feeling quite a bit of

22  pressure and I was not getting any support from

23  anyone in the organization at all regarding the

24  issues I was facing.  And so it was not a good

 1  choice but I did -- I did write the e-mail.

 2      **Q.        And, Mr. Sutton, you knew at the time**

 3  **you sent the e-mail that it was improper to send**

 4  **but you sent it anyway; correct?**

 5              MR. PEARLMAN:  Objection to form.

 6              THE WITNESS:  I regret having brought

 7  these concerns to my direct manager -- or my

 8  district manager, rather -- in this format.  I --

 9  I would have preferred that I had done it in a

10  different way.  However, I did not.

11  BY MR. KRAUSS:

12      **Q.        Now, you said on Page 3 of your**

13  **e-mail that you felt that you were being used as a**

14  **handy scapegoat.**

15              **Do you see that?  Fourth line down.**

16      A.        Yes, I see that.

17      **Q.        What did you think you were being**

18  **made a scapegoat for?**

19      A.        For a variety of issues that were

20  happening within the branch.

21      **Q.        What do you think you were being made**

22  **a scapegoat for?**

23      A.        I think I was being made a scapegoat

24  in this instance for the lack of production and

1   sales for the beginning of the year.

2        Q.        Now, as a head teller part of your

3   job was to motivate the other tellers; correct?

4        A.        Yes.  That was -- that was a part of

5   my job and, in fact, that was one of the things

6   that I was complimented on.  The senior teller

7   that I had in Ardmore achieved more sales under me

8   than she had in I think the last five years.

9        Q.        Who?

10       A.        So we were seeing that progress and I

11  enjoyed that portion of my job.

12       Q.        Who are you referring to?

13       A.        I worked with a variety of tellers.

14  Lisa Davenport was the teller who had a history of

15  not being able to make sales and I worked a lot

16  with her, again, during the times that I was able

17  to be in the branch given how much my mother's

18  sickness and death in the first quarter of the

19  year required me to be outside of the branch.

20       Q.        So you knew part of your job was

21  motivating people to sell; correct?

22       A.        Yes.  I knew that part of my job was

23  to absolutely encourage sales activity.

24       Q.        And did you think you were good at

1  your job?

2      A.      I think that I was good at my job.

3  However, I do understand in this time frame that I

4  was not able to be at my best self because of

5  sickness and a variety of other things that were

6  going on as a result of taking care of my mother.

7      **Q.      And you say you contracted walking**

8  **pneumonia.**

9              **Do you see that?**

10     A.      Yes.

11     **Q.      Did you tell anybody at the branch**

12 **that you had walking pneumonia?**

13     A.      I did.  And, in fact, when I had

14 walking pneumonia in I believe it was January of

15 that year, I provided documentation for it so --

16 to HR per the request of my manager, so...

17     **Q.      Okay.  Did you actually have walking**

18 **pneumonia at any point when you were at the**

19 **branch?**

20     A.      Yes.  I had only been out for three

21 days.  I was still on steroids and I'm assuming

22 some kind of antibiotic, Z-Pak or something, but I

23 came back to work after three days because that's

24 what was needed.

1    Q.        And how, if at all, did you believe
2  that the walking pneumonia impacted your ability
3  to do your job while you were at work?
4    A.        I worked a number of times throughout
5  my mother's sickness where I was not well.  So I
6  don't think that it was always easy for me to do.
7  I recall in February that I had at one point
8  developed a bleeding ulcer and I was coughing up
9  blood at work.
10             And so, yeah, there were times where
11  my health was going poorly in trying to manage
12  taking care of my mother and -- and my
13  responsibilities in Ardmore.
14    Q.        So when you were coughing up blood at
15  work, did you go to the doctor?
16    A.        I'm sorry.  Say again?
17    Q.        Did you go to the doctor?
18    A.        I did go to the doctor.
19    Q.        Did others at work know that you were
20  coughing up blood?
21    A.        Again, I believe at least two people
22  were aware because they saw it.
23    Q.        Okay.
24    A.        And I did my best, again, to not make

1  it a big deal because I knew that I shouldn't -- I

2  couldn't be out.

**3        Q.        So who is it that you said knew that**

**4  you were coughing up blood when you were at work?**

5        A.        If I'm not mistaken, Lisa Davenport

6  and Magdaline Intzes both witnessed me coughing at

7  one point during lunch and some black sputum came

8  out into a tissue, quite obviously dried blood,

9  so...

**10       Q.        And did they say anything?**

11       A.        They were very concerned about my

12 health, yep.

**13       Q.        Did they urge you to see a doctor?**

14       A.        Yes.  And I had -- had been, as best

15 I could, given everything going on, getting as

16 best I could medical care.  I could not get even

17 the imaging done because I was not getting time

18 off or any help from Bryn Mawr in terms of being

19 empathetic to my situation.

**20       Q.        Did you ever ask for time off --**

21       A.        I did.

**22       Q.        -- to get imaging done because you**

**23 were coughing up blood?**

24       A.        I remember requesting time off

1   because I was having issues with an ulcer.  As to

2   whether I specifically said, I'm coughing up

3   blood; I can't imagine that I said that, but I

4   can't imagine that if I had been asked that I

5   would have denied it.

6          **Q.       Did Ms. Intzes and -- I apologize --**

7   **the other woman who you said coughing up blood,**

8   **what was her name?**

9          A.       Lisa Davenport.

10         **Q.       Did either of them urge you to go**

11  **home because you were ill?**

12         A.       I recall that was something that they

13  aspired to, but I don't believe we had the

14  personnel to allow it.

15         **Q.       Did they urge you to do it, was my**

16  **question.**

17         A.       As best I can recall, I don't recall

18  them saying, You go home.  I do recall them

19  saying, You need to get better, but I don't recall

20  being told that I should or could go home.

21         **Q.       Now, could either Ms. Intzes or**

22  **Ms. Davenport send you home?**

23         A.       Again, I don't recall who was running

24  the branch at that point, because in February we

1  were converting with Royal Bank.  So I believe

2  Ms. Perez was in a Royal branch in Philly and

3  another location.  So I believe Ms. Intzes had,

4  you know, acting authority but, again, I can't

5  recall specifically to that date.

6       **Q.       Okay.  Do you ever recall asking**

7  **Ms. Intzes, Hey, I'm coughing up blood, can I get**

8  **out of here?**

9       A.       Again, I felt that I brought it up to

10  my manager and I brought it up to my district

11  manager that I was very ill.  And given that they

12  had very little patience for it, despite what I

13  was going through, I don't know that I would have

14  brought it up to Ms. Intzes.

15      **Q.       Okay.  Did you ever tell Ms. Perez**

16  **that you were coughing up blood?**

17      A.       Again, not that I recall that I went

18  out of my way to tell her that.  However, I was

19  very visibly ill for a good portion of February

20  that everyone could see.  Customers as well were

21  concerned and expressed concern.  So it was -- it

22  was a rough period.

23      **Q.       Did you ever tell Ms. Biernacki that**

24  **you were coughing up blood?**

1    A.        I recall telling Ms. Biernacki that,

2  I believe, approximately a week thereafter that I

3  was having serious issues and needed time off

4  because I at least needed to get that checked out;

5  if not, I could just use the unpaid time for a

6  break, because I was overwhelmed, as you can all

7  see from this document.

8    **Q.        Mr. Sutton, my question was, did you**

9  **ever tell Ms. Biernacki that you were coughing up**

10  **blood?  Did you tell her that or not?**

11    A.        I cannot specifically recall.  I do

12  specifically recall telling her that I had a

13  bleeding ulcer and that I was having continued

14  illness.  I have to imagine I did but I cannot

15  specifically recall that mentioned.

16    **Q.        Now, you said you were sick for the**

17  **entire month of February.**

18    A.        I was very sick for the majority of

19  February.

20    **Q.        Now, at that point you had been**

21  **working at the branch for something like a month;**

22  **right?**

23    A.        I had been working in the branch

24  since December.

1      Q.      Do you believe that Ms. Perez had

2   seen you enough to know what you usually looked

3   like and that you now looked worse than usual?

4      A.      There were a lot of comments around

5   my not looking well, my looking tired, my looking

6   very unwell.  I was, again, working full time,

7   leaving work, driving an hour to go take care of

8   my mother for the majority of the night and

9   driving back to work.  So it was a very strenuous

10  time.

11     Q.      In your e-mail, Exhibit 73, you say

12  that you felt, quote, We are a rudderless (sic)

13  ship with absentee leadership who doesn't even

14  take five minutes a week as a group to coach us

15  let alone one-on-one coaching.

16             Did I read that correctly?

17     A.      You read that correctly.

18     Q.      Who are you referring to as "absentee

19  leadership"?

20     A.      Again, I think this was a reference

21  to leadership within the branch.  So, again, that

22  I felt that I was not getting any assistance in

23  the branch to know what to do.  I can recall

24  Debbie Lamartino was brought in to train me in the

1  branch because they did not have time to take me

2  out of the branch, which is traditionally how it's

3  done to teach you how to do your job.

4              So, again, she was at that time,

5  because my manager was not there, really one of my

6  only resources to problem-solve or figure out how

7  things would work, as I mention in here,

8  operations for audit or systems, let alone sales.

9  So it was a rough period of transition

10 professionally and personally.

11     **Q.       Okay.  So when you were talking about**

12 **absentee leadership, you were talking about**

13 **Ms. Perez; correct?**

14     A.       Again, I think I was referring to

15 absentee leadership in the branch, which would

16 have been a reference to Ms. Perez.  But also I

17 think it would refer to Ms. Intzes who had been

18 nominally named the acting manager and who was not

19 really stepping up into the role as best I could

20 say.

21     **Q.       Was Ms. Intzes physically present in**

22 **the branch?**

23     A.       For the most part.  Again, I don't

24 have records of her time.  I'm sure you do.  So

1  you would have a better insight into that.

2      **Q.**     **And you said Ms. Perez was out of the**

3  **branch because there was a acquisition of Royal**

4  **Bank and she had to manage another branch;**

5  **correct?**

6      A.     She was assisting them for a majority

7  of February, I believe, with the Royal Bank

8  conversion.

9      **Q.**     **Okay.  And did you believe it was**

10 **fair to refer to Ms. Perez as absentee leadership**

11 **when she was helping with a merger integration?**

12     A.     Again, I'm repeating myself.

13 There -- there is -- there are comments in here.

14 There's words I would have preferred not to use in

15 terms of absentee leadership and things of that

16 nature.  However, I think it speaks to the

17 position I was in and felt I was in and I was just

18 trying to reach out to somebody to figure out what

19 to do.  I felt overwhelmed and I was looking for

20 someone to provide me some sense of how to move

21 forward.

22     **Q.**     **You went on to say, quote, Right now**

23 **I don't have the bandwidth to fix all the branch's**

24 **problems.**

1               **Did I read that correctly?**

2        A.        You read that correctly.

3        **Q.        Is that a true statement?**

4        A.        In that moment as my -- yes.  In that

5    moment I did not have bandwidth to fix all the

6    branch's problems.

7        **Q.        Did you believe it was part of your**

8    **job description to try and fix at least some of**

9    **the branch's problems?**

10       A.        Yes.  Part of my job was to certainly

11   assist in a great many day-to-day operations at

12   the branch.

13       **Q.        And you were admitting you didn't**

14   **have the ability to do that at that time; correct?**

15       A.        I'm admitting that given absences

16   that that was making life more difficult.

17       **Q.        Your absences; right?**

18       A.        Yes, sir.  My absences.  I also am

19   emphasizing that, again, I felt that I was doing

20   the best I could given the situation and was just

21   looking to try and find a better way forward.

22       **Q.        Is it fair to say that you were**

23   **scapegoating your manager in this e-mail?**

24       A.        I think in this e-mail, again, it

 1  does -- it does -- in this e-mail I think I am

 2  trying to accomplish 101 things when I needed to

 3  accomplish one.  And as a result, I said some

 4  things that I should not have certainly e-mailed

 5  and brought to my district manager's attention in

 6  that format.  I should have in hindsight been more

 7  concise and directly dealt with my concerns around

 8  how I could get back on track.

 9              However, I think given the emotional

10  turmoil of my mother's demise that I was in a bad

11  spot in terms of where I was feeling and I just

12  was overly verbose and I regretted that.

**13      Q.      Mr. Sutton, it's fair to say that in**

**14  Exhibit 73 you were scapegoating your manager,**

**15  Ms. Perez; correct?**

16      A.      I think it is fair to say that I

17  was -- I was looking to try and get some traction

18  to figure out how I could make things better.  As

19  for -- as for scapegoating, I think I certainly

20  was trying to emphasize that I'm trying to make

21  things better and I was just trying to look to how

22  I could make contact and start to get things

23  working in a better way, because my efforts

24  previous to this were obviously not going in my

1  favor in trying to elicit any understanding or

2  compassion.

3      Q.      On Page 2 of your e-mail, Exhibit 73,

4  you said that you feared you would be retaliated

5  against when your mother died.

6      A.      I'm sorry.  Again, this is Page 2?

7      Q.      Yes.  Do you see at the bottom of the

8  page you say, quote, I fear that I will be

9  retaliated against, and that's at the end of your

10 sentence beginning "When my mother finally does

11 pass."

12     A.      Uh-huh.

13     Q.      Do you see that?

14     A.      I do see that.

15     Q.      What did you fear?  How did you feel

16 you would be retaliated against?

17     A.      Again, I felt that I was never able

18 to have any productive conversation around my

19 needs and what would be beneficial given

20 everything that was going on both within the

21 branch and outside of the branch for me

22 personally.  As for -- as for, you know, what I

23 specifically was worried about writing that

24 sentence, I just think that I -- I was exactly

 1  very concerned about how this would be viewed and

 2  how -- how I would be treated, because it had not

 3  been a great start.

 4        **Q.        What's your understanding of what it**

 5  **means to retaliate against somebody?**

 6        A.        My sense is that when someone

 7  retaliates, it's -- they're acting -- they're

 8  essentially -- my sense is that, and my concern in

 9  writing that I was retaliated against -- or

10  worried that I was retaliated against my mother's

11  -- my mother passing was, again, that I was

12  worried that they would use my mother dying as a

13  convenient, you know, reason to terminate my

14  employment.  And I was just hoping that there

15  would be some empathy around this being somewhat

16  of a mitigating circumstance that was beyond my

17  control.

18        **Q.        So my question, Mr. Sutton, was,**

19  **what's your understanding of what it means to**

20  **retaliate?**

21        A.        That I would -- I would, you know,

22  essentially as a result I would lose my job or

23  that I would be discriminated against, that I

24  could be -- I could be treated poorly, which I

1  think was very much my experience, and that it was

2  -- it was my concern that this would be

3  continually hanging over my head, because my

4  desire was to continue to work for Bryn Mawr

5  Trust.

6            And that that is exactly what

7  retaliation would be, would be using something

8  that I had experienced or something that I had

9  observed against me in order to terminate my

10 employment.

11      **Q.      Do you believe you were discriminated**

12 **against?**

13      A.      I -- I -- my sense is this, is that

14 because I was asked about race and I was asked

15 about other issues 11 days, more or less, before I

16 was terminated, I think that speaks pretty plainly

17 to me that, yes, that that was a motivating

18 factor.

19      **Q.      But my question was, do you believe**

20 **you were discriminated against?**

21            MR. PEARLMAN:  He answered your

22 question.

23            THE WITNESS:  I do not.  I think that

24 I was -- I was retaliated against because when I

 1  was asked direct questions with regards to race

 2  and the environment in the branch, I can recall

 3  initially hesitating, because I said I don't want

 4  to get involved with this, because I understood

 5  that this would likely terminate my career.

 6              However, I also was aware that I

 7  needed to live with myself and that given that

 8  some of the toxic issues that I had witnessed were

 9  something that I could speak to, they were not

10  just rumors, that I felt that I had an obligation

11  knowing that -- again, you know, knowing that I

12  was going to be a father, I didn't want to look

13  back on this and say, I didn't say anything

14  because I was afraid of losing a job that I

15  could -- I could -- I could get another job, but I

16  could not look at myself in the mirror and say I

17  excused racist behavior, I looked the other way,

18  and look my son in the eye when he was born.  So I

19  feel good that I did finally say something when I

20  was interviewed by Nikkie Fryer.

21  BY MR. KRAUSS:

22      **Q.        What did Nikkie Fryer ask you about**

23  **race?**

24      A.        Again, she asked me about what I had

1  witnessed in the branch and what I had experienced

2  in terms of interpersonal issues in the branch

3  with specifically Alicia McDaniel and Magdaline

4  Intzes.

5              Again, I believe they had it

6  recorded.  I did not get much out beyond I think

7  the environment's very toxic before that was about

8  the amount I was able to speak to HR.

9      Q.      And so what happened?  They threw you

10  out of the room?

11     A.      And so again --

12              MR. PEARLMAN:  Hold on.  You're done

13  with this exhibit.

14              THE WITNESS:  Thank you.

15              So when I was --

16  BY MR. KRAUSS:

17     Q.      Go on.

18     A.      When I was interviewed over the phone

19  by Nikkie Fryer, I think I had to come back in the

20  next day for Saturday and then I was in training

21  for the next week.  I wasn't thrown out of the

22  building.  It was after hours after we had closed.

23              When I returned to the branch after

24  my week in training I was fired in the first day

1  or two that I was back, if I recall.

2      **Q.        So walk me through.  You got a phone**

3  **call from Nikkie Fryer; correct?**

4      A.        Yes.  So this is in July I got a

5  phone call -- everyone in the branch had to speak

6  with her, and I was taken back into the manager's

7  office to speak with Nikkie Fryer and I was asked

8  repeatedly about things at the bank, and was I

9  aware of any issues with people not being paid

10 properly, or being shorted time, and also with

11 regards to the environment in Ardmore.

12                And once I -- I initially said I

13 don't want to get involved in this.  I don't want

14 to get involved in this, because my instructions

15 had been from management to really just mind my

16 business and to do my job and again --

17     **Q.        And so who had instructed you to mind**

18 **your business and do your job?**

19     A.        The instructions I was getting from

20 my manager and my district manager were to focus

21 on the teller line and not to worry about anything

22 else within the branch.  For instance, any racial

23 issues that were in existence, any tension that

24 existed within the branch.

ERIN DINGER v BRYN MAWR BANK                          Page 145
Michael Sutton, 11/04/2020

1      **Q.        Did you ever discuss racial issues**
2   **and tension with either Ms. Perez or**
3   **Ms. Biernacki?**
4      A.        I did speak with Ms. Perez regarding
5   tensions between Magdaline and Alicia.  I tried to
6   address what I felt were some disparities in both
7   the customers that were being directed to both
8   individuals and, again, their attitudes toward
9   each other were -- were obvious to customers, let
10   alone to us as employees, that there was conflict
11   there.
12           And so I simply was doing what I
13   thought I could do to contact my manager and say,
14   I think this is a situation that you need to get
15   involved in, and my sense is that nothing positive
16   came from it, as within about a month Alicia was
17   moved out of the branch and Magdaline then soon
18   thereafter.
19      **Q.        And do you know why either one of**
20   **them was moved out of the branch?**
21      A.        I was not given a reason.  When
22   asked, I was told it was not something that,
23   again, I should be concerning with myself.  That
24   Alicia was still with the bank and that if

 1  customers came in with questions on outstanding

 2  items that I should tell them that Alicia was

 3  still at the bank and that they should contact her

 4  via e-mail, because we were not given any

 5  forwarding information for where she would be

 6  placed.

 7      **Q.      Do you know whether either Alicia**

 8  **McDaniel or Maggie Intzes asked to be moved out of**

 9  **the Ardmore branch?**

10      A.      Again, I'm not familiar with how

11  things occurred with regards to people being moved

12  offices.  The messaging to myself as the head

13  teller and the other two tellers being the senior

14  teller and a part-time teller was focus on the

15  teller line; don't worry about what happens on

16  what they call the platform side.

17      **Q.      That was your job; right?**

18      A.      Say again?

19      **Q.      That was your job.  Your job was the**

20  **teller line; right?**

21      A.      Yes.

22      **Q.      Do you believe it was appropriate for**

23  **management to tell you to focus on the teller**

24  **line?**

1       A.         I do think it was appropriate to

2  remind me and I was very well aware that the

3  teller line was my primary area of responsibility.

4  However, things were so tense within the branch

5  that customers and other employees were bringing

6  complaints to us that we were then escalating

7  because it was a very tense environment that made

8  customers feel uncomfortable.

9              So simply an effort to try and

10 improve that situation I tried to escalate it and,

11 obviously, no traction happened with the staff as

12 it existed.

13      **Q.       Is it fair to say that Ms. McDaniel**

14 **and Ms. Intzes didn't get along?**

15      A.         Again, I'm not privy to their entire

16 history together.  I can only speak to what I

17 experienced and, again, there was a very difficult

18 and troubling dynamic where it appeared to me

19 based on my interactions that Ms. Intzes would

20 often make commentary to Ms. McDaniel that was

21 very inappropriate and at times, and a number of

22 times, explicitly what I would consider to be

23 racist commentary.

24      **Q.       And this is the commentary you've**

1   talked about earlier in the deposition; correct?

2        A.        And I alluded to that commentary

3   earlier.  The other issues, however, though were

4   just, to my mind, both of -- both Ms. Intzes and

5   both Ms. McDaniel had responsibilities on the

6   teller line with me from time to time just to

7   cover lunches, things of that nature.

8                 It was disproportionately a

9   responsibility of Ms. McDaniel, where Ms. Intzes

10  rarely was required to do any work on the teller

11  line which, again, created a situation where

12  Ms. McDaniel would be very pressed for time and

13  she was often having to turn over customer after

14  customer as Ms. Intzes would be typically directed

15  the more affluent clientele which in Ardmore was

16  predominantly Caucasian, and Ms. McDaniel would

17  get the more low income, based on certainly the

18  accounts she was bringing up to me to do deposits

19  for and the people she was meeting like more

20  workaday trade, which, of course, would be less

21  lucrative for her as she was trying to move

22  forward with her career path.

23                It was disturbing to me that it

24  seemed that based on Ms. McDaniel's race, as that

 1  was the only real difference I could see, they

 2  both were very capable at their jobs, that it was

 3  surprising to me that it seemed certain clients

 4  were being directed to Ms. Intzes and not directed

 5  to Ms. McDaniel.

 6      **Q.        Ms. Intzes was senior to**

 7  **Ms. McDaniel; correct?**

 8      A.        That is my understanding that she had

 9  some prior experience in private banking.

10      **Q.        Well, in fact, also Ms. Intzes was a**

11  **universal banker 2; correct?**

12      A.        Yes.

13      **Q.        Ms. McDaniel was a universal banker**

14  **1; correct?**

15      A.        Yes.  However, the responsibilities

16  as it deals with my area being the teller line are

17  the same for both a banker 2 and a banker 1.  They

18  both are required to open a drawer so that we can

19  go to lunch.

20              So, again, there were a lot of issues

21  that I'm not fully privy to between them, but

22  certainly what I did experience and what I did see

23  was very troublesome.

24      **Q.        So just to make it clear, a universal**

1  **banker 2 is senior to or a promotion over a**

2  **universal banker 1; correct?**

3      A.        My sense, again, is that it is a more

4  senior position.  You do typically have more

5  experience.  However, based on the folks that were

6  being directed to Ms. Intzes versus Ms. McDaniel,

7  there was not a lot of nuance to determine if

8  these were necessarily the appropriate clients to

9  meet with a banker 1 or banker 2.  The appearance

10  seemed to be mostly driven on race.

11          So, again, if we had workaday or, you

12  know, people who were just coming and cashing

13  paychecks that we wanted to open accounts with,

14  they were the people that Alicia should be seeing

15  who was African-American and the -- Ms. Intzes who

16  was Caucasian, she was often given the -- the more

17  affluent white folks that would come and sit with

18  her for hours, and she wouldn't necessarily be

19  opening accounts, but it would cause a great

20  stress in the workload in the branch.  So that was

21  causing tension as well.

22          So there was a variety of factors,

23  but race was certainly a primary motivator as far

24  as I could tell in why they could not work

 1  together.  But there was a lot of troubling signs

 2  as to what was going on there historically

 3  perhaps.  I can't speak to anything beyond my six

 4  and a half months of experience.

 5      **Q.        So, Mr. Sutton, you keep saying that**

 6  **Ms. Intzes was being given these customers;**

 7  **Ms. McDaniel was being given these customers.  Who**

 8  **was doing the giving?  Who's giving out customers?**

 9      A.        So, again, it would be the manager

10  directing based on, I believe, what she was being

11  coached to do by the district manager.  So, again,

12  what -- what I observed to be at issue was that

13  Ms. McDaniel was, again, being given a

14  disproportionally large workload between both the

15  teller line and a lot of people coming in that she

16  would have to service both to open accounts and

17  just to do customer service.

18              Whereas Ms. Intzes was not held to

19  that same standard.  That to me was very stark,

20  again, having worked in a number of banks, having

21  worked with bankers of a variety of different

22  stripes.  I've never seen the division of

23  clientele done in such a deliberate manner.

24      **Q.        And the person who you say was**

1   dividing that clientele in a deliberate manner was
2   the branch manager, Ms. Perez; correct?
3        A.        My sense was that it was being --
4   those activities were being driven by management,
5   so district manager and the manager at the bank.
6        Q.        Well, Ms. Perez; right?
7        A.        So Ms. Biernacki and Ms. Perez.
8        Q.        Was Ms. Biernacki at the branch
9   saying, Hey, you customer, go to her; you
10  customer, go to her?
11       A.        She was at the branch quite a bit.  I
12  know she would meet with Danielle for extended
13  periods of time to coach with her, but I was not
14  privy to many of those conversations.
15                 However, I would say based on my
16  observations, the resulting behavior changes would
17  be to exactly delineate what I was just
18  describing.  So the --
19       Q.        My question -- please answer my
20  question.  Isn't it true that the person you say
21  was dividing up the clients between Ms. Intzes and
22  Ms. McDaniel was the branch manager Ms. Perez;
23  yes?
24       A.        Again, that is my sense of things.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  However, when we would try and address anything in

2  the branch with regards to sales, there was --

3  there was very much a couch language where Laura

4  would like to see it done this way.

5              So I understand that we were getting

6  a lot of direct coaching from the district

7  manager, which at times does make sense.  However,

8  my impression is that some of this direction was

9  not necessarily equitable in terms of sending the

10  most appropriate clients to the most appropriate

11  people.

12              It seemed to me to be very

13  disproportionate in terms of workload provided for

14  Ms. McDaniel versus workload provided to

15  Ms. Intzes and there was not a lot of rhyme or

16  reason.

17       Q.       **Ms. Perez is black; correct?**

18       A.       She is.

19       Q.       **Okay.  Now, bankers had goals for**

20  **opening accounts; correct?**

21       A.       That is correct.

22       Q.       **And if you opened a savings account,**

23  **does it matter for goal purposes whether it's a**

24  **$100 deposit or a $1,000 deposit?**

```
 1        A.        It does not.  However, based on the

 2   amount of money being deposited, certain products

 3   would be worth more to their score card, if I'm

 4   not mistaken.  So, for example, if you had someone

 5   who could open a high yield savings account versus

 6   a plain savings account with $100 in it, you were

 7   certainly being rewarded for that in your score

 8   card.  So, again, that was something that was an

 9   issue.

10             Another issue that was common was

11   that credit would be distributed for sales that,

12   again, did not seem to make sense in that clients

13   would come in to open a credit card with a

14   brochure with Ms. McDaniel's card attached to it

15   that she had spoken to them and then whoever would

16   open the card would then get the credit.

17        Q.        Did you see that?

18        A.        In my prior experience --

19        Q.        Do you know that was happening?

20        A.        I know that was happening --

21        Q.        And how?

22        A.        -- from, again, arguments that were

23   happening during morning meetings around sales.

24        Q.        So you're just repeating what other
```

1  people were saying?

2      A.      I am giving you an insight into what

3  we discussed as a branch and these were constantly

4  issues that were causing tension between them.

5      Q.      Mr. Sutton, did you ever see somebody

6  get credit for a sale you thought was

7  Ms. McDaniel's?  Did you ever see that happen?

8      A.      Yes.

9      Q.      When did you see that happen?

10     A.      I can recall we had a, I believe, a

11  business checking account promotion --

12     Q.      Right.

13     A.      -- in March and April, and I think

14  maybe even May, and there were a number of

15  instances where accounts were opened where there

16  was -- apparently the client came in with

17  documentation with Alicia's information on it.

18     Q.      Did you see that?

19             MR. SCHWARTZ:  Wait.  Let him finish

20  his answer.

21             MR. KRAUSS:  No, no.  My question

22  was, what did you see --

23             MR. SCHWARTZ:  No, no.  He was

24  answering the question.

 1              MR. KRAUSS:  -- and I'm getting this

 2  stream of consciousness hearsay.

 3  BY MR. KRAUSS:

 4       Q.        What did you see?

 5              MR. PEARLMAN:  No, no.  Come on.

 6  That's not proper, Aaron.

 7  BY MR. KRAUSS:

 8       Q.        What did you see?

 9              MR. PEARLMAN:  He's answering your

10  question.  Please.  Maybe it takes some patience

11  on your end, but let him give an answer.

12              THE WITNESS:  Again, from my

13  experience there were a number of customers who

14  would come in with information, with cards from

15  Alicia who would then have to open accounts with

16  other folks.

17              Typically that credit would be

18  transferred to whoever originated the sale.  That

19  was consistently not happening in that branch.  I

20  can't speak to it happening more than the few

21  times I observed it in the six months that I was

22  there.

23              However, my sense in working at other

24  banks is that it happens and it's not something

1  that managers should be allowing to happen.

2  BY MR. KRAUSS:

3      **Q.        Okay.  Mr. Sutton, are you saying**

4  **under oath that you saw with your own eyes**

5  **somebody come in with a brochure --**

6      A.        Uh-huh.

7      **Q.        -- with Ms. McDaniel's card on it --**

8      A.        (Witness nods.)

9      **Q.        -- and then you saw somebody else get**

10 **credit for opening that account?  You saw both of**

11 **those things with your own eyes?**

12     A.        I did.  In fact, because I would take

13 deposits for opening checking and savings

14 accounts, the customers would come to me with

15 their deposit slip after finishing with the

16 banker.  They would have their packets with them

17 and I can recall at least two instances, if not

18 three, that Ms. McDaniel's card was there;

19 however, that credit never got transferred.

20     **Q.        How do you know that credit never got**

21 **transferred?**

22     A.        Because I would always ask

23 afterwards, Hey, did you -- Mr. Braysoff

24 (phonetic) came in and opened that account; did

1  someone let you know?  And she would then have to

2  try and see if she could retrace steps to get the

3  credit for it.

4       Q.        And do you know whether she did?

5       A.        My sense?  Again --

6       Q.        No, no.  Do you know whether she did?

7       A.        I do not -- I do not know that she

8  always got credit for her sales.

9       Q.        Do you know if she didn't get credit

10 for any of her sales?

11      A.        I'm aware of several conflicts around

12 her not getting credit for sales.

13      Q.        All right.

14      A.        But that was not something that was

15 given to me as being in my purview.  Again, I

16 think you're asking of me more information than I

17 would have.

18      Q.        You got a copy of Bryn Mawr Trust's

19 personnel manual when you started at the bank;

20 correct?

21      A.        I did.

22      Q.        Did you read it?

23      A.        I did.

24      Q.        Did you try and follow it?

1    A.       I did.

2    Q.       Let me show you what's been marked as

3  Exhibit 18.  Exhibit 18 is the HR manual; correct?

4    A.       Yes.

5    Q.       Let me ask you to turn to Page 10.

6             Do you have that page?

7    A.       Yes.

8             MR. SCHWARTZ:  Wait a minute while

9  Jason gets to that.

10  BY MR. KRAUSS:

11   Q.       On Page 10 of the employee manual it

12  says that there is a duty to report and a

13  complaint procedure.

14            Do you see that?

15   A.       I do see that.

16   Q.       And it begins by saying, Any employee

17  who believes that he or she has been discriminated

18  against, harassed by or retaliated against by any

19  employee or nonemployee with whom we do business,

20  or witnesses such behavior must immediately report

21  this conduct to human resources.

22            Do you see that?

23   A.       I do see it.

24   Q.       Did you ever report to human

1  resources that you believed you had witnessed

2  discrimination, harassment, or retaliation?

3       A.       When I spoke to Nikkie Fryer I did in

4  July.  However, I met with Nancy Pinkowicz in

5  April to try and determine where my future would

6  lie with the bank as HR was not giving me much

7  sense of my own standing.  And in discussing the

8  issues that were happening in Ardmore with Nancy

9  Pinkowicz, I did make her aware that there was

10 issues around and disputes around credit and that

11 I was not sure exactly what was going on, but it

12 concerned me that this could be an issue for them.

13 I do not know that anything was ever escalated

14 beyond that.

15      Q.       Now, Nikkie Fryer called you;

16 correct?

17      A.       She called the branch and spoke to

18 every branch employee.

19      Q.       And Nikkie Fryer was the one who

20 specifically brought up the topics of potential

21 discrimination or harassment with you; correct?

22      A.       She did.

23      Q.       Okay.  You never brought up those

24 topics with her; correct?

ERIN DINGER v BRYN MAWR BANK                                Page 161
Michael Sutton, 11/04/2020

```
 1        A.        No.  Again, I only spoke to her twice
 2   that I can recall outside of doing my paperwork.
 3        Q.        And, in fact, when she brought up the
 4   topics of discrimination or harassment your first
 5   reaction was, I don't want to talk about it, I
 6   don't want to get involved; correct?
 7        A.        My first response was I do not want
 8   to get involved because, again, I had been -- I
 9   had felt that this would be something that could
10   be used to potentially end my career and I in the
11   moment was thinking that perhaps it would be
12   better, as I had been directed to do, to keep my
13   head down.
14              However, thankfully, I have morals
15   that overwon, or won over I should say, and I
16   said, No, you keep asking me this, the environment
17   is toxic.  I did not get a chance to expand beyond
18   that.
19        Q.        Why not?
20        A.        Because I went to training -- well,
21   the conversation was, I was told, we'll look into
22   it; we'll get back to you.  I went to training the
23   next week and I was, I believe, fired the Tuesday
24   I was back in the branch.
```

1     Q.        Do you believe Ms. Fryer cut you off

2    and prevented you from giving a complete answer?

3         A.        I don't know what her motivations

4    were.  I just know that we did not have a

5    continuation of that conversation and I was not

6    given an opportunity to further explain my comment

7    or provide any context to it.

8         Q.        Did you feel when you made your

9    comment to Ms. Fryer that it needed more

10   explanation?

11        A.        I did.  And, again, I was

12   anticipating upon either my -- during my week in

13   training or when I returned to the branch that I

14   would get contact from HR to look into this

15   situation more.  However, when I did get contact

16   from HR it was to let me know that they were

17   terminating me.

18        Q.        I'm confused.  You say you were at

19   the branch and you got a call from Ms. Fryer

20   asking to meet with you; correct?

21        A.        No.  So, again, if I may repeat,

22   Ms. Fryer called the branch and we all had to go

23   into the manager's office to speak with her.

24        Q.        Did she call you individually or did

1  she just call the branch and say --

2       A.        She called the branch --

3                 MR. PEARLMAN:  Hold on.

4                 THE WITNESS:  I'm sorry.

5                 MR. PEARLMAN:  Let him finish his

6  question and then you can give an answer.  Okay?

7                 THE WITNESS:  Okay.

8  BY MR. KRAUSS:

9       Q.        Did she just call the branch and say,

10 Hey, look, I got to meet with everybody.  Line

11 everybody up outside the conference room and I'll

12 meet with all of them one at a time.  Is that what

13 happened?

14      A.        No, sir.

15      Q.        What happened?

16      A.        Nicola Fryer called the office.

17 After we were closed after the vault and

18 everything was closed, we were then brought in one

19 at a time to be asked these questions.  I have to

20 imagine that the other employees were asked the

21 same things.

22      Q.        Okay.  Where were you brought in the

23 process?

24      A.        We were brought into the manager's

 1  office.

 2      Q.      Were you the first one brought in?

 3  Were you the last?  Were you somewhere in the

 4  middle?

 5      A.      I believe I was the second person

 6  brought in.

 7      Q.      Do you know who the first was?

 8      A.      It might have been Lisa Davenport, my

 9  senior teller.  I'm fairly confident she was the

10  first to be brought in.

11      Q.      Do you have any sense as to how they

12  were selecting the order?

13      A.      I think it might have just been who

14  was an available body as we were also trying to

15  finish our operations and close up the branch for

16  the day.

17      Q.      So you were brought into the

18  conference room with Nikkie Fryer; correct?

19      A.      Yes.

20      Q.      Who else was in the room?

21      A.      I believe Danielle Perez was in the

22  room.

23      Q.      Tell me your best memory of what

24  happened in that room.

1      A.        Again, I was asked have I ever

2  experienced -- or have I ever witnessed any toxic

3  environment.  And I said, I really would not like

4  to get into that; I'm just trying to keep my head

5  down.

6            Then they asked me about it again and

7  I said I've really been thinking about it and I

8  said the environment here is toxic.  That is -- at

9  that point I was essentially cut off from talking

10  about that.

11            They turned to me and then said, Have

12  you ever experienced being -- having your pay cut

13  or your pay being shorted, your time being

14  changed?  And I said, Perhaps.

15            And that was the extent to which I

16  was able to speak to HR regarding those two items.

17      **Q.        Explain to me how you believe you**

18  **were cut off.**

19      A.        In that they needed to speak to the

20  next person.  I was directed to go back out and

21  ensure that the teller line was closed up, the

22  computers were off, and everything was ready to go

23  and turn the key, and then the next person was

24  brought in to speak.

1     Q.        Did they ask you what have you seen?

2     A.        Again, I was not asked to elaborate.

3  I assumed they said they were doing an

4  investigation to start and I would be asked more

5  questions.  However, I was never asked any follow-

6  up.

7     Q.        You said you were asked whether you

8  thought any of your time had been shorted and you

9  said, Maybe; correct?

10     A.        I said, Maybe.

11     Q.        Okay.  Did they ask you any questions

12  about when you thought your time might have been

13  shorted?

14     A.        I don't recall them asking that.  I

15  do recall them saying they were going to review

16  for whatever time period but I don't exactly

17  recall.

18     Q.        How long was the meeting?

19     A.        How long was what?

20     Q.        The meeting.

21     A.        It was maybe four to five minutes.

22  Again, it was very rushed at the end of a long day

23  and they were just -- we were all still on the

24  clock.  They needed to get us out and on the road.

 1 | So it was a very, very short conversation given

 2 | the, you know, significance of the subject matter.

 3 | **Q.        Now, let's go back to your meeting**

 4 | **with Ms. Pinkowicz.  Did you tell her that you**

 5 | **wanted to report harassment, discrimination, or**

 6 | **retaliation?**

 7 | A.        When I met with Ms. Pinkowicz my

 8 | primary objective was to figure out what my

 9 | standing was with the bank, because I was very

10 | obviously concerned after the absences that I had

11 | had.

12 |           In meeting with Ms. Pinkowicz, who's

13 | the only person in HR willing to meet with me, she

14 | essentially told me to do my job and to, you know,

15 | again, just do what I could do, what was in my

16 | control.  You can, you know, essentially start on

17 | a fresh -- on a fresh start.

18 |           What I brought up to her was my

19 | continued concerns about the environment in

20 | Ardmore and that there were a lot of interpersonal

21 | issues that may be related to race, but that I had

22 | concerns.  And that was -- again, I don't recall

23 | her asking me much more than, you know, who's the

24 | manager there.

 1              And then I assumed, again, she would
 2   be doing what I thought human resources would do
 3   which would be to sort out what the issue was.
 4        Q.       **What words do you remember using?**
 5        A.       I remember using, I believe, the
 6   word, This does not make sense to me that certain
 7   individuals are being directed to one banker
 8   versus another and certain bankers are being asked
 9   to do more tasks than others.  And that was, you
10   know, again, couched in words that in hindsight I
11   should not have couched them in.
12              I should have probably been a little
13   bit more assertive in bringing up, you know, or
14   more forthright in bringing up my concerns to
15   Nancy Pinkowicz.
16        Q.       **What concerns?**
17        A.       The concerns about interpersonal
18   issues and the potential of race being obviously a
19   big jumping-off point for why there was such
20   conflict within the branch and it was not a good
21   environment.  I had not emphasized that in
22   retrospect as much as I should have.
23        Q.       **So, in fact, you hadn't brought it up**
24   **at all; correct?**

1      A.        I brought it up.  However, I did not

2  bring it up in hindsight as clearly as I thought I

3  -- I thought I did enough so that they would at

4  least look into the situation.  Based on my

5  experience, no investigation, that I'm aware of,

6  was conducted.

7      **Q.        So do you agree that from a universal**

8  **banker's perspective working on the teller line is**

9  **not something they want to do?**

10     A.        So I would say having been a

11 universal banker and also from my experience being

12 a head teller, they do find that it can be a

13 difficult position to try and do both.

14          However, I do recall both Ms. Intzes

15 and Ms. McDaniel able to make sales from the

16 teller line because they had that system on their

17 computer.  So I found it a bit disingenuous that

18 we couldn't just share that responsibility,

19 meaning that they could step in for the hour that

20 two tellers needed to go for lunch and divide that

21 up in a reasonable fashion.

22     **Q.        Mr. Sutton, you agree that from a**

23 **universal banker's perspective working the teller**

24 **line is a pain in the neck; correct?**

ERIN DINGER v BRYN MAWR BANK                                    Page 170
Michael Sutton, 11/04/2020

1      A.         I don't think it's something that
2  they seek out to do.
3      **Q.         In fact, they don't want to do it;**
4  **right?**
5      A.         Some bankers are more resistant to
6  others.
7      **Q.         And does it surprise you that when**
8  **there's a job that people generally don't want to**
9  **do, it's the junior person that ends up doing the**
10 **bulk of it?  Does that surprise you?**
11     A.         It does not surprise me that when
12 there are some undesirable tasks that the lowest
13 person on the totem pole would take on the
14 majority of them.  However, I would not consider
15 the work division to be -- to have been that well
16 thought out.
17              It seemed to me to not have -- to not
18 have -- to not have been thought well out in terms
19 of who should best be sitting with whom.  I think
20 it was we -- I think my sense of it was that some
21 customers were perhaps uncomfortable with dealing
22 with an African-American perhaps.  I don't know.
23              But it doesn't seem -- I never
24 experienced that seeing Alicia interact with any

1 | client that they felt uncomfortable.  But I did

2 | see a number of clients who interacted with

3 | Ms. Intzes who felt overwhelmed.

4 | So I can't speak to whether that

5 | should in turn make the division of labor the way

6 | it was.  What I saw and based on my experience,

7 | the division of labor was done in a more arbitrary

8 | way.

9 | **Q.        Did you ever write an e-mail to human**

10 | **resources complaining about what you believed to**

11 | **be discrimination, harassment, or retaliation?**

12 | A.        I did not.  What I did do is I tried

13 | to bring it up with the manager who I thought

14 | could best parse it and that was not the

15 | appropriate way to do that.

16 | **Q.        Did you ever write an e-mail to your**

17 | **manager complaining about what you believed was**

18 | **discrimination, harassment, or retaliation?**

19 | A.        Again, I don't recall specifically

20 | e-mailing about the idea of discrimination or

21 | harassment.  I definitely do recall a number of

22 | e-mails just saying that things were not going

23 | well between -- in the branch and that, you know,

24 | it would behoove us to try and, you know, again,

1  introduce some civility and some professionalism.

2      Q.       Let me ask you to turn back to the HR

3  manual.

4      A.       Could we do a break for the rest room

5  in a few minutes?

6      Q.       Sure.  Let me real quick get through

7  the manual and then absolutely.

8      A.       Sure.

9      Q.       If you could turn to Page 15.  Do you

10 see the section labeled Overtime?

11     A.       Yes.

12     Q.       It says only managers may schedule

13 overtime and employees must have prior approval

14 for each instance of overtime.

15              Do you see that?

16     A.       I do see that.

17     Q.       And you were aware that Bryn Mawr

18 Trust was doing its best to try and cut down on

19 overtime?

20     A.       Yes.

21     Q.       That's common; correct?

22     A.       It's common practice.

23     Q.       And Section 3 is labeled Attendance

24 and Punctuality.

```
 1                    Do you see that?
 2       A.        I do.
 3       Q.        It says, Employees are expected to
 4  work all scheduled workdays and during all
 5  scheduled work hours and to report to work on
 6  time.  Correct?
 7       A.        I do see that.
 8       Q.        You were aware of that; right?
 9       A.        I am aware of it.
10       Q.        And you know you got to show up at
11  work on time; right?
12       A.        I do.
13       Q.        It goes on to say, Violations of
14  department standards for excessive and unexcused
15  lateness may adversely affect an employee's
16  performance appraisal and they may be subject to
17  disciplinary action up to and including
18  termination.
19                    Do you see that?
20       A.        I do.
21       Q.        Okay.  And you're aware of that;
22  correct?
23       A.        I was aware of this policy.
24       Q.        You agree with it; right?
```

```
 1        A.        I think that it's a policy that has

 2   merit depending on its application.

 3        Q.        Let me ask you to turn to Page 51.

 4   Do you see at the top under Workers' Compensation

 5   it says, If an injury occurs on the job, no matter

 6   how slight, the employee must immediately report

 7   the injury to their supervisor and complete an

 8   accident report to be submitted to the human

 9   resources department within one business day of

10   the accident.

11                  Do you see that?

12        A.        I do.

13        Q.        And you were aware of that

14   requirement; correct?

15        A.        I was aware of that requirement.

16        Q.        Let me ask you to turn to the next

17   page, Page 52.  Do you see where it lists Bryn

18   Mawr Trust's antiretaliation policy?

19        A.        I do see the section that says

20   antiretaliation.

21        Q.        Were you aware that Bryn Mawr Trust

22   had an antiretaliation policy?

23        A.        I was.  Because most companies

24   should.
```

```
 1        Q.        Let me ask you to turn to the next
 2   page, Page 54.  The Employee Acknowledgment Form.
 3   And do you see most of the way towards the bottom
 4   of the page it says, I understand that Bryn Mawr
 5   Trust has the right to monitor the operation and
 6   use of its electronic systems and reserves the
 7   right to access, review, record, and disclose all
 8   communication data, records, files and other
 9   information created on -- that's created or stored
10   on, retained in the electronic systems without
11   prior notice to me.
12        A.        I do see that.
13        Q.        And were you aware that Bryn Mawr
14   Trust had the policy to review whatever you did
15   electronically on Bryn Mawr Trust's systems?
16        A.        Yes.
17        Q.        Let me ask you to turn to Page 58
18   where it says Employer Monitoring.  And do you see
19   it says, Employees are cautioned that they should
20   have no expectation of privacy while using the
21   Internet on company computers, company-issued
22   mobile devices, networks and other BMT IT
23   resources and communication systems.
24                  Do you see that?
```

```
 1      A.        I do.

 2      Q.        Were you aware that Bryn Mawr Trust

 3  could monitor anything you were doing

 4  electronically and that you had no expectation of

 5  privacy?

 6      A.        I do.

 7                MR. KRAUSS:  Let's take that break

 8  you requested.

 9                VIDEOGRAPHER:  Off the video record,

10  3:02 p.m.

11                     RECESS

12                VIDEOGRAPHER:  Back on the video

13  record, 3:14 p.m.

14  BY MR. KRAUSS:

15      Q.        So, Mr. Sutton, let's go back to your

16  e-mail to Laura Biernacki, Exhibit 73.  At the

17  bottom of the second very long page of that e-mail

18  you write that you were, quote, willing to bet

19  your paycheck that Laura Biernacki had been

20  largely left in the dark about your family

21  situation.

22                Did I read that correctly?

23      A.        Yes.  That is what I wrote.

24      Q.        Okay.  Now, let me show you what's
```

1  been marked as Exhibit 71.  Exhibit 71 is an

2  e-mail exchange between Ms. Perez, Ms. Fryer, and

3  Laura Biernacki on February 5th.

4              Do you see that?

5       A.    I do.

6       Q.       And that's three days before you

7  wrote your very long e-mail to Laura Biernacki;

8  correct?

9       A.    Yes.

10      Q.       And in the e-mail Ms. Perez says that

11 she was e-mailing regarding you and that she had

12 previously spoken with Ms. Fryer and Ms. Biernacki

13 about you regarding both your attendance and what

14 you're going through with your family and your own

15 personal health.

16              Do you see that?

17      A.    I do see that.

18      Q.       And Ms. Perez reports that your

19 mother is in hospice care and you reported she was

20 declining rapidly.

21              Do you see that?

22      A.    I do see that.

23      Q.       She went on to say that it was

24 affecting your ability to do your duties and you

1  had voiced your concerns about that to Ms. Perez;
2  correct?
3       A.       Yes.
4       Q.       And Ms. Perez asks, Are there any
5  options that are available to you.
6                Do you see that?
7       A.       I do see that.
8       Q.       She noted that you requested to leave
9  early that day and she was fine with that, but
10 that she was concerned with your overall well-
11 being.
12                Do you see that?
13      A.       I do see that.
14      Q.       And you say Laura Biernacki then
15 reached right back out to Danielle Perez to
16 discuss your situation and your mother being in
17 hospice.
18      A.       I do see that.
19      Q.       Okay.  So you lose the bet; right?
20                MR. SCHWARTZ:  Objection.
21                THE WITNESS:  I -- I am obviously --
22 I was obviously mistaken on the 5th and the 8th in
23 thinking that Laura had not been clearly
24 identified -- or clearly relayed as to what my

 1 | situation was with my mother.

 2 | BY MR. KRAUSS:

 3 |      **Q.        Okay.  So you wrote in your e-mail,**

 4 | **Exhibit 73, that you were willing to bet your**

 5 | **paycheck that Laura Biernacki was largely in the**

 6 | **dark as to your family situation; correct?  That's**

 7 | **what you wrote?**

 8 |      A.        That is -- those are the words what I

 9 | wrote.

10 |      **Q.        Okay.  And, in fact, three days**

11 | **earlier she had gotten an e-mail explicitly**

12 | **explaining your family situation and asking for**

13 | **ways to help you; correct?**

14 |                MR. SCHWARTZ:  Objection to explicit.

15 |                THE WITNESS:  So, obviously, this was

16 | not something I was aware that Danielle had done,

17 | but I'm glad to see that she had.

18 | BY MR. KRAUSS:

19 |      **Q.        Okay.  And Mr. Schwartz was saying is**

20 | **this explicit.  You see the e-mail asking for help**

21 | **says, quote, Are there any options that are**

22 | **available to you?**

23 |                **Do you see that?**

24 |      A.        Yeah, I do see the sentence.

1   However, it doesn't...

2        Q.        So let me go back to Exhibit 73.  You

3   say at the end of your e-mail, quote, I assure

4   you, even if I have to be wheeled in tomorrow and

5   Saturday, I'll be there for my team 110 percent.

6        A.        Uh-huh.

7        Q.        Correct?  You said that; right?

8        A.        That is what I stated.

9        Q.        Okay.  Did you think you'd be

10  productive if you had to be wheeled in?

11       A.        No, I did not feel that it would be

12  beneficial to be wheeled in on a gurney.  However,

13  I do think that, again, as we've gone over seven

14  times I'd say at this point, I was in a bad

15  position; I felt very -- I felt very concerned

16  about the fact that, obviously, I knew that I

17  should be in the branch and wanted to be in the

18  branch, but I was unable to be in the branch.

19                 However, while I appreciate that

20  Danielle was apparently asking for options that

21  would be available to me, none were ever offered.

22  So it's good to know in hindsight.

23       Q.        Now, in fact, even though you said

24  that you were assuring your boss's boss that you

1  would be in tomorrow and Saturday even if you had

2  to be wheeled in and you'd be there 110 percent,

3  in fact, you called out sick the next day.  Right?

4       A.      If I remember correctly I did not --

5  was not able to return until Saturday of that

6  week, but you would have that record better than

7  I, sir.

8       Q.      So even though you said you'd be

9  there tomorrow no matter what, in fact, you

10 weren't there tomorrow?

11      A.      Yes.  Apparently I was unable with

12 the bleeding ulcer to get there.

13      Q.      Now, Laura Biernacki put a call in to

14 you when she got your e-mail; correct?

15      A.      Yes.  Apparently.

16      Q.      And she left you a voicemail; right?

17      A.      That's what her e-mail states.

18 However, I don't know.

19      Q.      Did you ever call her back?

20      A.      I don't recall speaking to her that

21 day.

22      Q.      Okay.  So why not?

23      A.      I recall -- I believe I left her a

24 message on her phone in the office, but I don't

1  know that I heard from her.  She traveled from

2  branch to branch.

3      **Q.        Now, you see on the first page of**

4  **Exhibit 73 Ms. Perez corrects the statement that**

5  **you attributed to her about the death of her**

6  **father.**

7              **Do you see that?**

8      A.        Yes.

9      **Q.        And Ms. Perez says, quote, What I**

10  **stated was, I lost my father when I was ten; it is**

11  **still a pain that I deal with daily.**

12                **Did I read that correctly?**

13      A.        You did read that correctly.

14      **Q.        And, in fact, that's what she said;**

15  **right?**

16      A.        That is not what she said to me.

17      **Q.        Okay.  Ms. Perez also went on to say,**

18  **I mentioned that I'm here to talk if you want.**

19              **Do you see that?**

20      A.        I do see that she says that.  And,

21  again, when that was mentioned to me, it was

22  because I was being told I had to stay to make

23  sales calls and could not go to group therapy, but

24  that an alternative would be that she would be

 1  glad to chat with me in between calls.  So I don't

 2  believe that that was an accurate representation

 3  of the conversation.

 4      **Q.      Now, in addition to bad-mouthing your**

 5  **boss to Laura Biernacki, you also bad-mouthed the**

 6  **entire Ardmore branch when you were in training;**

 7  **right?**

 8          MR. PEARLMAN:  Objection to form.

 9          THE WITNESS:  I'm sorry?  Could you

10  provide me some context to this?

11  BY MR. KRAUSS:

12      **Q.      Do you remember going for training in**

13  **Bala Cynwyd?**

14      A.      Yes.  I was sent for a day down to

15  observe, yeah.

16      **Q.      And do you remember bad-mouthing the**

17  **Ardmore branch when you were in Bala Cynwyd?**

18      A.      I remember being asked a few

19  questions by the person I was observing because

20  she had spent time over there.  I remember

21  offering her in confidence a few candid

22  observations that I had and I do recall being

23  called on the carpet upon my return.

24              Again, I was just trying to talk to

 1  someone at the Bala Cynwyd branch, another branch,

 2  who had worked in my branch to figure out what was

 3  going on as I didn't see things working very well

 4  in my branch.

 5            So while I wasn't bad-mouthing the

 6  branch, per se, I was certainly trying to figure

 7  out do you have any insights into what's going on

 8  and how I could make things better.  That was

 9  immediately relayed back in a negative way.

10            I -- my only purpose in asking those

11  questions was to just try and make the day-to-day

12  more tolerable, because we all had to be there and

13  it wasn't going very well.  I thought someone who

14  was a prior employee who knew a lot of the staff

15  might have some insights.

16            She -- she didn't have much to offer.

17  So the result though was certainly that word got

18  back to my district manager and my manager and

19  they, of course, took that very, very much to

20  heart that I should not be speaking about issues

21  outside of the branch.

22  **     Q.        Did you believe that what you said**

23  **about the Ardmore branch when you were in Bala was**

24  **complimentary?**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1       A.        No.  Again, I was concerned about

2   some things that I had seen there and, again, in

3   seeing the Bala Cynwyd branch function apparently

4   at least the majority of the day I was there in a

5   more appropriate fashion to what I had experienced

6   in my five years of banking, just eager to see

7   what insights and suggestions this employee who

8   had worked with many of my coworkers who I was

9   still getting to know might be able to provide.

10          So I think perhaps the intent of

11  my -- of my trying to do some problem-solving, you

12  know, was lost on them and it was viewed as more

13  of a complaint.  I was just trying to figure out

14  how to make things work better.

15      **Q.        To whom did you make these comments**

16  **at Bala?**

17      A.        I don't remember the young lady's

18  last name, but I believe her first name was

19  Kristin.  She was the head teller and perhaps a

20  universal banker.  I was there shadowing her for a

21  day in January or February.  I don't recall.

22      **Q.        And you told Kristin that your**

23  **manager didn't support you; correct?**

24      A.        I don't recall exactly what I

1  discussed with her aside from saying that there

2  are issues in Ardmore; I don't have a good

3  understanding of the historical context.  What

4  could I -- what could we be doing better?  And we

5  didn't get very much constructive conversation

6  there.

7      **Q.**    **You bad-mouthed Magdaline Intzes;**

8  **correct?**

9      A.    Again, I don't recall speaking

10  positively or negatively about any specific

11  member.  I just remember talking to Kristin and

12  asking for her insights as a new employee to a

13  group of people that I was still getting to know

14  and I was observing that there was some issues

15  underneath the surface that I obviously had no

16  understanding of.

17      **Q.**    **Did you speak positively about**

18  **anybody at Ardmore when you were in the Bala**

19  **branch?**

20      A.    Again, I can't specifically recall

21  the extent to what I was complimentary about the

22  staff there.  I do recall speaking very nicely

23  about Debbie Lombartino and that I felt that they

24  were doing a very nice job in trying to provide me

1  what support they could knowing they couldn't send

2  me to training.

3       Q.        All right.  Let me show you what's

4  been marked as Exhibit 83.  Exhibit 83 is an

5  e-mail that Laura Biernacki sent you after you

6  went to the Bala branch.

7                 Do you see that?

8       A.        I do see it.

9       Q.        And she directed you not to discuss

10  personnel challenges or gossip with other

11  branches.

12                 Do you see that?

13      A.        I do.

14      Q.        Did you agree with that instruction?

15      A.        So now that you've helpfully provided

16  me a better context in terms of the date, I do

17  recall that I was asked with regards to Kristin

18  why I was -- why things were not going well in my

19  opinion.  And I said -- I had mentioned that

20  because my mother had been sick that I felt like I

21  was, you know, behind the eight ball.

22                 That, I believe, is what's being

23  referred to as far as the gossip and what you may

24  have been alluding to before in terms of

 1  bad-mouthing.  I was, again, probably just trying

 2  to explain to Kristin while I was there observing

 3  and that we were trying to get things working

 4  better.

 5      Q.        And do you think a comment by you

 6  that you had been out sick would result in a

 7  district manager admonishing you not to gossip or

 8  discuss personnel challenges?

 9      A.        Could you repeat the question?  I'm

10  sorry.

11      Q.        You said you think your memory is

12  what you discussed with Kristin was that you had

13  been out sick and were having issues with your

14  mother's death?

15      A.        I had mentioned that my mother had

16  passed and that, obviously, that in caring for her

17  that had been impactful.  I believe that is what's

18  being referred to as "the gossip."

19      Q.        That's what you think is being

20  referred to?

21      A.        I'm very much assuming that is the

22  case.  Because, again, I cannot recall.

23      Q.        Why are you making that assumption?

24      A.        I do recall that that was something

1  that they asked me about because, obviously, they

2  were in our district.  Perhaps on one of the

3  occasions when my mother had her service and I was

4  out for a few days, or on the two occasions that I

5  was very sick and caring for her, that maybe they

6  had to fill in, because they certainly were aware

7  that I had been going through this.  It was not

8  exactly a secret.

9       Q.      Let me show you what's been marked as

10 Exhibit 74.  Exhibit 74 is a series of e-mails and

11 the cover e-mail is reporting the days that you

12 were out sick.

13               Do you see that?

14      A.      I do.

15      Q.      Okay.  It says you were out sick on

16 December 18th.

17               Do you see that?

18      A.      I do.

19      Q.      That's true; right?

20      A.      That is true.  I had the flu.

21      Q.      And then it says you were out January

22 22, 23, and 24; correct?

23      A.      Uh-huh.

24      Q.      Correct?

```
 1        A.        That is correct.

 2        Q.        And that's true; right?

 3        A.        That is true.

 4        Q.        It notes that on February 7th you

 5   took a half day of PTO; correct?

 6        A.        Yes.  I had a fertility appointment

 7   with my wife.

 8        Q.        And then on February 8th you called

 9   out sick the next day; correct?

10        A.        That is correct.

11        Q.        That's the day you sent Exhibit 73,

12   that very long e-mail; correct?

13        A.        That is correct.

14        Q.        And it says that Ms. Perez had had a

15   discussion with you on January 30 about PTO usage

16   and team work issues.

17                  Do you see that?

18        A.        I do.

19        Q.        And Ms. Perez was stressing with you

20   the need to form a more cohesive team; correct?

21        A.        Yes.

22        Q.        That's part of your job; right?

23        A.        Yes.  She was encouraging me to be a

24   better team player and that obviously I needed to
```

 1  be -- be there more.

 2      **Q.        And Ms. Perez goes on to say that**

 3  **during that conversation on January 30 you said**

 4  **that your wife had told you to put in two weeks**

 5  **notice because of your stress at work.**

 6              **Do you see that?**

 7      A.        I do.

 8      **Q.        Is that true?**

 9      A.        So, again, my wife and I had been

10  talking, as a result of everything going on, and

11  when there was no appetite for Bryn Mawr Trust to

12  allow me to take the time unpaid, my wife said

13  perhaps you should just resign and focus on your

14  mother and I felt that that would be something

15  that was premature and I wanted to continue with

16  the job.  So I obviously did not put my two weeks

17  notice in and I attempted to continue forward.

18      **Q.        So why did you tell your manager on**

19  **January 30 that your wife had told you to put in**

20  **your two weeks notice because of the stress?**

21      A.        Because, again, when we met, we were

22  talking about how, how we could move forward.  And

23  I was expressing to her that I wanted to stay, but

24  I wanted to make things work.

1            However, that, you know, if things
2    were not going to work out, that, you know, given
3    I could not use unpaid time and other things, that
4    my wife was worried about me, which again, I think
5    is pretty evident based on what I was going
6    through, and that she felt that if -- obviously,
7    the timing of this job, I did not know my mother
8    was going to die.

9            So she thought perhaps it would just
10   be better to close the chapter and -- and try
11   again once, you know, things with my mother had
12   resolved.  So it was not a threat.  It was not any
13   kind of an announcement.  I was just explaining to
14   Danielle who was asking and trying to work with me
15   on figuring out what we could do to make things
16   work better and, you know, one of the suggestions
17   I made besides unpaid was that my wife had
18   mentioned that, but that I did not want to do it.

19        **Q.        Let me ask you to turn in Exhibit 74**
20   **to the page Bates stamped BMT 31711.**

21                MR. PEARLMAN:  31711?

22                MR. KRAUSS:  Correct.

23   BY MR. KRAUSS:

24        **Q.        Do you have that page.**

1      A.        I'm sorry.  Say those digits again.

2   31711?

3      Q.        Correct.

4      A.        Okay.  Thank you.

5      Q.        And do you see that's an e-mail that

6   you sent to Ms. Perez on January 9, 2018?

7      A.        Yes.

8      Q.        And you wanted to report to your boss

9   some comments that Maggie Intzes made to you that

10  you believe were disrespectful to you.

11            Do you see that?

12     A.        Yes.

13     Q.        And you say that Ms. Intzes referred

14  to your work as mindless.

15            Do you see that?

16     A.        I do.

17     Q.        And what was she referring to as

18  mindless work?

19     A.        She was referring to our job in terms

20  of breaking down money shipped from the federal

21  government, verifying it, and making sure that it

22  is accurate, and storing it in the vault and then

23  distributing it to the teller drawers.

24     Q.        And she said that she thought that

1   must be therapeutic for you to do while your

2   mother is sick because it would distract you.

3                    Do you see that?

4        A.        I do see that.

5        Q.        Do you believe that was true?

6        A.        Do I believe that was true?

7        Q.        Yeah.  Do you believe that work was a

8   therapeutic distraction while your mother was

9   dying?

10       A.        Again, I think that there were

11  aspects of my job that were a very good

12  distraction.  However, I felt that this particular

13  interaction, as many of my interactions with

14  Ms. Intzes, were often very difficult, because I

15  don't think that she had a lot of tact when

16  speaking to me or to any other employee, and

17  customers at times.

18       Q.        You say that Ms. Intzes also told you

19  that you needed to clean up the tickets in the

20  back because it's a mess and it's your job to fix

21  it.

22                   Do you see that?

23       A.        I do.

24       Q.        Were the tickets in the back a mess?

```
 1      A.        Again, as best to my recollection, it
 2 was an ongoing project and we did complete it that
 3 week, but I don't recall that -- I don't recall it
 4 being -- I don't recall it being a priority.
 5      Q.        Was it your job to fix it?
 6      A.        It was my job to get things
 7 operationally more in order, which is absolutely
 8 what we did.
 9      Q.        And you say you responded to
10 Ms. Intzes by saying that honestly, it's good to
11 know that she doesn't respect what you do and
12 you'll get to the cabinet next week.
13                Do you see that?
14      A.        Yes.  We were getting a cabinet in to
15 store more materials.  But I did feel disrespected
16 by her emphasis because, again, the mindless work
17 was a reference to my background and I felt that
18 it was just an inappropriate comment.
19      Q.        What do you mean "the mindless work
20 was a reference to your background"?
21      A.        It was just, you know, saying that
22 you must not really have to use your brain at all
23 to do your job.  I just felt that was just
24 something you shouldn't say about anyone and the
```

 1  crew that they're doing.  You wouldn't say to

 2  someone sweeping the floors in your office that,

 3  you know, shouldn't you be doing something better

 4  with your time?  It just felt to me that it was,

 5  again, an indication that there was a lack of

 6  fundamental respect for other people in the

 7  office.

 **8      Q.       And you told her that to her face;**

 **9  right?**

10      A.       I believe I did, that I felt it was

11  disrespectful, yeah, to say that.

**12      Q.       And you said that you'd get to the**

**13  job next week; correct?**

14      A.       Yeah.  We were getting -- we were

15  waiting a piece of equipment, furniture, to store

16  in the vault to enable us to have storage for

17  these additional tickets.

**18      Q.       So what does breaking down the**

**19  shipment from the fed involve?**

20      A.       The breaking down the shipment from

21  the fed involves literally meeting the armed

22  guards at the front and bringing them, escorting

23  them into the vault under dual control, and to go

24  through a process of, you know, not only verifying

1  the packaged money as it comes, but then going

2  through on a minute level and granular level and

3  breaking that cash down into various

4  denominations, whether it's was 20s, 50s, 100s, et

5  cetera, so that it is then useable from the vault

6  for the tellers and the universal bankers in their

7  drawers.

8      **Q.      It's counting how many packages of**

9  **money you got; correct?**

10     A.      So, again, it's taking, say, a pack

11 of a thousand 20s that you get from the fed,

12 breaking them down into two $1,000 increments, and

13 exactly verifying that all the bills are there and

14 ensuring that everything's accurate, because from

15 time to time you get money in from the fed and it

16 is not.  So it's something that you do need to be

17 mindful of.

18     **Q.      Is it fair to say it doesn't take a**

19 **Harvard degree to break down a shipment?**

20     A.      I would certainly say it does not

21 take a Harvard degree but, again, I just felt that

22 that was something that shouldn't -- should not be

23 an attitude that any of us are taking.

24     **Q.      Okay.  Is it fair to say that it is a**

1  **fairly mindless job to count the money and break**

2  **down the shipment?**

3      A.      I think that would be a

4  mischaracterization.  It doesn't certainly require

5  you to have 150 IQ.  But I do think that it is --

6  it's important work.  You would never want to give

7  -- you'd never want to go to the bank and get

8  money from a teller and they had a pack of 20s and

9  gave you a 5 in that pack of 20s.  You'd be

10  shorted your money.

11              So, again, it may seem mindless, but

12  I think, again, when you work in that environment

13  you should honor one another at least and

14  particularly when you're first getting to know

15  someone it's a very abrasive encounter.  That's

16  all.

17      Q.      **You went on to say, This is becoming**

18  **too much to bear because she's avoiding**

19  **responsibility and it's really obvious.**

20              **Do you see that?**

21      A.      Yes, I do see that.

22      Q.      **What was becoming "too much to bear"?**

23      A.      So we had issues in the teller line

24  that were specific to Ms. Intzes, Mrs. Intzes in

1  that on the few days that she was required to open

2  a drawer, one of the obligations of the teller is

3  not only to settle the drawer at the end of the

4  day to the penny, but to also scan any associated

5  work, deposits, transactions, withdraws, et

6  cetera.

7              This was something that from my first

8  day in the branch that we had to do essentially

9  for Maggie.  And, again, given that she was, as

10 you referred to earlier, a more senior banker, it

11 was frustrating that she didn't value us enough to

12 even try to learn how to do these things and just

13 relied on us to settle her up effectively and do

14 all of her scanning which, again, impacted how

15 quickly we could close which impacted overtime,

16 which, again, impacted Danielle.

17             So it was something that she should

18 be aware of.  Again, I wish I had used a better --

19 I should have been more succinct and maybe had

20 talked to her more about this verbally, Danielle,

21 but it was something that certainly I felt I

22 needed to bring to her attention and I

23 consistently brought to her attention the lack of

24 attention and care that she was taking,

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

 1  Ms. Intzes.

 2       Q.        You don't like Ms. Intzes?

 3       A.        Say again?

 4       Q.        You don't like Ms. Intzes; is that

 5  fair?

 6       A.        Again, I had no issue with

 7  Ms. Intzes.  I really did try my best to have a

 8  good working relationship when I worked with her.

 9  I did find it frustrating.

10                 However, I think I did my utmost, as

11  I did I think with everybody I was closely working

12  with, to just do my job and to help and to not try

13  and step op anyone's toes.

14                 And that was certainly not the

15  attitude that she was playing with.  So I think it

16  was not a -- it was not a good environment for the

17  both of us, but we -- we made it work, for lack of

18  a better term.

19       Q.        Really?  You weren't stepping on

20  anybody's toes.  Is that your testimony?

21       A.        Again, I'm referring to this specific

22  e-mail.  I understand that reaching out to the

23  district manager was certainly can be viewed and

24  should be viewed potentially as going above and

 1  beyond what I should have been doing but --

 2      Q.        That's not stepping on toes; right;

 3  that's stomping on them.  Fair?

 4              MR. SCHWARTZ:  Objection.

 5              MR. PEARLMAN:  Objection to form.

 6  BY MR. KRAUSS:

 7      Q.        Is that true?

 8      A.        So, again, the tactic that I took in

 9  reaching out to Laura was -- was not the most

10  appropriate manner in which to address those

11  concerns and I've addressed that now several times

12  in the testimony.

13      Q.        In Exhibit 74 you said, This is

14  becoming too much to bear.

15              Do you see that?

16      A.        I do.

17      Q.        Now, at that point you had been

18  working at Bryn Mawr Trust for a shade over a

19  month.

20      A.        Six weeks, yeah, thereabouts.

21      Q.        And already you couldn't bear it.

22      A.        Again, I think to provide some

23  context for the rest of the room, my mother had

24  been diagnosed as dying nine days previous to

1  this.  My -- my -- my composure in making this

2  e-mail was lacking in its tact.  However, the fact

3  that there was issues in avoiding and ducking

4  responsibility remains.

5       **Q.        Let me ask you to turn to the next**

6  **page, which is your January 17 e-mail to**

7  **Ms. Perez.**

8              **Do you see that?**

9       A.        I do.

10      **Q.        And that's you complaining again**

11  **about Ms. Intzes.**

12              **Do you see that?**

13      A.        I do.

14      **Q.        And you open it with, Things are**

15  **getting out of hand.**

16      A.        Uh-huh.

17      **Q.        Do you see that?**

18      A.        I do.

19      **Q.        So a month into the job things were**

20  **out of hand?**

21      A.        So, again, we have discussed a number

22  of times today the concern holistically for Bryn

23  Mawr Trust around overtime.  So in this instance

24  we were still at the branch, having closed at

 1 | 4:00, at 4:50 in the evening so almost an hour
 2 | after we should have closed, and the issues were
 3 | that Ms. Intzes was chatting with a customer
 4 | rather than helping the rest of us who were
 5 | working.
 6 |            So, again, while I, in retrospect,
 7 | could have used a better tact, I do feel that it
 8 | was justified in, again, this was an issue that
 9 | not only did I address to Ms. Perez, everyone in
10 | the branch had addressed to Ms. Perez, Laura
11 | Biernacki was addressing to Ms. Perez and to
12 | Maggie as well.
13 |            So this was nothing new, but this was
14 | something that as my job was being affected and my
15 | tellers had to stay for overtime, I had to alert
16 | my boss so that she was aware.  You made us look
17 | at the overtime policy earlier.  She needed to be
18 | aware of why we were still there.
19 |      **Q.       So it's a universal banker's job to**
20 | **talk to customers; correct?**
21 |      A.       Yes.  However, chatting about
22 | personal business for an hour and 15 minutes into
23 | and past closing, obviously, severely impacts all
24 | the other members of the branch because we cannot

 1  leave and lock up without all of us being

 2  together.

 3          Q.        You said in your e-mail that

 4  Ms. Intzes was, quote, honestly so disconnected

 5  with the rest of us.

 6                    Do you see that?

 7          A.        Yes.

 8          Q.        And that was your belief; correct?

 9          A.        I'm sorry?  Say again?

10          Q.        That was your belief; correct?

11          A.        Yes.

12          Q.        That she was disconnected from the

13  rest of the branch.

14          A.        There was a disconnect in that she

15  did not -- she did not seem to recognize that

16  these behaviors were causing impacts to every

17  other member of the team.

18          Q.        And you said it was becoming a huge

19  problem that you needed Ms. Perez's help to

20  resolve; correct?

21          A.        Again, as Ms. Intzes did not report

22  to me, I reported to Danielle, I felt it was my

23  job in her absence to report this issue so she was

24  aware of it as a supervisor and it impacting

ERIN DINGER v BRYN MAWR BANK                               Page 205
Michael Sutton, 11/04/2020

1   overtime.  And also, that we could work to resolve
2   some of the issues in the branch around working --
3   working as a team.
4        Q.        Let me ask you to turn to the last
5   page of Exhibit 74.  That's another e-mail you
6   sent to Ms. Perez complaining about Ms. Intzes;
7   correct?
8        A.        I don't see -- I'm sorry.  We're
9   looking at the e-mail from the 26th?
10       Q.        Right.  The day after Christmas;
11  right?
12       A.        Uh-huh.
13       Q.        You've been there for two weeks;
14  right?
15       A.        Uh-huh.  I had been there for two
16  weeks, yes, sir.
17       Q.        Okay.  And you say that you're
18  complaining about universal bankers dumping work
19  to be scanned on the tellers.
20                 Do you see that?
21       A.        Yes, I do.
22       Q.        Okay.  And that's something you said
23  that it was Ms. Intzes doing that; correct?
24       A.        Yes.

ERIN DINGER v BRYN MAWR BANK                                    Page 206
Michael Sutton, 11/04/2020

```
 1      Q.        And you go on to say, This needs to
 2  change next week because I'm happy to do it to
 3  assist, but people seem to be mistaking kindness
 4  for weakness and they are taking advantage.
 5              Do you see that?
 6      A.        Yes.
 7      Q.        Okay.  And then you believed that
 8  people were thinking you were weak and taking
 9  advantage of you?
10      A.        No.  So just to, again, provide some
11  context beyond this, it was -- it was often left
12  to myself or the senior teller to scan that work.
13  We were happy to do it understanding for, you
14  know, as business allows.
15              However, again, the idea of mistaking
16  kindness for weakness, I would often do it for
17  people with a smile just because I was the new guy
18  at the branch and I was still learning, but I
19  wanted to -- and this is why it says notes for
20  January meeting.  We needed to kind of have a
21  January meeting to get off to a good start.
22              I had been asked by Danielle, What
23  have you observed in the branch; what are some of
24  the things we could be doing better.
```

 1              So while, again, the nomenclature at

 2    times was not the best, it was not meant with any

 3    kind of menacing intent.  It's a common phrase

 4    mistaking kindness for weakness.  It doesn't imply

 5    any kind of strong arming or anything to that

 6    nature.

 7         **Q.      And in the last paragraph you**

 8    **complained about universal bankers looking down on**

 9    **you; correct?**

10         A.      I complained about the universal

11    bankers not doing their -- their part of the job

12    when they were on the teller line.  So again --

13         **Q.      Well, your words were, There seem to**

14    **be certain employees who look down on the work on**

15    **this side of the shop; right?**

16         A.      That is the words that I used.

17         **Q.      And you're referring to Ms. Intzes in**

18    **looking down on teller work; correct?**

19         A.      Again, yes.  I am -- I'm relaying to

20    my manager that while I'm happy to assist, I have

21    been there for two weeks and I'm noticing these

22    consistent issues.  So I was just, again, I think,

23    as I conclude the e-mail, I really think we need

24    to reset on this.  So, again, I understand that in

1  out of context it's very easy to see this as much

2  more than it is.

3      Q.        And the context is you having been

4  there for two weeks; correct?

5      A.        The context is having been there for

6  two weeks and being asked by my manager what we

7  should talk about in January to get things running

8  in a more beneficial way to hit the ground running

9  in the first quarter.

10      Q.        Let me show you what's been marked as

11  Exhibit 76.  Now, you were written up for being

12  late; correct?

13      A.        Yes.

14      Q.        And Exhibit 76 is that writeup;

15  correct?

16      A.        Yes.  This is the writeup that was

17  delivered on the 14th, I believe, of February.

18      Q.        Now, the cover e-mail says, We

19  administered the writeup today.

20              Do you see that?

21      A.        Uh-huh.

22      Q.        I'm sorry?

23      A.        I do see it, yes, sir.

24      Q.        And it reports that you were taking

1   it home to write comments.

2            Was that true?

3       A.       Yes.

4       Q.       And it goes on to say that you had

5   refused to sign it at the time.

6       A.       Uh-huh.

7       Q.       That was true; right?

8       A.       That was true.

9       Q.       It says that you just keep talking

10  about your health and your mother and stress.

11           Do you see that?

12      A.       I do see that.

13      Q.       Was that true?

14      A.       I recall that I was very surprised

15  that they were delivering this unannounced at the

16  end of the day, and that given that it was a very

17  long day and it had been a very long few weeks

18  with my mother's rapidly declining health and it

19  was Valentine's Day, that I would really like to

20  take it home and look at it and put some thought

21  behind it.  However, what I found most interesting

22  about the writeup was that I was never asked to

23  return it.

24      Q.       Well, you did receive it; correct?

1      A.        I did receive it and I was never

2   asked to return it.

3      **Q.        Okay.  And why do you find that**

4   **significant?**

5      A.          Because, again, I was told to take it

6   home and to review it and to think about it and to

7   come up with, I believe, any employee comments

8   that I wanted to include.  And essentially I kept

9   reaching out to Nicola Fryer who's written on

10  this, because I wasn't able to speak to her when I

11  was being written up, to understand why this is

12  the first that this is being delivered to me and

13  what this -- what this meant.

14            And so as a result there was never

15  really any formal understanding of where I stood.

16  As a result of that in April, as I mentioned at

17  least twice today, I reached out on my own

18  volition after my mother had passed and we were

19  into the second quarter to request a meeting with

20  Nancy Pinkowicz as I continued to call Nicola

21  Fryer into March and was unable to get any further

22  sense of is this in effect.

23            Interestingly enough, when I was

24  speaking to Ms. Biernacki the last week of the

 1  second quarter, so that would be the last week of

 2  June, she alluded to the fact that though I was on

 3  a writeup, she would gladly make sure I got paid

 4  if I was able to complete my sales by the end of

 5  the month, which, again, had this been real, would

 6  not have been accurate.

 7            So it was -- it was very confusing to

 8  me, again, because I was never able to actually

 9  speak to someone at HR what -- where I stood and

10  why this was delivered the way it was.

11       Q.       We'll get to that.

12                But did you make your sales?

13       A.       I'm sorry?

14       Q.       Did you make your sales?

15       A.       I unfortunately was one sale short

16  that month.

17       Q.       Now, let's go through Exhibit 76.  On

18  the 13th it reports that you were late.  You were

19  supposed to be in at 8:45 and, in fact, you were

20  in by 9:30.

21                Do you see that?

22       A.       I do.

23       Q.       Is that true?

24       A.       Yes.  As I, again, was at a fertility

1  appointment with my wife and had to conduct the

2  medical tests at the fertility doctor, so...

3       Q.       Let's turn to the third page of

4  Exhibit 76, the writeup itself.  And it says it's

5  for absenteeism.

6                Do you see that?

7       A.       I do.

8       Q.       And you see it's a final written

9  warning.

10               Do you see that?

11      A.       I do see it.

12      Q.       It says from December 18, 2017 to

13 February 9, 2018, you've been unavailable to work

14 your scheduled hours due to family or health

15 issues and that while we understand you're going

16 through a tough time we are in a client-facing

17 business.

18               Do you see that?

19      A.       I do.

20      Q.       Do you agree that you were in a

21 client-facing position?

22      A.       I do.

23      Q.       And you agree you've got to show up

24 to do your job; correct?

1        A.        I do.

2        Q.        It goes on to say you were out of the

3   office on December 18, January 22, January 23,

4   January 24, February 8, and February 9.

5                  Do you see that?

6        A.        I do.

7        Q.        That's all true; correct?

8        A.        That is all true.

9        Q.        And it concludes, We understand you

10  are going through a difficult time.  Just keep in

11  mind that we still have a business to maintain.

12  Correct?

13       A.        Yes.

14       Q.        Now, were you aware that Bryn Mawr

15  Trust had held off issuing disciplinary memos to

16  you because of your family situation?

17       A.        No.  No one ever made me aware of

18  that.

19       Q.        All right.  Let me show you what's

20  been marked as Exhibit 75.  Exhibit 75 is a

21  February 8 e-mail string, so the same day you sent

22  that long e-mail to Laura Biernacki; correct?

23       A.        Yes.  That would be the same date.

24       Q.        All right.  It starts off with the

ERIN DINGER v BRYN MAWR BANK                                  Page 214
Michael Sutton, 11/04/2020

```
 1    e-mail Ms. Perez sent to Ms. Fryer and

 2    Ms. Biernacki asking them -- or advising them of

 3    your family and medical situation and asking if

 4    there were any options available to you.

 5                    Do you see that?

 6        A.       I do.

 7        Q.          And then Ms. Perez sends a second

 8    e-mail asking whether you would qualify for the

 9    Family Medical Leave Act.

10                    Do you see that?

11        A.       I do.

12        Q.          And were you aware that you didn't

13    because you hadn't been employed long enough?

14        A.       Yes.  I had -- I had reviewed that.

15        Q.          When did you review the Family

16    Medical Leave Act?

17        A.       I was aware of the Family Medical

18    Leave Act because I had read the employee handbook

19    and I had been employed at other places.

20                    So I was aware that that was

21    something that was not available to me; hence, why

22    I reached out proactively during this time to

23    offer to take it unpaid to try and meet them in

24    the middle, understanding that's often the case
```

 1  when people that are on FMLA for an extended

 2  period of time.

 3       Q.       And on the first page of Exhibit 75,

 4  this is a February 8 e-mail Ms. Perez sent at

 5  9:33 a.m. saying that you had called saying you

 6  were out of work because you had a virus with a

 7  fever; correct?

 8       A.       Yes.

 9       Q.       So she was already responding to your

10  e-mail at 9:30 in the morning; correct?

11       A.       Apparently, yeah.

12       Q.       And is it true that you stated you

13  had a virus with a fever?

14       A.       Again, I had a fever and I thought I

15  had a virus.  It turned out I had a bleeding

16  ulcer.

17       Q.       Okay.

18       A.       However, I still had a fever.  I

19  still was very sick and I was unable to attend.

20       Q.       So is it fair to say that you never

21  mentioned a bleeding ulcer when you called out

22  sick?

23       A.       Again, at that time I had not

24  mentioned it.  I know I subsequently discussed

1  that with them.

2      **Q.        Ms. Perez points out that you've**

3  **called out five times and that you're not reliable**

4  **and that you may not be the best person for the**

5  **Ardmore office as a head teller.**

6              **Do you see that?**

7      A.        I do.

8      **Q.        Do you agree that was a valid concern**

9  **for somebody that had called out five times in the**

10 **first two months of work?**

11     A.        I do think it's a valid concern and I

12 do understand that as a head teller -- and as a

13 teller in general -- it's important to be on the

14 job.

15             However, what was striking to me was,

16 again, there was not a lot of dialogue that I was

17 at least included on, around, you know, my status

18 until I received the final warning.  And then when

19 there was no follow-up around it, and when I did

20 follow up around it after my mother had passed, it

21 was relayed to me that it was something to not

22 worry about and that it was simply something they

23 had to do in the moment and that I was on a good

24 path, so...

1      Q.         Well, in Exhibit 75 Ms. Fryer

2  suggests a corrective action report for

3  attendance, including a statement that's

4  sympathetic to your string of illnesses and your

5  family situation.

6               Do you see that?

7      A.       I do.

8      Q.         Now, you got the corrective action

9  report you said on the 14th.

10     A.       Uh-huh.

11     Q.         And the next day you e-mailed Nikkie

12 Fryer; correct?

13     A.       I believe.  I know I reached out to

14 her in a variety of formats.

15     Q.         Let me show you what's been marked as

16 Exhibit 77.  Exhibit 77 is the e-mail you sent to

17 her the next day after you received the corrective

18 action report; correct?

19     A.       Uh-huh.

20     Q.         I'm sorry.  Did you say "Yes"?

21     A.       I said yes.  I see that I had

22 answered questions about corrective action.

23     Q.         You said you had some questions

24 regarding discrepancies.  Now, did you note any

1  **discrepancies?**

2      A.      And, again, I recall that's why I had

3  reached out to her.

4      **Q.      So what discrepancies did you notice?**

5      A.      I can't specifically identify what I

6  had observed or what I had concerns about at that

7  time.

8      **Q.      So sitting here today --**

9      A.      Sitting here today I don't -- I don't

10  directly see what I had a question about.  Perhaps

11  my question might have been, and I know this was a

12  question I had asked of Danielle and Laura when it

13  was being delivered to me as to why I had been

14  provided no written warning which is the prior

15  step.

16          As to whether that was the specific

17  issue that I felt was incomplete, I cannot speak

18  to that.

19      **Q.      So that's the only discrepancy you**

20  **thought of is, why didn't I get a verbal warning**

21  **before I got a final written warning?**

22      A.      Again, I -- you're asking me to

23  recall from this date what I had observed.  I

24  don't -- I don't see it on this what I had a

1  concern with, unless it was that why was I not
2  first delivered a verbal warning.
3           So that is as best I can recall what
4  my question would have been about.  However,
5  perhaps there was something else that I had a
6  question about.
7      Q.        Okay.  Now, you had received verbal
8  warnings about being late; correct?
9      A.        Yes.
10     Q.        Okay.  You said you also reached out
11 to Tiffany Brouillet who you remembered from your
12 orientation.
13     A.        Yes.  She was the -- she was the
14 orientator, or orientation coordinator for my
15 group.
16     Q.        But you hadn't reached out to your
17 manager or your market area manager; correct, the
18 ones who actually gave you the final written
19 warning?
20     A.        Subsequent to Nikkie's encouragement,
21 I did.
22     Q.        Because she told you to; right?
23     A.        Yes.
24     Q.        Now, you didn't like Laura Biernacki;

1  correct?

2       A.      I had -- I had no reason to dislike

3  her.  However, I did observe over time that she

4  did not view, I think, the business I guess in the

5  same way that I did and was very -- pushing us to

6  be very aggressive, which does not always work

7  with all clients.

8       **Q.      Ms. Biernacki wanted to drive sales;**

9  **correct?**

10      A.      Yes.

11      **Q.      Okay.  Do you agree without sales**

12  **there's no bank?**

13      A.      Without good sales there is no bank.

14      **Q.      Right.  And you knew part of your job**

15  **was sales; right?**

16      A.      I did know that part of my job was

17  sales, yes.

18      **Q.      You thought you were good at that;**

19  **right?**

20      A.      I thought that I had been good at

21  that.

22      **Q.      I mean, you worked in development;**

23  **correct?**

24      A.      Yes.  And I've worked in banking and

1  been successful in those arenas, yes.

2      **Q.        And so as a development officer, you**

3  **have no problem asking people for money; correct?**

4      A.        No.   I had no problem as a

5  development officer asking people for money.

6      **Q.        Let me show you what has been marked**

7  **as Exhibit 229.   Exhibit 229 is another long**

8  **series of e-mails you exchanged with your wife.**

9  **It starts off with the e-mail Laura Biernacki sent**

10 **you telling you not to gossip about the Ardmore**

11 **branch when you go to other branches.**

12             **Do you see that?**

13     A.        Yes, I do.

14     **Q.        And what was your wife's response**

15 **when you forwarded that e-mail to her?**

16     A.        She wrote, I'm sorry, but is she

17 serious?

18     **Q.        Well, first she said laughing out**

19 **loud; correct?**

20     A.        Yeah.   No, I'm sorry, I did not see

21 it.   It's a little bit faint.   LOL, so yeah, laugh

22 out loud.   I'm sorry, but is she serious?

23     **Q.        And you asked, quote, So that is a**

24 **threat; no?   That was your question; right?**

 1        A.        That is what I typed to her.

 2        Q.        **So you thought that by telling you**

 3   **not to gossip Laura Biernacki was threatening you.**

 4   **That's what you thought at the time; right?**

 5        A.        It seemed to me that that would be --

 6   that it was obviously not appreciated that I had

 7   mentioned my issues with my mother's passing and

 8   how that was treated.

 9        Q.        **Is it fair to say your wife didn't**

10   **think it was a threat?**

11        A.        She writes, as I'm sure you've read,

12   it sounds incredibly paranoid to me, so...

13        Q.        **Well, her first reaction was to**

14   **laugh; correct?**

15        A.        It was.

16        Q.        **You generally don't laugh at things**

17   **you think are threatening; right?**

18                  MR. SCHWARTZ:  Objection to form.

19                  MR. KRAUSS:  I'm sorry.  Who's

20   objecting in this deposition?

21                  THE WITNESS:  My wife may --

22                  MR. SCHWARTZ:  Whoever's awake.

23                  MR. KRAUSS:  Actually, the rules are

24   one per customer.

 1   BY MR. KRAUSS:

 2       **Q.        So do you generally laugh at things**

 3   **you think are threats?**

 4       A.        I don't laugh at generally things

 5   that are threats, but given my wife is an attorney

 6   and I think the majority of the room is attorneys,

 7   perhaps you do.  I don't know.  I can't speak to

 8   why my wife laughed out loud.  I think it's pretty

 9   clear that I was, you know, just trying to make

10   sure I was okay and if I should be concerned.

11       **Q.        And your wife says to add it to the**

12   **list.**

13              **Do you see that?**

14       A.        Yes.

15       **Q.        What list?**

16       A.        I think what she meant in this term

17   was add it to the list of crazy things that have

18   happened in my experience being employed for Bryn

19   Mawr during the time my mother was sick and then

20   passed.  It was pretty notable.

21       **Q.        So you respond to your wife saying,**

22   **quote, so I haven't gotten any out reach from that**

23   **department I called last night and I was supposed**

24   **to hear from.  Very disappointed and now**

1   concerned.  Should I reach back out to them

2   tonight in light of this incident?  This seems to

3   be escalating now and I've noticed several

4   conference room calls and lots of awkward and

5   paranoid type interactions.

6              Did I read that correctly?

7       A.      Yes, you did.

8       Q.      What were you talking about?

9       A.      So, again, this is my wife having

10  encouraged me since I received a final written

11  warning to get to speak to someone in human

12  resources to understand what exactly my status was

13  and if -- if this is, you know -- if this is

14  something that is going to pass with time or if

15  this is the work environment.

16      Q.      So you were referring to human

17  resources?

18      A.      Yes.

19      Q.      What paranoid type interactions were

20  you referring to?

21      A.      I just can recall that there were

22  awkward interactions where, again, just people

23  were not acting themselves and just seeming a

24  little bit defensive and I just felt like I should

1  probably talk to someone at human resources to

2  understand where I stand.  It's odd that I'm not

3  getting able to speak to anybody.

4       Q.       So who did you think was paranoid?

5       A.       So, again, I was trying to get

6  information around where I stood, and I was not

7  getting anywhere with my manager or my district

8  manager, so I was trying to speak to somebody at

9  HR, because they're the only other people on that

10 warning, to see where I stood and how -- how this

11 would, you know, how this would work; how I could

12 make this work.

13      Q.       Do you believe you were being

14 paranoid?

15      A.       I don't believe I was being paranoid.

16 I believe that I was looking out for my employment

17 at the moment and I was really just trying to

18 figure out what, what my best move was in terms of

19 how do I keep making the day to day in Ardmore

20 work.

21      Q.       And you respond to your wife on the

22 next page saying, How do I ask this person via

23 e-mail and explain the urgency without using the

24 term escalation?

1              Do you see that?

2        A.        I do.

3        Q.        Who are you referring to e-mailing?

4        A.        I had been reaching out to Nancy

5   Pinkowicz who I've mentioned several times who was

6   in human resources and an associate vice

7   president.  She evaded speaking to me and

8   eventually did, if I recall correctly, in April,

9   as I've now mentioned several times.

10       Q.        And you said, Lisa thinks they're

11  trying to push you out.

12             Do you see that?

13       A.        Yes.

14       Q.        Who is Lisa?

15       A.        Lisa would be Lisa Davenport who was

16  the senior teller who, because I had not been at

17  the company long and did not know anyone in human

18  resources, she was the one who really said you

19  should try and speak to someone besides Nicola;

20  she's not going to give you a response.

21       Q.        On the first page you say to your

22  wife, Laura is here.  I'm scared.

23             Do you see that?

24       A.        I do.

```
 1        Q.        What were you scared of?

 2        A.        Again, she never seemed to come

 3   bearing good news.

 4        Q.        "She" being Laura Biernacki; correct?

 5        A.        "She" being Laura Biernacki.

 6        Q.        Okay.

 7        A.        I think in -- it was being a little

 8   bit tongue in cheek in saying I'm scared.  But

 9   yes, I was just, again, probably a little worried

10   as to my prior interactions with Laura had not

11   been very positive and it wouldn't have surprised

12   me if she came with bad news.

13        Q.        What kind of bad news were you

14   fearing?

15        A.        I did not know.

16        Q.        So your wife responds, quote, Don't

17   be scared.  I'm here for you and we will get

18   through anything together.  Plus I have an awful

19   lot of free time on my hands now.  Draxx them

20   sklounst baby.

21              Did I read that correctly?

22        A.        That is correct.

23        Q.        Okay.  So when your wife said she has

24   an awful lot of free time on her hands now, what
```

1   did you understand that to be referring to?

2        A.        She was making a joke.  She obviously

3   does not have a lot of free time on her hands as

4   she's a partner at a law firm and draxx them

5   sklounst is a line from a Key and Peele comedy

6   show.  So it's something we jokingly say to each

7   other as a nonsensical phrase.

8        Q.        What's it mean?

9        A.        It's a literal nonsense word that

10  they say in a sketch.  They say, draxx that

11  sklounst.  It's just a --

12       Q.        What does it mean?

13       A.        It does not have a meaning.  It's a

14  nonsense word from a Comedy Central show.  It does

15  not have any validity beyond the sketch.

16       Q.        So why was your wife talking

17  nonsense?

18       A.        She was trying to make me laugh, I

19  think, and to provide some levity given I had

20  written that I was nervous.  I think she's a

21  supportive spouse and tries to help when she can.

22       Q.        So you don't believe that draxx them

23  sklounst has a meaning?

24       A.        Again, I've watched the Key and Peele

 1 | skit.

 2 |     **Q.       Right.**

 3 |     A.       I don't think it has a negative

 4 | connotation.  It's a silly sketch.

 5 |     **Q.       Let me show you what's been marked as**

 6 | **Exhibit 239.  Exhibit 239 is another series of**

 7 | **e-mails you exchanged with your wife.  By the way,**

 8 | **did you ever go a day at work without exchanging**

 9 | **at least a half a dozen e-mails with your wife?**

10 |     A.       I would e-mail my wife from time to

11 | time.  But, you know, it varied depending on the

12 | pace of business.

13 |     **Q.       Well, let's see.  On Exhibit 239 this**

14 | **is an e-mail string on July 23rd; correct?**

15 |     A.       I see that.

16 |     **Q.       So it was 18 e-mails on that day;**

17 | **right?**

18 |     A.       Yep.

19 |     **Q.       All right.  Your wife on the first**

20 | **page offers to make you more coffee; right?**

21 |     A.       Yes.

22 |     **Q.       Then after that you tell her that**

23 | **Ms. Perez still hasn't changed your time card.**

24 |             **Do you see that?**

ERIN DINGER v BRYN MAWR BANK                                    Page 230
Michael Sutton, 11/04/2020

```
 1        A.        Yes.
 2        Q.        Now, you knew that if you approved
 3   your time card you were saying it was correct;
 4   right?
 5        A.        Yes.
 6        Q.        Okay.  And your wife reminded you not
 7   to approve your time card until it was correct;
 8   right?
 9        A.        Yes.
10        Q.        Your wife says, Oh, my God, seriously
11   not even trying not to get sued.
12                  Do you see that?
13        A.        I do see that.
14        Q.        What was that referring to?
15        A.        Again, I think my wife was trying to
16   introduce some levity into the day and just saying
17   it's kind of silly that you have to deal with
18   that.
19        Q.        At the very front end of Exhibit 239
20   you say, That's great.  So L -- that's Laura
21   Biernacki; correct?
22        A.        Uh-huh.  I can assume that might be
23   her.
24        Q.        Laura Biernacki just showed up
```

```
 1  looking like an angel of D.
 2              Do you see that?
 3      A.      Uh-huh.
 4      Q.      You're referring to an angel of
 5  death?
 6      A.      I believe so.
 7      Q.      Why did you believe Laura Biernacki
 8  was the angel of death?
 9      A.      I think she came to the branch with a
10  very serious, you know, a very stern approach, was
11  not very conversant and, you know, she didn't seem
12  to be very happy.
13      Q.      Is it fair to say that Laura
14  Biernacki was no nonsense?
15      A.      I think that would be a way she would
16  like to describe herself.
17      Q.      How would you describe her?
18      A.      I would describe her as someone who
19  was often overly aggressive in her pursuit of
20  trying to get sales and motivate people and I
21  think that was done in a very improper way.
22      Q.      What do you mean by an "improper
23  way"?
24      A.      Again, I think she was so very
```

1  focused on sales of any nature, it was no concern

2  to her.  It was actually a beneficial thing to do

3  for the client, which is kind of a fundamental

4  part of banking and building trust with clients.

5            So I -- I think we just had a

6  different viewpoint on trying to sell to the

7  customer what they need rather than selling them

8  something that you can just get them to walk away

9  with to do a tick mark.

10     **Q.        Did you ever report to HR the fact**

11  **that you thought you were being pressured to make**

12  **improper sales?**

13     A.        Again, I never reported to HR any

14  pressure regarding sales that I can recall.

15     **Q.        Okay.  In fact, you were okay with**

16  **sales; right?**

17     A.        Again, I made sales when I could

18  and -- and when, again, I felt it was beneficial

19  for the customer.  I did not try and put customers

20  into positions that would be deleterious to them

21  financially.

22     **Q.        Because you knew that would be wrong;**

23  **correct?**

24     A.        Yeah.  You don't want to put somebody

 1 | in a bad spot.

 2 |     **Q.       In fact, you get fired for doing**

 3 | **stuff like that; right?**

 4 |     A.       You can get fired for doing a lot of

 5 | bad things in banking, yeah.

 6 |     **Q.       So let me show you what's been marked**

 7 | **as Exhibit 122.  Do you remember having a problem**

 8 | **with being sent to training in Media and**

 9 | **improperly clocking out for lunches?**

10 |     A.       Yes.  I do recall this -- this issue.

11 |     **Q.       So what was the problem?**

12 |     A.       So, again, as I can recall, I was

13 | sent to Media to begin my universal banker

14 | training in and around the time that Alicia had

15 | been pulled from our branch and we were not told

16 | where she was to be.  I do recall that she at that

17 | point was in the Media branch.

18 |          So I remember driving in that morning

19 | and being concerned seeing her car in the lot

20 | knowing that she was probably working in the Media

21 | branch, because I was worried that if the manager

22 | or the district manager saw me even just speaking

23 | to her that I could be viewed as breaking kind of

24 | the Omertà we were told to take, which was

1  Alicia's no longer here; she's still with the bank

2  but we can't tell you where she is.  If customers

3  come in with issues or need to get a hold of her,

4  tell them to e-mail her.  Did not have a phone

5  number for her.

6              So, again, when I went up into the

7  branch and they didn't have time for me, I went

8  back down and continued training as Mary the

9  instructor told me to do that I could try and

10 practice more accounts to make the time worth it

11 for me.  I was supposed to, I believe, observe

12 Treslyn and the other bankers.

13             However, that was not available to me

14 and then given the presence of Alicia, I was

15 worried that it would then be used as an

16 additional way to say that I was not staying in my

17 lane and talking to an employee that I was not

18 supposed to be in contact with.

19    **Q.        All right.  So let's go back.  You**

20 **were scheduled for training all day at Media;**

21 **correct?**

22    A.        I was scheduled for the week.

23    **Q.        Now, the training room at Media is**

24 **separate than the bank; right?**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

ERIN DINGER v BRYN MAWR BANK                              Page 235
Michael Sutton, 11/04/2020

1        A.        It's in the basement of the branch.

2        Q.        Okay.  Training was scheduled for

3   eight hours; right?

4        A.        I think like -- yeah, seven hours,

5   something like that.

6        Q.        Well, you were supposed to take a

7   one-hour lunch correct?

8        A.        I believe that was the idea.  Now,

9   when I spoke to Danielle prior to going, she

10  really wanted me to come back ready to hit the

11  ground running, so that's why she suggested that I

12  try and get up and do some observations and maybe

13  shadow during the lunch.

14       Q.        Wasn't the issue you wanted to hit a

15  40-hour week so you didn't want to take a full

16  hour for lunch?

17       A.        Again, I also -- I also was happy to

18  get the 40 hours but it wasn't so much that.  It

19  was not -- I basically got no direction in Media

20  as to what the hell they wanted me to do.

21  Danielle was supposed to set it up.  And when I

22  came up, they were not ready for me and,

23  obviously, with the additional stress of knowing

24  that I should not be interacting with Alicia, made

1  me feel very uncomfortable.

2              So, again, I did what I felt was the

3  safest thing for me to do, which was to stay down

4  in the training branch and continue to work on

5  opening accounts and that was a simulation in

6  effect of what I would have been doing upstairs.

7      **Q.       Let's walk it through.  You were told**

8  **to take a 30-minute lunch and then spend 30**

9  **minutes upstairs shadowing; correct?  That's what**

10 **you were told to do; right?**

11     A.       The instructions, as I recall, were

12 to take 15 minutes and then go up.

13     **Q.       Okay.  And, in fact, you did not go**

14 **up and shadow; correct?**

15     A.       In fact, I did try to go up and it

16 was not available to me for the first day.

17 Thereafter when I reached out to anybody around

18 it, I was not getting any direction.  That

19 combined with Alicia being there and knowing that

20 that would be the end of sinking my ship, I think

21 I just took the safer way and stayed in the

22 training room and worked with Mary and opened

23 accounts on the system.

24     **Q.       Let's just get the time line.  You**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  were told go to training, take a 15-minute lunch,

2  and then go upstairs and shadow; correct?

3        A.        Yes.

4        Q.        That's what you were told; right?

5        A.        That's what I was -- I believe that's

6  the instruction I received.

7        Q.        And, in fact, you clocked out for 15

8  minutes; right?

9        A.        I believe I did.

10        Q.        You didn't spend the 45 minutes

11  upstairs training; correct?

12        A.        I did not.  I spent it in the

13  training room with the trainer.

14        Q.        Well, in fact, you left the branch,

15  didn't you?

16        A.        I did on Thursday.  I went out to my

17  car to get my lunch during my 15 minutes.  I was

18  confronted coming back in the branch with my

19  lunch.

20        Q.        So Ms. Perez e-mailed you and said

21  she was aware that you left the branch for

22  personal errands while being clocked in and she

23  needed an explanation as to why you didn't take a

24  30-minute lunch as opposed to the 15, 16, and 18

1 | minute lunches that it showed you taking.

2 |         Do you see that?  Do you see that?

3 | It's the third page of Exhibit 122.

4 |     A.      I'm reading it, thank you.

5 |         So, again, I do see that I took 15,

6 | 16, and 18 minutes.

7 |     Q.      When you were supposed to take 30;

8 | correct?

9 |     A.      Apparently, yep.

10 |     Q.      And you claimed that you were

11 | retrieving parking receipts when you went outside.

12 |     A.      That is what it was.  I thought it

13 | was my lunch, but, yeah, it was the receipts for

14 | parking because we had to pay for parking on site.

15 |     Q.      And you claimed that you weren't

16 | given clear direction on how to shadow; correct?

17 |     A.      I wasn't.  I was told to go up and

18 | figure it out.

19 |     Q.      Let me show you what's been marked as

20 | Exhibit 124.  Exhibit 124 starts out with

21 | Ms. Perez's e-mail about your only taking

22 | 15-minute lunches while in training in Media.

23 |         Do you see that?

24 |     A.      I'm sorry.  Could you repeat where

 1  that was stated?

 2       Q.        Last page of Exhibit 124.

 3       A.        Thank you.

 4       Q.        It's the e-mail we just looked at

 5  where Ms. Perez says --

 6       A.        Uh-huh.

 7       Q.        -- you were only taking 15-minute

 8  lunches in Media; correct?

 9       A.        Correct.

10       Q.        And then the prior page is your

11  response; correct?

12       A.        Yes.

13       Q.        And then it lists on the second page

14  six incidents.  Let's go down to the bottom.  On

15  July 16 it says you arrived late at 9:30 because

16  you locked yourself out of the house; correct?

17       A.        I'm sorry.  What page is that on

18  again?

19       Q.        Second page of Exhibit 124.

20       A.        Yes.  I do recall that on the 16th.

21       Q.        So you were late because you locked

22  yourself out of your house; correct?

23       A.        Yeah.  I left my key inside for the

24  car and pulled the door and couldn't get out.

1      Q.        Okay.

2      A.        So I had to get someone -- one of my

3  neighbors -- or rather my brother-in-law who lives

4  on 7th to come over and give me the spare key so I

5  was late.  I do recall that.

6      **Q.        And, in fact, that's not the only**

7  **time you were late because you lost your keys;**

8  **correct?**

9      A.        I believe there was an issue one time

10  early in my tenure where I think I could not find

11  my bank key.  I don't recall exactly.

12      **Q.        All right.  Then on July 17, you**

13  **clocked out for 15 minutes even though an hour**

14  **lunch was provided; correct?**

15      A.        And, again, as I stated earlier, I

16  had been training in the room per Mary Venditti

17  who's the trainer's instructor, so...

18      **Q.        And on the 18th again you were**

19  **supposed to shadow but only clocked out for 16**

20  **minutes.**

21      A.        Correct.

22      **Q.        And the same thing on the 19th;**

23  **correct?  Only the 19th you clocked out for 18**

24  **minutes; right?**

1      A.      That's correct.

2      **Q.      Now, at the top of that page it**

3  **discusses an incident where you claimed to have**

4  **been entitled to an extra quarter hour of time;**

5  **correct?**

6      A.      I'm sorry.  Where was this again now?

7      **Q.      Top of the second page of Exhibit**

8  **124.**

9      A.      Okay.

10     **Q.      Do you remember the incident where**

11 **there was a client waiting in the lobby and you**

12 **and Lisa Davenport were talking and Ms. Perez**

13 **asked you to help the customer?**

14     A.      Uh-huh.

15     **Q.      Do you remember that?  And you said**

16 **you didn't appreciate her tone.**

17     A.      Yes.  Afterwards I had mentioned to

18 her that I would appreciate her tone just be a

19 little more genital.

20     **Q.      And you said you stopped by at the**

21 **end of the day and told her that; correct?**

22     A.      Yes.  I had -- I had made it a point

23 to just try and clear the air.

24     **Q.      And you did that after you already**

 1   clocked out; correct?

 2       A.        That would be my guess.

 3       Q.        **There is no more than a five-minute**

 4   **conversation; correct?**

 5       A.        I can't imagine it was a significant

 6   amount of time.

 7       Q.        **Now, let me show you what's been**

 8   **marked as Exhibit 123.  Exhibit 123 reflects your**

 9   **e-mail saying that you told Ms. Perez that she**

10   **didn't -- that you didn't appreciate her tone;**

11   **right?**

12       A.        Yes, that was.  I was just trying to

13   -- I did not appreciate the tone of the -- of the

14   -- of the request.

15       Q.        **You said it made you feel like a**

16   **child; right?**

17       A.        Yes.  It was a -- the customer even

18   remarked to me that it was something you would say

19   to a child.

20       Q.        **And Ms. Perez reports that the**

21   **conversation lasted no more than five minutes.**

22                 **Do you see that?**

23       A.        I do see that.

24       Q.        **Do you agree with that?**

1    A.         It was not a significant amount of

2 time but again, as I mentioned, it was just the

3 tone and tenor.  It was very common that, you

4 know, for someone particularly moving from the

5 teller line, as I think that was their plan to

6 train me to be a universal banker, it's just

7 somewhat undercutting when you're asked to service

8 a client and that client says, You're being yelled

9 at like a child.  So that was really the genesis

10 of why we -- why I felt we should just touch on

11 it.

12    **Q.         You were actually given an extra**

13 **quarter hour of pay for that conversation; right?**

14    A.         Again, perhaps.

15    **Q.         Now, let me show you what's been**

16 **marked as Exhibit 125.  Do you remember being**

17 **awarded an extra quarter hour of pay?**

18    A.         Yes.  So, again, this was, I believe,

19 the same day they decided to let me go and so I

20 believe my understanding of this was made in their

21 review of the time concerns that Nicola had called

22 to the branch about before I went to training in

23 Media for that week and also during that

24 conversation was when she asked me about the

1  environment in the branch and I -- you know, as it

2  concerned to race and other matters, and I did not

3  want to say anything about time shortage or race

4  initially, but I did say that from time to time we

5  don't get the full amount of time that we're

6  supposed to get.

7           The .25 hours for the, you know, five

8  minutes was not what I was referring to when I had

9  mentioned that to human resources.  So while the

10 .25 hours, you know, they felt they owed it to me,

11 it certainly was nothing I asked or requested for.

12      **Q.      Did you ever ask or request for**

13 **additional time that you thought was owed to you?**

14      A.      I can remember having to just

15 mention, you know, that my time, as I, you know,

16 referred to earlier, my time from Monday looking

17 at the card that there was -- we were there until

18 4:30.  I very rarely asked for a lot of

19 adjustment.  I understood from time to time we

20 would be asked to be there a few minutes beyond,

21 but it was not something that was certainly a

22 great focus of mine.

23      **Q.      Well, you always knew when you were**

24 **approving your time card that the time card had to**

1  be correct; right?

2       A.        Yes.  I was aware.

3       Q.        **And you didn't approve it unless you**

4  **thought it was correct; right?**

5       A.        Again, yeah.  There were times in

6  which I -- I did not approve it immediately, but

7  there were times that I just went on and approved

8  it.

9       Q.        **Because it was right; correct?**

10      A.        There were times I just went on and

11 approved it because I didn't really feel like

12 having a debate after a while.

13      Q.        **So even after your long back and**

14 **forth with your wife about whether you should**

15 **approve a time card that you believed to be false,**

16 **you said you did it anyway?**

17      A.        So again --

18      Q.        **Is that your testimony?**

19      A.        No.  As I mentioned, when we were

20 discussing the incident from the prior five

21 exhibits ago, I asked her should I approve this?

22 She suggested I do not.

23                However, in the course of the day,

24 there were times I'm sure the manager can go in

 1  and adjust the pay.  We often just -- you know, if

 2  adjustments were made, you kind of learned to live

 3  with it.  Being the squeaky wheel, as evidenced by

 4  my experience at Bryn Mawr Trust, did not generate

 5  any benefit.

 6       **Q.       You also had quality issues with your**

 7  **work; correct?**

 8       A.       Perhaps.  I don't recall quality

 9  issues with my work.

10       **Q.       You don't recall being written up?**

11       A.       I don't recall being written up for

12  quality issues.

13       **Q.       All right.  Let me show you what's**

14  **been marked as Exhibit 81.  Exhibit 81 is an**

15  **e-mail in which Laura Biernacki and Ms. Perez are**

16  **discussing deficiencies in your performance.**

17            **Do you see that?**

18       A.       Yes.

19       **Q.       Including the fact that you have**

20  **difficulty multitasking.**

21            **Do you see that?**

22       A.       I do see it.

23       **Q.       Do you believe that's an accurate**

24  **criticism of your work?**

1      A.        I don't think it's a terribly

2  accurate criticism of the work.  Just, again, to

3  provide some context to the time line, this was

4  written the morning I was provided my first day

5  after my mother passed at 11:00 the night before I

6  was making the funeral arrangements that day.  So,

7  you know, I'm sure given what I was dealing with,

8  that that may have been her impression from time

9  to time.

10             However, I would refer to our branch

11  score card which did speak to how we were

12  performing operationally, which was doing

13  beautifully throughout my tenure there.

14             So as my responsibilities as the head

15  teller, as you've referred to a number of times,

16  is to make sure that the teller line is

17  operational and functional, that while I did have

18  issues with absences around that time, we were

19  operationally successful.

20             So I would think that that's somewhat

21  of a harsh characterization, but I never received

22  this writeup.

23      **Q.        So one of the other criticisms is**

24  **that Lisa Davenport was currently doing much of**

1  the head teller duties.

2             Do you see that?

3     A.      And again --

4     Q.      Do you believe that -- do you see

5  that?

6     A.      I do see that.

7     Q.      Do you believe that's a fair

8  criticism?

9     A.      Again, because I was out and because

10 I was out quite a bit in the first few months with

11 my mother, there were times that I wasn't there.

12 As the senior teller, it's her role to fill in as

13 the head teller.

14            So, again, I understand that on the

15 days that I was out, it was putting undue strain

16 on Lisa.  It's another reason why I really wanted

17 to get back and be there and work and help the

18 team.

19    Q.      Exhibit 81 also reflects that you

20 were not organized and lacked time management

21 skills.

22            Do you see that?

23    A.      I see that criticism as well.

24    Q.      Do you believe those are valid

1  criticisms?

2      A.      I wouldn't -- I wouldn't agree with

3  that, again, because I can remember in late --

4  later in March being applauded both by Laura and

5  Danielle that Lisa and I had made more phone calls

6  for a home equity loan promotion than anyone else

7  in the district.

8              So I do think that we had -- we were

9  honing our team on the teller side for the

10  majority of the first few months I was there,

11  which obviously was impacted by the fact that I

12  was sick, taking care of my mother, and I was out

13  also planning my mother's funeral and attending my

14  mother's funeral.

15      **Q.      The last criticism is that Ms. Perez**

16  **went back to Ardmore to do monthly audits that**

17  **were not completed by you.**

18              **Do you see that?**

19      A.      I do see this.

20      **Q.      Do you remember failing to complete**

21  **the monthly audits?**

22      A.      I don't recall failing to complete

23  monthly audit for -- I'm assuming this is in

24  reference to February?  I would imagine that that

 1  would have been brought to my attention.

 2              My sense is that because Danielle can

 3  also do the audits that that may have been a duty

 4  that she took on.  I don't recall specifically as

 5  to that month.

 6      **Q.       And you see on the first page of**

 7  **Exhibit 81 there is a decision made to table the**

 8  **issue because of your mother's passing.**

 9              **Do you see that?**

10      A.       I do.

11      **Q.       Okay.  And then --**

12      A.       And if I could be afforded a break in

13  the near term, that would be terrific.

14              MR. KRAUSS:  Sure.  Let's go off the

15  record.

16              VIDEOGRAPHER:  Off the video,

17  4:39 p.m.

18                     RECESS

19              VIDEOGRAPHER:  We're back on the

20  record at 4:54 p.m.

21  BY MR. KRAUSS:

22      **Q.       Mr. Sutton, you were in Media for**

23  **training on July 16, 17, 18, 19, and 20; correct?**

24      A.       That is correct.

ERIN DINGER v BRYN MAWR BANK                                      Page 251
Michael Sutton, 11/04/2020

1      **Q.        And your testimony was that the first**
2   **day on the 16th you went in and you saw Alicia**
3   **McDaniel's car there; right?**
4      A.        Uh-huh.
5      **Q.        I'm sorry?**
6      A.        That is correct.  I saw -- I observed
7   Alicia McDaniel's car.
8      **Q.        And, therefore, that's why you say**
9   **you didn't want to go up to the bank floor?**
10     A.        So, again to clarify, that was
11  certainly a concern of mine knowing that she had
12  been moved from the branch and we weren't supposed
13  to know where she was.
14              However, when I went up on the first
15  day Treslyn and the bank, they had no time for me
16  and basically sent me back downstairs.
17     **Q.        Okay.**
18     A.        So my sense from then on is that I
19  should maybe avoid running into Alicia and just
20  focus on doing what I could to learn the tasks
21  while I was in the training room with Ms. Venditti
22  who's the trainer.
23     **Q.        Except Alicia McDaniel wasn't in**
24  **Media until the 19th; right?**

1        A.          Again, on the first day that I saw

2    her physically there I believe was the 19th.

3        **Q.          She wasn't even there at all.**

4        A.          Say again?

5        **Q.          She wasn't even there at all.  She**

6    **was at BSA.**

7        A.          Again, I believe that date she -- the

8    19th, the 20th, I believe she exchanged an e-mail

9    with me and said, I see you and you've been in the

10   branch all week.  So I think we were in the same

11   place at the same time, sir.

12       **Q.          Let me show you what's been marked as**

13   **Exhibit 121.  Do you see Exhibit 121 is the**

14   **instruction for Alicia McDaniel to report to Media**

15   **on the 19th; correct?**

16       A.          Okay.

17       **Q.          So she wasn't there on the 16th;**

18   **right?**

19       A.          Again, I saw what I thought was her

20   car.

21       **Q.          She wasn't there on the 16th; right?**

22       A.          Based on what you're showing me,

23   perhaps she was not.

24       **Q.          She wasn't there on the 17th; right?**

 1       A.       Again, when I went up, they were not

 2   available for me.

 3       **Q.       She wasn't there on the 17th either;**

 4   **right?**

 5       A.       It's not -- again, based on what

 6   you're showing me, she was not there until the

 7   19th.

 8       **Q.       So you couldn't have seen her car on**

 9   **the 16th; right?**

10       A.       Again, she had a very common car.  It

11   was a Nissan Pathfinder.  Perhaps it was another

12   car parked in a very big parking garage in Media.

13   However, when it was confirmed to me I believe the

14   19th was Thursday, I certainly knew that they knew

15   I was there and that, you know, again, my

16   interaction with Alicia was something that I was

17   told should not happen, and based on any other

18   experience I've had with the bank, I knew that if

19   I had even a coincidental interaction with Alicia

20   that that could be viewed as being a cause for

21   termination.

22       **Q.       Now, did anybody ever tell you not to**

23   **talk to Alicia McDaniel?**

24       A.       We were told that Alicia --

1  essentially what was mentioned to us, Alicia left

2  early one day and never returned.  And what was

3  messaged to us as branch employees was that

4  customers will come in and they will ask where

5  Alicia is and she's still with the bank but you

6  cannot provide phone number, an office, anything,

7  just encourage customers to contact her via e-mail

8  and they will then make the connection.

9       **Q.      Mr. Sutton, my question was, did**

10  **anybody at Bryn Mawr Trust ever tell you not to**

11  **talk to Alicia McDaniel?  Did anybody say that?**

12       A.      We were instructed to not have

13  contact with Alicia.  We were not supposed to --

14       **Q.      Who said that?**

15       A.      When -- when she left the branch we

16  were told by Danielle Perez, our manager, that

17  she's no longer with the branch.  But your

18  messaging to people is that you are -- you can

19  provide her e-mail; you cannot know what office

20  she's currently located in and it was not

21  encouraged for us to contact her whatsoever.

22       **Q.      It's true that Ms. Perez never said a**

23  **word about whether or not you as branch employees**

24  **could call Alicia McDaniel; correct?**

1      A.          Again, the circumstances around her

2  departure indicated to me that there was a lot

3  more under the surface and so, again, when we were

4  told to not talk to customers about the

5  circumstances, do not direct them to do anything

6  other than e-mail her, it was pretty plain without

7  speaking it out loud and explicitly that if I were

8  to be contacting Alicia, if I were to be even seen

9  meeting with Alicia or running into Alicia, that

10  that could be very troublesome for me.

11              I made a few innocent comments in

12  Bala Cynwyd that came back to bite me.  So based

13  on my experience, I knew better than to color

14  outside of the lines.

15      **Q.          Now, were you aware that Ms. Perez**

16  **thought it was Alicia McDaniel who was being the**

17  **aggressor in the relationship with Ms. Intzes?**

18      A.          Again, when I would speak to

19  Danielle, or when I was ever asked to give my

20  sense of what was going on between them, it was

21  very limited and I was essentially told that it

22  was not my concern, it was interpersonal, and that

23  she was dealing with it.

24              However, I did not see any

 1  improvement and I think sadly that is why

 2  Ms. Perez and Ms. McDaniel both soon thereafter

 3  left the Ardmore branch.

 4       **Q.       Let me show you what's been marked as**

 5  **Exhibit 119.  Exhibit 119 is a series of notes of**

 6  **meetings with Alicia McDaniel and Ms. Perez.  Let**

 7  **me ask you to turn to the page Bates stamped**

 8  **891873.**

 9              MR. SCHWARTZ:  What Exhibit number?

10              MR. KRAUSS:  Exhibit 119.

11  BY MR. KRAUSS:

12       **Q.       Do you have that page?**

13       A.       1873.

14       **Q.       You see that's the notes of the July**

15  **13th meeting with Ms. Perez?**

16       A.       I see that these are notes from a

17  meeting, correct.

18       **Q.       With Ms. Perez; correct?**

19       A.       It says Meeting, Danielle Perez, at

20  2:30.

21       **Q.       Let me ask you to go to the third**

22  **paragraph down, and it says Nikkie Fryer asked**

23  **Danielle Perez if Maggie Intzes ever speaks to**

24  **Alicia McDaniel inappropriately.**

 1                    Did I read that correctly?

 2        A.        That is what it reads.

 3        Q.        And Ms. Perez said No.  That Alicia

 4   McDaniel's tone often seems like it's

 5   inappropriate to Maggie.

 6                   Do you see that?

 7        A.        I do see that is what is written.

 8        Q.        Okay.  Do you agree with that

 9   observation that Alicia McDaniel's tone often

10   seems like Alicia McDaniel is being inappropriate

11   to Maggie Intzes?

12        A.        Again, that was not my observation.

13        Q.        The memo goes on to say that

14   Ms. Perez said that early on Ms. Intzes made a

15   comment to Alicia McDaniel about working full time

16   while she had small children and that Alicia

17   McDaniel was very offended by that comment and

18   took it personally.

19                   Do you see that?

20        A.        I do see that.

21        Q.        That's true; right?

22        A.        Again, the conversations that I

23   witnessed were around child care and other issues.

24   So I could see that that would be something that

1  she was offended by.

2      **Q.        Ms. Perez went on to say that she**

3  **addressed the conversation with both of them but**

4  **that Ms. Perez felt that Alicia McDaniel never got**

5  **over it and held a grudge against Maggie Intzes.**

6              **Do you see that?**

7      A.        I see that is what is written.

8      **Q.        Do you agree with that statement?**

9      A.        I don't agree with that statement,

10  because, again, I wasn't present for this meeting

11  obviously.  But my experience, what I observed,

12  was very much Maggie Intzes making comments that

13  were inappropriate and race based and that I think

14  understandably put Alicia in an uncomfortable

15  position.

16              Now, as to how that made Maggie feel

17  and Alicia feel directly and Danielle feel

18  directly, I cannot speak to how that felt.  I do

19  know that it became very apparent that this was a

20  very difficult working environment and that it was

21  affecting not only our team work, but it was

22  affecting our ability just to service the

23  customers.

24              Understanding what I observed, I

 1  could see that Alicia had difficulty getting over

 2  comments that, you know, could understandably be

 3  seen as racist.  So I disagree with that

 4  characterization.

 5       **Q.        Okay.  Do you remember Alicia**

 6  **McDaniel accusing Magdaline Intzes of having a**

 7  **physical confrontation with Lisa Davenport?**

 8       A.        Again, I don't recall that at all.

 9  But that is something I'm just not familiar with

10  at all.

11       **Q.        So you don't remember the fact that**

12  **the videotape showed that that never happened?**

13       A.        I --

14            MR. PEARLMAN:  Objection.

15            THE WITNESS:  Again, I don't know

16  what date you're referring to.  You're just

17  mentioning an incident that I don't see on this

18  page yet.  So could you give me --

19  BY MR. KRAUSS:

20  **Q.        I'm asking for your memory.  Do you**

21  **remember Alicia McDaniel claiming --**

22       A.        I had never heard that until you have

23  just said that today.

24       **Q.        Okay.**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1       A.        -- that there was an assault of any

2   kind.  But I can't speak to me being present

3   obviously at all times and everywhere.

4       **Q.        Let me show you what's been marked as**

5   **Exhibit 84.  Do you remember talking through this**

6   **writeup with Ms. Perez and Ms. Biernacki and then**

7   **it being withdrawn because you promised to do**

8   **better and be more supportive?**

9       A.        Based on the notes it says he started

10  to do better and be supportive.  So I think that

11  would -- the characterization would be that

12  perhaps after my mother died I was better able to

13  do my job and perform.  I don't disagree with

14  that.

15      **Q.        Did you promise Ms. Perez and**

16  **Ms. Biernacki that you would do better and be**

17  **supportive?**

18      A.        I absolutely do recall continually

19  making the commitment to do my utmost and to be a

20  team player and I felt that I tried my best to do

21  so on a day-to-day basis.

22      **Q.        So in the third paragraph the memo,**

23  **Exhibit 84, notes that you didn't complete audits**

24  **in February in a timely fashion.**

1              **Do you see that?**

2       A.        I do see that.

3       **Q.        Okay.  Is that true?**

4       A.        Again, I don't recall the specific

5  instance.  I would love to reference what days I

6  was out.  Perhaps that was why those audits were

7  not able to be completed at the mid month and had

8  to be completed at the end of the month.

9       **Q.        Well, let's go through it.**

10      A.        However, the end of the month is when

11 they're required to be completed, so...

12      **Q.        Do you see the memo reflects that**

13 **Ms. Perez suggested you complete the audits by**

14 **February 15.**

15              **Do you see that?**

16      A.        I do see that.

17      **Q.        Do you remember her suggesting that?**

18      A.        I do recall her suggesting that.

19      **Q.        And do you remember telling her on**

20 **the 26th that you weren't going to be able to get**

21 **them done on time?**

22      A.        Again, as best I can recall, I may

23 have asked for her assistance to make sure that we

24 could get things completed and stay operational.

1     Q.        My question, Mr. Sutton, was, do you

2   recall telling Ms. Perez on the 26th that you

3   weren't going to be able to complete the audits,

4   that she suggested you do by the 15th a week and a

5   half previous?

6     A.        Again, as best I can recall, I would

7   have asked for her assistance if the audits had

8   not been complete.  But knowing that I was out for

9   a number of days in mid-February, it likely was

10  something that I did need to deal with but that I

11  likely needed some assistance given the

12  constraints of time.

13    Q.        In the fifth paragraph it says that

14  on March 26 the new part-time teller made a

15  mistake and that rather than coaching, you turned

16  it into a negative situation.

17              Do you see that?

18    A.        Okay.  So if I'm recalling

19  the incident --

20    Q.        The first question is do you see

21  that?

22    A.        I see.  I do see the listed date.

23    Q.        Do you know what that's referring to?

24    A.        As best I can recall, we had a

1  relatively new teller and an issue that she had --

2  one of many issues she had was just locking her

3  drawer, which you have to do whenever you would

4  leave your counter because you would not want

5  anyone else to go in and take your money.

6           So I believe what we may have done,

7  we just locked the drawer and put the keys in her

8  drawer so that she would come back and realize,

9  Oh, I need to make sure to lock this drawer.  So,

10  again, that is, as best I can recall, the instance

11  that's being referred to.

12    **Q.      Okay.  So rather than telling her**

13  **what she was doing, you just locked her drawer and**

14  **hid the keys?**

15    A.      Well, again, we can't let someone

16  leave without it being locked.  We're all on

17  videotape.  So I had to lock it.  Now, I just put

18  her keys next to her computer so when she came

19  back, she could see that her keys were there above

20  her drawer.  It was not, I think, as something

21  that would create a fear.

22           In fact, I would say that Cierra, the

23  employee in question, would often enjoy the

24  coaching that I was giving and would compliment

1  Danielle during her time there about her growth.

2       **Q.        In the next paragraph down the**

3  **writeup says that you need to maintain your**

4  **relationships on a professional level and that the**

5  **content of your discussion should meet that**

6  **criteria.**

7              **Do you see that?**

8       A.        I do see that.

9       **Q.        Do you agree you had a problem**

10  **maintaining your relationships on a professional**

11  **level?**

12      A.        Again, I think at this time that was

13  a concern based on a variety of different

14  interactions as I was going through a difficult

15  time.  So I'm sure as part of doing a reset, I was

16  very accepting of the criticism and saying that,

17  yes, I will do more to be a team player and be

18  supportive.

19      **Q.        In the bottom paragraph the writeup**

20  **says that Ms. Perez needed to convey to you that**

21  **when she met with you to discuss your performance,**

22  **your response is often an excuse for behavior and**

23  **very infrequently an acknowledgment of an error on**

24  **your behalf.**

1              **Do you see that?**

2        A.       I do see that.

3        **Q.       Do you believe that is a valid**

4   **criticism of your behavior?**

5        A.       Again, perhaps that would be for an

6   appropriate criticism for something like trying to

7   have the audits completed by mid month and being

8   unable to do so.  However, I do think that I

9   showed, and that's why I was not actually given

10  this writeup as you're referring to it, because

11  they had seen that I was doing better and that I

12  was taking more accountability and more

13  responsibility in the office.

14       **Q.       So this writeup is dated March 29;**

15  **correct?**

16       A.       Again, as it lists at the top, it was

17  never delivered at the request of the manager,

18  because I was doing better and being supportive.

19  So as best I can tell, this was, I guess,

20  something written in March, but I had never seen

21  it until today.

22       **Q.       Well, let me show you Exhibit 85,**

23  **which is an e-mail exchange you had that same day**

24  **with Nikkie Fryer.**

 1              **Do you see that?**

 2       A.       I do see an e-mail, yep.

 3       **Q.       It's between you and Nikkie Fryer;**

 4  **correct?**

 5       A.       I do see it.

 6       **Q.       March 29th; correct?**

 7       A.       I do see it.

 8       **Q.       You opened the e-mail exchange by**

 9  **saying that you're surprised not to hear from her**

10  **again today and that you were going to reach out**

11  **to Nancy Pinkowicz as the harassment against you**

12  **experiencing has escalated and you have not heard**

13  **from Nikkie Fryer.**

14              **Do you see that?**

15       A.       I do see that.

16       **Q.       So, first of all, what harassment are**

17  **you talking about?**

18       A.       So to mention for probably the

19  seventh time, I was trying to get a hold of Nikkie

20  Fryer to understand based on the final writeup

21  that I was given, based on the fact that I was

22  never asked to sign it and give it back, to

23  understand where I stood.

24              Nikkie Fryer never got back to me as

 1 | this e-mail alludes to.  I cc'd Nancy Pinkowicz,
 2 | as I mentioned earlier, in an effort to speak to
 3 | someone at human resources to understand where I
 4 | stood and how I could best move forward, because I
 5 | wasn't getting anything that was making me feel I
 6 | was in a good spot based on my interactions with
 7 | my manager and my area manager.
 8 |             So, again, that's why I'm reaching
 9 | out to Nikkie.  I cc'd Nancy Pinkowicz.  Nikkie
10 | declined to ever meet with me, but Nancy Pinkowicz
11 | did, to try and assure me that things were moving
12 | in the right direction and that I -- you know,
13 | again, they were under -- she alluded to me that
14 | they understood that I was going through a
15 | difficult time and that if I keep doing my job and
16 | doing it well, that I will have no issues.
17 |     **Q.        So, Mr. Sutton, the harassment you**
18 | **were referring to is Nikkie Fryer's refusal to**
19 | **call you back and tell you that everything was**
20 | **okay with the writeup, Exhibit 76?**
21 |     A.        I think the harassment I'm referring
22 | to is the fact that I had been given a final
23 | written warning six weeks prior and I had just
24 | tried to have a conversation to understand where I

1  stood and no one was giving me straight answers.

2           I referenced having e-mails from the

3  area manager to make me concerned and that I just

4  want to know what this means to me.  So, again, I

5  felt that I was being -- you know, I was in a

6  position where I needed to understood what my

7  standing is, because as I mentioned in the e-mail,

8  the concern of lack of understanding of where my

9  -- where this places my career at BMT.

10          So I just needed to understand where

11 I stood and sadly Nikkie never did give me the

12 courtesy of reaching back to me.  Thankfully

13 someone else in her department did.

14 **     Q.      And you believe that was harassment.**

15 **That's the word you used; right?**

16 **          I'm sorry, let me ask it this way.**

17 **Is there anything else that you believe was**

18 **harassment aside from Nikkie Fryer not calling you**

19 **back to talk to you about the writeup?**

20     A.      Again, so that is not the harassment

21 I'm referring to.  It's the lack of --

22 **     Q.      What is the harassment?**

23     A.      Again, so the lack of clarity around

24 the writeup that I was never asked to give back

1  and what does this mean for my career.  No one in

2  consumer banking that I worked for, my area

3  manager or my district manager, could give me a

4  clear understanding of whether this was truly in

5  effect.

6                  And when I finally was able to get a

7  meeting with Nancy Pinkowicz in April as a result

8  of this outreach, I was told not to worry about

9  it.  So that is why I felt I needed a

10 clarification, which is what this -- the thrust of

11 this e-mail is, I would like clarification on

12 where I stand.

13     **Q.        Now, you start your e-mail by saying**

14 **you were surprised not to hear from her again**

15 **today.  So you had heard from her before; correct?**

16     A.         I had.  And when I contacted you

17 Tuesday evening I had been told by my

18 supervisor --

19     **Q.        Wait, wait.  Hold on.  You're going**

20 **to a different --**

21     A.         I'm reading the first line of the

22 exhibit you put in front of me.

23     **Q.        Hold on, please.  One at a time.**

24     A.         I might ask you the same.

1      Q.        We're on the first e-mail.  You

2  expected a call that day; right?

3      A.        Yes.  Because, again, I had been

4  instructed by my branch manager Tuesday early a.m.

5  that she was going to reach out to me or come to

6  Ardmore.

7      Q.        Now, let's turn to the middle e-mail,

8  Ms. Fryer's response when she starts by saying,

9  quote, Your e-mail absolutely baffles me and I

10  encourage you to think back to our discussion last

11  night and how it ended.

12            Did I read that correctly?

13      A.        Yes.

14      Q.        Okay.  So you had had a discussion

15  the prior night with Nikkie Fryer; correct?

16      A.        Again, it was not very complete,

17  because I didn't understand what was going on.  I

18  was trying to understand what, given I had not

19  returned a final written warning, that to my

20  understanding required my signature, what was

21  going on and what this meant for my career.  As I

22  was not getting any traction with anyone in retail

23  banking, I had to reach out to human resources.

24      Q.        So why didn't you just sign the

1 | **writeup Exhibit 76 and give it back?**

2 |     A.       Because, again, I had concerns with

3 | it and I wanted to speak to someone about those.

4 |     **Q.       So why didn't you write down your**

5 | **concerns and sign it and give it back?**

6 |     A.       Again, I never was asked for it back.

7 | So I'm sure that at one point I had written

8 | concerns down and was prepared to address them.

9 | However, as they never requested the documentation

10 | back, it sat there, for lack of a better term,

11 | like a bad peroghie and no one kind of talked

12 | about it; it just stunk.

13 |          So I frankly am frustrated that we

14 | continue down the same line of questioning, but

15 | yes.  I -- I -- I do remember reaching out to HR

16 | because, again, no one would let me know what this

17 | truly meant for me.

18 |          Nikkie Fryer having written -- being

19 | on the writeup was supposed to be the person to

20 | give me that insight.  However, she was unwilling

21 | or unable to.  Eventually when I met with an

22 | associate vice president in human resources, a

23 | colleague, I don't know exactly Nikkie's role, she

24 | assured me that she reviewed things and that I was

1  trending in the right direction and I should just

2  continue and, you know, move on.

**3       Q.       What happened to the written response**

**4  you just referred to in your answer?**

5       A.       Say again?

**6       Q.       What happened to the written response**

**7  that you just referred to in your answer?**

8       A.       I had it in my drawer at the bank.

9  It was never asked for me to return it back.  As

10  far as I'm aware, it's still sitting in the drawer

11  in the bank.  I find it -- you know, again, I was

12  not given time to take any documentation or

13  materials.  So I would imagine it's still sitting

14  where it had been if it has not been subsequently

15  cleaned out.

**16      Q.       So you're saying you prepared a**

**17  written response to the writeup, Exhibit 76, and**

**18  left it in your drawer at the bank?**

19      A.       I did.

**20      Q.       That's your testimony?**

21      A.       I had written it up.  I had reached

22  back out to Nikkie Fryer.  I had not heard

23  anything.  I had not been requested to return the

24  document from my district manager or my direct

1  supervisor.  So I did not know what the situation

2  was.  It seemed to me that no one at HR,

3  particularly after my mother died, wanted to talk

4  to me about this particular writeup until I spoke

5  to Nancy Pinkowicz a full month after my mother

6  had passed.

7        **Q.        So when you wrote up your response,**

8  **how did you do that?  Did you go to your computer**

9  **and type up a Word document?**

10       A.        I'm sorry.  Which -- which response

11 are we referring to now?

12       **Q.        The one you were just talking about,**

13 **the response --**

14       A.        On the form, the final warning?

15       **Q.        The response to Exhibit 76, the one**

16 **you say you left in your desk drawer.  Had you**

17 **gone to your computer and written a response?**

18       A.        No.  I wrote on the physical piece of

19 paper and was waiting for someone to ask for me to

20 sign it in their presence and return it.  However,

21 I never got the opportunity to have that

22 conversation.

23       **Q.        All right.**

24       A.        No one ever asked me to return it,

1   which is why the document you produced does not

2   have my signature on it.

3        Q.        Let's go back to Exhibit 85 and

4   Ms. Fryer's e-mail.  She says that you contacted

5   her around 4:49 p.m. and said that she was going

6   to Ardmore to meet with you.  Is that true?  Had

7   you called her at 4:49 p.m. the night before and

8   said --

9        A.        Again --

10       Q.        -- and said that she was coming to

11  Ardmore to meet with you?

12       A.        If you look at the e-mail that I

13  responded to her it says that I had been told by

14  my supervisor here in the branch early a.m. on

15  Tuesday you were coming to Ardmore to see me to

16  explain this writeup.

17       Q.        My question --

18       A.        So I am sure that is what I had been

19  told.

20       Q.        That wasn't my question.  Can you

21  please listen to my question?

22       A.        Yeah.

23       Q.        Did you call Nikkie Fryer at

24  4:49 p.m. and say to her that you understood that

1    she was coming to Ardmore to meet with you?

2                    Did you do that?

3         A.        I'm confident that I reached out to

4    Nikkie Fryer as I had been for several weeks to

5    understand the consequences.

6         Q.        And she said she was completely

7    unaware of any meeting and never said she was

8    coming to Ardmore and there was no meeting on her

9    calendar; correct?  That's what she says?

10        A.        That is what she said.

11        Q.        Did you have any meeting on your

12   calendar?

13        A.        Again, I don't have a recollection

14   save for that my supervisor had told me that

15   Nikkie was going to come to the branch to speak to

16   me about it.

17        Q.        Now, when you called her the night

18   before, did you discuss your recent corrective

19   counseling with Ms. Fryer?

20        A.        When I called and spoke to Nikkie

21   Fryer?  I'm sorry.  You're losing me.

22        Q.        Well, I'm just going --

23        A.        We're still on the contact at 4:49.

24        Q.        I'm just going through the e-mail.

1  And Ms. Fryer writes, quote, You discussed your

2  recent counseling.

3       A.       Uh-huh.

4       Q.       Is that true?  Did you do that when

5  you called?

6       A.       I was asking about the writeup from

7  2/14.

8       Q.       And Nikkie Fryer said that she didn't

9  get involved -- I'm sorry.  And you said that

10  Nikkie Fryer didn't get involved in that

11  situation; correct?

12       A.       That she didn't get involved in

13  the --

14       Q.       Writing.

15       A.       -- explaining to me.

16       Q.       That's true; right?  You said that;

17  right?

18       A.       She never explained to me the extent

19  or the ramifications of the writeup, though her

20  name was on the writeup.

21       Q.       Okay.  And --

22       A.       Nancy Pinkowicz was the only person

23  who eventually did respond to me.

24       Q.       And in that conversation you accused

1  her of not following up; correct?

2       A.        Because, again, I had been told by my

3  supervisor that she's coming to meet with me.  I

4  don't think that's unrealistic or unreasonable

5  rather when my boss tells me they're coming to

6  talk to you about it.

7       **Q.        When did your boss tell you that**

8  **Ms. Fryer was coming to talk to you about --**

9       A.        Tuesday morning.

10      **Q.        Tuesday morning, the 27th of March?**

11      A.        That is, again, to the best of my

12  recollection.

13      **Q.        Okay.  Now, Ms. Fryer had gotten back**

14  **to you the day after and told you to follow the**

15  **chain of command; correct?**

16      A.        Again, that's what her e-mail

17  indicates to me --

18      **Q.        And that's what she --**

19      A.        -- and she said --

20      **Q.        And you had done that; right?**

21      A.        And I had done that and I had not

22  found answers.  So as she mentions, I'm copying

23  Nancy Pinkowicz in the event you wish to follow up

24  with her.  I eventually was able to follow up with

1  Nancy Pinkowicz to get answers.

2       **Q.        Ms. Fryer goes on to say that when**

3  **you called her you indicated you now believed you**

4  **had issues that are of a human resources nature to**

5  **discuss.**

6                 **Do you see that?**

7       A.        I do.

8       **Q.        Did you tell her?**

9       A.        Did I tell Ms. Fryer?

10      **Q.        Yeah.  Did you tell Ms. Fryer when**

11 **you called her on the night of March 27 that you**

12 **had issues that are of a human resources nature to**

13 **discuss?  Did you tell her that?**

14      A.        I did.

15      **Q.        Okay.**

16      A.        I wanted to understand the writeup

17 and the consequences.

18      **Q.        So those were the human resources**

19 **issues you wanted to discuss; correct?**

20      A.        Those were the human resources issues

21 I wanted to discuss with Nikkie.  When I had the

22 opportunity to speak with Nancy, I also talked and

23 shared with her some additional concerns that I

24 had.

1    **Q.        Did you mention any of those**
2    **additional concerns to Nikkie Fryer in the**
3    **conversation?**
4         A.        In the two minutes I believe we were
5    on the phone, if that, I did not have the
6    opportunity to mention anything beyond I need to
7    speak to someone at human resources.
8         **Q.        Now, Ms. Fryer reports that she**
9    **immediately agreed to speak with you in order to**
10   **learn more about your concerns.**
11                  **Do you see that?**
12        A.        I see that she agreed to do it, but I
13   never got a chance to speak to her until July.
14        **Q.        Did she say that in your conversation**
15   **when you spoke to her on the 27th --**
16        A.        I don't recall that she said that she
17   would be in contact with me, which is why I had to
18   follow up again the next day.
19        **Q.        Ms. Fryer goes on to say that she let**
20   **you know that she was expecting a visitor and she**
21   **was unable to speak to you that evening.**
22                  **Do you see that?**
23        A.        I do see that.
24        **Q.        Did she tell you that in the phone**

1    conversation?

2        A.        Perhaps she did.

3        Q.        Ms. Fryer goes on to say that she

4    suggested that you meet the next evening in Bryn

5    Mawr as opposed to the branch.

6                  Do you see that?

7        A.        I do see that.

8        Q.        Did she make that suggestion in the

9    phone call?

10       A.        She may have.

11       Q.        Ms. Fryer goes on to say that she

12   then instructed you specifically to e-mail her

13   that day as to your availability over the next

14   week to come to Bryn Mawr and meet with her.

15                 Do you see that?

16       A.        I do see that.

17       Q.        Did she give you that instruction

18   during your phone conversation?

19       A.        Perhaps she did.

20       Q.        Ms. Fryer goes on to say that you

21   said you would send the e-mail.

22                 Do you see that?

23       A.        And I said --

24       Q.        Do you see that?

```
 1        A.        I see -- yep.  I do see what you're

 2   referring to, sir.

 3        Q.        Did you say that you would send her

 4   an e-mail with your availability over the next

 5   week to come to Bryn Mawr to meet with her?

 6        A.        Yes.

 7        Q.        Okay.  Did you send her an e-mail

 8   with your availability over the next week to come

 9   to Bryn Mawr and meet with her?

10        A.        Again, I am confident if that was

11   requested of me, I would have done that as I had

12   to eventually meet with Nancy Pinkowicz in Bryn

13   Mawr.

14        Q.        So where's that e-mail?

15        A.        I don't recall.  I don't have copies

16   of all my e-mails.  You do.  So did I?

17        Q.        So if there's no such e-mail, that

18   means you didn't send it; right?

19        A.        I'm just -- my question to you is,

20   you're obviously implying that I had not followed

21   up.  Though the last e-mail you're showing is me

22   writing to her, Nikkie Fryer, and Nancy Pinkowicz.

23   So I'm just struggling to understand what exactly

24   we're talking about.
```

1      Q.        Mr. Sutton, do you have any memory of
2    sending Ms. Fryer an e-mail giving her your
3    availability to meet with her at Bryn Mawr over
4    the next week?
5      A.        I'm confident if she requested times
6    to meet with me, I would have provided what times
7    I could meet with her.
8      Q.        That's not my question.  My question
9    is, do you have any memory of doing that?
10     A.        I don't have an exact recollection of
11   that specific aspect.
12     Q.        Okay.  Now, do you agree that if
13   there's no such e-mail that's because you never
14   sent it; right?
15     A.        I have to -- I have to take your word
16   for it, sir, as, again, I don't have those records
17   available to me.
18             MR. PEARLMAN:  You don't have to take
19   his word for it.
20             MR. KRAUSS:  Actually, you do.
21             THE WITNESS:  I find that dubious.
22   BY MR. KRAUSS:
23     Q.        So let me ask.  Are you aware that
24   Bryn Mawr Trust has produced over a million pages

```
 1  of documents in this case?

 2       A.         I am very impressed by that.

 3       Q.         Okay.  Were you aware of that?

 4       A.         I am very aware that you've sent a

 5  bunch of documents to the lawyers like late and a

 6  ton of misscanned stuff.  But yeah, I understand

 7  you had to produce a number of documents.

 8       Q.         What do you believe was sent late?

 9       A.         I'm sorry.  Could you repeat your

10  question again?

11       Q.         You said you understood that I had

12  sent a lot of things late and misscanned stuff.

13       A.         My understanding --

14       Q.         What do you believe was sent late?

15                  MR. PEARLMAN:  All right.  I object.

16                  MR. KRAUSS:  No.  He --

17                  MR. PEARLMAN:  I instruct you not to

18  answer.

19                  MR. KRAUSS:  He opened the door.

20                  MR. PEARLMAN:  Because any

21  information he has regarding that would have been

22  received from his lawyer, so let's move on.

23  BY MR. KRAUSS:

24       Q.         What do you believe was misscanned?
```

```
 1              MR. PEARLMAN:  Let's move on.  I'm
 2  instructing you not to answer.  Let's move on.
 3  BY MR. KRAUSS:
 4      Q.      Have you reviewed any of the
 5  documents that Bryn Mawr Trust has produced in
 6  this case?
 7      A.      I -- I have done some preparation
 8  with my lawyer.  He sent me the few documents that
 9  we had to review.  So I did go over what, again,
10  what I was able to.
11      Q.      Okay.
12      A.      But I don't recall seeing this
13  specific document.
14      Q.      Ms. Fryer says that she did not
15  receive an e-mail from you with your availability.
16              Do you see that?
17      A.      I did not receive an e-mail from you
18  today with your availability.  Now --
19      Q.      That's what she wrote; right?  That's
20  what she wrote; right?
21      A.      Yes.
22      Q.      Now, you keep wanting --
23      A.      I just wanted to point out it's 6:19,
24  she's writing me on a Wednesday night, we close
```

1  the branch at 4:00.  So I couldn't respond back

2  until Thursday which is what I did, but yeah.

3     Q.        Now, you had had that conversation on

4  Tuesday the 27th; correct?

5     A.        Yes.  Again --

6     Q.        And on Tuesday the 27th she had asked

7  you to send her an e-mail with your availability

8  to meet with her at the Bryn Mawr branch over the

9  next week; correct?  That's what she had asked;

10  right?

11    A.        Again, that's what -- that's what

12  this reads.

13    Q.        Okay.  And she said that as of 6:19

14  the next night she hadn't received that e-mail

15  from you; correct?  That's what she said; correct?

16    A.        That's what she writes.

17    Q.        Okay.  Now, you keep wanting to talk

18  about your response.  When you wrote back, did you

19  say Hey, Nikkie, yes, I did send you the e-mail;

20  here's another copy.

21             Did you say that?

22    A.        Again, I did not.

23    Q.        Did you say that?

24    A.        I did not have the opportunity to say

1  that, no.

2       Q.        Okay.  Because you didn't do it;

3  right?

4       A.        Again, I don't recall not sending

5  dates.  However, I know that I provided a number

6  of dates and eventually did get a meeting in early

7  April with Nancy Pinkowicz.  So as to whether

8  Nikkie chose or did not choose to be a part of

9  that meeting, I can't -- I can't speak to why she

10 chose or did not choose to be a part of that.

11      Q.        Ms. Fryer goes on to say that she's

12 unsure and unclear as to why there continues to be

13 misunderstanding on your part, Mr. Sutton, with

14 our communications.

15                Do you see that?

16      A.        I do see that.

17      Q.        And she goes on to say, quote, You

18 appear to be intentionally reiterating incorrect

19 information regarding our communication and

20 incorrectly stating that I am not getting back to

21 you or following up in some other way as promised.

22                Did I read that correctly?

23      A.        That is what is written.

24      Q.        Okay.  Do you believe that what she

1  was saying was true, that's what you were doing?

2      A.      No, I do not believe that to be the

3  case.

4      Q.      So let's look at your response.  You

5  start off by saying that you apologize that there

6  must have been a misunderstanding.

7              Do you see that?

8      A.      I do see that.  I'm often overly

9  polite.

10     Q.      And you said you thought that Nikkie

11 Fryer was going to reach out to you with dates.

12             Do you see that?  That's what you

13 wrote; correct?

14     A.      Yes.  I did write that I was wanting

15 to know where I stood and -- yeah.

16     Q.      So is it fair to say that since you

17 thought she was going to send dates, you never

18 sent an e-mail to her with the dates of your

19 availability; correct?

20     A.      I find that difficult to believe,

21 again, given that in the first or second week of

22 April, which would be the following week, I met

23 with Nancy Pinkowicz.

24     Q.      All right.  You go on --

1     A.        Might there be a record since I
2  signed in at Bryn Mawr's main branch in human
3  resources to meet with her?  I'd love to know.
4  We'll see if it's in the million pages of
5  documents.
6     **Q.        So you go on to say that you didn't**
7  **receive any invites and instead got a vaguely**
8  **threatening e-mail from your market area manager**
9  **--**
10     A.        Correct.
11     **Q.        -- that made you more concerned.**
12     A.        Correct.
13     **Q.        Okay.  So that e-mail that you say is**
14  **a vaguely threatening e-mail, that was the one**
15  **where Laura Biernacki told you not to gossip at**
16  **Bala; correct?**
17     A.        Again, I would struggle to pinpoint
18  that based on that e-mail being reviewed with me
19  four hours ago.
20              But I cannot speak to the specific
21  e-mail that Laura sent that I found concerning.
22  There were a lot of communications that she gave
23  to branch employees, myself included, that made us
24  a little uneasy.  She's very aggressive and at

 1 | times a little bit difficult to please.
 2 |     **Q.      All right.  Let me show you what's**
 3 | **been marked before as Exhibit 229.  Actually, you**
 4 | **have 229 in front of you.**
 5 |     A.      Maybe.
 6 |     **Q.      No, you do.**
 7 |              MR. PEARLMAN:  Which one is 229?  Is
 8 | that an e-mail?
 9 |              MR. KRAUSS:  229 is the one in which
10 | his wife told him draxx them sklounst.
11 |              THE WITNESS:  239?  Was that the one?
12 | BY MR. KRAUSS:
13 |     **Q.      229.  229.  Do you have that e-mail?**
14 |     A.      I've relocated the paper, thank you.
15 | Perhaps that was the message that I felt was
16 | vaguely threatening.
17 |     **Q.      Let's ask you to turn to the**
18 | **beginning of Exhibit 229.  That's Laura**
19 | **Biernacki's March 28, 2019 e-mail; correct?**
20 |     A.      Correct.
21 |     **Q.      The day before you sent your e-mail**
22 | **to Nikkie Fryer that's been marked as part of**
23 | **Exhibit 85; correct?**
24 |     A.      Correct.

1       **Q.        And you told your wife that you**

2   **thought it was threatening; correct?**

3       A.        I did.

4       **Q.        All right.**

5       A.        However, I will say I received a

6   number of communications as we all did in the

7   branch that were at times intimidating and may

8   have had nothing to do with anything other than

9   sales pressure or other issues.  So we -- her

10  verbiage was often very abrasive.  And so, again,

11  based on the dates, this seems like it's likely,

12  but I cannot speak if that was the only one that I

13  received in that time frame that was vaguely

14  threatening.

15      **Q.        So you go on to say that you've**

16  **e-mailed and called Nikkie Fryer a few times to**

17  **discuss the writeup that you received.**

18              **Do you see that?**

19      A.        I do see that.

20      **Q.        Okay.  In fact, the only time you had**

21  **e-mailed her was the day after you received the**

22  **writeup, Exhibit 76; correct?**

23      A.        Again, I recall leaving her a number

24  of voicemails and also sending her e-mails in the

1  six weeks between this e-mail on the 29th and the

2  14th when I received the final written warning.

3  That is my -- that is my recollection.

4       **Q.        Do you remember --**

5       A.        I consistently reached out to her to

6  understand what this meant.

7       **Q.        Okay.  Do you remember sending**

8  **Ms. Fryer any e-mails, aside from Exhibit 76, the**

9  **one you sent the day after you got the writeup**

10 **about the matter?**

11      A.        Again, I have to imagine I did, but I

12 cannot directly recall the e-mails that I sent

13 over two years ago March.  But I have to imagine I

14 recall very regularly reaching out to human

15 resources to get a hold of Nikkie.  So I can't

16 imagine I wouldn't have e-mailed as well.

17      **Q.        Now, you go on to say you find it**

18 **hard to believe that I would be willingly given**

19 **time to meet with HR during the work week.**

20            **Do you see that?**

21      A.        Yes.

22      **Q.        Okay.  Why did you find that hard to**

23 **believe?**

24      A.        Because as I mentioned in the first

1  paragraph that I had been told by my supervisor
2  that she was going to finally come to Ardmore to
3  meet and discuss this with me.
4              So given that didn't happen and two
5  days had passed, I was growing concerned that this
6  was not going to be an opportunity that I was
7  going to be availed to speak to human resources to
8  understand where I stood.
9      **Q.      Okay.  Now, in fact, the very next**
10  **day you were offered time off during the workday**
11  **to meet with HR; right?**
12     A.      And I'm sorry.  Are we talking about
13  the 30th or the 29th?
14     **Q.      Yeah.  The 30th of March, the very**
15  **next day after you said you found it hard to**
16  **believe that you would be given time to meet with**
17  **HR during the work week, it happened the very next**
18  **day; right?**
19     A.      I don't recall meeting with anyone at
20  HR on the 30th.  You're referencing a memorandum
21  that I've never seen before.
22     **Q.      Hold on.  Stay with me.  You were**
23  **offered a meeting with HR on the 30th; right?**
24     A.      I don't recall that.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

ERIN DINGER v BRYN MAWR BANK                                    Page 293
Michael Sutton, 11/04/2020

```
 1        Q.         All right.  Let me show you what's
 2  been marked as Exhibit 225.  Exhibit 225 is a
 3  tentative appointment --
 4        A.         With Nancy Pinkowicz.
 5        Q.         -- where you're asking to meet with
 6  her Monday at 4:15.
 7                   Do you see that?
 8        A.         Yep.
 9        Q.         And that's the date she agreed to
10  meet with you; correct?
11        A.         Yes.  That's the date Nancy
12  Pinkowicz, not Nikkie Fryer, agreed to meet with
13  me.
14        Q.         Okay.  And then the first thing you
15  said is you wanted to discuss that meeting with
16  your wife; correct?
17        A.         I said to my wife, let's discuss this
18  tonight.
19        Q.         And what did you discuss with her?
20        A.         What I -- what I needed to tell HR
21  and what should be, you know, my objective in this
22  conversation.  And we said let's come out with a
23  sense of what does this mean.  My sense from the
24  meeting, as I've said repeatedly throughout the
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  afternoon, is that when I met with Nancy she told

2  me that things were trending in the right

3  direction, to continue doing what I was doing, to

4  keep my nose to the grind stone, so to speak, and

5  all is well.

6       **Q.      Let me go back to Exhibit 85.  You**

7  **said in your e-mail --**

8       A.      I'm sorry.  We're referring back to

9  yet another exhibit now?

10      **Q.      Exhibit 85, the one we were just**

11  **talking about.**

12      A.      Okay.  My apologies.  I have it now.

13      **Q.      You said, Consumer banking keeps**

14  **telling me this writeup and the continued**

15  **harassment I'm not supposed to worry about and**

16  **that HR knows all about the ins and outs of this**

17  **final writeup I received but I've never gotten**

18  **clarification on.**

19           **Did I read that correctly?**

20      A.      That is what I wrote, yes, because I

21  did not -- no one would tell me, you know, what

22  this truly meant to me.  Everyone -- when I spoke

23  to anyone in the consumer banking would say, Oh,

24  yeah, just keep doing what you need to do.  I

1  wanted to understand more deeply.  I did not get

2  any answers I felt.

3       **Q.        Is that the kind of sentence they**

4  **taught you to write at Harvard?**

5              MR. PEARLMAN:  Objection.

6              THE WITNESS:  I don't believe that

7  that was a class that I took in my time there.

8  However, I do recall taking a very good class with

9  Michael Sandel in Ethics, and so that certainly

10 stuck with me.  So I find your continued questions

11 regarding my ethics to be a bit concerning.

12             But I do recall writing this because

13 exactly that, I was not getting -- no one wanted

14 to give me a straight answer and that's all I was

15 looking for, and I feel this e-mail very clearly

16 asks.

17 BY MR. KRAUSS:

18      **Q.        And you believe that them not giving**

19 **you a straight answer as to what that writeup**

20 **meant constituted harassment.  That's the**

21 **harassment you were referring to; right?**

22      A.        I felt that this was not being

23 delineated to me and it was causing me not to

24 understand where I stood.  So exactly that.  I

 1  felt that it was -- no one was getting back to me

 2  and I had what I could only imagine was a

 3  potentially serious issue.

 4                  So I felt I needed to bring that into

 5  greater relief and understand from HR's

 6  perspective what this meant to me as no one in

 7  consumer banking was really giving me any clear

 8  direction around what does this mean to you.

 9      **Q.        You said at the end of that paragraph**

10  **that the escalations since that time has made my**

11  **outreach and need to understand what this writeup**

12  **means even more urgent.**

13                  **Did I read that correctly?**

14      A.        Yes.

15      **Q.        What escalations were you referring**

16  **to?**

17      A.        I would say that the escalations that

18  I was concerned about were exactly related to this

19  was a, you know, again, a very stern warning that

20  I was delivered.  No one was giving me an answer

21  and so I felt that they were not answering me

22  because there was no definitive answer to give.

23                  So the lack of answers, the lack of

24  any clear instruction as to this means you're

1   screwed, this means you're okay, you know, proceed

2   past go and collect $200, I was getting no

3   direction.

4                So I would say the absence of the

5   information of any substance regarding my standing

6   was, to me, an escalation of the situation.  So I

7   simply was looking to defuse that by understanding

8   where I stood, which I felt I accomplished with

9   that meeting on Monday at 4:30 when I met with

10  Nancy Pinkowicz and was told that --

11       Q.       At the end of your --

12       A.       -- I was okay.

13       Q.       -- e-mail you say, quote, I feel

14  every day like I'm going into face a certain

15  firing.

16                Do you see that?

17       A.       Yes.

18       Q.       Is that how you felt?

19       A.       Again, because no one would give me

20  clear instructions as to what my standing was as a

21  result of no one wanting to see the written

22  warning to receive it back and no one wanting to

23  delineate to me what this meant for my career path

24  that it was making me feel that it was something

 1 HR didn't want to discuss with me because perhaps

 2 I was just going to get fired.

 3              So, again, in the interest of trying

 4 to get someone to discuss with me -- which the

 5 next line I say, I am unsure of who to talk to

 6 since no one seems to want to discuss this matter

 7 with me.

 8              Frankly, to my mind, I thought that

 9 they felt it was distasteful that they weren't

10 trying to be more supportive during obviously what

11 was a really difficult time, but I can't speak to

12 their intentions.

13     **Q.       All right.  So let's talk about the**

14 **meeting with Nancy Pinkowicz.  Where did it occur?**

15     A.        I recall meeting her at the human

16 resources office at the Bryn Mawr main site across

17 from the branch.

18     **Q.        When did it take place?**

19     A.        4:30 on the Monday following.  So I'm

20 assuming the 1st, 2nd.

21     **Q.        April 3rd?**

22     A.        Yes.  I don't have my calendar out.

23     **Q.        Well, that's what the invitation**

24 **said; right?**

1      A.         Yeah.  It said Monday at 4:30,

2   correct.

3      **Q.         How long did it last?**

4      A.         As best I can recall about 45

5   minutes.

6      **Q.         Okay.  Who was there?**

7      A.         Myself and Nancy Pinkowicz.

8      **Q.         Anybody else?**

9      A.         No one else attended that I can

10  recall.

11     **Q.         So give me your best memory of what**

12  **you said and what she said during the meeting.**

13     A.         Again, I can recall asking Nancy

14  Pinkowicz was she aware of the writeup and that I

15  had been trying to reach out to Nikkie Fryer.  She

16  said she was -- my recollection of it was this.

17              She said to me she was concerned why

18  she was being even, you know, brought into the

19  loop because this was not something she dealt with

20  commonly in consumer banking anymore, but that she

21  said, if I'm not mistaken, something to the effect

22  of consumer banking kind of is their own thing.

23  What I would do is, you know, looking at your

24  file, it seems like things are trending in the

1  right direction.  Keep focused on that.  I

2  wouldn't really worry about this writeup.

**3**        **Q.      Okay.**

4        A.      As they never asked for it back, I

5  don't really know what to tell you aside from

6  that.

**7**        **Q.      Do you remember anything else being**

**8  discussed at that meeting?**

9        A.      I remember mentioning a few other

10  things that I was noticing interpersonally with

11  the staff in terms of some of the tensions between

12  folks.

**13**        **Q.      And what specifically did you**

**14  mention?**

15        A.      I specifically mentioned that there

16  seemed to be issues between the platform staff in

17  general and that I just felt that that might be

18  something that they should talk to them about to

19  understand what the background and why things were

20  so tense.

21              I did not directly refer to anything

22  that was racial in that.  Again, I assumed that in

23  bringing these concerns to someone who was an

24  associate vice president in human resources that

 1  they would do their due diligence and, again, make

 2  sure that what -- what I had observed was not the

 3  case or that it was not a concern.  However, I

 4  don't know what Nancy did from there.

 5       **Q.       So how did it come up that you**

 6  **started talking about the, what you said, tension**

 7  **between the platform staff?**

 8       A.       I -- I believe what was discussed

 9  was, again, you know, just how I was feeling being

10  a part of the bank.  And I said, you know, I've

11  noticed some, you know, conflicts between people

12  in the branch.  And again, when pressed I said

13  there have been some, you know, not very

14  appropriate comments.

15            But I did not feel it appropriate for

16  me to bring the race directly into that

17  conversation because I assumed that Nancy would

18  follow up and get the story directly from the two

19  individuals who were having the primary issues

20  being Alicia and Magdaline Intzes.

21       **Q.       So did you actually mention the names**

22  **of the people you said were in conflict?**

23       A.       Again, as far as I recall, I remember

24  mentioning every member of the staff and that's

1  where, you know, this is what we're trying to

2  accomplish and we're all pushing -- or I think I

3  used the term, you know, paddling in different

4  directions.

5       **Q.       So you didn't single out any**

6  **particular members of the staff?  You just said**

7  **that everybody there is paddling in different**

8  **directions?**

9       A.       Again, as best I can recall, in that

10 meeting, I alluded to there being tension between

11 Alicia and Maggie and that there was inappropriate

12 commentary being made and that I just felt that

13 that was something they should be aware of as

14 perhaps something to look into or just -- again,

15 human resources avoids lawsuits; I understand that

16 they do.

17             So I thought that they would want to

18 know that hey, this guy who's only been there a

19 few months is just observing some things that are

20 very out of pattern.  Certainly, I've never seen

21 this in other banks that I had worked in,

22 particularly between employees.  I assumed that

23 Nancy would take it from there.

24      **Q.       So I want to get very specific as to**

1  what you said.  Did you use the names?  Did you

2  say that there was -- let me finish my question.

3      A.      Yes.

4      Q.      Did you use the names?  Did you say

5  that there was conflict between Alicia McDaniel

6  and Maggie Intzes?  Did you use those names?

7      A.      I'm -- I'm fairly confident that I

8  would have used their names in referring to that

9  ongoing dynamic and how toxic and --

10     Q.      Did you use the word "toxic"?

11     A.      I've used the word toxic --

12     Q.      No, no.  With Nancy Pinkowicz in that

13 meeting --

14     A.      Again --

15     Q.      -- did you use the word "toxic"?

16     A.      Perhaps I did not use the word toxic.

17 I may have couched my language more carefully as,

18 again, in that moment I was more concerned with my

19 job and myself.

20            It was only until I had been with the

21 bank longer, experienced more, and witnessed some

22 direct commentary that I felt I was in a position

23 to, when asked by Nikkie Fryer the second time,

24 that I finally said, Yes.  If I'm going to be able

 1  to look someone in the eye, I need to tell the

 2  truth here.

 3              But when I was meeting with Nancy, I

 4  think the thrust of the meeting was to understand

 5  what in the hell is going on with my situation.

 6  Anything that we discussed I would say with the

 7  branch in Ardmore may have been viewed by Nancy as

 8  an ancillary piece of that conversation, but I

 9  still felt it was worth addressing to someone in

10  human resources.

11      **Q.      So did you tell Nancy Pinkowicz in**

12  **that meeting that you thought there were**

13  **inappropriate comments being made between**

14  **Ms. McDaniel and Ms. Intzes?**

15      A.      Yes.  I believe that is something I

16  said, because again, that was something that was

17  causing a great deal of stress and causing us to

18  really not work well, because it was a very

19  difficult situation and no one was addressing it.

20      **Q.      Do you remember anything else being**

21  **said during that meeting with Nancy Pinkowicz?**

22      A.      Again, I think she really focused her

23  comments to me around me just doing my day-to-day

24  and, you know, trying to assure me that in due

1  time everything, you know, was fine.

2      Q.      All right.  Let me show you what's

3  been marked as Exhibit 86.  Exhibit 86 is a copy

4  of the memo given to you and notes of the

5  meetings.  Let me ask you to turn to the last page

6  of Exhibit 86.

7      A.      Uh-huh.

8      Q.      Do you see these are Ms. Pinkowicz's

9  notes?

10             She starts out with a note on March

11 28, 2018 saying that you had contacted her to talk

12 about some issues and concerns and that you said

13 you had a scheduled appointment with Nikkie Fryer

14 but that meeting didn't take place.

15             Do you see that?

16     A.      I do see that.

17     Q.      Okay.  And was that the sum and

18 substance of the call you made to Ms. Pinkowicz on

19 March 28?

20     A.      Again, I believe that was the sum and

21 substance as Nikkie had suggested I reach out to

22 her and I needed to speak to someone to understand

23 what I was -- where I stood.

24     Q.      Okay.  Now, on April 2nd she has

1  notes of the meeting with you.

2              Do you see that?

3      A.      I do see that.

4      Q.      She says that the two of you met and

5  that you said that you felt that the time you took

6  off for your personal health and bereavement was

7  being held against you.

8              Do you see that?

9      A.      Uh-huh.

10     Q.      Did you tell her that?

11     A.      I did feel that in terms of certainly

12 the market area manager and she was putting that

13 down to Danielle, yeah.

14     Q.      Ms. Pinkowicz's memo goes on to say

15 that you feel that you're being harassed by your

16 manager and the market area manager concerning

17 your work performance.

18             Do you see that?

19     A.      Yep, I do see that.

20     Q.      Do you believe they were harassing

21 you about your work performance?

22     A.      I felt that, again, I think it's a

23 mischaracterization of work performance.  I felt

24 they were harassing me around the fact that I had

1  been out with my mother, but that is certainly why

2  I wanted the meeting.  I felt that my job was very

3  much at risk.

4        **Q.        Now, at the end of that memo**

5  **Ms. Pinkowicz writes that she asked you to provide**

6  **examples of how you felt harassed.**

7                **Do you see that?**

8        A.        I do see that.

9        **Q.        Do you remember her asking you that?**

10       A.        Again, I don't -- I don't recall her

11  asking me much beyond just, you know, a few things

12  that I had experienced.  But we did not have an

13  extended conversation.  I think the total of our

14  interaction was maybe 40 minutes, 45 max.

15       **Q.        Now, Ms. Pinkowicz's memo reflects**

16  **that you gave three examples of how you felt**

17  **harassed.  Being told to watch your back, being**

18  **told to get your knowledge test done and it has to**

19  **be 90 percent, and somebody saying thanks for**

20  **showing up today.**

21                **Do you see that?**

22       A.        Yep.

23       **Q.        Do you recall giving Ms. Pinkowicz**

24  **those three examples of how you felt harassed?**

1          A.          Yeah.  I think I provided those three

2  as just a few common things that were being said

3  to me that I felt, again, were just not examples

4  of me being welcomed in the branch.  As to those

5  being the only examples in which I felt harassed,

6  I think that is not inclusive of how I had -- my

7  experience to April 2nd.

8          **Q.          Who told you to watch your back?**

9          A.          I can recall both my direct managers

10 saying that to me, but also just other employees

11 who had been in the bank and just knew how things

12 worked that, you know, your only -- your only ally

13 is yourself.

14         **Q.          And who told you to get your**

15 **knowledge test done and it has to be 90 percent?**

16         A.          I believe that was Danielle and the

17 market area manager.  We had to do, you know,

18 periodic tests to keep up with various regulations

19 and I believe the passing grade was 80 but it was

20 somehow put on me that I had to do 90 and above.

21                  While I would understand that from,

22 you know, the standpoint of as the head teller I

23 should know to a higher degree, that was not the

24 way it was delivered to me.  It was delivered as

1  a, you know, you need to kind of make up for lost

2  time.

3            So I felt that it was just an example

4  of ways in which my performance is being held to a

5  different standard.

6       **Q.       So, Mr. Sutton, do you agree that you**

7  **had to pass knowledge tests?**

8       A.       Yes, I did have to pass knowledge

9  tests, absolutely.

10      **Q.       And you'd agree that the higher the**

11  **score the better; right?**

12      A.       I think the more thoroughly you know

13  a subject is not a bad thing.

14      **Q.       Did you think a 90 percent score was**

15  **a high hurdle for you to clear?**

16      A.       A think a 90 percent score when

17  you're trying to do this in between servicing

18  customers both in the lobby and at the drive can

19  be challenging, because you're not able to provide

20  a lot of direct focus because you're constantly

21  multitasking in our job.  So I feel from that

22  perspective it was challenging but I certainly was

23  able to accomplish it.

24      **Q.       You think it's fair for a manager to**

1  **assume that somebody who went to Harvard can do**

2  **better than average on a knowledge test?**

3              MR. PEARLMAN:  Objection.

4              THE WITNESS:  Again, I think someone

5  -- I think the idea that I should be held to a

6  different standard was not anything to do with the

7  fact that I went to any particular school.  I

8  think it was relayed to me as, again, that I

9  needed to pick up the slack and, you know, I did

10 not feel that that was representative of, you

11 know, me being knowledgeable and competent in my

12 job.

13 BY MR. KRAUSS:

14     **Q.        So who said to you thanks for showing**

15 **up today?**

16     A.        I can recall that happening a number

17 of occasions with both -- both my direct manager

18 and also with Ms. Intzes, you know, and in very

19 kind of like inappropriate instances I can recall

20 that being said to me.

21             One day the week my mother died I had

22 to come back and work because I only had so many

23 days off, and I can recall that being said to me

24 when I arrived at the branch that morning and just

1   -- I felt that it was obviously a comment that was

2   not appropriate to someone who was going through

3   what I had been going through but, you know, it

4   was -- there were far worse things happening than

5   what was happening to me.

6       **Q.        So did you consider the possibility**

7   **that somebody was, in fact, thanking you for**

8   **showing up for work shortly after your mother's**

9   **death so that there would be extra staffing at the**

10  **bank?**

11      A.        I've been around the earth long

12  enough to know sarcasm and read facial expressions

13  and I can assure you that when that was delivered

14  to me through a half snarl it was not meant in a

15  sincere or a welcoming fashion.

16      **Q.        Now, Ms. Pinkowicz's notes don't**

17  **reflect anything at all about any mention of any**

18  **conflict in the branch.**

19              **Do you see that?**

20      A.        Again, I can't speak to what she took

21  notes on and what she reported.  I spoke to her.

22  I gave her the information.  I gave her my

23  insights.  And as she says to me, I told Michael I

24  would investigate further and get back to him.

ERIN DINGER v BRYN MAWR BANK                                    Page 312
Michael Sutton, 11/04/2020

1    **Q.        And did you think she was**
2    **investigating your concerns about harassment that**
3    **you had brought to her?**
4        A.        I -- my expectation was she was
5    trying to look into the situation and figure out
6    what the conflicts were in Ardmore to make things
7    better.
8    **Q.        You thought that was what you had**
9    **brought to her, the conflicts in Ardmore?**
10       A.        Again, I had primarily gone to
11   understand my own issues.  However, we talked
12   about other issues as she mentions with employees
13   and interpersonally.  So based on our interaction
14   and her very much volunteering to me that I will
15   investigate, I'll look into this, and I will get
16   back to you, that she would.
17              The fact that she did not do much
18   investigation, as far as I'm aware, that I can't
19   speak to what her motivations were.
20   **Q.        Did you think Nancy Pinkowicz was**
21   **good at her job?**
22       A.        Again, I only had that sole
23   interaction with her.  I was appreciative that she
24   encouraged me to focus on what I could control.

1  But I was concerned that there was yet again an

2  instance in which I reached out to HR I was told I

3  would be getting more information or that I would

4  be contacted and that I never was.

5       Q.       Let me ask you to look down to her

6  notes of the April 3 conversation she had with

7  Laura Biernacki and Ms. Perez as well as Nikkie

8  Fryer.

9                Do you see that?

10      A.       I do see it.

11      Q.       And the notes reflect the fact that

12 you had gotten a Corrective Action regarding your

13 absenteeism; correct?

14      A.       Correct.

15      Q.       And it reflects that you've had

16 performance issues that you're trying to work

17 through.

18                Do you see that?

19      A.       I do see that.

20      Q.       It says that your performance was not

21 at the level of a head teller.

22                Do you see that?

23      A.       I see that.

24      Q.       Do you agree with that comment?

ERIN DINGER v BRYN MAWR BANK                           Page 314
Michael Sutton, 11/04/2020

```
 1        A.        I would not.
 2        Q.        It says that you get easily
 3   flustered.
 4                  Do you see that?
 5        A.        I see the comment.
 6        Q.        Do you agree with it?
 7        A.        I would not.
 8        Q.        The notes go on to say that Ms. Perez
 9   had tried to work with you but you seemed
10   resistant to feedback and are not approachable.
11                  Do you see that?
12        A.        I see where that is written, yes.
13        Q.        Do you agree with that criticism?
14        A.        I would find that to be a bit of a
15   harsh assessment.
16        Q.        Do you believe it to be an accurate
17   assessment?
18        A.        I don't agree it's an accurate
19   assessment.
20        Q.        Now, let me show you what's been
21   marked as Exhibit 96.  Exhibit 96 is an e-mail you
22   sent to Ms. Perez, your boss, on May 16, 2018.
23                  Do you see that?
24        A.        I see a blank e-mail.
```

1      Q.        Well, it says, And now I've changed
2   my mind again and might agree with HR.
3                Do you see that?
4      A.        Yeah.  But I don't -- it's a blank
5   piece of paper.
6      Q.        Yeah, that's what you sent.  What
7   were you referring to?
8      A.        I have no idea.
9      Q.        Okay.
10     A.        I don't recall this e-mail in any
11  way, shape, or form.
12     Q.        Do you recall ever changing your mind
13  about HR's suggestions?
14     A.        My mind about HR suggestions as to
15  doing my job?
16     Q.        About anything.
17     A.        No, I don't.  I don't think that I
18  disagreed with -- with her suggestion that I focus
19  on doing what I could do and controlling what I
20  could control.
21     Q.        Let me show you what's been marked as
22  Exhibit 230.  Exhibit 230 starts off again with
23  Laura Biernacki's e-mail telling you not to gossip
24  about Ardmore personnel.

```
 1                    Do you see that?
 2       A.         I do see that.
 3       Q.         And it has your wife's laughing
 4  response.
 5                    Do you see that?
 6       A.         I do.
 7       Q.         And then it has you asking if it's a
 8  threat.
 9                    Do you see that?
10       A.         I do see it.
11       Q.         And then your wife saying no.
12                    Do you see that?
13       A.         I see that she said it's not
14  something to worry about, yep.
15       Q.         And then you ask your wife if you
16  should respond.
17                    Do you see that?
18       A.         I do.
19       Q.         And your wife gives you a suggested
20  response.
21                    Do you see that?
22       A.         I do.
23       Q.         And then you respond, E-mail my
24  personal.
```

1              Do you see that?

2       A.        I do.

3       Q.        **Why did you ask your wife to respond**

4  **to your personal e-mail?**

5       A.        I would assume because she was

6  e-mailing me or I was able to e-mail her back at

7  5:00 on a Wednesday.  I was probably leaving the

8  office.  So probably to continue the conversation

9  as my wife typically works past 7:00, I wanted to

10 be able to read her e-mail to me.

11      Q.        **Did you believe that you were going**

12 **to discuss something of a confidential nature and**

13 **wanted to do it on a personal e-mail?**

14      A.        No.  I wanted to be able to continue

15 to discuss with my wife what my day was about and

16 I was hoping to continue that conversation as she

17 was still at work at 2 Liberty and I was heading

18 home to Conshohocken.

19      Q.        **All right.  Let's take a look at**

20 **Exhibit 231.**

21      A.        I don't mean to interrupt you but

22 could we do another bathroom break shortly?  I

23 apologize.  I'm drinking a lot of water.

24              MR. KRAUSS:  We can do it now.

```
 1                    Let's go off the record.

 2                    THE WITNESS:   Thank you.

 3                    VIDEOGRAPHER:   Off the video record,

 4    6:09 p.m.

 5                         RECESS

 6                    VIDEOGRAPHER:   Back on the video

 7    record, 6:17 p.m.

 8    BY MR. KRAUSS:

 9         Q.        So I asked you to take a look at

10    Exhibit 231.   That's another e-mail exchange that

11    you had with your wife while you were at work;

12    correct?

13         A.        Yes.   That is what it appears to be.

14         Q.        Now, in the second page in the middle

15    you say that you're probably going to be off the

16    next week.

17                   Do you see that?

18         A.        Yeah.   I don't know why.

19         Q.        Well, your wife was asking about

20    going to New York.

21                   Do you see that?

22         A.        Yeah.   She had a case in New York at

23    the time.

24         Q.        So you said you might be off the next
```

1  week.  Your wife asked you why; correct?

2      A.      Yes.

3      Q.      And then you said --

4      A.      Oh, yeah.

5      Q.      -- that you let folks into the room

6  for training and you let an old lady in and you

7  escorted her up to the branch and you say you're

8  going to be fired for security violation.

9              Do you see that?

10     A.      Yes.  Because I was very -- you know,

11 again, an older woman approached me and would not

12 let me close the door and basically grabbed my arm

13 and asked me to escort her up.

14             I knew that that was not what I

15 should have done.  I did not have much experience

16 in terms of that building and knowing where to

17 take her, aside from going up into the branch, and

18 I know that it was made -- they made a big deal of

19 it at the moment and so I was very concerned that

20 it would just be an opportunity for me to lose my

21 job.  Though it did not seem to be as egregious as

22 it was, you know, brought about.

23     Q.      So were you actually written up?

24     A.      Again, I remember having, you know,

 1  being scolded and I don't recall being actually

 2  written up but I recall them saying that they

 3  might file a formal complaint.  I don't recall if

 4  they did.

 5      Q.      Who's the "they"?

 6      A.      Again, I believe it was the service

 7  manager at the training branch at that time.

 8      Q.      Okay.

 9      A.      But I don't recall who that even was

10  at that point.

11      Q.      **So do you agree that under the rules**

12  **you were not supposed to let the customer in the**

13  **back door?**

14      A.      Yes.  However, I did not have an

15  option as she was in the doorway.  I -- again, I

16  felt that my options were limited given she was an

17  elderly woman; she needed assistance to walk to

18  begin with, and I felt the lesser of two evils was

19  to walk her up the flight of stairs rather than

20  around the building to the entrance I did not know

21  where, you know, exactly what the stair situation

22  would be.

23      Q.      **So let me just again get the time**

24  **line.**

 1       A.        Yes.

 2       **Q.        You let a customer in the back door;**

 3  **correct?  That's what you did; right?**

 4       A.        So if I could -- if I could speak and

 5  not be directed how I should respond as the

 6  witness, thank you.

 7            As the statement says during breaks

 8  we would have to go up and let other people who

 9  would go out to their cars in.  I was asked to go

10  let other folks in.  This woman came in with those

11  other people and just grabbed my arm and said, I

12  need to go up to the branch; they let me come

13  through here.

14            So although I tried to talk my way to

15  get her around, she would not.  So the lesser, to

16  my mind, of two evils, I couldn't forcibly make

17  the woman leave, she was inside the building, was

18  to escort her personally up and bring her into the

19  lobby.

20            There weren't a lot of good options

21  for me in terms of adhering to the best practices

22  for security except that the customer was with me

23  and, you know, I was escorting her.  She was not,

24  you know, unattended walking through a branch.

```
 1              But yes, it was to my mind something

 2    that could have been used against me and it was

 3    something I knew I shouldn't have done.  However,

 4    I was not given any explanation of what I could

 5    have done to prevent it.

 6         Q.        Okay.  So, Mr. Sutton, I just want to

 7    get the time line.

 8         A.        Yeah.

 9         Q.        You let the customer in the back

10    door; correct?  You've explained why, but you did

11    it; right?

12         A.        Yes.

13         Q.        You knew you shouldn't have done it;

14    correct?

15         A.        Yes.

16         Q.        You knew it was a violation of

17    policy; correct?

18         A.        I knew that it was a -- something

19    that should not be done, absolutely.

20         Q.        You were scolded for it; right?

21         A.        Yes.  I was reprimanded a number of

22    times that day for it.

23         Q.        And that was it; correct?  There was

24    no writeup?  There was no --
```

```
 1       A.        Again --

 2       Q.        Was there a writeup?

 3       A.        To my knowledge, there was not a

 4  writeup.

 5       Q.        Okay.  Were you docked pay?

 6       A.        Again, to my recollection, there was

 7  nothing beyond being told that they would be

 8  calling everyone I worked with to let them know

 9  that I made this error.  I, of course, I think

10  based on my experience was worried that this would

11  be an instance that would cause me to lose my job.

12       Q.        So did that happen?  Did they call

13  your branch?

14       A.        As far as I'm aware, the -- the news

15  got back there.

16       Q.        Okay.

17       A.        I don't -- I was not specifically

18  there to observe the phone call.

19       Q.        So you got scolded and you wrote your

20  wife an e-mail saying you're being fired; right?

21       A.        I was venting to my wife because I

22  felt it was, again, something that was kind of BS

23  as I did not feel it was good options for me to

24  avoid, you know, providing the customer that
```

1  escort.

2      **Q.        Do you believe your reaction in**

3  **Exhibit 231 was a little on the hysterical side?**

4      A.        I would say it was a little bit on

5  the -- on the -- on the -- I wouldn't quite call

6  it hysteria, but I would say given my experience I

7  think it was somewhat understandable because

8  constantly it seemed like anything that I had done

9  that was not to the T would be something that

10  could potentially be held against me.

11              So, again, in the environment post my

12  writeup and being told just do everything right

13  and you're fine, I was worried that it would be

14  something that would get in my way.  I was

15  thankful it did not.

16      **Q.        All right.  So there was no adverse**

17  **consequences to you for letting the customer in?**

18      A.        There was -- there was no -- nothing

19  that I received that was a formal issue or a

20  complaint.

21      **Q.        Let me ask you to turn back to**

22  **Exhibit 227.  We looked at that a little bit**

23  **earlier today, but I want to ask you -- let's**

24  **start at the beginning.**

1      A.        Uh-huh.

2      Q.        You start this 17-long e-mail

3  exchange with your wife by saying in the subject

4  line, So I'm already being harassed, et cetera for

5  being out for this, what's my move?

6              Do you see that?

7      A.        I see the Subject line.

8      Q.        And you're asking your wife what's

9  your move.

10             Do you see that?

11     A.        I see that that's what I was asking.

12     Q.        And your wife asks, You're being

13  harassed for taking your three bereavement days?

14             Do you see that?

15     A.        Uh-huh.

16     Q.        Now, Bryn Mawr Trust allowed you to

17  take nonsequential bereavement days; correct?

18     A.        Yes.  Because I had to make the

19  arrangements for my father for my mother's

20  funeral, which was a difficult task.

21     Q.        Well, you asked for nonsequential

22  bereavement days; right?

23     A.        Yes.  I needed to pick up my brother

24  and my Spanish brother who's not actually a blood

```
 1  relative who were coming in for my mother's
 2  funeral.
 3       Q.        And they gave it to you; right?
 4       A.        They gave me three nonconsecutive
 5  days which was very...
 6       Q.        So you said -- I'm sorry.  It was
 7  very what?
 8       A.        That they gave me three bereavement
 9  days and that was accommodating to my needs for
10  that week.
11       Q.        Okay.  Now, you said, Yes, you're
12  being harassed for taking three bereavement days.
13                 Do you see that?
14       A.        Yes.
15       Q.        And your wife asks, What's she doing?
16                 Do you see that?
17       A.        Yes, I see that.
18       Q.        And you responded.
19       A.        Uh-huh.
20       Q.        Already made a comment when I was on
21  my way.  I guess you come and go as you please and
22  two times already today in front of customers
23  mentioning me returning for my few days away like
24  I was on vacation.  It's upsetting.  Acting like I
```

 1  forgot my keys in some sort of effort to delaying

 2  or prevent having to come to work.  I honestly

 3  just want to walk out.

 4            That was your response; correct?

 5     A.     Yes.

 6     Q.     Okay.  So who was it that made the

 7  comment?

 8     A.     Again, this was the -- the second day

 9  after my mother's funeral that I was back in the

10  office.

11     Q.     Mr. Sutton, my question was, who made

12  the comment?

13     A.     Again, as best I can recall, I would

14  imagine that it was a comment made by my manager

15  as she would have been -- she had been somewhat

16  insensitive in her phrasing around this subject

17  and others and I understand that, you know,

18  mentioning me being away for a few days without

19  context was something that caused customers to ask

20  some more questions rather than less.  So that was

21  essentially why I found it an upsetting issue.

22     Q.     Now, did you think that perhaps she

23  was trying to give customers the heads-up that you

24  had been out and that's why you didn't know what

 1  **was going on?**

 2      A.        So, again, I think my -- my sense of

 3  what was relayed to customers was that people were

 4  pretty well aware as the majority of my time with

 5  the bank to that date, I had been dealing with my

 6  mother dying almost the entire time.

 7             A lot of customers I think at that

 8  point had seen that I had been going through a

 9  very rough time.  It's pretty difficult for me to

10  come work a day, you know, the day after or two

11  days after my mother had died in my arms; that I'm

12  sure that at times as I can be someone who is

13  empathetic that, you know, my emotions were easy

14  to read through my eyes.

15             However, I just felt that there were

16  a number of occasions where things, again, that I

17  would have hoped would have been delivered in just

18  a more -- a less callous manner, you know, could

19  have been done.

20             I mean, it was surprising as my wife

21  notes in the e-mail above that Bryn Mawr didn't

22  even send a flower arrangement to my mother's

23  funeral.

24      **Q.        That upset you, didn't it?**

1    A.       Well, again, it was something that I
2  was surprised in that every other person in my
3  family, their employer, even vendors that worked
4  with my sister's company, sent flowers and that
5  Bryn Mawr didn't even, you know, give me a
6  condolence card the day I -- you know what I mean?
7           I was surprised, but it wasn't
8  something I took personally.  What I took
9  personally was the comments made to customers
10 which, again, provided I think more of a sense
11 that I come and go as I please rather than I'm
12 there to serve them.
13    **Q.       And you made a reference to you**
14 **forgetting your keys.**
15           **Do you see that?**
16    A.       Yes.  I had forgotten my keys I
17 imagine that day.
18    **Q.       This was another instance in which**
19 **you forgot your keys and were therefore late for**
20 **work; correct?**
21    A.       So, yes, in that instance I had
22 forgotten my bank keys at home, I guess, in
23 another suit jacket.  And so when I arrived I had
24 to work with another teller to get my spare set

 1 | out of the vault.
 2 |     Q.      Now, let me ask you to turn to the
 3 | next page of Exhibit 227 where you say, Not only
 4 | did they do nothing, they've punished me for the
 5 | fact that my mother passed.  I've already been
 6 | told no lunch and I'm not getting paid for the day
 7 | I came back here 90 minutes to find the keys or
 8 | the day they sent us home early with the snow.
 9 | All of the above go against bank policies.  Not
10 | cool.
11 |     A.      Uh-huh.
12 |     Q.      Do you see that?
13 |     A.      I do.
14 |     Q.      Now, let me take that apart.
15 |             You showed up late because you forgot
16 | your keys; correct?
17 |     A.      Yes.  I made a mistake.
18 |     Q.      So you had to work through lunch to
19 | make up the time; correct?
20 |     A.      I did.
21 |     Q.      So they didn't tell you you didn't
22 | get lunch.  The issue was you came in late and if
23 | you wanted your full day you had to actually work
24 | a full day correct?

```
 1        A.        The issue was this was I felt in the
 2  immediate aftermath of my mother's death something
 3  that they could have been a little bit more kind
 4  about to give me 15 minutes to have a break to eat
 5  something.  I understand that when keys are left
 6  it's impactful.
 7                  When I'm not able to do my job to the
 8  best of my ability, it's not -- it's not good for
 9  customers, it's not good for my colleagues.
10  However, again, considering that there were --
11  what I felt were very consequential things that
12  happened to me in just the week prior, I was
13  hoping that there would be a little bit more of a
14  sense of understanding or just empathy.  However,
15  I understand in business that's not -- there's not
16  often room for that.
17        Q.        So you thought that they should, you
18  know, pay you for the full day even though you --
19        A.        No.  I thought it would be nice to at
20  least offer me the opportunity to take a lunch.  I
21  think it's often good to provide employees the
22  opportunity to eat during a seven-, eight-hour
23  day.
24        Q.        Is that how long you were there?
```

 1      A.        Again, I did not arrive until 9:15, I
 2 believe.  So I was only there for eight hours that
 3 day.
 4      **Q.        Now, you said that all the employees**
 5 **were sent home early with the snow.**
 6           **Do you see that?**
 7      A.        Yes.  There was a day, I guess, in
 8 March or February that we had to -- we were sent
 9 home early with the snow.
10      **Q.        Okay.  Now, that had nothing to do**
11 **with you; correct?  That was everybody in the**
12 **branch; right?**
13      A.        Yes.  That had nothing to do with me.
14 It's just I had to come back to find something, I
15 guess.
16      **Q.        And the policy was since you weren't**
17 **working, you weren't getting paid; correct?**
18      A.        Yes.  The policy --
19      **Q.        Do you believe that's reasonable?**
20      A.        I believe it's reasonable that when
21 someone is not working that they should not be
22 paid.
23      **Q.        Now, on the next page you said that**
24 **you were ready to break down crying; correct?**

1    A.        Yes.  Again, I was very depressed in

2    the week after my mother died and things were

3    overwhelming.  So I was getting -- venting to my

4    wife and she was trying to keep my spirits up, as

5    I think it's very clear, and just trying to

6    encourage me to focus on something positive.

7    **Q.        And on the second page of Exhibit 227**

8    **you said that this was the story of your life;**

9    **taking undignified behavior on the chin and smile**

10   **for the experience as everyone takes a big poop**

11   **all over me all for about 15 bucks an hour.  I'm**

12   **really winning at life.**

13   **              Did I read that correctly?**

14   A.        You did read that correctly.  And,

15   again, I wrote that and that may have been how I

16   felt in that moment.  I don't think it is

17   surprising for someone to lose a parent to be

18   going through depression and grief and to speak in

19   less than flattering terms about themselves.  It's

20   fairly common occurrence as far as I'm aware what

21   little I studied in psychology.

22                So, again, I found -- I find this to

23   be a little bit unproductive in that while I

24   certainly was in a negative frame of mind, it does

 1  not, I think, indicate any greater significance

 2  than that.

 3      **Q.      And you said on the first page of**

 4  **Exhibit 227 that your last two jobs were like**

 5  **this; correct?**

 6      A.      Yes.  Again, being in a very negative

 7  state of mind I was not really looking at things

 8  in a very optimistic and upbeat mood and this is

 9  why my wife in each exchange is trying to remind

10  me that things are okay.  Obviously, it was very

11  difficult for me to be going through all of this

12  and also working.

13      **Q.      So in your --**

14      A.      I don't think that should surprise

15  anyone.

16      **Q.      So in your last two jobs you believed**

17  **that you had to take undignified behavior on the**

18  **chin and smile for the experience as everyone**

19  **takes a big poop on you?**

20      A.      As I've said now three times as we've

21  been going through this exhibit, during this

22  period, the two, three days after my mother's

23  funeral, sir, I was very depressed.  I was having

24  grief reaction.  I was very depressed.

1           So yes, I was looking at things from

2    a very glass half full type of a mentality.

3    However, I don't think that you can attribute this

4    as some greater -- with any greater meaning than I

5    was going through a very rough time and depressed.

6       **Q.       What were your prior two jobs?**

7       A.       My prior two jobs to Bryn Mawr Trust

8    were working for Joe Torsella and his election

9    campaign, which it was a successful endeavor, and

10   then previous to that I worked as a development

11   officer at West Chester University.

12      **Q.       Let me show you what's been marked as**

13   **Exhibit 232.  Exhibit 232 is another series of**

14   **e-mails you exchanged with your wife.  The Subject**

15   **is No one is helping me.**

16      **       Do you see that?**

17      A.       Yes.  I see the Subject, No one is

18   helping.

19      **Q.       Okay.  And you begin that exchange by**

20   **saying that you are a whirling dervish and the**

21   **only one here.**

22      **       Do you see that?**

23      A.       Yes.  I was very busy that day.

24      **Q.       And you said nobody else wants to**

1  lift a finger and you've done 95 percent of the

2  transactions.

3               Do you see that?

4       A.      Yes.  And I'm sure that was an

5  exaggeration, but I was many days working

6  overzealously and it was difficult.

7       Q.      And you said that every day is

8  killing your spirit.

9               Do you see that?

10      A.      Yes, I do see that.

11      Q.      Then on the second page of Exhibit

12 232 you complained that Alicia McDaniel and Maggie

13 Intzes are too busy to not take 45 minutes lunches

14 and too busy to help you all day.  Then at the end

15 of the day can sit and collect overtime and wait

16 for Danielle.

17              Do you see that?

18      A.      I see that comment, yes.

19      Q.      And your wife tells you to make sure

20 you let your manager know how helpful Alicia

21 McDaniel and Maggie Intzes were to you today;

22 right?

23      A.      Yes.

24      Q.      And you responded, Oh, trust me.  I

ERIN DINGER v BRYN MAWR BANK                                    Page 337
Michael Sutton, 11/04/2020

1  have let her know.  Correct?

2       A.        That is what it appears that I wrote.

3       Q.        So, in fact, you told Ms. Perez that
4  you thought that Alicia McDaniel and Maggie Intzes
5  hadn't been helpful?

6       A.        On that day I obviously had relayed
7  to Danielle that I felt that they were not being
8  helpful with -- with assisting in -- in helping to
9  run the line.

10      Q.        And you said you were upset by having
11 to stay late, even though you get overtime,
12 because you wanted to stop at Giant and get a
13 mango.

14               Do you see that?

15      A.        Yeah.  I wanted to get -- yeah.  I
16 wanted to get mango juice.  My wife loves mango
17 juice.

18      Q.        Well, actually your wife responded,
19 Sorry.  You're out of mango.

20               Do you see that?

21      A.        Yes.  Because we -- we both
22 occasionally drink mango juice, but I drank the
23 last of it, so anyway.

24      Q.        Let me show you what's been marked as

 1   Exhibit 235.  Exhibit 235 is yet another series of

 2   e-mails you exchanged with your wife during the

 3   workday.

 4             Do you see that?

 5      A.     I do.

 6      Q.     And you complain about it being slow

 7   at work.

 8             Do you see that?  Do you see on the

 9   first page of Exhibit 235 you say, It's pretty

10   dead to be honest.  I'm just getting stuff done

11   for the audit, et cetera.  Do you see that?

12      A.     I do see that.

13      Q.     And then your wife says, Well, enjoy

14   the lull while it's dead.

15             Do you see that?  Her June 26 e-mail

16   at 10:41 a.m.

17      A.     Yes.

18      Q.     And you say, No, it's not that we

19   aren't busy.  We're being made to make 30 phone

20   calls between customers today pitching 80 years

21   olds' savings accounts.  So don't think they

22   aren't squeezing every drop of my soul out just

23   like any other day.

24      A.     Uh-huh.

1      Q.        Do you see that?

2      A.        Uh-huh.

3      Q.        I'm sorry?

4      A.        Yes.  I do see the -- what I had

5  written.

6      Q.        Okay.

7      A.        So, again, I think I was venting to

8  my wife about having to make 30 calls to people

9  who were 80 and older who had savings accounts and

10  no other products with us.  It just was a

11  fruitless task.  It wasn't going well.  There's, I

12  think, nothing wrong with complaining about or

13  venting from time to time to your spouse about

14  your day not going as well as you'd like.

15      Q.        So you didn't think there was

16  anything wrong with the calls you were being asked

17  to make; you just thought it was soul sucking;

18  correct?

19                MR. PEARLMAN:  Objection.

20                THE WITNESS:  So, again, I had a

21  lovely time talking to whomever I spoke to in

22  those 30 phone calls.  Again, I found it was not

23  productive to be trying to convince that segment

24  of the population that they needed more products

1   with our bank as they only had a very tenuous and

2   sometimes did not know they had a relationship

3   with us.

4              So it was good from a customer

5   service standpoint that we at least reached out to

6   folks and made contact.  However, it was not very

7   fruitful so I'm sure that's why I felt it was

8   unproductive.

9   BY MR. KRAUSS:

10      **Q.        But there was nothing wrong with it;**

11  **correct?**

12      A.        Again --

13              MR. PEARLMAN:  Objection.  Asked and

14  answered.  Come on.  Move on.

15  BY MR. KRAUSS:

16      **Q.        Answer my question, please.**

17              MR. PEARLMAN:  He already did.  Come

18  on, Aaron.  You're really getting silly.

19  BY MR. KRAUSS:

20      **Q.        Can you answer my questions, please?**

21              MR. PEARLMAN:  He did.

22              THE WITNESS:  I very clearly answered

23  the question.  I'm finding it incredibly

24  frustrating that I have to answer three to four

 1 | times the same question.

 2 |            So, again, I was happy to make the

 3 | phone calls.  I made the phone calls.  The folks I

 4 | spoke to were happy to get phone calls from the

 5 | bank.  However, I can't say that I recall getting

 6 | any sales or anything productive from it.

 7 |            So, again, based on my experience in

 8 | banking, it was not exactly a useful tool for us

 9 | to drive business in the last four days of the

10 | quarter whether it was for me personally or for

11 | anyone else in the branch.  So it doesn't --

12 | again, it does not mean I was unwilling to do the

13 | task.

14 | BY MR. KRAUSS:

**15 |     Q.      All right.  Let me show you what's**

**16 | been marked as Exhibit 236, yet another long**

**17 | string of e-mails you exchanged with your wife**

**18 | while at work at Bryn Mawr Trust.**

19 |     A.      Is anyone familiar with Mavis Beacon

20 | Teaches Typing?  It's an excellent program.  I

21 | took it in Catholic school.

**22 |     Q.      On the second page of Exhibit 236 you**

**23 | say that you're very busy because Daja didn't**

**24 | show.**

ERIN DINGER v BRYN MAWR BANK                                    Page 342
Michael Sutton, 11/04/2020

```
 1                    Do you see that?
 2       A.        Yes.
 3       Q.        Who is Daja?
 4       A.        Daja was a part-time, I believe,
 5  maybe a summer employee that we had, at that point
 6  and she did not show up that day for whatever
 7  reason.  I don't recall.
 8       Q.        And you say, But yeah calling and
 9  killing my soul.
10                    Do you see that?
11       A.        I do.
12       Q.        And what were you referring to when
13  you say that you were calling and killing your
14  soul?
15       A.        Again, I see a number of different
16  subjects throughout this exchange.  I probably was
17  making sales calls, but I could also be referring
18  to the fact that we were trying to call our
19  homeowners insurance because we were getting air
20  conditioning installed in July and we needed to
21  make an adjustment on that, but I can't speak to
22  exactly which calls I found so fruitless.  If
23  you've ever called insurance companies, they're
24  not very fun to deal with.
```

1      Q.        Your wife responds, quote, What is it

2    with your branch and people just not showing up to

3    work?

4              Do you see that?

5      A.        I see that.

6      Q.        Okay.  Do you agree it's very

7    frustrating when somebody doesn't show up to work?

8      A.        I absolutely agree that when someone

9    does not show up for work it is very impactful to

10   the rest of the organization.

11     Q.        And at the beginning of Exhibit 236

12   you say, Well, people are in full on diva modes

13   today.

14              Do you see that?

15     A.        Uh-huh.

16     Q.        What were you referring to when you

17   said people were -- I'm sorry.  Let me ask it this

18   way.  Which people were in full on diva mode?

19     A.        Again, I don't exactly recall who was

20   in a full on diva mode, but I have to imagine

21   that, again, if it was a day in which we were

22   pushing towards the end of the quarter, it was

23   probably everyone feeling a lot of pressure to

24   achieve their sales goals and so people were very

1 | on edge, and that's probably what I was referring
2 | to with people being in diva modes and throwing
3 | around -- throwing things around the office.
4 | I can recall when we would make calls
5 | and be on the phone, all of us making calls, that
6 | very often people out of frustration would throw
7 | the receiver, you know, that kind of a thing.  I
8 | don't think it was a very -- again, I don't think
9 | this is any kind of a -- it should not be a
10 | revelation for people working in an office that
11 | people occasionally get tired of making phones
12 | calls by 4:00.
13 | **Q.     Was it common for people to be in**
14 | **full on diva mode in the Ardmore branch?**
15 | A.     Again, there were times in which
16 | people were very focused on what they needed to
17 | do, myself included.  As to what I was
18 | specifically attributing that comment to, or who,
19 | I can't speak to that.  I can just recall during
20 | that week us making a lot of phone calls and
21 | probably, as I mentioned earlier, looking to the
22 | first of the month as the drop-dead date for
23 | getting sales in.
24 | **Q.     Because that's when your score card**

1  **turns over; correct?**

2      A.       That is when you're obliged as the

3  branch to have, yes, to have everything in order.

4      **Q.**       **Well, also you get a bonus if you**

5  **make your sales calls; right?**

6      A.       So, again, that was something that I

7  should not have been eligible for had I been under

8  that warning, but I was told they would -- they

9  would -- that it wasn't -- it was an opportunity

10 for me if I ended up getting my goal.

11 Unfortunately, I ended up, I believe, one or two

12 accounts short.

13     **Q.**       **Okay.  But, Mr. Sutton, the point is,**

14 **one of the reasons you pushed to get sales by the**

15 **end of the quarter is because if you make your**

16 **sales goals you get a bonus; correct?**

17     A.       One of the reasons why everyone in

18 the branch was doing it is because everyone in the

19 branch benefits from us hitting our goal as a

20 collective.  But also individual people can make

21 money depending on how they do.

22     **Q.**       **Right.  Let me show you Exhibit 237.**

23 **Exhibit 237 is another text exchange you had with**

24 **your wife while you were working at Bryn Mawr**

1  Trust, in which you start by saying that you even

2  get treated like you're a nobody by your

3  coworkers.

4              Do you see that?

5      A.       Yes.  I was having difficulty, it

6  being the end of the month and the end of the

7  quarter, in trying to get audits completed, which

8  is an important task operationally for the head

9  teller.  So it just made me feel less than that no

10 one really wanted to avail themselves to do it.

11     Q.       So you believed everybody was

12 treating you like you were a nobody?

13     A.       Again, I think I was venting to my

14 wife and using colorful language.  I think as you

15 can tell, it's something that she and I do on a

16 regular basis.

17     Q.       Do you ever recall there being a day

18 where you worked at Bryn Mawr Trust that you

19 didn't send at least one e-mail to your wife

20 venting as you put it?

21     A.       I'm sorry.  Could you repeat the

22 question?

23     Q.       Do you ever recall there being a day

24 when you worked at Bryn Mawr Trust when you didn't

1  send an e-mail to your wife venting as you put it?

2       A.        Again, there may have been.

3                 MR. PEARLMAN:  A day?  Are you asking

4  for a specific day?

5  BY MR. KRAUSS:

6       Q.        Was there ever one?  The next

7  question would be which one is it.  Do you ever

8  recall there being one?

9       A.        Again, my wife and I exchange e-mails

10 regularly as spouses do.  So I think to be able

11 to, as Jason just mentioned, allude to a specific

12 date or date range that we were not in contact, I

13 can't speak to any specificity around that.

14                My wife and I would occasionally

15 check in with each other throughout the day.

16 Again, I don't think this is something atypical

17 for spouses to do.

18      Q.        Let me show you what's been marked as

19 Exhibit 92.  Exhibit 92 is an e-mail between Laura

20 Biernacki and Nikkie Fryer.

21                Do you see that?

22      A.        I do see the e-mail.

23      Q.        And it reports that you had a

24 conversation with Laura Biernacki on March 27

1  **along with Danielle Perez and you said that**

2  **everything was going well and that you and**

3  **Ms. Perez had a good working relationship.**

4              **Do you see that?**

5      A.       I do see that.

6      **Q.       Did you say that?**

7      A.       Again, I don't specifically recall

8  this meeting from March 27th.  I'm assuming,

9  again, you're referring to what was supposed to

10 potentially have been a corrective action.  I'm

11 not aware of the exact -- I'm not recalling the

12 exact substance of that conversation save for

13 Laura seemed to just be trying to do a check-in.

14            I also find it odd that this is dated

15 on the first of May recalling a conversation from

16 six weeks prior.  So I would be speculating two

17 years later as to what that specific instance was.

18     **Q.       Do you recall ever telling Laura**

19 **Biernacki that you and Ms. Perez had a good**

20 **working relationship?**

21     A.       Yes.  I do recall saying that on an

22 occasion or two, because I was working to try and

23 have a good working relationship with my superior.

24     **Q.       Do you know Erin Dinger?**

 1      A.      I don't.

 2      Q.      So I take it you've never had a

 3 conversation with her?

 4      A.      I can't say that I ever have.

 5      Q.      Do you know Penny Hughes?

 6      A.      I knew that she was an employee when

 7 I was there for like two, three weeks but she --

 8 she's no longer there.

 9      Q.      Have you ever had a conversation with

10 Penny Hughes about your case against Bryn Mawr

11 Trust?

12      A.      I can't say that I've ever spoken to

13 Penny Hughes except for her calling the Ardmore

14 branch in the first week that I worked there.

15      Q.      Have you ever spoken about your case

16 with Alicia McDaniel?

17      A.      I believe I spoke to Alicia around

18 the holidays.  We just exchanged well wishes to

19 each others' families.  I don't think we spoke

20 about the case at all because there was nothing to

21 speak about.

22      Q.      The holidays of which year?

23      A.      I believe the holidays of '19 I guess

24 that would have been.

1        Q.        Have you spoken with Ms. McDaniel
2   since --
3        A.        No.
4        Q.        -- December of 2019?
5        A.        I don't think I did.
6        Q.        Do you know who Patricia Real-Loomis
7   is?
8        A.        Patricia...?
9        Q.        Real-Loomis.
10       A.        I feel like I recall the name maybe
11   from the company directory, but I don't know her
12   and I can't say that I ever worked alongside of
13   her.
14       Q.        Okay.  Do you know Karen Stevens?
15       A.        I worked in Bryn Mawr for a few days
16   as we -- as I discussed previously and I believe
17   she was there on a few days that I was there.  She
18   worked part-time, if I recall.
19       Q.        Did you ever discuss your case with
20   Karen Stevens?
21       A.        I can't say I've ever had a
22   discussion with Karen Stevens except for when I
23   was working two drawers down from her in Bryn Mawr
24   for two afternoons.

1    Q.        Let me show you what's been marked as

2  Exhibit 6.  Exhibit 6 is the Complaint that you

3  filed in this matter.

4    A.        Uh-huh.

5    Q.        Do you remember signing the

6  verification for the Complaint?

7    A.        I do.

8    Q.        And when you signed the verification,

9  did you know that you were swearing that

10 everything in the Complaint was true and correct,

11 to the best of your knowledge, information, and

12 belief?

13   A.        Yes.

14   Q.        Did you do anything to assure

15 yourself that everything in the Complaint was true

16 before you signed a verification form?

17   A.        Yes.  I reviewed and made sure

18 everything as accurate -- was accurate.

19   Q.        In Paragraph 2 you say you were fired

20 on July 24, 2018.

21            Do you see that?

22            MR. PEARLMAN:  22?

23 BY MR. KRAUSS:

24   Q.        Paragraph 2.

1       A.        Okay.  Yes, I do see that.

2       **Q.        Is that true?**

3       A.        That was my recollection, yep.

4       **Q.        Why were you fired?**

5       A.        Again, they, I believe, said

6  something about my time.  However, if as we've

7  discussed a number of times and excuse me for my

8  frustration, 11 days prior I had been interviewed

9  over the phone with regards to any race issues and

10 any time issues that I had observed in Ardmore and

11 in other branches.

12            After being pressed a second time I

13 did admit to the toxic environment that I had

14 observed in the branch and I did say that from

15 time to time I do believe there were issues with

16 time.

17            However, I was not given an

18 opportunity to elaborate.  No one followed up with

19 me.  The only thing that I heard as a result of

20 that was they came on that -- the Tuesday

21 following my training and fired me.

22      **Q.        And they said that you were being**

23 **fired for attendance issues; correct?**

24      A.        That was what they told me in that

1  moment.  However, I don't believe that to be the

2  true reason that I was fired.  Given they had

3  taken me for a week and put me in Media to train,

4  that's an extreme cost for a company that for

5  whatever reason was already going to fire me.  So

6  I think that it does not make a lot of sense.

7       **Q.        So you were training in Media after**

8  **you talked with Nikkie Fryer; correct?**

9       A.        Yes.  I was sent to Media, I believe,

10  that next week as I've discussed.  Thursday or

11  Friday was the date that she called the branch.

12      **Q.        In Paragraph 11 you say that you won**

13  **a scholarship to Harvard University.**

14               **Do you see that?**

15      A.        I do.

16      **Q.        What kind of scholarship was it?**

17      A.        I received an academic scholarship.

18  So I essentially had to -- you know, I worked very

19  hard to get that scholarship and to maintain it,

20  because when I left school for recovering from my

21  accident and so forth, it was very important when

22  I returned to be able to keep up.  So it's

23  something I was proud to be able to finish there.

24      **Q.        In Paragraph 11 you said you worked**

1  at Wachovia and then its acquirer Wells Fargo.

2              Do you see that?

3      A.        Correct.

4      Q.        When did you work at Wachovia?

5      A.        I worked at Wachovia in 2010 I

6  believe I was hired and I worked there through the

7  acquisition with Wells Fargo into the next year.

8  When I saw the writing on the wall with Wells

9  Fargo I left and went to Univest Bank and Trust.

10     Q.        How long did you work for Wells

11 Fargo?

12     A.        I would say my combined time between

13 Wachovia and Wells Fargo was about 20 months

14 maybe, or slightly longer.

15     Q.        Wells Fargo merged with Wachovia on

16 December 31, 2008.

17     A.        Again, that had not occurred on the

18 East Coast.  So, again, when I started working it

19 was still a Wachovia branded branch and it was not

20 transitioned over until at least my sixth month of

21 employ, because they had to bring a bunch of

22 people from South Dakota to teach us new systems.

23 It was a big to-do.

24     Q.        So in Paragraph 12 you say you

1  **immediately recognized the same fraudulent sales**

2  **tactics that you had seen at Wells Fargo when you**

3  **started working at Bryn Mawr Trust.**

4              **Do you see that?**

5      A.      That is correct.  We were directed --

6      **Q.        What fraudulent sales tactics --**

7      A.      We were directed that if the client

8  wanted to open two accounts that we could do two

9  no minimum checking accounts rather than do a

10 checking and savings so that the customer would

11 have to come back and essentially open a third

12 account to actually get the savings, but we would

13 get the credit up front for the first two.

14             That to me is essentially feeling

15 that you can't sell the checking and then try and

16 sell the savings a month later when the customer

17 has the $100.  It was a lazy way and something

18 that was very common at and pushed at Wells Fargo

19 and I did not agree with that.

20     **Q.        Did you complain to anybody about it?**

21     A.      I remember having discussions about

22 how I felt that sales quality was not being taken

23 seriously and that I think we would be better off

24 doing that.  It's not something that ever was

 1  taken with much traction.

 2      **Q.        So did you ever tell anybody at Bryn**

 3  **Mawr Trust that you thought you were observing the**

 4  **same fraudulent sales practices you had observed**

 5  **at Wells Fargo?**

 6      A.        I expressed -- I expressed concern to

 7  not only my manager and my direct report, I

 8  expressed concern to the trainer, Mary Venditti,

 9  when I was brought back in January and again in

10  April to do additional customer service training

11  that I just wanted to understand where she felt we

12  should be trying to --

13      **Q.        Now, let's be very clear.  Did you**

14  **tell your manager that you thought you were**

15  **observing fraudulent sales practices?  Did you**

16  **tell her that?**

17      A.        I said that I felt that these were

18  very similar to things that we were doing at Wells

19  Fargo and that I didn't feel comfortable in asking

20  clients to open a new account knowing they would

21  have to close it in a matter of weeks.

22              So I did not do that with any

23  customer that I had.  Though I will say because of

24  the pressure I felt with my job, I did,

 1   unfortunately, encourage my father -- I felt a lot

 2   of pressure from the branch -- to apply for a home

 3   equity line after my mother passed and it was a

 4   very unfortunate situation to have him do that and

 5   it was a very poor experience for him as a

 6   customer that I was constantly having to deal with

 7   issues.

 8       **Q.        So do you believe you defrauded your**

 9   **father?**

10       A.        I believe that I encouraged my father

11   to talk to doing -- talk with Danielle Llewellyn-

12   Perez and my branch manager and I felt like I -- I

13   should not have perhaps encouraged him to do that,

14   but I bowed to what I felt were pressures that

15   were being very clear to me from both Laura

16   Biernacki and Danielle that I needed to post some

17   numbers to justify why I was there.

18            And, again, I regret having done it,

19   because I don't think it was a good experience for

20   my father and it was something that still -- I

21   regret having bowed to that pressure to this day.

22       **Q.        Did your father need a home equity**

23   **line of credit?**

24       A.        He did not.

1      Q.        So why did he take out the loan?

2      A.        I think he took out the loan because

3   he felt badly that I had been helping him out so

4   much with my mother's illness and death and I

5   think he felt a lot of guilt around that, and so I

6   think he wanted to try and help me knowing that

7   certainly I was having a very difficult time at

8   work with them -- with Bryn Mawr understanding,

9   you know, what I was going through.

10     Q.        And he was told that if he opened an

11  account and had the payments for the home equity

12  line of credit taken out of that account, he'd get

13  a lower rate; correct?

14     A.        That is correct.

15     Q.        That's a common practice; right?

16     A.        It's a common practice.

17     Q.        Every bank does that; right?

18     A.        Most banks do it, again, in order to

19  develop more deposit account.

20     Q.        You say you asked for fewer hours.

21  In Paragraph 13 you say you asked for fewer hours

22  to care for your mother.

23               Do you see that?

24               MR. SCHWARTZ:  What paragraph?

```
 1                     MR. KRAUSS:  Paragraph 13.

 2                     MR. SCHWARTZ:  13?

 3   BY MR. KRAUSS:

 4        Q.        Do you see that?

 5        A.        It says plaintiff asked for fewer

 6   hours even if they were unpaid.  Is that what

 7   you're referring to?

 8        Q.        Yep.  That's what you said; right?

 9        A.        Yeah.

10        Q.        You asked to leave early on a few

11   days; right?

12        A.        I did and I volunteered to take a

13   number of days unpaid repeatedly.

14        Q.        You're saying you asked to take days

15   off.  When did you ask to take a day off?

16        A.        I asked -- again, I feel like we're

17   relitigating.

18                    MR. PEARLMAN:  Hold it.  Can you

19   answer his question?

20                    THE WITNESS:  I can.

21   BY MR. KRAUSS:

22        Q.        Good.  When did you ask to take a day

23   off?

24        A.        When I proactively reached out a
```

1  number of times, through e-mail, which we've gone

2  over, but also verbally with both my district

3  manager and my area manager, I offered to take

4  days unpaid understanding that given my situation

5  and given that my mother was dying that I would be

6  happy to take those days as unpaid in order to

7  provide me a break.

8              I was trying, and we discussed this

9  at length this morning -- apologies, it's been a

10 very long day -- that we discussed -- again, I

11 tried to provide as much flexibility and upfront

12 clear communication as to the situation at hand as

13 I could so that I was proactive in relaying the

14 situation as it unfolded to my employer.

**15     Q.        Did you ever ask Bryn Mawr Trust to**

**16 take a specific day off and were denied the**

**17 permission to take that day?  Did that ever**

**18 happen?**

19     A.        Again, I never recall during the

20 period of this time that I was allowed to take any

21 days unpaid.  I don't recall there being any

22 opportunity for me to take any additional days for

23 break.  That was never addressed to me.

**24     Q.        Mr. Sutton, please answer my**

1  **question.  My question is, did you ever ask Bryn**

2  **Mawr Trust to take a particular day off and have**

3  **that request denied?**

4                    MR. PEARLMAN:  Objection.

5                    THE WITNESS:  It's a very broad

6  statement.  Again, during this time period, I

7  repeatedly was asking for time unpaid to -- to

8  deal with the situation.  So I think it's been

9  asked and answered.

10 BY MR. KRAUSS:

11     **Q.        So in Paragraph 13 you say that bank**

12 **management went so callously far as to suggest to**

13 **you that your mother's funeral be held on a**

14 **weekend for the bank's convenience.**

15               **Do you see that?**

16     A.        Yes.

17     **Q.        Now, that's not true.**

18     A.        It is true.  Now, I understand that

19 when I wrote my proactive e-mail to Danielle in

20 the beginning of February, I had mentioned that

21 that was an opportunity.  However, it was later in

22 that same month, in February, I met with Laura

23 Biernacki and she told me, again, very sorry for

24 all that you're going through, but you're being

 1  very impactful to the day-to-day business here.

 2  So if you could, when your mother does pass,

 3  arrange for your -- her funeral to be on Saturday,

 4  that would be the least amount impactful, as

 5  Saturday is only four hours, five hours.

 6      **Q.        Now, Saturday is the heaviest traffic**

 7  **day at the bank; correct?**

 8      A.        Yes, it is.

 9      **Q.        Let me show you what's been marked as**

10  **Exhibit 82.  Exhibit 82 is an e-mail you sent to**

11  **Ms. Perez and Ms. Biernacki.**

12               **Do you see that?**

13      A.        I do.

14      **Q.        And you start by thanking them for**

15  **their kind words of condolences regarding your**

16  **mother's passing.**

17               **Do you see that?**

18      A.        I do.

19      **Q.        And you say that you understand**

20  **you're allowed to take three days of bereavement**

21  **leave; correct?**

22      A.        I do.

23      **Q.        And you asked to take them**

24  **nonsequentially; correct?**

```
 1        A.      I do.
 2        Q.         You go on to say, quote, I do know
 3   that I'm scheduled to work this Saturday and we
 4   hope to have the service then, if possible.  So
 5   please let me know how I should account for this
 6   missed time if the venue is available to us.
 7        A.      Uh-huh.
 8        Q.         Did I read that correctly?
 9        A.      You did read that correctly.
10        Q.         And you said, I know Lisa offered to
11   fill in for me Saturday if need be given the
12   uncertainty of my mom's outlook.
13             Did I read that correctly?
14        A.      You did read that correctly.
15        Q.         So it was your choice to have the
16   funeral on Saturday because the venue was
17   available; correct?
18        A.      The venue was available regardless.
19        Q.         What venue was it?
20        A.      It was The Hill School chapel in my
21   mother's hometown of Pottstown.
22        Q.         Now, you were scheduled to work that
23   Saturday; correct?
24        A.      I was scheduled to work that
```

 1 | Saturday.
 2 |     **Q.        And instead you had it off because of**
 3 | **bereavement; right?**
 4 |     A.        Instead I had it off because of
 5 | bereavement.
 6 |     **Q.        Let me ask you to turn to Paragraph**
 7 | **16.**
 8 |     A.        Uh-huh.
 9 |     **Q.        In Paragraph 16 you say, Others,**
10 | **including African-Americans Wandrea Russo and**
11 | **Alicia McDaniel, had complained to HR about racial**
12 | **harassment and being shorted in terms of their**
13 | **pay.**
14 |               **Do you see that?**
15 |     A.        I do.
16 |     **Q.        And you said you never spoke with**
17 | **Wandrea Russo; correct?**
18 |     A.        No.  But I -- as you made very plain,
19 | I had scanned and seen the article and was aware
20 | after I had been in Bryn Mawr that obviously
21 | that's why Wandrea wasn't there and they needed me
22 | to fill in.
23 |     **Q.        Okay.**
24 |     A.        So I'm able to read and put two and

```
 1  two together.  So, yes, sir, I figured out that
 2  she was obviously being harassed.
 3       Q.       Okay.  So your knowledge about
 4  Wandrea Russo comes from reading the newspaper;
 5  correct?
 6       A.       My understanding of Wandrea's
 7  situation is, again, based on what I heard from
 8  the newspaper and from, again, what I've read in
 9  that.
10       Q.       So --
11       A.       Alicia McDaniel and I worked very
12  closely together and I witnessed experiences that
13  she had were racist comments, very insensitive
14  comments, very appalling comments, I think, were
15  made.
16       Q.       What knowledge do you have about
17  Alicia McDaniel being shorted in terms of pay?
18  What knowledge -- what did you see or hear that
19  had caused you to believe she was shorted in terms
20  of pay?
21       A.       Again, we -- we, I feel, have touched
22  on this several times.  There was constantly
23  issues around sales credit and who that belonged
24  to.  That, particularly for universal bankers much
```

 1  more so than tellers such as myself, is a large

 2  part of their compensation.

 3              So particularly I can recall there

 4  being instances of accounts, credit cards of

 5  various natures both in the first and second

 6  quarter that there was issues for credit over that

 7  perhaps were misproperly (sic) applied that,

 8  obviously, would impact her payment.

 9      **Q.       The bonuses for universal bankers**

10  **maxed out at a total of $800; right?**

11      A.       Sure.

12      **Q.       Okay.**

13      A.       Take your word for that.

14      **Q.       Do you know?**

15      A.       Again, that sounds right to me.  I

16  don't have that in front of me.  As best as I

17  recall from that time it was, I believe, a maximum

18  of about $700 or $800.

19              MR. PEARLMAN:  Aaron, we're right at

20  seven hours, so...

21              MR. KRAUSS:  Then thank you very

22  much.

23              I presume as per our prior

24  stipulation you will reserve the right to question

1  this witness at a mutually agreeable time in the

2  future after which I will have limited recross

3  focusing only on issues that you brought up in

4  your direct.

5               Is that agreeable?

6               MR. PEARLMAN:  Agreed.

7               MR. KRAUSS:  Then we are off the

8  record.

9               VIDEOGRAPHER:  This concludes the

10 video deposition of Michael Sutton.

11              We're going off the record at

12 7:13 p.m.

13

14

15

16

17

18

19

20

21

22

23

24

ERIN DINGER v BRYN MAWR BANK                                    Page 368
Michael Sutton, 11/04/2020

1                        CERTIFICATION

2

3              I, BARBARA McKEON QUINN, a Registered

4    Merit Reporter and PA Notary Public in and for the

5    Commonwealth of Pennsylvania, hereby certify that

6    the foregoing is a true and accurate transcript of

7    the deposition of said witness who was first duly

8    sworn by me on the date and place herein before

9    set forth.

10

11             I FURTHER CERTIFY that I am neither

12   attorney nor counsel for, not related to nor

13   employed by any of the parties to the action in

14   which this deposition was taken; and further that

15   I am not a relative or employee of any attorney or

16   counsel employed in this action, nor am I

17   financially interested in this case.

18

19

20

21

22

23   BARBARA McKEON QUINN
     Registered Merit Reporter
24   and PA Notary Public

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

19-cv-2420

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Michael McShane Sutton

## DEFENDANTS
Bryn Mawr Bank Corporation d/b/a Bryn Mawr Trust Company

**(b)** County of Residence of First Listed Plaintiff   Delaware
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mark D. Schwartz, 300 Sandcastle Drive, Bryn Mawr, PA 19010
610 525-5534

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
Title 7 1981
Brief description of cause:
Retaliatory firing

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ >$150,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE Schiller
DOCKET NUMBER 2-19-2408-001

DATE June 5. 2019
SIGNATURE OF ATTORNEY OF RECORD

JUN - 5 2019

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

19 2420

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 142 East 8th Ave, Conshohocken, PA 19428

Address of Defendant: _____ 801 Lancaster Ave., Bryn Mawr, PA 19010

Place of Accident, Incident or Transaction: _____ corporate locations of Defendant in Eastern Pa.

**RELATED CASE, IF ANY:**

Case Number: 2-19-cv-002408.001    Judge: Berle M. Schiller    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐    No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☑    No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☐

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: June 5, 2019 _____ Pa. 30527

_Attorney-at-Law / Pro Se Plaintiff_ _____ _Attorney I.D. # (if applicable)_

---

**CIVIL:** (Place a √ in one category only)

A. **Federal Question Cases:**

☐ 1. Indemnity Contract, Marine Contract, and All
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
    *(Please specify)*

THIS CASE IS RELATED TO: 19CV 2408

CIVIL ACTION NO.
CRIMINAL NO.    19    2420

ASSIGNED TO:    BMS

---

*(The effect o...*

I, _____ Mark D. Schwartz _____ , counsel of record or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

JUN 5 2019

DATE: June 5, 2019 _____ Pa 30527

_Attorney-at-Law / Pro Se Plaintiff_ _____ _Attorney I.D. # (if applicable)_

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>

Michael McShane Sutton

CIVIL ACTION

v.

Bryn Mawr Bank Corporation
d/b/a Bryn Mawr Trust company

NO. 19    2420

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus -- Cases brought under 28 U.S.C. § 2241 through § 2255.           ( )

(b) Social Security -- Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                             ( )

(e) Special Management -- Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)                                                                ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   (X)

June 5, 2019     Mark D. Schwartz     Plaintiff
_____   _____  _____
Date             Attorney-at-law        Attorney for

610 525-5534     610 525-5534          markschwartz684@gmail.com
_____   _____  _____
Telephone        FAX Number            E-Mail Address

(Civ. 660) 10/02

JUN - 5 2019

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL McSHANE SUTTON          :
142 East 8th Ave                :
Conshohocken, PA 19428          :          **CIVIL ACTION**
            **Plaintiff**          :
                           :          **NO.**    19    2420
                           :
           **v.**          :          **JURY TRIAL DEMANDED**
                           :
BRYN MAWR BANK CORPORATION d/b/a          :
BRYN MAWR TRUST COMPANY          :          **COMPLAINT**
801 Lancaster Avenue             :
Bryn Mawr, PA 19010             :
            **Defendant**          :
                           :

## COMPLAINT

1.      Plaintiff Michael McShane Sutton, a Caucasian male has been retaliated against and ultimately fired as a result of his acknowledgement and criticism of the racial discrimination and hostile working environment claims of Wandrea Russo, an African- American head teller at Bryn Mawr Trust Company's main branch and Alicia McDaniel, an African- American universal banker at Plaintiff's Ardmore Branch who was suddenly removed to another branch as a result of her complaints of racism..   He has witnessed the hostile and illegal working environment which pervades Bryn Mawr Trust Company, all of which is countenanced and supported by management. Shortly after being interviewed by HR and calling the racial environment throughout the retail bank toxic.  Mr. Sutton filed a charge of discrimination with the EEOC. Plaintiff now seeks to recover compensatory and punitive damages pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951 *et seq.*

1

## PARTIES

2.　　　Plaintiff Michael McShane Sutton ("Mr. Sutton" or "Plaintiff") is an adult
Caucasian male born on March 6, 1983 residing in the Commonwealth of Pennsylvania.  He was
initially hired on December 11, 2017 as the Head Teller for the Ardmore Branch. On July 24,
2018, Plaintiff was fired.  As a fellow employee who corroborated the discrimination claims of
others, Plaintiff enjoys protected status from retaliation under pertinent civil rights statutes.

3.　　　Defendant, Bryn Mawr Bank Corporation d/b/a Bryn Mawr Trust Company
("Defendant" or the "Bank") is a publicly-traded commercial bank, headquartered at 801
Lancaster Avenue in Bryn Mawr, Pennsylvania.  The Bank employed Mr. Sutton and
approximately 600 employees and is an employer as defined by Title VII and the PHRA.

4.　　　At all relevant times hereto, Defendant acted by and through its duly authorized
actual and/or apparent agents and employees acting within the course and scope of their actual
and/or apparent agency and employment.

## JURISDICTION AND VENUE

5.　　　This Court has federal question jurisdiction over the subject matter of Plaintiff's
claims under federal law pursuant to 28 U.S.C. §1331.

6.　　　This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant
to 28 U.S.C. §1367 because the state claims and federal claims are so interrelated that they form
part of the same case or controversy under Article III of the United States Constitution.

7.　　　Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b)
and (c) since Plaintiff and Defendants reside in the Eastern District of Pennsylvania and since a

2

substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Pennsylvania.

## FULFILLMENT OF TITLE VII CONDITIONS

8.      Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII and PHRA.  Plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRA") on or about August 9, 2018.

9.      The EEOC issued a Right to Sue letter to the Plaintiff on March 7, 2019, and this lawsuit is brought within ninety (90) days of the issuance of the Right to Sue letter

## FACTUAL ASSERTIONS

10.      As set forth in his EEOC charge, during the course of his employment Plaintiff learned of the Bank's history of hostility to those protected under applicable civil rights laws generally, and specifically with respect to African-American head teller Ms. Wandrea Russo and African-American universal banker Alicia McDaniel.  However, as noted in his EEOC Charge this lawsuit focuses on retaliation against Plaintiff on account of his support of claims of discrimination.

11.      After winning a scholarship to Harvard University, Plaintiff had work experience in banking at various institutions.  Prior to being hired, Plaintiff met with two representatives of the Bank, Service Manager Danielle Lewellyn Perez and the District Manager. Plaintiff explained his prior experience at Wachovia and then its acquiror, Wells Fargo, as a personal banker and Branch Manager, as well as employment at Univest Bank and Trust Co.as a Financial Service Center Manager. Explaining his distaste for the tactics and atmosphere at Wells Fargo, Plaintiff emphasized the importance of strong sales ethics of future fellow employees and

3

management were he to take the new position at the Bank. and be encouraged to drive business both himself and by those reporting to him. Assured that there was no need for concern, Plaintiff accepted the position and began in December of 2017.

12.     However, once Plaintiff had accepted the job, during the first branch meeting in January, recently-employed District Manager Ms. Laura Biernacki placed a new stress on sales and hitting numerical goals. Plaintiff recognized the same fraudulent tactics that he had seen at Wells Fargo when it came to foisting upon bank clients new accounts and products that they did not need or request.  This included Plaintiff's being encouraged to have his father apply for a home equity line and insisting that his father had to open a checking and savings account in order to get the lowest rate.

13.     Plaintiff's mother fell ill and was hospitalized on or about January 10, 2018 in Pottstown, Pennsylvania and it fell upon Plaintiff to care for her. This was something of which Bank management was very well aware. Plaintiff had to attend to her every evening. Plaintiff asked for fewer hours, even if they were unpaid, which was all denied. His mother went into hospital-based hospice before the end of January, and was sent home a week later to finish her hospice at home, due to limited family means and the expectation that she would die any day then. She finally died on March 5, 2018.  During this time, Plaintiff himself developed walking pneumonia in January and a bleeding ulcer in February due to stress. Notwithstanding, on February 14, Plaintiff received a final written warning for time worked, when no one had ever made this an issue given his personal situation. At this time, despite the fact that he was actively coughing up blood, again all as well known to Bank management, he was working.  In addition to the write up, before Plaintiff's mother actually died, Bank management went so callously far as to suggest to Plaintiff that the funeral be held on a weekend for the Bank's convenience.

14.     Plaintiff reached out to HR about the "final warning" asking Ms. Fryer what it would mean as far as his career was concerned following the passing of his mother. She refused to answer his repeated requests to meet saying that it was not HR's concern. It was suggested that he reach out to HR manager Ms. Nancy Pinkowitz who said that she would investigate his status as it related to the write up from February. After two weeks, Plaintiff called to inquire. There was no report and he was told to "grin and bear it," as a result thinking that the matter had been dropped. He also wrote to his superiors about the write up and was told not to worry about it. Moreover, he was told that, despite the language of the write up, he would still be able to be paid sales incentives, despite the actual language in the write up suggesting that Plaintiff was ineligible to such performance bonuses due to the write up.

15.     Sometime in June, 2018, Plaintiff met with Ms. Danielle Perez with respect to the tension between fellow employees Alicia McDaniel and banker Magdaline Intzes. Plaintiff observed that from what he saw from his desk that the Bank was steering low income and African-American clients to Ms. McDaniel with high income clients going to Ms. Intzes. Moreover, Plaintiff knew full well that credit for sales origination had been stolen from Ms. McDaniel.

16.     In the meantime, others, including African Americans Wandrea Russo and Alicia McDaniel had complained to HR about racial harassment and being shorted in terms of their pay. After her complaint to HR, Ms. McDaniel was retaliated against and abruptly transferred out of the Ardmore Office. Given its suddenness, Plaintiff was afraid that something was terribly wrong. When he inquired, he was told that it was none of his business. Because Plaintiff had worked in so many retail banking environments for many years and had never encountered such bizarre behavior by management regarding employees in any company, Plaintiff grew

5

increasingly fearful for his own employment prospects. Customers would ask Plaintiff about Ms. McDaniel and he did not have an answer for them. Further he was told that he would be actively punished for appearing to engage in conversations with a customer who pressed him for more details about the absent Ms. McDaniel. He was told to not to respond further than to use the phrase "I do not have an answer for you".

17.     Clearly as a result of the above-referenced complaints, late on July 13, 2018 Plaintiff was told to contact Ms. Nicola Fryer in HR. Given Ms. Fryer's reluctance to respond to Plaintiff's prior questions about the bank's issues with his mother's passing and his need for sick days during her home hospice, the Plaintiff felt immediately like no matter what happened, this contact would be unpleasant based on his prior interactions with Ms. Fryer. When they spoke, he repeatedly was asked if there were ever instances when he was required to work off the clock, allegations reported by Ms. McDaniel to HR.  Plaintiff's response was "I don't want to cause any issues". When forced to answer he admitted that there were instances of this occurring. He was also asked about racial discrimination which Ms. McDaniel experienced. Plaintiff begged not to be brought into this situation. Notwithstanding, he knew about the racial insults directed at Ms. McDaniel and he had heard of the retaliatory "security investigation" lodged against Ms. Russo, as he had been called to fill in for her in Bryn Mawr during HR's "investigation" of Ms. Russo. Asked to describe the racial environment, Plaintiff characterized it as being "toxic" and that "everyone was aware of it to some extent" and "in all his years of retail banking, he had never experienced work or office dynamics this dysfunctional".

18.     Less than two weeks later, Plaintiff was fired on July 24, 2018.

19.     Plaintiff believes that his firing was retaliatory and came about as a result of his protected activity

6

## COUNT I
## VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

20.     Plaintiff restates and realleges all previous paragraphs as though fully set forth herein.

21.     Defendant has retaliated against Plaintiff for speaking truth about discrimination at the Bank, violating Plaintiff's rights in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 as recognized by the U.S. Supreme Court in *CBOCS West Inc. v. Humphries* (No. 06-1431) (May 27, 2008)

22.     Defendant's conduct has been intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

23.     By reason of the continuous nature of Defendant's discriminatory conduct, persistent throughout Plaintiff's employment with Defendant, he is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

24.     By reason of Defendant's retaliation and its firing of Plaintiff, Plaintiff is entitled to all legal and equitable remedies available under § 1981, including but not limited to damages for mental anguish and emotional distress, reasonable attorney fees and costs, as well as punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT II

**RACIAL DISCRIMINATION, RETALIATION AND MAINTENANCE OF A HOSTILE
WORK ENVIRONMENT IN VIOLATION OF
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED,
42 U.S.C. § 2000e *et seq***

25. Plaintiff restates and realleges all previous paragraphs as though fully set forth

herein.

26. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.* as amended by

the Civil Rights Act of 1991 ("Title VII), makes it unlawful for employers to discriminate

against any individual in the terms, conditions, or privileges of employment on the basis of race.

27. Discrimination on the basis of race that creates an abusive and hostile work

environment, such that the conditions of employment are altered, is actionable under Title VII as

racial discrimination. In order to establish a hostile work environment, five factual elements must

be established: (1) that the employee suffered intentional discrimination because of his or her

race; (2) that the discrimination detrimentally affected him or her; (3) that the discrimination was

pervasive and regular; (4) that the discrimination would detrimentally affect a reasonable person

in the same position as the employee; and (5) that respondeat superior liability exists. In the

totality of circumstances, the foregoing five elements are established.

28. Defendant retaliated against Plaintiff as a result of his complaints of

discriminatory treatment of others and a hostile work environment.

29. Defendant is liable for discrimination alleged herein under the doctrine of

*respondeat superior* due to the actions and statements of its managers and employees.

30. Defendant is liable for the acts of management and Plaintiff's co-workers,

because it knew of the existence of a discriminatory and a hostile work environment, but allowed

the illegal acts and practices to continue.

31.     Defendant is liable for the acts alleged herein because of its culture of encouraging racial discrimination, harassment and retaliation.

32.     Based upon the foregoing facts, Defendant has discriminated against Plaintiff as he was retaliated against for decrying Defendant's "toxic environment" which stood in opposition to rights guaranteed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq. as amended.*

33.     The described unlawful employment practices by Defendant were intentional, deliberate, willful and were with malice or reckless indifference to Plaintiff's rights protected by the laws of the United States, as well as the laws of the Commonwealth of Pennsylvania.

34.     By reason of Defendant's discrimination, retaliation and maintenance of a hostile work environment, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT III

### RACIAL DISCRIMINATION, RETALIATION AND MAINTENANCE OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

35.     Plaintiff restates and realleges all previous paragraphs as though fully set forth herein.

36.     This claim arises under the Pennsylvania Human Relations Act ("PHRA"). The Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.*, makes it unlawful to discriminate

9

against any individual in the terms, conditions, or privileges of employment on the basis of race or to retaliate against those who complain of those conditions.

37.     Plaintiff, is protected under the Pennsylvania Human Relations Act.

38.     Based upon the foregoing facts, Defendant has discriminated against Plaintiff in violation of the Pennsylvania Human Relations Act, 43 P.S. § 955 *et. seq.*

39.     The effect of the aforementioned practices has been to deprive Plaintiff of equal employment opportunities and adversely affect his status, given his unjust firing as a result of supporting others who claimed racial discrimination.

40.     Racial discrimination that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under the Pennsylvania Human Relations Act as race discrimination.

41.     With respect to allegations of discrimination and retaliation, Defendant is liable for the acts of its supervisory and management employees, because the harassers and those who effectuated the discrimination used their actual or apparent authority to further the unlawful conduct, and were otherwise aided in accomplishing the unlawful conduct by the existence of an agency relationship.

42.     Defendant is liable for the acts alleged herein because its managers and supervisors established its corporate culture which encouraged racial discrimination as well as a hostile work environment.

43.     The described unlawful employment practices and actions by Defendant were intentional and were done with malice or reckless indifference to Plaintiff's rights protected by the laws of the Commonwealth of Pennsylvania.  These unlawful acts were committed because of racial discrimination and the fact that Plaintiff opposed such discrimination.

44.     By reason of Defendant's discrimination, retaliation and maintenance of a hostile work environment, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## JURY DEMAND

The Plaintiff demands a trial by jury of eight on all issues triable by a jury.

## CERTIFICATION

I hereby certify that Plaintiff has not brought a similar or related lawsuit encompassing the claims brought in this matter.

Respectfully Submitted,

**MARK D. SCHWARTZ, ESQUIRE**

By:  /s/Mark D. Schwartz
       Mark D. Schwartz, Esquire (Pa ID #30527)
       300 Sandcastle Drive
       BRYN MAWR, PA 19010
       Telephone & Fax 610 525-5534
       Markschwartz6814@gmail.com

**THE PEARLMAN LAW FIRM, PLLC**

By:      /s/ Jason L. Pearlman
       Jason L. Pearlman, Esquire (Pa ID #93879)
       Two Bala Plaza, Suite 300
       Bala Cynwyd, PA 19004
       610-660-7793
       jpearlman@pearlmanlawfirm.com

DATED:  June 5, 2019                    *Attorneys for Plaintiff Michael McShane Sutton*

11

## VERIFICATION

I, Michael McShane Sutton, do hereby certify that I am the Plaintiff in the within action, and that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I do further understand that these statements are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

Michael McShane Sutton

Dated: June 5, 2019

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                            - - -

                             VOLUME II
ERIN DINGER,
                 Plaintiff
                                    CIVIL ACTION
       v                            NO. 19-CV-2324

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                 Defendants
```

**CERTIFIED TRANSCRIPT**

_____

```
WANDREA RUSSO,
                 Plaintiff
       v                            CIVIL ACTION
                                    NO. 19-CV-2408

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                 Defendants
```
_____

```
PENNY HUGHES,
                 Plaintiff
       v                            CIVIL ACTION
                                    NO. 19-CV-2417

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                 Defendants
```
_____

```
KAREN STEVENS,
                 Plaintiff
       v                            CIVIL ACTION
                                    NO. 19-CV-2418

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
                 Defendants
```

```
 1  CAPTION: Continued

 2  ALICIA McDANIEL,
                   Plaintiff
 3       v                         CIVIL ACTION
                                   NO. 19-CV-2419
 4
    BRYN MAWR BANK CORPORATION d/b/a
 5  BRYN MAWR BANK COMPANY,
                   Defendants
 6  _____
                                                        _
 7
    MICHAEL McSHANE SUTTON,
 8                 Plaintiff
         v                         CIVIL ACTION
 9                                 NO. 19-CV-2420

10  BRYN MAWR BANK CORPORATION d/b/a
    BRYN MAWR BANK COMPANY,
11                 Defendants

12

13

14            Continued video deposition of ALICIA

15  McDANIEL, taken on Wednesday, February 17, 2021,

16  held at the offices of Cozen O'Connor, 1650 Market

17  Street, Suite 2800, Philadelphia, Pennsylvania,

18  commencing at approximately 10:08 a.m., appearing

19  before Barbara McKeon Quinn, a Registered Merit

20  Reporter and Notary Public, pursuant to notice.

21

22

23

24

25
```

DINGER v BRYN MAWR BANK                                          Page 473
Alicia McDaniel - Volume II, 02/17/2021

```
 1   APPEARANCES:

 2   MARK D. SCHWARTZ, ESQUIRE
     markschwartz6814@gmail.com
 3   300 Sandcastle Drive
     Bryn Mawr, Pennsylvania  19010
 4   610-525-5534
     Counsel for Plaintiffs
 5

 6   COZEN O'CONNOR
     AARON KRAUSS, ESQUIRE
 7   akrauss@cozen.com
     1650 Market Street
 8   28th Floor
     Philadelphia, Pennsylvania  19103
 9   215-665-2000
     Counsel for Defendant
10
     ALSO PRESENT:
11
     LORI GOLDMAN, ESQUIRE (Via Videoconference)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              MR. SCHWARTZ:  I'll give this to you
 2   as McDaniel 1.
 3              COURT REPORTER:  Thank you.
 4   BY MR. SCHWARTZ:
 5   Q.    Did Laura Biernacki ever discuss these
 6   lawsuits with you?
 7   A.    Yes.
 8   Q.    Did she ever make any comment?
 9   A.    She's made several comments.  She's said
10   that I would not -- I would not win and that this
11   is all for -- for the money and that there was no
12   matter to my claims and that Bryn Mawr Trust has
13   hired the best legal counsel and that I had no
14   chance and that any claim that I made would be shut
15   down and I would be made out to be a liar.
16   Q.    When did she say this?
17   A.    She said this -- I don't recall the exact
18   date, but I know in dealings and talkings and even
19   with my leadership, particularly my managers, she's
20   made these statements to other colleagues within
21   the retail department.
22   Q.    Did she make any comment to you about how
23   she interacted with HR with respect to these
24   lawsuits?
25   A.    Correct.  She mentioned that HR has -- will
```



1  have her back, they will protect her at all costs,
2  because she is being led to say what they want her
3  to say.
4  Q.    What did you take her meaning to be when she
5  said because she would say what they wanted her to
6  say?
7  A.    Meaning that no matter how many claims I
8  brought forth, whatever she did, she would be
9  protected, because she diligently will flat out lie
10 for them.  She believed that she could do and say
11 whatever they want and that HR would back her,
12 because she had close relationships with HR.
13 Q.    Whose idea was it for you to be transferred
14 to Media?
15 A.    HR.  Particularly Nicola Fryer and Gina.
16 This is -- I received an e-mail stating that they
17 would temporarily transfer me to the Media branch.
18 Q.    Are you still at the Media branch?
19 A.    I am.
20 Q.    Is that still considered temporary?
21 A.    As of today, that's my permanent house.
22 Q.    When were you told that it would be your
23 permanent place of work?
24 A.    It was right around the time or shortly
25 after my previous manager, Frantz Excellent, came.



```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                       - - -

                             VOLUME I
ERIN DINGER,
              Plaintiff
                             CIVIL ACTION
       v                     NO. 19-CV-2324

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,            CERTIFIED
              Defendants           TRANSCRIPT
_____

WANDREA RUSSO,
              Plaintiff
                             CIVIL ACTION
       v                     NO. 19-CV-2408

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
              Defendants
_____

PENNY HUGHES,
              Plaintiff
                             CIVIL ACTION
       v                     NO. 19-CV-2417

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
              Defendants
_____

KAREN STEVENS,
              Plaintiff
                             CIVIL ACTION
       v                     NO. 19-CV-2418

BRYN MAWR BANK CORPORATION d/b/a
BRYN MAWR BANK COMPANY,
              Defendants
```

```
 1   CAPTION: Continued

 2   ALICIA McDANIEL,
                   Plaintiff
 3        v                        CIVIL ACTION
                                   NO. 19-CV-2419
 4
     BRYN MAWR BANK CORPORATION d/b/a
 5   BRYN MAWR BANK COMPANY,
                   Defendants
 6   _____

 7   MICHAEL McSHANE SUTTON,
                   Plaintiff
 8        v                        CIVIL ACTION
                                   NO. 19-CV-2420
 9
     BRYN MAWR BANK CORPORATION d/b/a
10   BRYN MAWR BANK COMPANY,
                   Defendants
11

12

13

14

15

16              Oral deposition of FRANTZ T.

17   EXCELLENT, taken on Friday, February 5, 2021, held

18   at the offices of Cozen O'Connor, 1650 Market

19   Street, Suite 2800, Philadelphia, Pennsylvania,

20   commencing at approximately 10:08 a.m., appearing

21   before Barbara McKeon Quinn, a Registered Merit

22   Reporter and Notary Public, pursuant to notice.

23

24

25
```



DINGER v BRYN MAWR BANK                                    Page 3
Frantz T.  Excellent, 02/05/2021

```
 1   APPEARANCES:

 2   MARK D. SCHWARTZ, ESQUIRE
     markschwartz6814@gmail.com
 3   300 Sandcastle Drive
     Bryn Mawr, Pennsylvania  19010
 4   610-525-5534
     and
 5   THE PEARLMAN LAW FIRM, PLLC
     JASON L. PEARLMAN, ESQUIRE
 6   (Via Videoconference)
     jpearlman@pearlmanlawfirm.com
 7   Two Bala Plaza, Suite 300
     Bala Cynwyd, Pennsylvania  19004
 8   610-660-7793
     Counsel for Plaintiffs
 9
     COZEN O'CONNOR
10   AARON KRAUSS, ESQUIRE
     akrauss@cozen.com
11   1650 Market Street
     28th Floor
12   Philadelphia, Pennsylvania  19103
     215-665-2000
13   Counsel for Defendant

14   ALSO PRESENT VIA VIDEOCONFERENCE:

15   Lori Goldman, Esquire
     Mr. Jerry Cary
16

17

18

19

20

21

22

23

24

25
```



AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

 1      A.        Yes.

 2      Q.        **In your opinion, do they take it**

 3   **seriously?**

 4      A.        You know, based on my observation --

 5   based on my observation and the fact that the

 6   event was happening there in real time with me, I

 7   didn't think so.

 8            I didn't think -- because if you put

 9   that in writing as policy, then a major complaint

10   like that regarding harassment and discrimination

11   should have been dealt with immediately.  One

12   phone call to HR and HR should have been there the

13   next day or the following day, something

14   immediate.  So there was nothing immediate

15   regarding this.

16      Q.        **Do you recall a meeting with Laura**

17   **Biernacki and Lindsay Saling that you had?**

18      A.        I've had a few of those.

19      Q.        **Okay.  Who is Lindsay Saling?**

20      A.        Lindsay Saling is Laura Biernacki's

21   immediate supervisor.  I forgot her title.

22      Q.        **And did there come a time when you**

23   **were issued a written warning or a memo warning?**

24      A.        Yes.

25      Q.        **Okay.  What was that all about?**

1  meet and greet.  She wanted Ms. Barbara Pope to

2  have a meet and greet with my employees and

3  myself.

4              So Ms. Pope sat down with me in the

5  conference room and she was telling me about the

6  responsibility of a leader and leadership.  So I

7  felt, wow, I just felt this is a little bit staged

8  here.  Right?  I just met you and all of a sudden

9  we're talking about the responsibility of

10 leadership and coaching and so forth from an HR

11 personnel I just met.

12             Okay.  So meet and greet.  A few

13 weeks later we had our managers meeting in Newtown

14 Square, at a branch in Newtown Square.  We get to

15 Newtown Square; they introduce Ms. Pope.

16             Ms. Pope says, you know, she has over

17 30 years of experience in HR with different

18 companies and so forth and she's learned a lot

19 about HR.  And so she started to talk about the

20 fine-tuning, the fine details of what it entails

21 to be an HR specialist.

22             And basically she said from my

23 experience, you have to understand, she said, I'm

24 not going to lie to you or sugar-coat this.  HR is

25 there to protect the interest of the company

```
 1  first.
 2              And we were like, Hmm, interesting.
 3  She said, I'm not going to lie to you.  It's the
 4  company that comes first.  We protect their
 5  interests first and then once we do that, anything
 6  else that comes with regard to personnel or
 7  anybody else, then we'll look into that, but our
 8  main goal -- so, she started going over certain
 9  fine points that were very interesting to Laura
10  Biernacki and Laura (sic) Saling and some of the
11  other managers that were there and we all were
12  very surprised that, you know, huh, oh, so these
13  are some of the fine secrets of HR.
14              So now Laura Biernacki had a
15  wonderful warm smile on her face that's just like
16  yes, this is the type of person that we need here
17  at Bryn Mawr Trust.
18              All right.  So that was our manager's
19  meeting.  And then a week later or a month later,
20  Ms. Pope was gone.  She had left.  No more
21  Ms. Pope.  I think she was there for approximately
22  six weeks.  She was gone.
23              When we asked, Where is Ms. Pope?
24  What was the reason we no longer have Ms. Pope?
25              Oh, Ms. Pope is no longer with HR.
```

| CHARGE OF DISCRIMINATION | | Agency | Charge Number |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form | | EEOC | APPENDIX A |

PENNSYLVANIA HUMAN RIGHTS COMMISSION and EEOC   530-2020-05866

| NAME *(Indicate Ms., Mrs., Mr.)* | HOME TELEPHONE |
|---|---|
| Ms. Laura Biernacki | (215) 817-8592 |

| STREET ADDRESS        CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 122 Cornerstone Drive, Newtown Square PA 19073 **Counsel address**: Joseph F. Schwartz, Esq. Silver and Silver, 42 W. Lancaster Ave. 3rd Floor Ardmore, PA 610-658-1900            jschwartz@silverandsilver.com | June 30, 1968 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one, list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS |
|---|---|
| Bryn Mawr Trust | More than 500 |

| STREET ADDRESS AND PHONE NUMBER | COUNTY |
|---|---|
| 801 Lancaster Ave. Bryn Mawr, PA 19010 | Montgomery |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(s=es))* ☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify)* | DATE DISCRIMINATION TOOK PLACE August 4, 2020 |
|---|---|

**THE PARTICULARS ARE** *(If additional space is needed, attach extra sheets)*

1. I was hired in January of 2018 as a as a Market Area Manager and my position was later changed to Regional Manager.

2. In April of 2018, I was contacted by an African American employee Wandrea Russo, who said she was being racially harassed by her manager. I contacted Nicola Fryer from Human Resources and advised that the manager be transferred. This request was denied and Ms. Russo quit shortly after that.

3. In or about August of 2018, I was interviewed by an attorney for Respondent regarding an employment discrimination claim brought by a terminated employee, Michael Sutton against Respondent. During the interview the attorney was trying to lead me from saying that I believed his medical situation could have been accommodated better.

4. In or about September of 2018, I spoke with Nicola Fryer in Human Resources and advised her that I was concerned that I was being pressured to give inaccurate testimony in the employment discrimination case.

5. Mary Venditti, who is in charge of training, would frequently discuss sexual stories during her presentations and also referred to people from Delaware County where I live, as "white trash." In January of 2020 I complained about these sexual and racial comments to Jerry Cary in HR and to Lindsay Saling who replaced Steve Novak as Senior VP in December of 2019. The best of my knowledge no action was taken about my complaints.



EXHIBIT
Biernacki 1
PENN0:3/26/21

PENGAD 800-631-6989

Confidential

6. My similarly situated co-worker, Ray Tuck, is an African American male who is also a regional manager supervised by Lindsay Saling. He told me after I was fired that he had been written up, given a chance to improve, and not terminated. I was never written up before I was terminated.

7. In December of 2019, I promoted an African American employee named Alicia McDaniel who is suing BMT for racial discrimination.

8. In the June and July of 2020, Jerry Cary, Retail's HR Business Partner (who is African American), asked me "have you called your black employees?" I asked for guidance about what he wanted me to do because of the racial discrimination lawsuits that were ongoing and an article in the Delaware County Times about how our bank President, Frank Leto, was not communicating properly with our African American employees. I wanted to make sure I didn't make anything worse or cause tension, but Mr. Cary would not provide me with any guidance. I believe he was trying to get me to say something about racial issues and then blame me for not doing it properly.

9. On or about July 31st, 2020. I received an email from Dave Kennedy, the manager of the Bryn Mawr branch, saying that I was going to Karaoke sing, "I'm the one that you want" from *Grease* if the branch made their loan goal. I never said I would do this or sing anything else. The email was sent to the entire branch. This was sexually inappropriate and I complained to Lindsay Saling about that email. I told Ms. Sailing I believed we should write him up, but she refused.

10. I was never written up before I was fired.  I had the highest performance ratings of any of the Regional Managers at the time Respondent terminated my employment. Ms. Sailing told me the reason for the termination was my management style, that I was "unapproachable" and that there were employee complaints. I was never informed of any employee complaints or given a chance to respond. When other managers have employee complaints there is a procedure where HR meets with the manager and discusses the complaints and how to respond. I was never given this opportunity.

11. By these and other acts. I believe that I have been discriminated against and retaliated against by the Respondents in a pattern of continuing and ongoing violations of any and all applicable federal, state and/or local statutes, regulations and ordinances, including but not limited to the Americans with Disabilities Act, the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act.

---

☒ I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date  9/1/2020          Charging Parties (*Signatures*) *Laura Biernacki*

---

Confidential

Revised 11/00

**Information For Complainants & Election Option
To Dual File With The
Pennsylvania Human Relations Commission**

Ms. Laura Biernacki _____ vs _ Bryn Mawr Trust _____

EEOC No. 530-2020-05866 _____

You have the right to file this charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") under the Pennsylvania Human Relations Act. Filing your charge with the PHRC protects your state rights, especially since there may be circumstances in which state and federal laws and procedures vary in manner which could affect the outcome of your case.

Complaints filed with PHRC must be filed within 180 days of the act(s) which you believe are unlawful discrimination. If PHRC determines that your PHRC complaint is untimely, it will be dismissed.

If you want your charged files with PHRC, including this form as part of your EEOC charge, with your signature under the verification below, will constitute filing with PHRC. You have chosen EEOC to investigate your complaint, so PHRC will not investigate it and, in most cases, will accept EEOC's finding. If you disagree with PHRC's adoption of EEOC's finding, you will have the chance to file a request for preliminary hearing with PHRC

Since you have chosen to file you charge first with EEOC, making it the primary investigatory agency, the Respondent will not be required to file an answer with PHRC, and no other action with PHRC is required by either party, unless/until otherwise notified by PHRC.

If your case is still pending with PHRC after one year of filing with PHRC, you have the right to file your complaint in state court. PHRC will inform you of these rights and obligations at that time.

**[Sign and date appropriate request below]**

I want my charge filed with PHRC. I hereby incorporate this form and the verification below into the attached EEOC complaint form and file it as my PHRC complaint. I request EEOC to transmit it to PHRC.

*I understand that false statements in this complaint are made subject to the penalties of 18 Pa.C.S. §4909, relating to unsworn falsification to authorities.*

_Laura Biernacki  9/1/2020_
Signature and Date

*I do not want my charge dual filed with PHRC.*

_____
Signature and Date



**Aaron Krauss**
Direct Phone    215-665-4181
Direct Fax  215-701-2381
akrauss@cozen.com

**Jason A. Cabrera**
Direct Phone    215-665-7267
Direct Fax  215-253-6797
jcabrera@cozen.com

October 22, 2020

**VIA EEOC RESPONDENT PORTAL**

Jamie Williamson
Equal Employment Opportunity Commission
801 Market Street,
Philadelphia, PA 19106

> Re:    **Laura Biernacki v. Bryn Mawr Trust**
> **EEOC Charge No. 530-2020-05866**
> **Position Statement of Respondent Bryn Mawr Trust Co.**

Dear Ms. Williamson:

This letter serves as the position statement of Respondent Bryn Mawr Trust Company ("BMT") with respect to the Charge of Discrimination filed by Laura Biernacki on September 1, 2020 and docketed at EEOC Charge No. 530-2020-05866. As set forth below, the Charge should be dismissed because Biernacki's allegations are both incorrect as a matter of fact and insufficient as a matter of law.

I.    Introduction

Biernacki was formerly employed as a Market Area Manager (also known as a Regional Manager) for BMT. Throughout her employment, BMT received numerous complaints from other employees about Biernacki's management style. These employees complained that Biernacki was rude, micro-managed them, and failed to maintain a positive and cooperative culture. BMT received so many complaints that it hired an executive coach with a focus on sensitivity for Biernacki. In July 2020, BMT HR received yet another complaint about Biernacki. The investigation conducted into this complaint revealed that the issues that had previously arisen with Biernacki's management style – and which had previously been brought to Biernacki's attention – persisted. After its investigation, BMT decided that, because none of its past efforts to help Biernacki improve her performance had been effective, further remedial efforts with Biernacki were futile. BMT therefore terminated Biernacki's employment.

Leaving aside the fact that most of the factual allegations in Biernacki's charge are false, even if they were true they would not suggest discrimination or retaliation of any kind, let alone discrimination on the basis of race, sex, or retaliation. Biernacki's Charge begins with a variety of misstatements about events that Biernacki claims took place in 2018. None of these "claims" are timely. Perhaps more importantly, none of these "claims" – even if true (which they are not) – involve discriminatory or adverse actions regarding Biernacki. The Charge next makes demonstratively false statements, such as Biernacki's claim that she "was never informed of any employee complaints." As BMT demonstrates in this statement, Biernacki was well aware that numerous employees have complained about her management style. After offering a variety of misleading and half-true allegations about her recent interactions with BMT supervisors and HR personnel, none of which involve discriminatory actions against her, Biernacki closes her Charge with a conclusory allegation of discrimination and retaliation, including an invocation of

One Liberty Place    1650 Market Street    Suite 2800    Philadelphia, PA 19103
215.665.2000    800.523.2900    215.665.2013 Fax    cozen.com



Jamie Williamson
October 22, 2020
Page 2

_____

the "Americans with Disabilities Act" even though she does not allege she has a disability.  Such allegations cannot state a claim.

II.      Background and Chronology of Key Events

BMT is an independent local bank and trust company, with its headquarters in Bryn Mawr, Pennsylvania. Established in 1889, BMT has branches in Pennsylvania, New Jersey and Delaware. Each branch has a local manager who reports to a regional manager; in turn, the regional manager reports to the head of retail banking. BMT prohibits discrimination or retaliation on the basis of age, race, sex, gender, or any other similar characteristics and BMT maintains a handbook to emphasize these values. See Exhibit A.

Biernacki was hired as a market area manager in December 2017.  In this role, Biernacki supervised bank branch managers and was responsible for furthering BMT's values.  These values include a collaborative work environment where individual employees feel valued.  In September 2018—that is, after the first three "allegations" listed in her Charge—BMT promoted Biernacki to Vice President and Region 2 Manager. The promotion included a raise and a new supervisor, Lindsay Saling (a white female). This promotion directly refutes any suggestion that BMT discriminated or retaliated against Biernacki prior to September 2018.

In late September 2018, one of Biernacki's branch managers (Frantz Excellent) sent Biernacki and BMT HR an "urgent" email demanding an immediate meeting with Biernacki, her supervisor (Lindsay Saling) and human resources.  See Exhibit B. Excellent explained in his email that he needed to express the "strong concerns" that his branch employees had about Biernacki, but he did not identify the specific complaints. Separately, however, Excellent forwarded a copy of the complaints he received directly to Biernacki.  See Exhibit C. Biernacki, who was obviously aware of these complaints about her management style, forwarded Excellent's email to HR later that day.  See Exhibit C.

BMT conducted an investigation into the issues raised by these complaints, speaking with seven employees between September 25 and September 27. One of the branch employees who spoke with Biernacki by phone on September 21 reported that Biernacki's call made her feel like she was being treated like a child and that she thought Biernacki "was out to get them all." See Exhibit D at p. 2 & 3. Another employee, a female manager in a different branch than Excellent, reported that Biernacki made her feel nervous and managed by causing fear. See Exhibit D at p. 4. As a result, she said she had difficulty working with Biernacki.  See Exhibit D at p. 4. BMT also interviewed Biernacki as part of its investigation, and Biernacki confirmed that she made calls to branch employees and, although she had a different perception of the impact of her words, she agreed that her subordinates were accurately describing the conversations. The investigation concluded that, while there was no support for any suggestion that Biernacki had discriminated against any employee, Biernacki should receive additional training and coaching on her communication skills because some of what she communicated to her staff was perceived as not appropriate or negative.  See Exhibit D at p. 5.

As a result, BMT engaged Mosteller & Associates, Inc. in December 2018 to find an executive coach with a focus on sensitivity for Biernacki. Biernacki had five separate sessions with the executive coach throughout the first half of 2019. As part of these coaching sessions, Biernacki received "a personalized report that provided her with strategies to better understand and interact with her colleagues" and discussed "strategies for dealing with colleagues that challenge her because of style/approach and/or non-performers." Exhibit E. On July 29, 2019, Biernacki reported that she feels "she has a good foundation on communication to move forward" and "no longer needs to meet regularly" with the executive coach.  See Exhibit E.

Confidential

Jamie Williamson
October 22, 2020
Page 3

Unfortunately, Biernacki's assessment of her communication skills was inaccurate. On the same day that Biernacki reported to the executive coach that she was ready to move on, one of Biernacki's subordinates met with Biernacki's supervisor (Lindsay Saling) to express concerns about Biernacki's poor management style, and condescending, demeaning and disrespectful communication style. At the end of August 2019, as this employee was voluntarily resigning from BMT, she again complained about the poor leadership, nepotism, and favoritism in the region run by Biernacki. In an interview to follow-up on her complaints, this employee described that Biernacki, following the death of the employee's mother and a one-week period of bereavement leave, met with the employee to inform her that the employee had only one week left of PTO which would have to stretch for the remainder of the year and that the bank would not allow any unpaid time off. The employee found Biernacki's comments to be "hurtful and not humane." Exhibit F.

Over the following months, BMT continued to receive reports of Biernacki's troubling management style. In April 2020, Biernacki's supervisor (Lindsay Saling) had a "feedback and expectation setting meeting" with Biernacki. Saling discussed how current and former employees continue to express that they are fearful of getting on Biernacki's "bad side" and that they are concerned about being placed on corrective actions following their interactions with Biernacki. See Exhibit G. In order to coach Biernacki on these issues, Saling instructed Biernacki to attend the training session on implicit bias that BMT offered as part of its diversity and inclusion initiative and then to have a follow-up meeting with Saling. See Exhibit G. Saling also determined that that one of Biernacki's goals for 2020 would be "the development of a plan to shift the team atmosphere / culture of your Region to better align with the direction of the BMT Cultural Evolution." Exhibit G. Finally, Saling informed Biernacki that it is "critical that we see a broadening of your leadership skills in order to improve upon the team atmosphere in your region." Exhibit G.

In July 2020, shortly after Biernacki's feedback and expectation setting meeting, BMT HR received another complaint about Biernacki. Although BMT determined that the complaint was unfounded, BMT received troubling feedback about Biernacki during the course of its investigation. Specifically, one of Biernacki's subordinates reported that he had a negative working relationship with Biernacki, that he did not think he could remain employed at BMT for very much longer if Biernacki's management styled continued as-is, and that members of his branch staff became upset when Biernacki called. See Exhibit H. This employee also reported conversations with other employees on his level where everyone voiced concerns about Biernacki, ranging from "does [Biernacki] actually care about us?" to being degraded and micro-managed by Biernacki, to having one employee report that Biernacki "screamed" at the employee and did not let the employee "finish a thought before [Biernacki] just started screaming." Exhibit H.

At the conclusion of its investigation, BMT decided that any further efforts to guide or coach Biernacki were useless and that Biernacki could no longer be employed at BMT. Accordingly, Saling terminated Biernacki on August 4, 2020. In the termination meeting, Biernacki stated that she "thought everything was fine" and felt she had not been given "a warning of any kind." The fact that Biernacki would say that she thought "everything was fine" in August 2020—despite numerous, repeated efforts by her supervisor and BMT to counsel her, including an April 2020 meeting where her supervisor told her that some of her subordinates were fearful of her and that it was "critical that we see a broadening of your leadership skills in order to improve upon the team atmosphere"—demonstrates that Biernacki was utterly failing in her role as a manager.

Jamie Williamson
October 22, 2020
Page 4

III.   Statement of Position

    A.    *Biernacki's Allegations in the Charge are False or Misleading*

Biernacki's Charge consists of eight substantive paragraphs, all of which contain false or misleading statements, and none of which support a claim of discrimination or retaliation.

In paragraph 2, Biernacki alleges that she received a complaint of racial discrimination from Wandrea Russo in April 2018, that Biernacki contacted BMT HR and asked that Russo's manager be transferred, that her request was denied, and that Russo quit shortly after that. None of those allegations are true. On April 19, 2018, Biernacki did contact BMT HR in order to seek guidance on dealing with tension between Russo and her then-supervisor, Therese Trainer. Biernacki's request did not include or mention a claim of racial discrimination. In response to Biernacki's request, BMT HR held a meeting with Biernacki and Russo the following day. In that meeting, Russo described a "deterioration" of her relationship with her supervisor. Only at the end of the meeting did Russo allege that she had been subjected to inappropriate racial comments. BMT conducted an investigation into all of these allegations. Contrary to the allegation in the Charge, BMT re-assigned Trainer to a different branch in July 2018 and told her that she would need to attend additional (sensitivity) training; Trainer resigned shortly thereafter. Contrary to the allegation in the Charge, Russo did not quit "shortly" after this event. Russo continued as an BMT employee through May 2019 – more than a year after the April 2018 meeting. In addition to being incorrect, Biernacki does not connect any of the allegations in paragraph 2 of her Charge to any adverse action against her.

The allegations in paragraphs 3 and 4 of the Charge are also false and misleading. In these paragraphs, Biernacki alleges that she was interviewed by an attorney for BMT and that she felt she was pressured to give inaccurate testimony. Although Biernacki was interviewed as part of an investigation into an employee's complaints, the attorney who spoke with her did not pressure her or lead her to provide particular recollections. BMT HR met with Biernacki on September 27, 2018 (outside the presence of the attorney) to reiterate that it was critical for Biernacki to give accurate answers during interviews, to explain why BMT asked outside counsel to conduct the interviews, and to allow Biernacki to explain if she felt pressured to make certain statements. Biernacki told BMT HR that the pressure she felt did *not* come from the attorney but, instead, was because she knew there were ways to answer the questions which would put the bank in the best light. BMT asked Biernacki directly if she was ever directed or pressured not to report accurate facts, or to report situations in a certain way, in any of the interviews by HR, supervisors, BMT attorneys, or anyone else. Biernacki answered directly and confidently with "no." In addition to being false, Biernacki (again) does not connect these September 2018 allegations to any adverse action against her or her August 2020 termination.

The allegations in paragraph 5 are similarly false and misleading. In this paragraph, Biernacki claims that Mary Venditti offered "sexual stories during her presentations" and referred to people from Delaware County as "white trash." The Charge does not, however, allege *when* those statements were allegedly made. This critical omission makes it difficult for BMT to respond and makes it impossible for Biernacki to show that these alleged comments were made within the 300-day statute of limitations. Venditti has been a trainer at BMT for five years and came to BMT with years of experience in HR training. The allegation that Venditti offered "sexual stories during her presentations" is particularly incredible because Venditti regularly conducts trainings on sexual harassment and discrimination. To avoid any doubt, BMT denies any allegation that Venditti offered "sexual stories" that were inappropriate during training. In addition, even if Venditti had referred to people from Delaware County as "white trash,"

Confidential

BMT 1009914

Jamie Williamson
October 22, 2020
Page 5

---

(something BMT denies), "people from Delaware County" are not a protected group. Once again, Biernacki does not connect this alleged incident to any adverse action against her.

Although Biernacki purported to identify a comparator in paragraph 6, even a cursory examination demonstrates that a comparison would be inappropriate. Specifically, Biernacki alleges that she is similarly situated to Ray Tuck, an African American regional manager, who allegedly told her that he had been "written up, given a chance to improve, and not terminated" but that she was not written up before termination. Biernacki is not similarly situated to Tuck because, among other reasons, BMT has not been advised by other employees that they are going to leave BMT because of Tuck's management style, and Tuck has not been the subject of numerous employee complaints. By contrast, numerous employees have informed BMT of their complaints about Biernacki or stated how they left or would leave the bank if her management style did not change. Contrary to her allegation, Biernacki was "written up," and was given multiple chances to improve her behavior. See, e.g., Exhibits D, E, I. Indeed, BMT went so far as to hire an executive coach with a focus on being sensitive to the needs of others and the impact of actions on them in an effort to help Biernacki improve.

In paragraph 8, Biernacki alleges that Jerry Cary (BMT HR) asked her if she had called her Black employees but would not provide her with guidance. Cary did send an email on July 9, 2020 to five employees – including Biernacki – with three questions as a "follow-up to what we discussed at the leadership team meeting." Exhibit I. Cary did *not* ask Biernacki specifically if she had called her Black employees; instead, he sent a group message to numerous supervisors. One of the questions Cary asked was: "After reading the articles [on diversity] have you taken any proactive steps to reach out to your teams and/or Black employees specifically?" Exhibit I. There is nothing improper about this question. When Biernacki replied to the email, she related the steps she took and, at the end, stated that she had not reached out directly to her Black employees to discuss the articles and would "prefer a script of some sort and am concerned in one case that this call would need to be scripted." Exhibit I. Nothing in Biernacki's email reply suggests that she thought Cary was "trying to get [her] to say something about racial issues and then blame [her] for not doing it properly." Nor did Biernacki complain to Cary about his email. And, once again, Biernacki does not connect these events to any adverse action against her.

In paragraph 9, Biernacki asserts that an email one of her subordinates (David Kennedy) sent to his branch in July 2020 was "sexually inappropriate" and that she complained about that email to her supervisor. In fact, the email from Mr. Kennedy stated:

> Laura will sing a karaoke tune here for us if we get to our Loan Goal this quarter, but being as astute as she is, she Made me Commit to Making it a Duet if this team can pull this off. So Laura and I will do either the classic Sonny and Cher "I've Got You Babe" , Huey Lewis and Gwenneth Paltrow's version of "Cruisin'", or the all time classic from the Grease Soundtrack "You're the One That I Want." To see us do this, we simply need to achieve our Loan Goal in Q3, or, I'm adding an additional chance, wait for it wait for it..... If Team Bryn Mawr Can hit 200% of our Credit Card Goal, with every member of the team having at least 1, we will do this for you!

Exhibit J. The email therefore suggested a karaoke song involving *both* the branch manager and Biernacki. Additionally, the song choices were not "sexually inappropriate," and the email was plainly an effort by the branch manager (her subordinate) to incentivize his workforce to exceed the listed goals rather than an attempt to change the terms or conditions of Biernacki's employment on the basis of sex. Although Biernacki complained about this email to her supervisor, Biernacki did not complain that the email was "sexually inappropriate." Instead,

BMT 1009915

Jamie Williamson
October 22, 2020
Page 6

Biernacki wrote that she was concerned about the email, she thought it was inappropriate, and she "also attached an email that is disrespectful to [BMT CEO] Mr. Leto." Exhibit J. Thus, Biernacki's contemporaneous concern was *not* that the email from Kennedy was sexually inappropriate or discriminatory at all, but that Kennedy used disrespectful language generally, including language that Biernacki thought was disrespectful to the bank's (male) CEO. Nothing about this allegation suggests discrimination on the basis of sex/gender or retaliation, and nothing in the Charge links this email or complaint to any adverse action against Biernacki.

Finally, Biernacki alleges that she was never written up, was never informed of employee complaints, and never given the opportunity to respond to employee complaints. As this statement shows, these allegations are false. Biernacki's belief that she was never informed of employee complaints and never given the chance to improve is either an outright lie or an admission that she utterly failed in her role as a manager to understand the instructions from her supervisors and/or to comprehend the antagonistic relationships she had with her subordinates.

B.   *Biernacki's Charge is Insufficient as a Matter of Law*

On its face, Biernacki's Charge is insufficient as a matter of law because it does not set forth sufficient – or indeed any – allegations of discrimination, harassment, or retaliation. The Charge should therefore be dismissed.

The Commission is required to dismiss charges that fail to state a cognizable claim under Title VII. "When a charge on its face, or as amplified by the statements of the person claiming to be aggrieved discloses...that the charge and every portion thereof...fails to state a claim under Title VII,...the Commission shall dismiss the charge." 29 C.F.R. § 1601.8(a).

The charging party bears the burden of establishing a *prima facie* case. See Burton v. Teleflex, Inc., 707 F.3d 417, 425-26 (3d Cir. 2013). To do so, a claimant must "demonstrate that the adverse employment action that [s]he suffered was due to discrimination in the form he alleges." DeSantis v. N.J. Transit, 756 F. App'x 197, 202 (3d Cir. 2019). For age, race, and gender claims, this includes showing that the adverse action "occurred under circumstances that give rise to an inference of unlawful discrimination." DeSantis, 756 F. App'x at 202. For disability discrimination, a party must also show that she was a qualified individual with a disability – that is, suffered from an impairment that substantially limited a major life activity – and suffered an adverse action because of that disability. See McNelis v. Pa. Power & Light Co., 867 F.3d 411, 414 (3d Cir. 2017). To state a *prima facie* case for retaliation, a charging party must establish that she engaged in protected activity, adverse action by the employer either after or contemporaneous with the protected activity, and a causal connection between the protected activity and the adverse action. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015).

Biernacki's Charge fails to even suggest, let alone establish, any of these elements.

To the extent Biernacki is asserting a violation of the ADA,[1] her Charge fails to show that she meets the definition of a qualified individual with a disability. Biernacki's Charge includes no

---

[1] Biernacki alleges in paragraph 11 of her Charge that she believed she was discriminated against by BMT in violation of "any and all applicable federal, state, and/or local statutes, regulations, and ordinances, including but not limited to the Americans with Disabilities Act..." But, on page 1 of her Charge, Biernacki does not check off the "disability" box for the basis of the alleged discrimination. It is thus unclear if Biernacki intends to advance a claim that she was discriminated against in violation of the ADA, or not.

Confidential

Jamie Williamson
October 22, 2020
Page 7

allegation of any physical or mental impairment of any kind.  Such a showing is required to show a "disability" under the law.  Biernacki also fails to suggest that she engaged in any activity protected by the ADA, such as asking for a reasonable accommodation to modify some policy or practice.  Thus, Biernacki's Charge is insufficient to state a claim for discrimination or retaliation on the basis of disability.

To the extent Biernacki is asserting retaliation under Title VII, her Charge fails to establish that she engaged in protected activity.  An informal complaint to management "must allege that the opposition [of the employee making the complaint] was to discrimination based on a protected category, such as age or race."  Daniels, 776 F.3d at 193.  In order to qualify, the person complaining must have an objectively reasonable belief that the activity opposed was unlawful discrimination under the relevant statute.  See Daniels, 776 F.3d at 193.  In Clark County School District v. Breeden, 532 U.S. 268 (2001), the Court held that a female employee's complaint about a joke made by two male co-workers when reviewing applications was not protected activity for purposes of a retaliation claim because "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' " so as to violate Title VII, and the single incident described by the employee could not remotely satisfy the standard.  See Clark, 532 U.S. at 271.  As set forth above, Biernacki's Charge shows that none of her alleged complaints were for conduct that she thought was "discrimination based on a protected category."

To the extent Biernacki is asserting an adverse employment action for anything other than her August 2020 termination, she fails to satisfy the requirement for an adverse action.  An adverse employment action for a discrimination claim requires a significant change in employment status, such as a termination, failure to promote, reassignment, or a significant change in benefits.  See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152-53 (3d Cir. 1999) (citing Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 759-60 (1998)); Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 328 (3d Cir. 2015).  "It is well-established that Title VII is not violated by the 'mere utterance of an ... epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment."  Gresham v. Del. Dep't of Health & Soc. Servs., 821 F. App'x 146, 151 at n.4 (3d Cir. 2020) (citing and quoting Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 280 (3d Cir. 2001)).  "Minor annoyances that many employees have endured in the workplace" and "workplace gossip, and disparaging comments, do not rise to the level of a materially adverse employment action."  Clarkson v. SEPTA, 700 F. App'x 111, 115 (3d Cir. 2017) (citation omitted) (retaliation case).

Other than her termination, Biernacki never identifies any adverse employment action.  The comments that she alleges were inappropriate from Mary Venditti or David Kennedy are nothing more than "minor annoyances" or "disparaging comments" that did not generate a "significant change" in her employment status.  Even if Biernacki was offended at those comments, and there is nothing other than her post-hoc allegations in the Charge to suggest that these comments were made or that Biernacki was actually offended by them, an employee hearing comments that generate "offensive feelings" or are discourteous or rude do not violate Title VII.  See Gresham, 821 F. App'x at 151 n.4.  Biernacki offers no support for her speculation that Cary was going to "blame" her if she did not "properly" reach out to her Black employees after a management meeting, and Cary's email makes clear that he asked a general question of five different managers to see if they had "taken any proactive steps to reach out to your teams and/or Black employees specifically?"  Exhibit I.  The remaining allegations in the Charge do not contain any facts or suggestion that any action was taken against Biernacki at all.  Thus, those paragraphs do not support her obligation to show an adverse employment action.

Confidential

Jamie Williamson
October 22, 2020
Page 8

_____

Finally, Biernacki's termination cannot support a claim under Title VII or the ADA because she cannot (and does not) allege facts that suggest any inference of discrimination or retaliation. This prong requires some evidence from which a factfinder can conclude that the employer is treating others outside of the protected class differently from the plaintiff.  See, e.g., Gethers v. PNC Bank, 813 F. App'x 746, 749 (3d Cir. 2020) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003)).  Biernacki offers nothing in her Charge to support this element.  Her termination occurred in August 2020, well after many of the allegations made in the Charge. The only recent events described in the Charge, a complaint about Cary's email July 2020 and of Kennedy's email on July 31, 2020, do not contain any facts or evidence that would suggest any connection at all to Biernacki's termination in August 2020.

Biernacki was terminated in August 2020 after BMT HR had received yet another complaint about her management style and, in the course of that investigation, received complaints from yet another employee about Biernacki's demeanor, micro-managing of her subordinates, and rude behavior.  This employee even told BMT HR of his intent to leave BMT if Biernacki's management style did not change.  In light of BMT's numerous unsuccessful efforts to counsel and improve Biernacki's management style, including hiring an executive coach with a focus on sensitivity for Biernacki, BMT made the decision to terminate Biernacki.  This decision was not based on any inappropriate or improper motivation.  On the contrary, it was based on Biernacki's continued failure to improve her management style and communication skills.

IV.   Conclusion

Biernacki's allegations of discrimination and retaliation are false as a matter of fact and insufficient as a matter of law.  BMT has not discriminated or retaliated against Biernacki in any way.  The record is replete with instances in which Biernacki was informed of employee complaints against her and was given the opportunity to improve her performance.  Biernacki failed to do so.  As a result, and for all of the reasons set forth above, the Commission should dismiss the Charge.[2]

Respectfully yours,

COZEN O'CONNOR

By:   Aaron Krauss
      Jason A. Cabrera

_____

[2]      BMT is pleased to cooperate with the Commission by submitting this position statement, but by doing so does not waive its rights to present any new, different, or additional facts in relation to this Charge. BMT specifically reserves the right to amend, modify, or supplement the information provided here during this investigation or in any subsequent proceeding, and/or to submit factual information or evidence related to any and all relevant facts and issues, whether addressed in this letter or not, at any later proceeding (in this matter or related matters).

                                                                 BMT 1009918

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ERIN DINGER,

               Plaintiff,

      v.

THE BRYN MAWR TRUST COMPANY,

               Defendant.

:
:  CIVIL ACTION
:  NO. 19-CV-2324
:  JURY TRIAL DEMANDED
:
:
:
:
:
:
:

---

WANDREA RUSSO,

               Plaintiff,

      v.

THE BRYN MAWR TRUST COMPANY,

               Defendant.

:
:
:  CIVIL ACTION
:  NO. 19-CV-2408
:  JURY TRIAL DEMANDED
:
:
:
:
:

---

PENNY HUGHES,

               Plaintiff,

      v.

THE BRYN MAWR TRUST COMPANY,

               Defendant.

:
:  CIVIL ACTION
:  NO. 19-CV-2417
:  JURY TRIAL DEMANDED
:
:
:
:
:

---

KAREN STEVENS,

               Plaintiff,

      v.

THE BRYN MAWR TRUST COMPANY,

               Defendant.

:
:  CIVIL ACTION
:  NO. 19-CV-2418
:  JURY TRIAL DEMANDED
:
:
:



EXHIBIT

Biernacki 3

PENGAD 800-631-6989

nemo 3/26/21

ALICIA MCDANIEL,              :

                      :    CIVIL ACTION
          Plaintiff,    :    NO. 19-CV-2419
      v.               :    JURY TRIAL DEMANDED
THE BRYN MAWR TRUST COMPANY,  :

        Defendant.    :

                      :

                      :

                      :

---

MICHAEL MCSHANE SUTTON,     :

                      :    CIVIL ACTION
          Plaintiff,    :    NO. 19-CV-2420
      v.               :    JURY TRIAL DEMANDED
THE BRYN MAWR TRUST COMPANY,  :

        Defendant.    :

                      :

                      :

                      :

---

## DEFENDANT BRYN MAWR TRUST COMPANY'S RESPONSE
## TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant The Bryn Mawr Trust Company ("BMT") responds to Plaintiffs' First Set of

Interrogatories as follows:

    1.    Kindly provide the identity and contact information for the attorney referenced in paragraph 3 of BMT bates stamped document 1009908 consisting of the first page of a Charge of Discrimination signed by Ms. Laura Biernacki.

    **ANSWER:**    BMT objects to this interrogatory because it was served on February 25, 2021.  Under Rule 33(b)(2)[1], BMT has 30 days (i.e. until March 27, 2021) to respond to this interrogatory.  Indeed, the interrogatory itself states that BMT has 30 days to respond.  Because March 27 falls on a Saturday, a response to this interrogatory is not due until Monday, March 29, 2021.  On November 18, 2020, the Court ordered that all discovery be completed by March 26, 2021.  As a result, this interrogatory was not served in a timely fashion, and BMT is under no obligation to respond.  Subject to, and without waiver of, the foregoing objections, BMT states

---

[1] Plaintiffs' interrogatory "requests Defendant to respond to the following Interrogatory pursuant to Federal Rule of Civil Procedure 34."  Rule 34 governs requests for production.  BMT has no obligation to respond to an interrogatory under Rule 34.  BMT responds pursuant to Rule 33, which governs interrogatories.

that the attorney to whom Biernacki referred in paragraph 3 of her EEOC charge was Sionne C. Rosenfeld.  In August of 2018, Attorney Rosenfeld practiced at Cozen O'Connor.  In November of 2018 Attorney Rosenfeld left Cozen and took an in-house position with Georgetown University.  Attorney Rosenfeld's current contact information is Sionne C. Rosenfeld, Esquire, Associate Counsel, Office of General Counsel, Georgetown University, 37th and O Streets, N.W., 202 Healy Hall, Washington, D.C. 20057-1246, 202-527-4502, sionne.rosenfeld@georgetown.edu.

                                        COZEN O'CONNOR

Dated:  March 12, 2021                  BY:_____
                                        Aaron Krauss (62419)
                                        Harper S. Seldin (318455)
                                        One Liberty Place
                                        1650 Market Street, Suite 2800
                                        Philadelphia, PA  19103
                                        215-665-4181
                                        akrauss@cozen.com
                                        Attorneys for Defendant The Bryn Mawr
                                        Trust Company

3

## **VERIFICATION**

I, Linda Sanchez, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

foregoing DEFENDANT BRYN MAWR TRUST COMPANY'S RESPONSE TO

PLAINTIFFS' FIRST SET OF INTERROGATORIES is true and correct, to the best of my

knowledge, information and belief.

Executed on March _4, 2021                           _____

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on this date, I caused a true and correct copy of DEFENDANT THE BRYN

MAWR TRUST'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES to be

served upon the following via email:

Mark D. Schwartz, Esquire
300 Sandcastle Drive
Bryn Mawr, PA 19010
(610) 525-5534
markschwartz6814@gmail.com

Jason L. Pearlman, Esquire
The Pearlman Law Firm, PLLC
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004
(610) 660-7793
jpearlman@pearlmanlawfirm.com

Dated:  March 12, 2021                              BY: _____
                                                                    Aaron Krauss (62419)

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release is entered into as of January 26,

2021 by Laura Biernacki and The Bryn Mawr Trust Company.

1.      "BIERNACKI" as used herein shall mean Laura Biernacki, the plaintiff in

the LITIGATION, together with each and every one of her relations, heirs, executors,

administrators, representatives, agents, trusts, insurers and assigns, and each and every

corporation, partnership, or other business entity in which Laura Biernacki has more than a 5%

interest.

2.      "BMT" as used herein shall mean and include (a) The Bryn Mawr Trust

Company, the defendant in the LITIGATION, and each and every one of its predecessors,

successors (by merger or otherwise), parents (including but not limited to Bryn Mawr Bank

Corporation), subsidiaries, affiliates, and assigns; and (b) the directors, officers, employees,

shareholders, members, representatives, agents and insurers of BMT, PROVIDED HOWEVER

that BIERNACKI is not included in the definition of BMT.

3.      "LITIGATION" as used herein shall mean and include the action

captioned Laura Biernacki v. The Bryn Mawr Trust Company, EEOC No. 530-2020-5866.

4.      In full and complete settlement of the claims which were or could have

been made by BIERNACKI against BMT, in the LITIGATION or otherwise, and intending to be

legally bound hereby, BIERNACKI and BMT hereby enter into and agree to be bound by the

terms of this Settlement Agreement and General Release.



EXHIBIT

Biernacki 4

BMC 3/26/21

(d)    Laura Biernacki agrees to sign the engagement letter attached as Exhibit A hiring Cozen O'Connor to represent her with respect to the matters set forth in paragraph 5(c), and to waive any conflicts that could arise out of that representation; and

(e)    BIERNACKI does hereby expressly, conclusively, absolutely, unconditionally and irrevocably forever remise, release, waive and discharge BMT of and from any and all manner of actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, mortgages, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, obligations and demands of whatsoever nature, civil or criminal, in law, in equity, or in admiralty, direct or indirect, known or unknown, suspected or unsuspected, matured or not matured, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen or otherwise, including for contribution and/or indemnity and for interest, costs and/or attorneys' fees, that BIERNACKI ever had or now has against BMT, including, but not limited to, (i) those with respect to any and all matters alleged or which could have been alleged, irrespective of jurisdiction or venue, in the LITIGATION, or which could have been alleged in a court following the withdrawal or dismissal of the Charge filed in the LITIGATION, (ii) those arising out of or related to the contracts, transactions, actions, omissions, events, facts or occurrences upon which the LITIGATION is based, (iii) those arising out of or related to her employment by BMT, and/or (iv) claims and/or claims for benefits to which she may be entitled under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA"), claims for benefits to which she may be entitled under the Age Discrimination in Employment Act, as amended, or the Older Workers Benefit Protection Act, which prohibit age discrimination in employment, the Family and Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act of

1964, as amended, which prohibits discrimination in employment based on race, color, creed, national origin or sex, the Equal Pay Act, which prohibits paying men and women unequal pay for equal work, the Americans with Disabilities Act of 1990, which prohibits discrimination against qualified disabled persons, the Pennsylvania Wage Payment and Collection Laws, the Pennsylvania Human Relations Act or any other federal, state or local laws or regulations prohibiting employment discrimination or which otherwise regulate employment terms and conditions, PROVIDED HOWEVER that BIERNACKI does not release any claims to enforce this Settlement Agreement and General Release.

6.      While BIERNACKI is not prohibited from communicating or cooperating with the Equal Employment Opportunity Commission, the Securities and Exchange Commission, or with any other governmental agency, should any charge, lawsuit, complaint, or other claim be filed in her name or on her behalf by or with any governmental agency or organization or in any other forum, against any of the persons released herein, based upon any act or event released herein, BIERNACKI will not seek or accept any personal relief based upon such charge, lawsuit, complaint, or other claim, including but not limited to an award of monetary damages or reinstatement to employment.

7.      BIERNACKI covenants and agrees never to commence or prosecute against BMT any charge, action, lawsuit or other proceeding based upon any claims, circumstances, demands, causes of action, damages, liabilities, charges, complaints, suits or controversies which are the subject of this Settlement Agreement and General Release or which arise from or relate or refer in any way to her employment or other relationship with BMT, the LITIGATION, or the contracts, transactions, actions, omissions, events, facts or occurrences upon which the LITIGATION is based, including but not limited to a lawsuit based upon the

issuance of a "Right to Sue" notice by the EEOC issued in relation to the LITIGATION.

BIERNACKI acknowledges that this Settlement Agreement and General Release is in Settlement

of her claims, and agrees that she shall not be able to recover, and she expressly waives any right

of recovery to, any monetary benefits in connection with his claims, or any lawsuit,

investigation, complaint, administrative complaint or other proceeding related thereto, or

resulting therefrom, or any other proceeding relating to any claim released in this Settlement

Agreement and General Release.  Nothing contained herein limits any right BIERNACKI may

have to:  (a) file a charge or complaint with the Securities and Exchange Commission ("SEC"),

the Financial Industry Regulatory Authority ("FINRA"), or any other securities regulatory

agency or commission; or (b) receive an award for information provided to the SEC, FINRA or

similar securities regulatory government agency or commission.

        8.     For and in consideration of the terms, promises and covenants contained in

this Settlement Agreement and General Release, and intending to be legally bound hereby,

        (a)     BMT agrees to pay (or cause to be paid) the sum of Two-

Thousand-Five-Hundred Dollars ($2,500.00) to Joseph F. Schwartz, Esquire, of the firm of

Silver & Silver, 42 W. Lancaster Avenue, Third Floor, Ardmore, PA 19003, within thirty days of

the date the last signature is affixed to this Settlement Agreement and General Release.  This

amount will be reportable on form 1099 Misc. to Joseph F. Schwartz, Esquire, of the firm of

Silver & Silver, 42 W. Lancaster Avenue, Third Floor, Ardmore, PA 19003, and to

BIERNACKI.  BMT makes no representations as to the tax consequences (if any) of this

payment; and

(b)     BMT agrees to sign the engagement letter attached as Exhibit A agreeing to pay Cozen O'Connor's fees to represent Laura Biernacki with respect to the matters set forth in paragraph 5(c).  BMT expressly disclaims any obligation (and BIERNACKI agrees that BMT has no obligation) to pay for any other attorney to represent Laura Biernacki.

9.     It is the intention of BIERNACKI and BMT in executing this Settlement Agreement and General Release that this Settlement Agreement and General Release shall be deemed effective as a full and final accord and satisfaction, general release, settlement and covenant not to sue.  BIERNACKI and BMT acknowledge they are aware that they might discover facts in addition to or different from those they know or believe to be true with respect to the subject matter of this Settlement Agreement and General Release, but that it is their intention hereby to fully, finally, and forever settle and release any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, mortgages, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, obligations and demands of whatsoever nature, civil or criminal, in law, in equity, or in admiralty, direct or indirect, known or unknown, suspected or unsuspected, matured or not matured, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen or otherwise, including for contribution and/or indemnity and for interest, costs and/or attorneys' fees, which do now exist, may exist, or heretofore have existed between BIERNACKI as plaintiff and BMT as defendant, and that in furtherance of such intention, this Settlement Agreement and General Release shall be and will remain in effect as a full and complete general release notwithstanding the discovery by BIERNACKI or BMT of the existence of any such additional or different facts.

10.     BIERNACKI and BMT agree that Rule 229.1 will not apply to this Settlement Agreement and General Release.

11.     BIERNACKI and BMT agree to sign such additional documents, and give such further assurances, as are reasonably required to effect the intent and purpose of this Settlement Agreement and General Release.

12.     The entry of this Settlement Agreement and General Release by BIERNACKI and BMT does not constitute an admission by BIERNACKI or BMT of any liability, wrongdoing, or fault with respect to claims that were made or could have been made by BIERNACKI or BMT in the LITIGATION or with respect to any matter arising out of the transactions or occurrences upon which the LITIGATION is based.  On the contrary, BIERNACKI and BMT are entering this Settlement Agreement and General Release solely in order to settle claims whose merits they strenuously deny and to avoid the expense and annoyance of further litigation.  Accordingly, BIERNACKI and BMT expressly deny all liability, wrongdoing, and fault.

13.     BIERNACKI acknowledges that she has been advised to consult with (and by this writing BMT advises her to consult with), and has consulted with, an attorney prior to executing this Settlement Agreement and General Release.  BIERNACKI further acknowledges that she has had a reasonable period of time (in excess of 21 days) to review and consider this Settlement Agreement and General Release, and that her agreement to execute this document is knowing and voluntary.

14.     BIERNACKI may, within seven days of the date she signs this Settlement Agreement, revoke her release of claims under the Age Discrimination in Employment Act only.

- 7 -

BIERNACKI may not revoke her release of any other claims under this Settlement Agreement for any reason. If BIERNACKI chooses to revoke her release of claims under the Age Discrimination in Employment Act only, she must do so in writing, with a copy being sent to counsel for BMT. If BIERNACKI chooses to revoke her release of claims under the Age Discrimination in Employment Act only, BMT may, at its sole option, either enforce the remainder of this Settlement Agreement (including BIERNACKI'S release of all other claims), or treat this entire Settlement Agreement and General Release as being null and void.

15. BIERNACKI acknowledges that the consideration she is paying is less than she could have been required to pay, and the consideration she is receiving is greater than she would have been entitled to, if she had not entered into this Settlement Agreement and General Release.

16. BIERNACKI hereby represents and warrants to BMT that she has not directly or indirectly assigned or transferred, or purported to assign or transfer, to any person or entity any claim or cause of action released hereunder, and further agrees to indemnify BMT against any liability, loss, damage, cost or expense, including reasonable attorneys' fees, arising out of any breach of this representation and warranty.

17. The signatories to this Settlement Agreement and General Release represent and warrant that they have the power and authority to sign and enter this Settlement Agreement and General Release, and to bind themselves and/or their principals to the terms of this Settlement Agreement and General Release.

Case 2:19-cv-02420-BMS   Document 28-2   Filed 02/25/21   Page 91 of 102

18.     It is understood and agreed that this Settlement Agreement and General Release contains the entire agreement between BIERNACKI and BMT, and that the terms of the Settlement Agreement and General Release are contractual and not a mere recital.

19.     This Settlement Agreement and General Release may not be modified except by a writing executed by all parties.

20.     This Settlement Agreement and General Release shall be construed in accordance with the law of the Commonwealth of Pennsylvania, without regard to the choice of law provisions that would apply the laws of any other jurisdiction.

21.     Identical copies of this Settlement Agreement and General Release may be executed in two or more counterparts, which together shall constitute and shall be treated as a single, fully executed version of this Settlement Agreement and General Release, and which shall be as binding on the parties as if a single copy had been executed by all parties hereto. Additionally, facsimile and electronic signatures shall be treated as originals.

22.     Since the terms of this Settlement Agreement and General Release have been mutually negotiated and agreed upon, to the extent this Settlement Agreement and General Release must be construed, it will not be construed against any party as the drafter.

IN WITNESS WHEREOF, Laura Biernacki and The Bryn Mawr Trust Company, expressly intending to be legally bound hereby, and acknowledging that they have consulted with and have received the advice of their respective counsel with respect hereto, and having given

**EXHIBIT A**

January 26, 2021

**Aaron Krauss**

Direct Phone   215-665-4181
Direct Fax 215-701-2381
akrauss@cozen.com

**VIA E-MAIL (LAURAROSE1504@COMCAST.NET)**

Laura Biernacki

**Re:    BMT Matters**

Dear Laura:

      We represent The Bryn Mawr Trust Company with respect to six lawsuits filed against BMT by Attorney Mark Schwartz on behalf of Erin Dinger, Wandrea Russo, Penny Hughes, Karen Stevens, Alicia McDaniel and Michael Sutton. As a former employee of BMT, you may have information that is relevant to these lawsuits. Attorney Schwartz is therefore likely to either try and contact you or take your deposition to obtain this information. You might also be called as a witness at a hearing or trial if one is held in these matters. BMT has authorized us to represent you, at BMT's expense, with respect to your role as a potential witness in these lawsuits. As such, our conversations will be cloaked with the attorney/client privilege, and we will be able to prepare you to give testimony. Our representation of you will also preclude Attorney Schwartz from contacting you directly; if he does, you should tell him that you are represented by counsel and he should contact us.

      The Rules of Professional Conduct for attorneys require that we confirm these terms in writing. Our representation of you will be limited to representing you as an actual or potential witness in these lawsuits. As set forth above, BMT will pay our fees. If BMT fails to do so in a timely fashion, we reserve the right to withdraw from the representation. Additionally, as set forth above, the Firm represents BMT. Although we do not currently believe that there is any conflict of interest between you and BMT, one could arise in the future. As a result, you waive any actual or potential conflict arising out of the Firm's representation of you and BMT. To the extent there is ever a dispute between you and BMT, you agree that we will continue to represent BMT, that you waive any conflict arising out of our doing so, and that you will not take any action to attempt to disqualify the firm from doing so. Finally, this Firm represents many other companies and individuals. It is possible that during the time we are representing you, some of our current or future clients will have disputes or transactions with you. You agree that we may continue to represent, or undertake in the future to represent, existing or new clients in any matter, including litigation, even if the interests of such other clients in such other matters are directly adverse to you, so long as those matters are not substantially related to our work for you and your confidences will not be compromised. You agree that the Firm may continue to represent such clients, both now and in the future, even though their interests are or may be adverse to yours, and you waive any actual or potential conflict arising out of such representations.

      Court rules impose a document retention obligation on any person or entity that has reason to believe that a lawsuit is either likely or pending. You therefore have an obligation to preserve documents (including documents such as emails, texts, instant messages or voicemails that are kept in electronic form, as well as drafts or non-identical copies of

- 11 -

documents) that relate to or bear on the claims that are the subject of this engagement and that have been raised by any party in this litigation. By signing this engagement letter, you agree to undertake this preservation obligation, including but not limited to by suspending any automatic deletion or potential destruction of documents.

While we will not disclose to persons outside this firm privileged or confidential information regarding our representation of you, by signing this letter you authorize us to disclose the fact of our representation.

You are, of course, free to consult with personal counsel of your own choosing concerning this matter. Indeed, you are encouraged to do so. Should you decide, now or at any time in the future, to retain your own lawyer and/or to discontinue this Firm's representation of you, then you will be responsible for any costs and fees incurred and BMT will not incur any of those expenses on your behalf.

If the arrangement outlined above is satisfactory, please execute this letter at your earliest convenience and return one copy to me. If you have any questions concerning the terms of this engagement, please do not hesitate to call me.

We very much appreciate the opportunity to represent you in this matter.

Sincerely,

COZEN O'CONNOR

By:    Aaron Krauss

AGREED TO and ACCEPTED
this *13* day of January, 2021

Laura Biernacki

By: _____

State of Pennsylvania, County of Delaware, On this, *15* day of,
*FEBRUARY 2021* *LAARA BIERNACKI*
personally appeared before me, and proved to me
through satisfactory evidence of identification, which
was a *VALID DEVICE*, to be the person whose name
is __ on the preceding or attached document in my
__ mission expires: *11/27/2023*

*[signature: Joseph Ostrander, Sr.]*

Commonwealth of Pennsylvania- Notary Seal
JOSEPH OSTRANDER SR - Notary Public
Delaware County
My Comission Expires: November 27, 2023
Comission Number 1360750

Acknowledged

The Bryn Mawr Trust Company

By: _____

- 12 -

**EXHIBIT B**

Re:    Request for Right to Sue Notice
       Charge No. 530-2020-5866

To Whom It May Concern:

The above-captioned charge was submitted to the EEOC on September 1, 2020. Charging Party hereby requests the issuance of a Right to Sue Notice. Please send such notice immediately and dismiss or discontinue further processing of the Charge.

Thank you—

# EXHIBIT K

# EXHIBIT L

**From:** Biernacki, Laura [LBiernacki@bmtc.com]
**Sent:** 7/21/2020 6:34:47 PM
**To:** Cary, Jerry [jcary@bmtc.com]
**Subject:** RE: Diversity & Inclusion Articles_Feedback

See my feedback below.

**From:** Cary, Jerry <jcary@bmtc.com>
**Sent:** Thursday, July 9, 2020 11:15 PM
**To:** Cunha, David <dcunha@bmtc.com>; Tuck, Ray <rtuck@bmtc.com>; Biernacki, Laura <LBiernacki@bmtc.com>;
Hammel, Jennifer <jhammel@bmtc.com>; Venditti, Mary <mvenditti@bmtc.com>
**Cc:** Kohl, Samantha <skohl@bmtc.com>; Saling, Lindsay <lsaling@bmtc.com>
**Subject:** Diversity & Inclusion Articles_Feedback

Hi All,

This is a follow-up to what we discussed at the leadership team meeting yesterday.  Please send your input back to me by Friday, July 17th or sooner if possible.

1) Has anyone on your teams provided any feedback or shared any reaction from employees on the articles (see attached) sent out by HR? – No feedback thus far

2) After reading the articles have you taken any proactive steps to reach out to your teams and/or black employees specifically? – I am mentioning during one on ones with my SM's. When I've asked thus far if an SM read the article I have not gotten questions, some recall and know the articles I'm referring to and some don't.  In one multicultural case, I asked the SM if they had put the shoes of their staff on?  I don't think this individual paid attention or read the articles. Spoken with 7 thus far. From a proactive standpoint I did visit 6 of 10 branches on the 18th and 19th of June.  No specific conversation just thing like, lots happening in the world.  I spoke with the teams more inclusively if I could in a group when I was out; Bryn Mawr with teller staff at the drive through for example. I also was laser focused the week of June 1st particularly regarding travel home and to work and how the staff felt if there were marches planed to go past their branches or close to their home; closed Bryn Mawr; closed Ardmore. Putting our shoes on other feet is important for everyone. During this time, I called all branches to get a pulse, as I do when I get a sense something may be amiss.  I have not reached out directly to black employees to discuss the articles ect  I would prefer a script of some sort and am concerned in one case that this call would need to be scripted.

3) Given the current environment & recent events related to the pandemic, civil unrest and recent company announcement – in one or two words how would you characterize the current work atmosphere of your teams? – anxious but positive – waiting on & flexible to additional change as needed. Earnings were better than we expected in 2nd Q, so more positive with that announcement.

Thanks and let me know if you have any questions.

Kind Regards,


Jerry


**Jerry A. Cary**
Human Resources Business Partner

801 Lancaster Avenue
Bryn Mawr, Pennsylvania 19010

Confidential

BMT 1009108