IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL MCSHANE SUTTON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE BRYN MAWR TRUST COMPANY, | : | No. 19-2420 |
| Defendant. | : | |

MEMORANDUM

Schiller, J.                                                                                                    October 27, 2022

Plaintiff Michael McShane Sutton, a white man, began working as head teller at The Bryn Mawr Trust Company's (the "Bank" or "BMT") Ardmore branch in December 2017 and was fired soon thereafter in July 2018. The Bank claims it fired Sutton for repeated absenteeism and tardiness. Sutton contends he was retaliated against for associating with Black colleagues and supporting a Black coworker's complaints about a racially hostile work environment. He asserts claims for race discrimination and retaliation. The Bank moves for summary judgment on all claims. For the reasons that follow, the Bank's motion is granted.

I.    BACKGROUND

The Bank hired Sutton on December 11, 2017 and he was an employee until his July 24, 2018 termination. (Def.'s Statement of Undisputed Material Facts [Def.'s SUMF] ¶¶ 1, 6; Pl.'s Statement of Disputed Fact in Opposition to Defendant's Statement of Undisputed Material Facts [Pl.'s SDF in Opp.] ¶¶ 1, 6.) He was the head teller at the Bank's Ardmore branch. (Def.'s SUMF ¶ 2; Pl.'s SDF in Opp. ¶ 2.)

A.    Sutton's "Attendance Issue"

From Sutton's first weeks at the Bank, he had a self-described "attendance issue." (Sutton Dep. 106:21-24). Sutton was absent more than six times in his first six weeks on the job. (Def.'s

1

SUMF ¶ 11). He called out sick on December 18, 2017, January 22, 23, and 24, 2018, and February 8 and 9, 2018 and used paid time off ("PTO") on February 7, 2018. (Def.'s SUMF ¶ 11; Pl.'s SDF in Opp. ¶ 11; Sutton Dep. 107:6-13, 190:4-10, 213:2-8; Def.'s Exs. 66, 74.) Sutton admits he had "an attendance issue," and it was "not a good start." (Sutton Dep. 106:17-20; Sutton Dep. 108:3-6.) But he did suggest to his managers that he would take the January absences without pay. (Pl.'s SDF in Opp. ¶ 11; Sutton Dep. 107:21-24.)

### 1. Sutton's Mother's Health Deteriorates in January 2018

The declining health of Sutton's mother precipitated his attendance issue. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Pl.'s Opp.] at 2.). Sutton's sixty-six-year-old mother was unexpectedly hospitalized on January 10, 2018. (Sutton Dep. 67:11-16; Def.'s Ex. 73.) Sutton did not know the severity of his mother's condition. (*Id.*) He made a concerted effort to proactively work with his Bank manager and keep his team knowledgeable about what was happening with his family because he was a new employee and the situation with his mother could change rapidly. (*Id.* 67:17-24; 70:16-23.) About two weeks later, Sutton's mother agreed to enter hospice care because her illness was terminal. (*See* Def.'s Ex. 73.) She sadly passed on March 5, 2018. (Def.'s SUMF ¶ 43.)

On January 24, after Sutton's first four absences and while his mother was in the hospital, Sutton's Ardmore branch manager, Danielle Llewellyn-Perez,[1] emailed human resources employee Nicola Fryer about his absences. (Def.'s SUMF ¶ 13, Pl.' SDF in Opp. ¶ 13; Def.'s Ex. 66.) Llewellyn-Perez shared her concern that "this may be a pattern" and that Sutton's PTO was in the negative because he had not yet accrued enough time off to cover his absences. (Def.'s Ex.

---

[1] In the briefs and depositions, both parties refer to Danielle Llewellyn-Perez interchangeably as both "Llewellyn-Perez" and "Perez." For the purposes of this Memorandum, the Court will use her full last name of "Llewellyn-Perez."

66.) Llewellyn-Perez spoke with Sutton about his PTO usage and shared her concerns about his accountability on January 30. (Def. SUMF ¶14; Sutton Dep. 190:11-21.) During this conversation, Sutton shared that his wife suggested he put in his two weeks' notice to focus on his mother. (Def.'s SUMF ¶ 14; Pl.'s SDF in Opp. ¶ 14; Sutton Dep. 191:2-24.) After his offer to take unpaid leave was denied, felt he was just trying to work with Llewellyn-Perez to figure out next best steps. (Sutton Dep. 192:9-18.)

### 2. Sutton's February 8, 2018 Email

On February 8, Sutton called out sick and sent a lengthy email to Ardmore branch market area manager Laura Biernacki explaining his absence and the situation with his ailing mother. (Def.'s SUMF ¶¶ 20, 22-29; Pl.'s SDF in Opp. ¶¶ 20, 22-29; Def.'s Ex. 73.) He felt comfortable reaching out to Biernacki because the two had trained together in January and she hadencouraged him to reach out. (Sutton Dep. 116:2-6.) Sutton wrote that he was "reaching out frankly because [he was] afraid based on [his] supervisor's behaviors, actions and reactions these past few weeks that [Biernacki] may not be aware of a sad and painfully serious issue [he was] dealing with outside of the bank." (Def.'s Ex. 73.) Sutton described his mother's illness and wrote that if he could have been at work, he would have, but he was not physically or mentally well enough to support the Bank team. (*Id.*) He offered some strongly worded critiques of his managers and workplace. Of Llewellyn-Perez, Sutton wrote "[m]y impression of my supervisor is she [is] singularly concerned with her own issues at BMT and beyond and has found my unfortunate circumstances to be a good excuse to use to exonerate herself and other teammates as to why Ardmore isn't going where it needs to be while letting the bus run over me in turn." (*Id.*) Of his Ardmore workplace, he wrote "[t]o be brutally honest I feel we are a rudderless ship with absentee leadership who doesn't even take 5 minutes a week as a Group to coach us let al[o]ne 1 on 1 coaching!" (*Id.*) He continued, "I

fear there are a host of issues with our team that I'm being used as a handy scapegoat for any and all of those issues." (*Id.*) He concluded by making assurances that he would "do whatever it takes to get back" to work the next day, "even if [he had] to be wheeled in tomorrow." (*Id.*) Nevertheless, Sutton did not come into work on February 9. (Def.'s SUMF ¶ 30; Pl.'s SDF in Opp. ¶ 30.) Sutton testified that his email may not have been a "wise decision at that moment" and was the product of an inordinate amount of stress given the difficult time in his life. (Sutton Dep. 116:10-24.) He claims he later apologized to Biernacki and Llewellyn-Perez. (*Id.* 118:10-16.)

In response to Sutton's email, a Bank employee prepared a "Corrective Communication Notice" detailing Sutton's repeated absences up until February 9, 2018. (Def.'s Exs. 76, 267.) The notice is dated February 8, 2018. (Def.'s Ex. 76.)[2]

### 3. **Sutton's Continued Absenteeism and February 14 Final Written Warning**

Sutton was late to work on February 13 and 14.[3] On February 14, Llewellyn-Perez and Biernacki gave him a final written warning for absenteeism. (Def.'s SUMF ¶ 35; Pl.'s SDF in Opp. ¶ 35; Def.'s Ex. 76.) It listed all of Sutton's absences and stated "[w]e understand you are going through a difficult time. Just keep in mind that we still have a business to maintain." (Def.'s Ex. 76.) Sutton refused to sign it. (Def.'s SUMF ¶ 35; Pl.'s SDF in Opp. ¶ 35.) He took the final written warning home to write comments on it, but nobody at the Bank asked him to return it. (Def.'s SUMF ¶¶ 37-38; Pl.'s SDF ¶ 38.) The next day, he emailed Fryer in Human Resources about "some discrepancies" in the final written warning. (Sutton Dep. 217:23-218:18.) Sutton testified

---

[2]    It is not apparent from the record who prepared this notice and when or whether it was given to Sutton on or around February 8, 2018.

[3]    The Bank directs the Court to an undated table detailing the date and nature of all disciplinary and attendance problems for Sutton during his time at the Bank. (*See* Def.'s Ex. 267.) The Bank also directs the Court to contemporaneous emails from other Bank employees noting Sutton's February 14 tardiness. (*See* Def.'s Ex. 76.) Sutton disputes he was late either day but offers no evidence to support his contention. (Pl.'s SDF in Opp. ¶¶ 33-34.)

4

that he did not remember what those discrepancies were but suggested he may have been curious about why he was not given a verbal warning before the final written notice. (*Id.*) But later in his deposition, he testified that he had received verbal warnings for his tardiness in the past. (*Id.* 219:7-9.)

### 4. Sutton's Mother's Passing, His Dissatisfaction with the Bank's Response, and Additional Discipline

After Sutton's mother died on March 5, he requested three days of nonconsecutive bereavement leave beginning March 6. (Def.'s SUMF ¶¶ 43, 48, Pl.'s SDF in Opp. ¶ 48.) The Bank granted his request. (Def.'s SUMF ¶ 48, Pl.'s SDF in Opp. ¶ 48.)

Sutton grew upset with the way the Bank handled his mother's passing. Sutton was upset that the Bank did not send a flower arrangement to his mother's funeral. (Sutton Dep. 328:2-329:12; Def.'s Ex. 227.) He also testified that Biernacki told him to schedule the funeral for a Saturday because it would "be the least amount impactful" on the branch's operations. (Sutton Dep. 361:11-362:8.)[4]

In a March 13 email exchange from his Bank email address with his wife, a law firm partner, Sutton sent an email with the subject line "So I'm already being harassed etc [*sic*] for being out for this," and asked his wife "What's my move?" (Def.'s Ex. 227; Pl.'s SDF in Opp. ¶ 52.) She replied "[y]ou're being harassed for taking your 3 bereavement days?" and Sutton answered "Yes." (Def.'s Ex. 227.) Sutton wrote that an unnamed female employee twice made a comment that he "come[s] and go[es] as [he] please[s]" in front of his Bank customers. (*Id.*) After

---

[4] The Bank contests that any of its employees asked Sutton to hold the funeral on a Saturday. (*See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 3 n.9.) It points out that Saturdays are the busiest days for bank branches and Sutton was scheduled to work on Saturday, so asking him to hold the funeral that day would only generate additional staffing issues for the Ardmore branch, not fewer. (*Id.*; Sutton Dep. 362:6-8.)

a few additional short emails Sutton wrote to his wife "[s]tory of my life. Take undignified behavior on the chin and smile for the experience as everyone takes a big poop all over me. All for about 15 bucks an hour." (*Id.*) Later he wrote "[i]t's basically my fate to work at a menial job and be treated like an abused dog. It's fine. I give up." (*Id.*)

On March 28, Sutton emailed Fryer about her purported failure to follow up on his request to discuss his February final written warning.[5] (Def.'s Ex. 85, Def.'s SUMF ¶ 55.) He wrote that since he had not heard back from Fryer, he would reach out to Nancy Pinkowicz, another human resources employee, because "the harassment against [him . . . had] escalated." (Def.'s Ex. 85.) Fryer sharply replied that Sutton's email "absolutely baffle[d] [her]" and asked him to think back to their discussion on March 27, 2018. (*Id.*) Fryer wrote "[y]ou appear to be intentionally reiterating incorrect information regarding our communication and incorrectly stating that I am not getting back to you or following up in some other way as promised. I expect this behavior to cease . . . ." (*Id.*) Sutton replied on March 29, apologizing for the confusion and explained he felt like she and Human Resources were giving him the "run around for the last 6 weeks" because nobody had been available to discuss his final written warning. (*Id.*) He wrote "I feel every day like I am going in to face a certain firing. I am unsure of who to talk to since no one wants to discuss this matter with me . . . ." (*Id.*)

On March 29, management drafted a second corrective counseling memorandum to assess Sutton's first ninety days on the job. (Def.'s SUMF ¶ 61; Def.'s Ex. 86.) It listed many problems with his work, including his failure to manage the teller line, complete his audits on time, train a

---

[5] It is not clear from the record what Sutton was following up about with Fryer. The Bank refers to an internal record showing Sutton reached out to Human Resources on March 27, 2018 to follow up on his February 2018 final written warning. (*See* Def.'s Ex. 267; Def.'s SUMF ¶ 55.) Fryer's reply to Sutton's email also refers to as discussion the two had the night of March 27, 2018. (Def.'s Ex. 85.)

6

new hire, and gossiping about his branch while temporarily working at BMT's Bala Cynwyd branch. (Def.'s Ex. 86; Def.'s SUMF ¶ 62.) But management withdrew the memorandum because Sutton promised to be more supportive of his team. (Def.'s SUMF ¶ 63, Pl.'s SDP in Opp. ¶ 63; Sutton Dep. 260:4-21.)

Eventually Sutton did meet with someone in Human Resources.[6] On April 2, he told a Human Resources employee he felt harassed at work because someone said "thanks for showing up today" after he returned from bereavement leave.[7] (Def.'s SUMF ¶ 68, Pl.'s SDF in Opp. ¶ 68; Sutton Dep. 310:14-311:5.) Sutton believed this comment was sarcastic. (Sutton Dep. 311:6-15.) He also said that two days after his mother's funeral, commented that he feels free to "come and go" as he pleases in front of his customers.[8] (Def.'s SUMF ¶ 68, Pl.'s SDF in Opp. ¶ 68; Sutton Dep. 326:20-24.) Sutton also alluded to a "toxic" dynamic between Alicia McDaniel, a Black Bank teller, and Maggie Intzes, another Bank teller, because of "inappropriate commentary." (Sutton Dep. 302:5-304:10; Def.'s SUMF ¶¶ 69, 72.) Sutton suggested this conflict may have had something to do with race but did not elaborate. (Sutton Dep. 301:15-20.)

Sutton faced additional consequences for other performance issues. In an April 19 email to his wife, Sutton detailed an instance where he allowed a Bank customer into the back entrance of his branch, violating security protocols. (Def.'s SUMF ¶ 77; Pl.'s SDF ¶ 77; Def.'s Ex. 231.) He

---

[6]  It is not entirely clear from the record who Sutton met with on April 2, 2018, but Sutton suggests it was Nancy Pinkowicz (Sutton Dep. 304:3) ("But when I was meeting with Nancy . . . .").

[7]  It is not clear from the record who said this to Sutton. His deposition testimony suggests he believed it may have come from Llewelyn-Perez. (Sutton Dep. 326:20-327:21.)

[8]  Again, the record is not clear as to who said this, but Sutton believes it may have been Llewelyn-Perez because "she had been somewhat insensitive in her phrasing around this subject and others . . . ." (Sutton Dep. 327:13-21.)

7

was scolded but not formally disciplined. (Sutton Dep. 322:6-324:1.) On June 11, Sutton emailed his wife suggesting he was late to work again. (Def.'s SUMF ¶ 81; Def's Ex. 233.)

### B. Allegations of Discrimination at the Bank and the Bank's Investigation

Sutton first learned discrimination allegations had been levied against the Bank when he read about them in the newspaper. (Sutton Dep. 62:23-63:6; *see also* Def.'s Ex. 234.) On June 24, The Daily Times published an article about Wandrea Russo's discrimination claims. (Def.'s Ex. 234; Def.'s SUMF ¶¶ 90-91.) Russo, an African American Bank employee, resigned from her position at the Bank's Bryn Mawr branch after experiencing allegedly discriminatory and harassing behavior. (Sutton Dep. 62:12-23; Def.'s SUMF ¶¶ 90-91; Def.'s Ex. 234.) On June 25, Sutton emailed his wife with an attached image of the article titled "Woman claims discrimination at Bryn Mawr Trust" and wrote "[s]o makes sense now that I was in [Bryn Mawr] last few weeks . . . ." (Def.'s Ex. 234; Sutton Dep. 62:12-23.) Importantly, Sutton never worked with or met Russo. (Sutton Dep. 46:2-21.)

On July 13, Fryer interviewed Sutton as part of BMT's Human Resources internal investigation into discrimination claims by current and former Bank employees. (Def.'s SUMF ¶ 93; Def.'s Exs. 119, 267; Sutton Dep. 159:24-160:14; 162:18-163:21.) Fryer asked Sutton about claims of discrimination brought by Alicia McDaniel, another African American Bank employee. (Def.'s SUMF ¶ 93; Sutton Dep. 160:19-161:24.) Fryer asked if Sutton witnessed any "toxic" work incidents and whether he had his pay cut or hours changed. (Sutton Dep. 164:23-165:16.) At first, Sutton did "not want to get involved because . . . [he] felt that this would be something that could be used to potentially end [his] career." (*Id.* 161:7-13.) But he did tell Fryer that the work "environment is toxic." (*Id.* 161-14-18.) He also said "maybe" in response to Fryer's question about his time being shorted. (*Id.* 165:7-10.) He testified that he felt Fryer then "cut him off,"

8

ending the interview, asking Sutton to send the next employee in to speak with her, and that he did not have the opportunity to elaborate. (*Id.* 165:8-24.)

### C. Sutton Witnesses Inappropriate Comments

Sutton worked "very closely" with McDaniel. (Sutton Dep. 365:10-14.; Pl.'s Statement of Disputed Facts [Pl.'s SDF] ¶ 10; Def.'s SUMF ¶ 101.) On at least four occasions, he heard Intzes tell McDaniel that it would be better if McDaniel were home raising her children rather than working due to the "troubles in African-American communities."[9] (Sutton Dep. 39:7-17, 40:12-20; *see also* Pl.'s SDF ¶ 11.) Sutton testified he also heard Intzes tell McDaniel that Intzes's Greek ethnicity gave her a "better background for education and things of that nature." (*Id.* 41:18-22; Pl.'s SDF ¶ 12.) Sutton interpreted this comment as racist, as if Intzes was comparing the capacity of Greek and African American people to learn. (*Id.*)

Sutton testified that he also witnessed inappropriate comments made to Shakeena Wilson, another African American Bank employee. (Sutton Dep. 42:14-24; *see also* Pl.'s SDF ¶ 11.) He explained he overheard Biernacki say something to Wilson as she worked the drive-through window. (*Id.*) Sutton was not sure what Biernacki said, but he saw that it upset Wilson. (*Id.* 43:1-13.) Wilson said the comment made her uncomfortable and had to take a break. (*Id.* 43:1-13.)

### D. Sutton's Termination

On July 16—only three days after his Human Resources interview with Fryer—Sutton arrived ninety minutes late to work because he accidentally locked himself out of his home. (Def.'s SUMF ¶ 113; Sutton Dep. 239:14-20; Def.'s Ex. 124.) His tardiness forced the branch to open its drive-through lane ten minutes late. (Def.'s SUMF ¶ 114; Def.'s Ex. 124.) For the next

---

[9]   Sutton testified that Intzes may have said "Black" instead of "African American." (Sutton Dep. 39:21-40:4.)

three days, Sutton was approved to train at the Media branch for thirty minutes each day, but he never went there. (Def.'s SUMF ¶¶ 119-121.) Moreover, he did not use his full lunch break and remained clocked in while running personal errands. (Def.'s SUMF ¶¶ 123, 126.) Sutton said he was not running personal errands (Def.'s SUMF ¶ 129; Def.'s Exs. 122, 124.)

On July 24, the Bank terminated Sutton for attendance issues. (Def.'s SUMF ¶ 134; Sutton Dep. 351:19-352:21.) Sutton believes the Bank fired him due to his interview with Fryer regarding the claims for discrimination eleven days prior, not because of the attendance problems. (*Id.*)

### E. Procedural History

Sutton filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Rights Commission ("PHRC") on August 9, 2018. (Def.'s SUMF ¶ 7). The EEOC issued a right to sue letter on March 7, 2019. (Comp. ¶ 9.) This lawsuit was filed ninety days later and is therefore timely.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-moving party may

demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994); *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

Sutton sues the Bank for race discrimination and retaliation. The Bank seeks summary judgment on all counts. Because Sutton has not offered sufficient evidence to permit a jury to reasonably find for him on any of his claims, the Court grants the Bank's motion in its entirety.

### A. Race Discrimination

Sutton's race discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework.[10] "To establish a *prima facie* case for disparate treatment, Sutton must show that: (1) [he] is a member of a protected class; (2) [he] was qualified for the position at issue; (3) [he] suffered a materially adverse employment action; and (4) the circumstances of the adverse

---

[10] Sutton asserts race discrimination claims under 42 U.S.C. § 1981, Title VII, and the Pennsylvania Human Relations Act (PHRA). The same burden-shifting framework applies to claims brought under each statute. *See Blakney v. City of Phila.*, 559 F. App'x 183, 187 (3d Cir. 2014); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020).

11

employment action support an inference of discrimination." *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 125 (E.D. Pa. 2022) (citing *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020)) (italicization added); *see also See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). If he establishes a *prima facie* case, the Bank must offer legitimate, non-discriminatory reasons for the adverse employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The Bank can satisfy "its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

If the Bank provides non-discriminatory reasons for its actions, Sutton must then set forth evidence to show that its "explanation is merely a pretext for the discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). Sutton "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [Bank]'s articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [Bank]'s action." *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). In doing so, Sutton "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Bank]'s proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Sutton, who is white, does not assert the Bank discriminated against him based on his race. (Sutton Dep. 141:11-142:-21). So, to make out his *prima facie* case for race discrimination he relies on a theory of associational discrimination, which federal courts recognize under Title VII,

12

section 1981, and the PHRA. *See LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 693-94 (E.D. Pa. 2016), *aff'd* 769 F. App'x 57 (3d Cir. 2019); *Kengerski v. Allegheny Cnty.*, 435 F. Supp. 3d 671, 677-78 (E.D. Pa. 2020). Sutton may assert a claim for race discrimination based on his association with a member of a protected class under this theory—even though he is not a member of the same protected class. *Kengerski*, 435 F. Supp. 3d at 677; *LaRochelle*, 210 F. Supp. 3d at 693. But associational discrimination claims are limited to causes of action that "involve[] more substantial relationships." *Id.* (quoting *Zielonka v. Temple Univ.*, No. 99-2693, 2001 WL 1231746, at *5 (E.D. Pa. Oct. 12, 2001)) (internal quotations omitted). Examples of these substantial relationships include interracial marriages and parent-child relationships. *See LaRochelle*, 210 F. Supp. 3d at 693-94 (listing interracial marriage cases); *Kengerski* 435 F. Supp. 3d at 677-78 (mentioning parent-child case). Merely being "good friends" with a coworker is insufficient. *LaRochelle*, 210 F. Supp. 3d at 694; *see also Baker v. Wilmington Tr. Co.*, 320 F. Supp. 2d 196, 203 (D. Del. 2004) (holding plaintiff's acquaintance with a fellow bank teller was insufficient relationship to make out associational discrimination claim on summary judgment); *Zielonka*, 2001 WL 1231746, at *6 (holding the plaintiff's "friendly acquaintance" with a fellow professor was an insufficient relationship to sustain an associational discrimination claim on summary judgment).

Sutton forfeited his race discrimination claims under 42 U.S.C. § 1981, Title VII, and the PRHA because he did not mention them in his brief. *Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure "constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues."); *LaRochelle v. Wilmac Corp.*, 769 F. App'x 57, 59 nn.4-5 (3d Cir. 2019). But even if he

did not, Sutton fails to set forth enough evidence to demonstrate that he had a substantial relationship with any member of a protected class to make out an associational discrimination claim. Sutton bases his race discrimination claims on his association with and support of Alicia McDaniel, a Black Bank employee who reported allegations of workplace racism to Human Resources. (Pl.'s SDF ¶¶ 10-12; Def.'s SUMF ¶¶ 101-104, 110; Sutton Dep. 141:11-142:21.) Sutton considered himself "friendly" with McDaniel when they worked together. (Sutton Dep. 25:14-18.) However, friendship—even "good" friendship—among coworkers is not enough to make out an associational discrimination claim. *See LaRochelle*, 210 F. Supp. 3d at 694; *Baker*, 320 F. Supp. 2d at 203; *Zielonka*, 2001 WL 1231746, at *6. Moreover, Sutton has not set forth evidence of any other substantial relationship that would support an associational discrimination claim. He testified he never worked with or met Russo, the Black Bank head teller at the Bank's Bryn Mawr branch who also came forward to Human Resources with claims of discrimination. (Sutton Dep. 46:2-21.) Nor did Sutton have a significant relationship with Shakeena Wilson, an African American Bank employee at the Bryn Mawr branch who he worked with for a few days. (Sutton Dep. 46:22-47:9). On the record evidence, Sutton cannot prevail as a matter of law.

The Bank's motion for summary judgment with respect to Sutton's race discrimination claims is therefore granted.

### B. Retaliation

An employer may not discriminate against an employee (1) because he has opposed any unlawful employment practice, or (2) "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." 42 U.S.C. § 2000e-3(a); *see also Anderson v. Boeing Co.*, 694 F. App'x 84, 86 n.4 (3d Cir. 2017) ("[Retaliation] [c]laims brought under Title VII, . . . § 1981, and the PHRA are analyzed coextensively.") To

prove his retaliation claims under the ADEA, Title VII, the PHRA, and section 1981 Sutton "must first establish a *prima facie* case under the *McDonnell Douglas* framework by showing": (1) he "engaged in protected activities"; (2) the Bank "took an adverse employment action" after or contemporaneous with the employee's protected activity; and (3) "there was a causal connection between [his] participation in the protected activity" and the Bank's adverse action. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)); *see also Anderson*, 694 F. App'x at 86 & n.4. Protected activities include an employee's filing of formal charges of discrimination against the employer and informal protests of discriminatory employment practices such as making complaints. *Smith v. N3 Oceanic, Inc.*, 717 F. App'x 162, 165-66 (3d Cir. 2017). An adverse employment action must be "materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Swain v. City of Vineland*, 457 F. App'x 107, 111 (3d Cir. 2012) (noting that "[a] broader definition of adverse action" applies to retaliation claims than discrimination claims). To assess whether protected activity and retaliatory conduct are causally connected, the Court may analyze "the temporal proximity between the two if 'unusually suggestive,'" or in the alternative, "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

1. **Sutton's *prima facie* case**

    a. **Protected activity**

15

Participation in an employer-defendant's internal investigation of discriminatory conduct may be protected activity. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 273, 28 (2009). For a plaintiff's participation in an internal investigation to qualify as a protected activity, he must have "act[ed] under a good faith, reasonable belief that a violation existed." *Daniels*, 776 F.3d at 193 (citing *Moore*, 461 F.3d at 344) (internal quotations omitted); *see also Kerstetter v. Pa. Dep't of Corr.*, No. 08-1984, 2010 WL 936457, at *11 (W.D. Pa. Mar. 12, 2010) (holding that by participating in an internal sex discrimination investigation, an employee engaged protected opposition so long as he complained of the allegedly violative conduct during the investigation). "This standard requires an objectively reasonable belief that the activity plaintiff opposed constituted unlawful discrimination under the relevant statute." *Daniels*, 776 F.3d at 193-94 (internal quotation and citation omitted).

Here, Sutton has not shown his participation in the July 13, 2018 interview probing discriminatory conduct at the Bank constitutes protected activity. Sutton was aware the interview was in response to Russo's allegations of race discrimination and harassment at the Bank. (Sutton Dep. 159:24-160:14, 162:18-163:21, 166:2-6, Def.'s Ex. 234.) Fryer directly asked Sutton whether he had witnessed any "topics of potential discrimination or harassment." (Sutton Dep. 160:15-161:18.) However, he testified that his only response was that "the environment is toxic" and he "did not get a chance to expand beyond that." (*Id.*) Although he had personally witnessed Intzes's racially-charged comments to McDaniel detailed above, he did not raise these comments during his interview with Fryer. (Sutton Dep. 39:7-17, 40:12-20, 41:18-22.) In fact, he testified that he "did not want to get involved" in the investigation. (*Id.* 161:7-13.)

Sutton does not point to any evidence showing he brought up or even mentioned race discrimination in the Bank's investigation. The only comment Sutton offered—that the work

environment was "toxic"—is vague and ambiguous and does not sufficice to make his interview protected activity. *See Paradisis v. Englewood Hosp. Med. Ctr.*, 680 F. App'x 131, 138 (3d Cir. 2017) (affirming district court and finding plaintiff did not demonstrate she participated in protected activity when she "made no mention of any type of discrimination protected by Title VIII"); *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006) (holding vague allegations of discrimination are not protected activity); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995) (holding that a letter complaining of "unfair treatment in general" but not specifically discrimination was not protected activity); *Hinton v. Pa. State Police*, No. 08-0685, 2010 WL 3419509, at *7 (W.D. Pa. Aug. 30, 2010) ("It is well-settled that general complaints of unfair treatment do not constitute 'protected activity' under Title VII.") (citing *Barber*, 68 F.3d at 701-02). Moreover, Sutton points to no record evidence that he informally protested or complained about Intzes's comments outside of the investigation. He has not met his burden to show he engaged in protected activity.

Therefore, Sutton fails to establish he engaged in protected activity, and the Court will grant summary judgment in favor of the Bank as to Sutton's retaliation claim.[11]

---

[11] The Court would grant summary judgment in the Bank's favor on Sutton's retaliation claim even if he had made out a *prima facie* case. The Bank had a legitimate, non-discriminatory reason for terminating him: his persistent and well document history of tardiness and absenteeism (*See* Sutton Dep. 106:21-24, 239:14-20, 351:19-352:21; Def's Exs. 76, 124, 267 Def.'s SUMF ¶ 11; Pl.'s SDF in Opp. ¶ 11.) It proffered evidence that Sutton had attendance issues from the beginning of his time at the Ardmore branch. *See Almodovar v. Freeman Decorating Co.*, No. 06-3707, 2009 WL 704383, at *3 (D.N.J. Mar. 16, 2003) ("[Plaintiff's] repeated tardiness, despite admonitions to the contrary, provide a legitimate non-discriminatory reason for his firing."); *Russell v. Vanguard Grp.*, No. 04-3269 2006 WL 2077010, at *4 (E.D. Pa. July 24, 2006) (Pollak, J.) (holding that plaintiff's tardiness combined with other behavioral issues is a legitimate, non-discriminatory reason for firing); *Baylets-Holsinger v. Pa. State Univ.*, No. 18-60, 2020 WL 3892881, at *8 (W.D. Pa. July 10, 2020) (same). Sutton himself acknowledged and admitted the same.

## IV.   CONCLUSION

For the reasons discussed above, the Court grants the Bank's motion for summary judgment as to all claims.

An Order consistent with this Memorandum will be docketed separately.

---

In response, Sutton has produced no evidence to show the Bank's legitimate, non-discriminatory reason for hid termination was pretext.

To demonstrate pretext, Sutton must show both that the Bank's proffered explanation was false and that retaliation was the real reason for his termination. *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 99 (3d Cir. 2016) (citing *Moore*, 461 F.3d at 342). Sutton cites (i) his own belief his termination was retaliatory because the Bank had been paying to train him the week before it fired him and that "does not make a lot of sense," (ii) Pinkowicz's comments assuring him that "things [were] trending in the right direction," and (iii) McDaniel's deposition testimony that she believes Biernacki will lie throughout this litigation. (Sutton Dep. 299:23-24, 352:4-353:6; McDaniel Dep. 482:22-483:12.)

None of these reasons would allow a reasonable factfinder to disbelieve the Bank's legitimate, non-discriminatory reason.

First, Sutton's confusion as to why the Bank would terminate him after paying him to train cuts in favor of the Bank; the Bank would not train him if it had the intention of firing him only days later. His subjective belief that the Bank's reason was pretextual is not enough. *See Jones*, 198 F.3d at 413-14 (holding that plaintiff's belief without any evidence is insufficient to demonstrate pretext on summary judgment); *Baylets-Holsinger*, 2020 WL 3892881, at *8 (holding plaintiff's "own subjective belief that the action was retaliatory" insufficient to demonstrate pretext on summary judgment); *Sawl v. Shulkin*, No. 16-1440, 2018 WL 4501061, at *12 (W.D. Pa. Aug. 27, 2018) (same).

Second, Pinkowicz's encouraging comments were made before Sutton's July absenteeism and tardiness—the concern for which he was ultimately fired. Third, McDaniel's subjective belief that Biernacki would lie to protect the Bank does not cast doubt on actions the Bank took before any plaintiff came forward with discrimination allegations. For example, the final written warning was given to Sutton on February 14, 2018, before many of the plaintiffs in these related cases filed any complaints.